**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**CORY EPPS,**

                              **Plaintiff,**

          **-against-**

**THE CITY OF BUFFALO, DETECTIVE**
**JOHN BOHAN, DETECTIVE**
**REGINALD MINOR, DETECTIVE**
**MARK STAMBACH, DETECTIVE**
**JAMES GIARDINA, DETECTIVE**
**ANTHONY CONSTANTINO,**
**DETECTIVE ROBERT CHELLA,**
**RANIERO MASSECHIA, CHARLES**
**ARONICA AND CHIEF JOSEPH RIGA.**

                              **Defendants.**

**COMPLAINT**

**Dkt. No. 19 cv _____**

---

          **PLEASE TAKE NOTICE** that Plaintiff Cory Epps, through his attorneys, Glenn A.

Garber, P.C. and Rickner PLLC, hereby alleges as follows:

## NATURE OF THE CASE

          1.          Although innocent, Plaintiff Cory Epps ("Epps") was wrongfully convicted of the

1997 murder of Tomika Means ("Means") and served more than twenty years in prison until he

was finally exonerated and released in 2017.

          2.          Epps was convicted due to the wrongdoing of detectives in the small homicide

unit of the Buffalo Police Department who were simultaneously investigating the Means murder

and the murder of Paul Pope, investigations which overlapped prior to Epps' conviction.  Days

before Epps was going to trial for the Means' murder, the police became aware that Russell

Montgomery ("Montgomery"), who was suspected of murdering Pope (and who was later

convicted of that crime) was also a viable suspect in the Means murder. Nevertheless, detectives

1

suppressed this exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny ("*Brady*"). Had this evidence been disclosed to Epps and his trial counsel, Epps, who had a compelling alibi, would not have been convicted.

3.      When Epps' defense attorneys finally learned at least part of what happened, they filed motions for a new trial conviction – first a motion in 1998 under CPL § 330.30 after verdict but before sentencing ("330 motion"), then one in 2000 under CPL § 440.10 ("440 motion"). Both were denied.  However, the denial of these motions was caused by the pretrial suppression of evidence that linked Montgomery to the Means murder, including a statement from a witness that directly implicated Montgomery; suppression of the identity of the exculpatory witness that destroyed any chance of success of the 330 motion and that delayed the 440 motion by two years and undermined it; and perjurious and misleading testimony at the 440 hearing that covered-up the suppression of the exculpatory evidence.  After Epps' conviction but before the 440 hearing, additional exculpatory evidence that implicated Montgomery in the Means murder and exculpated Epps was also withheld that further made 440 litigation incomplete and unfair and further undermined the integrity of the process and proceeding.

4.      Moreover, during the initial investigation of the Means murder, the detectives employed suggestive identification procedures with the only eyewitness that led to Epps' misidentification and then improperly bolstered the eyewitness' certainty of the misidentification, causing Epps to be maliciously prosecuted without probable and unfairly tried.

5.      As a result of the police misconduct, Epps spent over two decades in jail.

6.      His nightmare finally ended in 2017 when even more exculpatory evidence came to light that finally enabled a fair and successful 440 determination.

7.      In conceding Epps' motion and agreeing to vacate his conviction and dismiss the

2

indictment, the Erie County District Attorney John Flynn was emphatic that Epps "should not spend one more night in prison."  Flynn also stated Epps and Montgomery look "eerily similar" to Russell Montgomery the real killer of Tomika Means.

## JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction over Epps' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Epps' claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution.

9.     This Court has supplemental jurisdiction over Epps' state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Epps complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the City of Buffalo on February 22, 2018.  More than 30 days have elapsed since the notice of claim, and no offer of settlement has been made.

11.     Epps submitted to a hearing pursuant to New York General Municipal Law Section 50-h on May 24, 2018.

12.     Venue is lodged in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Western District of New York, including the defective investigation and *Brady* violations by the Defendants.

## JURY DEMAND

13.     Days demands trial by jury in this action.

## PARTIES

14.     Plaintiff Cory Epps was wrongfully indicted, prosecuted, tried, convicted, and

imprisoned by the actions of the Defendants named herein. He lives in Erie County, in the State of New York.

15.     Defendant City of Buffalo is and was a municipal corporation organized and existing under the laws of the State of New York, with principal offices in the City of Buffalo, County of Erie, State of New York, and is fully responsible for the Buffalo Police Department.

16.     Defendant Detective John Bohan ("Detective Bohan"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

17.     Defendant Detective Bohan is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

18.     Defendant Detective Reginald Minor ("Detective Minor"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

19.     Defendant Detective Minor is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

20. Defendant Detective Mark Stambach ("Detective Stambach"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

21. Defendant Detective Stambach is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

22. Defendant Detective James Giardina ("Detective Giardina"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

23. Defendant Detective Giardina is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

24. Defendant Detective Anthony Constantino ("Detective Constantino"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a

member of the Buffalo Police Department Homicide Squad, he had full access to the files

relating to the criminal investigations relevant to this Complaint, at all times relevant to this

Complaint.

25.     Defendant Detective Constantino is entitled to indemnification under New York

General Municipal Law Section 50-k and by contract.

26.     Defendant Detective Robert Chella ("Detective Chella"), was at all times relevant

to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting

under color of law and in his individual capacity within the scope of employment pursuant to the

statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State

of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police

Department Homicide Squad, he had full access to the files relating to the criminal investigations

relevant to this Complaint, at all times relevant to this Complaint.

27.     Defendant Detective Chella is entitled to indemnification under New York

General Municipal Law Section 50-k and by contract.

28.     Defendant Detective Raniero Massechia ("Detective Massechia"), was at all times

relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department,

acting under color of law and in his individual capacity within the scope of employment pursuant

to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and

the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo

Police Department Homicide Squad, he had full access to the files relating to the criminal

investigations relevant to this Complaint, at all times relevant to this Complaint.

29.     Defendant Detective Massechia is entitled to indemnification under New York

General Municipal Law Section 50-k and by contract.

30.     Defendant Detective Charles Aronica ("Detective Aronica"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

31.     Defendant Detective Aronica is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

32.     Defendant Chief Joseph Riga ("Chief Riga"), was at all times relevant to this Complaint a duly appointed and acting officer of the Buffalo Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Buffalo and the State of New York. He is sued in his individual capacity. Further, as a member of the Buffalo Police Department Homicide Squad, he had full access to the files relating to the criminal investigations relevant to this Complaint, at all times relevant to this Complaint.

33.     Defendant Chief Riga is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

34.     Together, Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Massechia, and Aronica, and Chief Riga are referred to collectively as the "Defendant Detectives."

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### Russell Montgomery Kills Tomika Means and the Initial Investigation

35.     On Monday, May 26, 1997, shortly after four o'clock in the morning, Tomika Nicole Means was murdered while driving home from Birchfield's, a popular Buffalo nightclub.

36.     The murder occurred in a "road rage" incident.  Means was with her friend Jacqueline Bradley, who was in the passenger seat, when a car cut them off nearly causing an accident.  Means honked the car horn and continued driving.  The same car that had cut in front of them then pulled up alongside, and Montgomery leaned out of the front passenger seat and yelled at Means.

37.     When Means and Bradley reached the intersection of East Delevan and Chelsea Street, the same car cut in front of them again and stopped.  Montgomery exited the passenger seat of the vehicle and approached the passenger side window of Means' car.  He leaned in, drew a gun, and pointed it at Means. Bradley said, "It ain't worth it," but he replied, "Fuck that, bitch," and shot Means once in the head before returning to his car and fleeing the scene.

38.     Bradley described the shooter as a black male, five feet eight inches or five feet nine inches tall and weighing approximately 250 pounds, with noticeable pockmarks on his face, and a light goatee or beard. The pockmarks – scarring from acne – were particularly visible, because Montgomery was leaning into the passenger side, just inches away from Bradley. He was also wearing a baseball cap.

39.     Bradley also described the driver of the shooter's car as a light-skinned black female of slight build, with long black hair, and a gap in her teeth.  And, Bradley stated that the car the unknown woman and Montgomery were driving in was a gray or light blue Oldsmobile Delta 88 or Pontiac 6000.

40.     The day following the murder, Bradley aided the Police in creating a composite sketch of the male shooter and female driver.  The composite sketch of the shooter (now known to be Montgomery) did not include the pockmarks which Bradley had initially described. The sketch also had the shooter wearing a hat.

41.     Bradley also said that she knew of the shooter from a popular local bar, Birchfield's but did not know his name (both Montgomery and Epps frequented Birchfield's).

### Cory Epps is Falsely Identified

42.     There was no evidence, whatsoever, to connect Epps to the Means murder.  No leads suggested he was involved. No witnesses said he was in the area. And no forensic or physical evidence linked Epps to the crime.

43.     Several weeks went by, and the police were out of leads.

44.     Eventually, information may have surfaced that Epps resembled the composite sketch created by Bradley.  But Epps did not fit the description in two important ways. *First*, he is six foot two inches tall – roughly six inches taller than Montgomery, and six inches taller than the description provided by Bradley. *Second*, Epps has smooth skin, unlike Montgomery, who has acne scars, scars that Bradley saw first-hand when he leaned into the car to shoot Means.

45.     Nevertheless, Detective Minor and Detective Bohan showed photographs to Bradley, with Epps' photo being amongst them.  Even though she did not initially identify Epps, the detectives continued to show her the photographs, with Epp's among them, until she made an identification.

46.     On July 6, 1997, after eventually identifying Epps from photographs, the detectives bolstered the identification by telling Bradley that she had in fact identified Cory Epps.

47.     Moreover, even though Bradley did not know Epps by name, upon information and belief other people she knew did know him, and once his name was introduced, Bradley's identification became bolstered even more.

48.     On July 9, 1997, Detective Raniero Massecchia went to speak with Jerriah Johnson, Epps' girlfriend, at her home and to examine her car, which did not match the description of the vehicle provided by Bradley.  Johnson was not home, but Epps was, and passed along the detective's message that he wished to speak with Johnson. Later that day, Epps accompanied Johnson to police headquarters to assist with the police investigation.

49.     Once there, Epps readily agreed to speak with detectives regarding the Means murder and waived his *Miranda* rights. He was open and cooperative with officers and denied any knowledge of or participation in the Means murder.

50.     Then on July 30, 1997, believing it would prove his innocence, Epps agreed to participate in a lineup.  The line-up procedure was conducted by Detectives Minor and Bohan.

51.     Bradley identified Epps in an initial line-up, a procedure that took several minutes and involved the subjects and target stepping forward and turning around.  Despite the identification, the detectives inexplicably placed Epps in another line-up within minutes of the first one where she was permitted to review Epps again.  Unsurprisingly, she identified Epps a second time.

52.     Collectively, the photographic procedures, the confirmation by the police that she had chosen the right person, the revelation of Epps' name to Bradley to discuss with others, and the redundant lineups all worked together to both teach Bradley that Epps looked like the perpetrator, and to bolster her identification and convince her that she was correctly identifying the right person.

**Epps' Trial and Sentencing**

53.     Epps' trial started on April 20, 1997.

54.     At trial, Bradley identified Epps as the person she observed shoot and kill Tomika Means.  She said she was "certain" that Epps was the shooter even though she had been drinking that night and only saw the shooter very briefly in the dark under terribly stressful circumstances when he exited his vehicle and approached Means' car with a gun in his hand.

55.     Epps' attorney was allowed to cross examine Bradley with photos of other suspects that had emerged, and about how Epps did not have acne and was much taller.  But Epps' attorney did not know about Montgomery, so he could not cross-examine Bradley with his photo – despite his eerie similarity to Epps. Nor, was he able to investigate and advance an alternate suspect defense.

56.     In his defense case, Epps raised an alibi which showed that he was on his way to Perkins, a restaurant across town, to eat breakfast with his girlfriend Jerriah Johnson when Means was killed.

57.     Johnson testified that Epps drove her to Perkins at around 4:30 a.m. in his car, a "four-door hunter green Chevy Malibu" (a different car than the one the killer was described as driving).   She recalled where they had sat in the restaurant, what their server looked like, and what they ordered.

58.     Johnson explained that she and Epps sat in the front of the restaurant near the window because "Cory wanted to watch his car."  She described the waiter as a "skinny white male, about five eight" who had "brownish blond hair" and who "appeared to be nervous or new."  Johnson testified that she ordered an omelet and Epps had French toast, a brownie, and a soda.  They chose Perkins because Epps wanted the brownie after having seen it advertised in a

11

display case in the restaurant.

59.     Joseph Murphy, a manager at Perkins, testified that he examined the schedule and learned that Mike Strasser, who was still new at the restaurant, was on duty that night, and confirmed that Strasser matched the description of the waiter Johnson provided.

60.     Murphy also located a receipt in the Perkins computer system which corroborated Johnson's testimony.  In particular, it showed the items Johnson and Epps ordered; that Strasser had been their server; that the couple sat at a table in the front of the restaurant near the window; and that Johnson and Epps were present in the restaurant when the server input their order into the computer at 5:01 a.m., all corroborative of Johnson's testimony including that she and Epps would have been en route to Perkins at the time Means was shot and killed.

61.     Nevertheless, on April 24, 1998, Epps was convicted of murder.

**Prior to Epp's Conviction Detectives Become Aware
that Montgomery is a Suspect for the Means Murder**

62.     On April 16, 1998, shortly before Epps' trial, Russell Montgomery murdered Paul Pope.

63.     Evidence quickly pointed to Montgomery.

64.     On April 17, 1998, Wymiko "Pumpkin" Anderson, the mother of Pope's child, was interviewed by Detectives.  Detective Stambach and Detective Giardina first talked to her at her home on April 17, 1998, and then brought her to the Homicide Squad officer where she also saw and spoke with Chief of the Homicide Unit, Joseph Riga and Detectives Aronica, Constantino, and Massechia.  During the interview, the detectives and chief not only learned about Montgomery's involvement in the Pope murder, they also came to suspect him for the Means murder.

65.    When the detectives asked Anderson what Montgomery looked like, she told them that he looked just like the sketch of the guy who killed Tomika Means, the sketch that had been on the news.  Also, Anderson was friends with Means' boyfriend, so she had a particular interest in, and had reason to be focused on, the Mean's case.

66.    After hearing that Montgomery looked just like the composite sketch Bradley generated during the Means investigation, Detectives Stambach and Detective Giardina left the room. When they came back into the room, Detective Stambach dismissed Anderson's statements about Montgomery and the Means murder and told her they were pretty sure that they had the right guy because all the evidence pointed to Epps.  Anderson responded that they (Epps and Montgomery) look alike, but she was told it was not enough.

67.    Then, in addition to making the Montgomery/Epps resemblance connection, Anderson told Detective Stambach and Detective Giardina that at 9 a.m. on May 26, 1997 (the day of the Means murder), Montgomery came to a house where she was Pope were sleeping together. Montgomery and Pope left for a while, and when Pope came back, Pope told Anderson that Montgomery had confessed to killing Means earlier that morning.

68.    These revelations not only formed a motive for Montgomery to kill Pope – because Pope was telling others that Montgomery killed Means – they further linked Montgomery to the Means murder.

69.    Notwithstanding what Anderson told the police, on information and belief the police were aware of the connection between Montgomery and the Means murder after learning what Montgomery looked like, which was on or before April 17, 1998.  They had to have realized that he looked like Epps and was an alternative suspect in the Means murder.

70.    Notably, Detective Chella interviewed Montgomery for five hours on April 19,

1998, and took a sworn statement from him. During this interview, he had an ample opportunity to examine Montgomery in person. (He also took extensive notes, which mysteriously disappeared until January 22, 2000, when he found them in some papers, and turned them over in the 440 proceeding in 2001.)

71.     Furthermore, it was also only a few days before Epps' trial started in which Epp's identification was the focus of the trial as it was the only evidence against him. What Epps looked like was a known fact in the small homicide unit in the Buffalo Police Department that consisted of only a dozen or so detectives.   On information and belief, it became immediately apparent that, despite the differences between Montgomery and Epps, the resemblance was palpable, and that Montgomery became a viable suspect in the Means murder.

72.     Indeed, Montgomery matched the description Bradley provided of the person who shot Means – male black, 5'8" or 5'9" 235 pounds and acne; and he was certainly closer to Bradley's description than Epps, who was much taller and did not have acne.

73.     In addition, through investigation before Epp's trial and jury verdict on April 24, 1998, the Defendant Detectives discovered several additional pieces of evidence that further linked Montgomery to the Means killing and placed him above Epps as the likely perpetrator of the Mean murder:

a.     Montgomery lived at 1118 East Delevan Avenue, less than a mile from where Means was killed, and only half a mile from where Bradley saw a similar looking suspect in a white car, who recognized her and quickly turned a corner;

b.     Montgomery frequented Birchfield's, the same club Bradley says she recognized the shooter from;

c.     Montgomery had a Buick Park Avenue, possibly tan, which is similar to the car

Bradley described the night of the shooting;

d.     Montgomery was engaged in criminal activity, including dealing large quantities

of illegal drugs;

e.     Montgomery regularly carried a gun;

f.     Montgomery murdered Pope in an awful act of cold-blooded violence, much like

the Means murder, and stuffed him into the trunk of a car; and

74.     In an effort to cover up the connection between Montgomery and the Means

murder and *Brady* material for Epps, Detectives Stambach and Giardino prepared a statement

from Anderson about the Pope murder that excluded mention of Montgomery's involvement in

the Means murder and resemblance to Epps, which they had Anderson sign.

75.     Anderson returned to the Homicide Squad on April 20, 1998, with her aunt's

boyfriend, who was also giving a statement related to the Pope murder. But the Defendant

Detectives never asked her any other questions about Montgomery, despite this powerful

evidence that he killed Means.

76.     Worse, the Defendant Detectives never disclosed this powerful, exculpatory

evidence to the prosecution or Epps before his trial, even though they possessed it. Consequently,

Epps' attorney – who was preparing to go to trial only days later – had no idea that Epps' had a

viable and strong alternate perpetrator defense.

**The Subversion of Epp's Post-Verdict 330 Motion and Post-Sentence 440 Motion**

77.     Three days after the verdict against Epps, after seeing it on the news, Anderson

wrote an anonymous letter to Epps' attorney telling him that Montgomery killed Means and that

he also killed Pope because Pope was gossiping about the Means murder. She also pointed out

the similarities between Epps and Montgomery.  Anderson wrote the letter knowing that the

15

police dismissed her claim about Montgomery being the killer of Means and in an effort to get the truth out.

78.     After Epps' counsel received this letter, he immediately went to the trial judge, and on June 2, 1998 he asked the court to delay sentencing so he could make a C.P.L. § 330 motion to reverse the outcome of the trial.

79.     The prosecution forwarded this letter to the Defendant Detectives, including Detective Chella, who spoke to Anderson over the phone. She admitted she wrote the letter and then returned to the Homicide Squad and spoke with Detective Chella and Detective Constantino, reiterating what she had said on April 17, 1998 about how Montgomery killed Means.

80.     However, the police continued to dismiss the significance of Anderson's implication of Montgomery in the Means murder, the resemblance between Montgomery and Epps, and the other evidence that linked Montgomery to Means murder.

81.     The anonymous letter became the subject of a C.P.L. § 330 motion which was argued at Epps sentencing on June 10, 1998.  But Epps' attorney was never made aware of who the author of the letter was or other information the officers knew about before Epps' trial that made Montgomery a viable alternate suspect in the Means murder.

82.     Given the withholding of Anderson's identity and the suppression of other evidence linking Montgomery to the Means murder, the court denied the motion.  The grounds were that that the letter was unsworn and that Anderson's anonymous account was undeveloped and questionable.

83.     Had Anderson's identity been known to the Epps' counsel, had the police disclosed the truth about what she told them and when, had the police revealed the

16

Montgomery/Epps resemblance and that Montgomery looked more like Bradley's description, and had the police disclosed the connections they made between Montgomery and the Means murder, all of which was known before Epps trial and/or verdict, the 330 motion would have been granted, Epps would have received a new trial, and his case would have been dismissed or he would have been acquitted in a retrial.

84.     The court sentenced Epps to twenty-five years to life in prison.  But, notably it directed the district attorney, "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a general premise that eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom, and that therefore the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case."

**Montgomery Confesses to the Means Murder, which is Suppressed;**
**He is Tried and Convicted for the Pope Murder**

85.     The Pope murder investigation continued, and the Defendant Detectives uncovered even more evidence that Montgomery killed Means. On May 4, 1998, Detective Constantino and Detective Aronica interviewed Gino Johnson ("G. Johnson"), who knew Montgomery. G. Johnson's stepfather was married to Montgomery's mother (and all three of them lived less than a mile from where Montgomery killed Means).

86.     On June 28, 1998, Detective Minor was following up on leads in the Pope murder from the interview with G. Johnson. On information and belief, based on an unsigned note with handwriting that matches handwriting by Detective Minor, Detective Minor spoke with G. Johnson, who told him that Montgomery was hot tempered and that he shot a girl on Delevan and Chelsea (the location of the Means murder).

17

87.     Montgomery was later charged with killing Pope, and on June 9, 2000 he was convicted of that murder, and subsequently sentenced to 25 years to life.

**The 2000 440 Motion**

88.     The detectives continued to withhold from Epps Anderson's identity and other exculpatory evidence implicating Montgomery in the Means murder.

89.     Two years after sentencing, Epps' new counsel learned serendipitously that the anonymous author of the letter was Wymiko Anderson.  Counsel learned of this revelation in a chance encounter in the courthouse during the Pope trial.

90.     Anderson signed an affidavit on May 7, 2000, which was submitted as part of a C.P.L. § 440 motion, alleging that Pope told Anderson that Montgomery confessed to killing Means, that Montgomery murdered Pope to silence him, and that Anderson had told this to police prior to Epps' trial.

91.     Epps' new counsel also attempted to obtain additional information regarding the Pope murder, but the court denied him access to the full file.

92.     The Defendant Detectives, then undermined the § 440 motion with false statements and strategic omissions. Detectives Stambach, Giardina, and Minor provided affidavits with false and misleadingly incomplete information, stating that on April 17, 1998, Anderson never told him that Montgomery killed Means. These were used to oppose the § 440 motion.

93.     At the 440 hearing, Anderson testified first, detailing how she had told Detectives that Montgomery looked just like the composite sketch from the Means murder. She explained that Detectives Stambach and Giardina left the room right after, came back, and said she was wrong. She argued with them, and then told them about how Montgomery had confessed to Pope

only hours after the Means murder.

94.     The prosecution called Detectives Giardina, Stamback, Constantino, and

Massechia, who testified falsely that Anderson had not told them about Montgomery's link to the

Means murder before Epps was convicted.

95.     During the hearing the Detectives never disclosed that they made the connection

between Montgomery and the Means murder even without Anderson's revelation.  Nor, did they

reveal the additional information they learned before Epp's verdict that connected Montgomery

to the Means murder, like the fact he lived very close to where the murder occurred and how

Bradley said she saw the shooter only half a mile from his house.

96.     Furthermore, prior to the 440 hearing in 2001, Defendant Detectives never

disclosed that Montgomery had confessed to the Means murder to Gino Johnson; thus, Epps

attorney could not make use of it at the hearing.

97.     Central to Epps' case at the hearing was Anderson's credibility.  Related was the

notion that Epps, not Montgomery, killed Means.  Certainly, the fact that Montgomery confessed

to the Means murder to Gino Johnson on June 28, 1998, was a critical material fact for the 440

Court.  However, the 440 Court was not made aware of it (indeed this information recently came

to light), and as such it was were deprived of the opportunity to consider it.  Undoubtedly, its

significance, especially when viewed in conjunction with the additional exculpatory evidence,

cannot be overstated.

98.     On September 13, 2001, and based on false, misleading and incomplete

information the court denied Epps' motion and he remained in custody.

**Epps' Exoneration**

99.     Almost two decades after he was first arrested, the Exoneration Initiative, Epp's

19

most recent post-conviction attorneys, received new information proving that Montgomery killed Means.

100.    In February 2017, Epps moved to vacate his conviction based on a claim of newly discovered evidence pursuant to C.P.L. § 440.10(1)(g), among other grounds. Much of this motion was placed under seal.

101.    Initially, the prosecution opposed the motion, but they were quickly persuaded that Epps was innocent. On the morning of December 1, 2017, the District Attorney joined Epps' motion to vacate his conviction based on the ground of newly discovered evidence and it moved to dismiss the indictment.  The Court then granted the motion and dismissed the indictment.

102.    The hearing was also reopened on consent wherein photographs of Epps and Montgomery possessed by the prosecution were admitted into evidence.  The photographs, depict a stark resemblance between the two men.

103.    Given that Montgomery, and his associates, are still an active threat, and given that Montgomery personally murdered Pope for gossiping about the Means murder, this information is kept strictly confidential and not addressed in this filing.  Suffice it to say, Epps' innocence cannot be in dispute, given the resounding the other evidence that links Montgomery to the Means murder and the manner in which the case against Epps was dismissed.

104.    Shortly after the order of vacatur and dismissal, Erie County District Attorney John Flynn held a press conference and stated that Epps and the true killer looked "eerily similar" and essentially conceded that Epps was innocent.

105.    As posted on the Erie County District Attorney's website Flynn stated:

After reviewing this case, it has become clear to me that Mr. Epps should not spend one more night in prison…This Office is committed to not only convicting the guilty, but protecting the innocent.

106.    Epps was released from custody on December 1, 2017, finally a free man after more than two decades of being wrongfully imprisoned.

**Damages**

107.    From 1997 to 2017 (more than 20 years) Epps was confined in pre-trial detention and then to the custody of the State of New York, post-conviction.  During this period, he suffered greatly as a victim of unjust conviction and incarceration.

108.     The injuries and damages sustained by Epps arising from his unjust conviction and imprisonment include, but are not limited to: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family; loss of companionship; loss of love; loss of income; infliction of physical and mental illness; humiliation; indignities; embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, travel, enjoyment, and expression.   As a direct result of Epp's unjust conviction and imprisonment, many of the effects of these disabilities continue to plague him to this day and will continue to plague him for the rest of his life.

**FIRST CAUSE OF ACTION**

**Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives**.

**(Pre-Trial Due Process and *Brady* Violations)**

109.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

110.    The Defendant Detectives, individually and in concert, failed to timely disclose

material favorable to the defense in contravention of *Brady*. There was substantial evidence that Montgomery killed Means, evidence that could have been used to cross Bradley and to present an alternate suspect defense, that was known by the Defendant Detectives prior to Plaintiff's trial. This was never disclosed to either the prosecution or Plaintiff's attorney.

111.    This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

112.    Alternatively, each of the Defendant Detectives had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

113.    Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

114.    In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

115.    The above misconduct was outrageous and shocking to the conscience.

116.    Plaintiff was unable to uncover this wrongdoing until after he was convicted.

117.    The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983. Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against the Defendant Detectives.**

**(Post-Trial Due Process)**

118.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

119.    Plaintiff filed motions under C.P.L. § 330 and C.P.L. § 440 and was granted a hearing pursuant to C.P.L. § 440. Plaintiff has a right to a fair and honest consideration of his motions and to a fair hearing, based on full disclosure of the true facts by all relevant witnesses, including the Defendant Detectives.

120.    The Defendant Detectives, individually and in concert, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, lied and withheld information, to provide false and misleading information to the prosecution, information that undercut Anderson's credibility and undermined Plaintiff's ability to fairly and effectively litigate a violation of his rights under *Brady*, as well as to strengthen the identification by Bradley.

121.    But for this false and misleading information, Plaintiff would have received fair consideration of his C.P.L. §§ 330 and 440 motions, leading, on information and belief, to a retrial and an exoneration years before he was ultimately exonerated in 2017.

122.    This misconduct violated Plaintiff's rights to procedural and substantive due process and to a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

123.    Alternatively, each of the Defendant Detectives had an affirmative duty to

23

Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

124.    Each of the Defendant Detectives knew that this exculpatory evidence was being withheld and did nothing to intervene.

125.    In failing to intervene, the Defendant Detectives proximately caused the violation of Plaintiff's rights to procedural and substantive due process and to a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and his resulting injuries.

126.    The above misconduct was outrageous and shocking to the conscience.

127.    Plaintiff was unable to uncover this wrongdoing until after he was convicted.

128.    The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**State-law Malicious Prosecution Against the Defendant Detectives
and the City of Buffalo.**

129.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

130.    The Defendant Detectives individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause.

131.    The proceedings terminated in Plaintiff's favor.

132.    Defendant City of Buffalo is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

133.    Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Defendant Detectives.**

134.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

135.    The Defendant Detectives, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

136.    The proceedings terminated in Plaintiff's favor.

137.    The Defendant Detectives are liable for their violation of Plaintiff's constitutional rights and for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**Violations of the New York State Constitution
Against the Defendant Detectives and the City of Buffalo.**

138.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

139.    By virtue of the aforementioned acts, the Defendant Detectives are liable to Plaintiff for violating his right to due process under Article I, § 6 of the New York State Constitution, and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

140.    Defendant City of Buffalo is liable for these violations of the New York State Constitution under the principle of *respondeat superior*.

141.    Consequently, the Defendant Detectives and the City of Buffalo are liable to Plaintiff for compensatory and punitive damages.

**WHEREFORE**, it is respectfully requested that this Court grant judgment in favor of Plaintiff against the City of Buffalo and Detectives Bohan, Minor, Stambach, Giardina, Constantino, Chella, Aronica, and Massechia, and Chief Riga in the nature of:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.    An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
          February 28, 2019
                                        GLENN A. GARBER, P.C.

                                        By:            /s/

                                            Glenn A. Garber

                                        The Woolworth Building
                                        233 Broadway Suite 2370
                                        New York, New York 10279
                                        Phone: (212) 965-9370

                                        RICKNER PLLC

                                        By:            /s/

                                            Rob Rickner

The Woolworth Building
233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 300-6506

*Attorneys for Plaintiff Cory Epps*