Jacqueline Bradley - Direct - Schwegler     118

1  Court.  That was a legitimate argument.  I

2  would not argue otherwise to this Court.

3          THE COURT:  I have allowed photographs of

4  the deceased where it is probative and

5  necessary to establish a particular aspect of

6  the case.  But, the Courts are also clear that

7  photographs, particularly morgue photographs,

8  are not admissible if they are offered for

9  prejudicial purposes.  And I would view that

10  to be the case in this instance.  Enough said.

11  Jury down.

12          (Whereupon the jury was then present.)

13          THE COURT:  Okay.  Let us resume with the

14  next witness.

15          MR. SCHWEGLER:  Jacqueline Bradley,

16  please.

17  J A C Q U E L I N E   B R A D L E Y, Buffalo, New

18  York, having been duly called and sworn as a witness on

19  behalf of the People, testified as follows:

20  DIRECT EXAMINATION BY MR. SCHWEGLER:

21      Q.   Good afternoon, Miss Bradley.  Miss Bradley,

22  you live in the City of Buffalo?

23      A.   Yes.

24      Q.   How long have you lived in Buffalo?

Jacqueline Bradley - Direct - Schwegler     119

1
2      A.    All my life.

3      Q.    What is your educational background, if you

4   would?

5      A.    I'm a graduate from high school, from the

6   Catholic School, Chicago, Illinois.  Now, I'm a CNA,

7   certified nursing assistant.

8      Q.    Are you employed at this time?

9      A.    Yes.

10     Q.    In what capacity, what do you do?

11     A.    I'm a certified nursing assistant.

12     Q.    Do you have any children?

13     A.    Yes.

14     Q.    How many?

15     A.    Two.

16     Q.    Young children or older?

17     A.    Young.

18     Q.    Miss Bradley, before we go any farther, I'd

19  like to bring out with you that incident back in 1996

20  where you appeared before Judge Margaret Anderson over

21  in City Court, do you recall that?

22     A.    Yes.

23     Q.    At that time did you plead guilty to the Class

24  A misdemeanor of petit larceny?

25     A.    Yes.

Jacqueline Bradley - Direct - Schwegler   120

1

2    Q.   Okay.  That related to receiving some social

3    welfare benefits and food stamps while you were

4    working?

5    A.   Yes.

6    Q.   As part of that agreement -- pardon me, as

7    part of that plea did you sign a confession saying I

8    owe this much money and agree to pay it back?

9    A.   Yes.

10    Q.   Have you paid some of that money back?

11    A.   Half of it's paid, I'm still paying.

12    Q.   Okay.  Does that come out of each check?

13    A.   Yes.

14    Q.   Have you ever been convicted of any other

15    crimes?

16    A.   No.

17            THE COURT:  I advise the jury this

18        evidence is adduced solely and only on the

19        question of general credibility.

20  BY MR. SCHWEGLER:

21    Q.   Miss Bradley, let's turn our attention now to

22  Tomika Nicole Means.  Did you know this young lady?

23    A.   Yes.

24    Q.   How long had you known Tomika prior to her

25  death in May of 1997?

1

2    A.    Fourteen and a half years.

3    Q.    Have you known each other since you were

4    children, then?

5    A.    Yes.

6    Q.    Did you and she spend a good deal of time

7    together?

8    A.    Yes.

9    Q.    In fact, were you with her the morning that

10   she was shot on Chelsea Place near East Delavan?

11   A.    Yes.

12   Q.    Before we get up to that scene, I'd like you

13   to take us back to the evening before May 26th, May

14   26th being early Monday morning, take us back into

15   Sunday evening starting at about 9:00 P.M.   Did you and

16   Tomika, were you together at about that time?

17   A.    Yes.

18   Q.    Tell the jury briefly where you were and what

19   you were doing and what your plans were.

20   A.    She came to my house about 9:00.   She just

21   came from the movies from her mother.   We sat there,

22   looked at photos, back and forth, clothing magazines.

23   Then we decided to go out.   I asked my mother would she

24   watch the children, she said yes.   From there we left

25   to my house, picked up my clothing, went to her house.

EPPS 00847

```
 1            Jacqueline Bradley - Direct - Schwegler    122

 2    I did her hair.  We left there about 12:00, 12:30, went
                                              Time
 3    to pick her cousin Shaneel up because Shaneel was going
                            never said
 4    to drive the car.  And, first place we went to was --

 5    it was this club called -- I'm trying to think of the

 6    name.

 7         Q.   Slow down.  After you -- if I may interrupt

 8    you, after you did Tomika's hair, you were with Shaneel

 9    at that time, were you?

10         A.   No, we didn't pick up Shaneel until after

11    12:30.

12         Q.   Okay.  At some point did you decide -- you

13    decided to go out with your friend, correct?

14         A.   Yes.

15         Q.   At some point did you go to the Squeeze Bar at

16    Main and Tupper?

17         A.   That was after we picked up Shaneel we went to

18    the Squeeze.

19         Q.   You pick up Shaneel, you go to the Squeeze,

20    you're with Shaneel and Tomika at the Squeeze?

21         A.   Yes.

22         Q.   How long do you stay there?

23         A.   About twenty minutes.

24         Q.   Okay.  Do you consume any alcoholic beverage

25    there?
```

```
 1              Jacqueline Bradley - Direct - Schwegler    123

 2      A.    No.

 3      Q.    At the Squeeze?

 4      A.    No.

 5      Q.    Not a one?

 6      A.    No.

 7      Q.    And who all leaves from the Squeeze with you

 8   and Tomika and Shaneel?

 9      A.    Just us.

10      Q.    Where did you go?

11      A.    To Birchfield's.

12      Q.    Is that a tavern up at Main and Glenwood?

13      A.    Yes.

14      Q.    What time did you arrive at Birchfield's, if

15   you recall?

16      A.    Had to be about 1:20, almost 1:30.

17      Q.    That's the three of you?

18      A.    Yes.

19      Q.    Did Shaneel meet up with a friend at

20   Birchfield's?

21      A.    Her boyfriend.

22      Q.    Okay.  Now, did she go off with him then for

23   that remainder?

24      A.    No, she didn't leave yet.  We dropped her off,

25   when we left Birchfield's, we dropped her off.
```

Jacqueline Bradley - Direct - Schwegler     124

1

2      Q.   How long did you stay at Birchfield's, you and

3   Tomika?

4      A.   I'd say hour, hour and a half.

5      Q.   Did you have anything to drink there at that

6   time?

7      A.   Yes, two drinks there.

8      Q.   What were you drinking?

9      A.   We was drinking brandy.

10     Q.   Singles?

11     A.   Yes.

12     Q.   Did there come a time when you decided to

13   leave Birchfield's?

14     A.   Yes, it was a fight broke out so we decided to

15   leave.

16     Q.   Okay.  Did you finish your second drink there?

17     A.   No.

18     Q.   So did you leave part of that second drink on

19   the bar when you left?

20     A.   Yes.

21     Q.   Because there was trouble, you decided to

22   leave, you and Tomika?

23     A.   Yes.

24     Q.   Was she driving?

25     A.   Yes.

1              Jacqueline Bradley - Direct - Schwegler     125

2       Q.    You were riding as a passenger?

3       A.    Uh-hum.

4       Q.    Shaneel did not leave with you?

5       A.    Yes, she was still with us.  We dropped her

6   off at Wyoming with her boyfriend.

7       Q.    All right.

8       A.    Then from there we went to O'Boys.

9       Q.    O'Boys is a tavern located were?

10      A.    On Dartmouth and Bailey.

11      Q.    Do you recall approximately what time you got

12  to O'Boys?

13      A.    It was around 2:00.

14      Q.    All right.  And how long did you stay at

15  O'Boys?

16      A.    Until closing.

17      Q.    And you yourself, did you have any alcoholic

18  beverage at O'Boys?

19      A.    We had two drinks there.

20      Q.    Two more.  Okay.  Same thing, single brandies?

21      A.    Yes.

22      Q.    At approximately 4:00 A.M. -- strike that,

23  please.  When you dropped Shaneel off on Wyoming, had

24  you and she and Tomika made plans to meet up later?

25      A.    Yes, we was going to come back and pick

Jacqueline Bradley - Direct - Schwegler      126

1    Shaneel up.

2

3        Q.   And do what?

4        A.   We was going to get something to eat and then

5    go home.

6        Q.   All right.  About what time did you leave

7    O'Boys with Tomika?

8        A.   It was like 4:00.

9        Q.   Okay.  Where did you go when you left O'Boys?

10       A.   Back on Wyoming to pick Shaneel up.

11       Q.   How did you get there?

12       A.   We went down Bailey to Delavan, west on East

13   Delavan to Wyoming.

14       Q.   Okay.  So Wyoming runs off of East Delavan?

15       A.   Yes.

16            MR. SCHWEGLER:  At this point, Your

17            Honor, I think it might be helpful if I might

18            have the other exhibit, ask this witness to

19            come down and show us the route she took, if I

20            may have that.

21            THE COURT:  You may.

22   BY MR. SCHWEGLER:

23       Q.   With the Court's permission, I would like to

24   ask Miss Bradley to step down and utilize this pen to

25   draw the route you took from O'Boys to Shaneel's, and

Jacqueline Bradley - Direct - Schwegler      127

then I'll have you speak very loudly and take us

through the rest of your travels that evening, all

right?  If you would, please, circle O'Boys, the tavern

you left at 4:00 A.M.  Now, you proceeded down Bailey

Avenue, did you, to Delavan?

    A.   Yes.

    Q.   Please draw a line down there to Delavan

Avenue.  When you reached Delavan, which way did you

go?  You turned right and you were headed then in a

westerly direction?

    A.   West.

    Q.   Please draw to where you stopped to turn to go

to your cousin -- your friend's cousin Shaneel's house

on Wyoming Avenue.

    A.   Went right on Wyoming.

    Q.   And what was Shaneel's house number?

    A.   The address was 421.

    Q.   421.

    A.   We pulled into the driveway.  We blew the horn

like two or three times.  Shaneel didn't come out so we

decided to go get something to eat and come back.

    Q.   Circle 421 for us, please. Show the jury how

you came back down on Wyoming.

    A.   We came back down Wyoming to Delavan.

EPPS 00853

Jacqueline Bradley - Direct - Schwegler          128

1

2     Q.    Turned which way?

3     A.    Another right.

4     Q.    So you're going west again?

5     A.    Yes.

6     Q.    You're passing by what streets, Humber?

7     A.    Humber and Deerfield, when you get to

8 Deerfield --

9     Q.    Speak up, please.

10    A.    When we came to Deerfield, a car pulled out,

11 and we was going straight.  Before we got to Delavan

12 and Grider, before we got to the Mobil gas station, we

13 was on the left-hand side, the car was on the right,

14 and they made a left-hand turn and almost hit the car.

15 Tomika blew the horn, so we kept going.  When we got --

16    Q.    Let me slow you down, if I may.  You got up

17 here, just past Durham heading west, is that when that

18 car --

19    A.    No, it came out at Deerfield.

20    Q.    When did that car cut in front of you, almost

21 causing the accident?

22    A.    Before we got to the corner of Grider and East

23 Delavan by the Mobil gas station, it cut in front of

24 us.

25    Q.    Okay.  Why don't you put an X right where the

OFFICIAL SUPREME COURT REPORTER

EPPS 00854

Jacqueline Bradley - Direct - Schwegler     129

1    car cut in front of you, if you would approximately.

2    Put your initials next to it there.  Okay.  After that

3    car pulled -- let me -- well, I'll do that on the

4    stand.  Go ahead and continue.  Which way did you go?

5    You kept going west on East Delavan, did you?

6    A.   Yes.

7    Q.   Step over this way, perhaps you can see it

8    better going this way.

9    A.   We kept going up East Delavan till we got to

10   East Dell -- East Delavan and Fillmore.

11   Q.   Let me ask you this, Miss Bradley.  As you're

12   going along, are there red lights at some of these

13   other intersections?

14   A.   Yes, at Deerfield and at Grider and at

15   Chelsea.

16   Q.   Did you hit any of those red lights or did you

17   catch green all the way as you were going west?

18   A.   Caught green all the way.

19   Q.   Until you reached Fillmore Avenue?

20   A.   Yes.

21   Q.   There you encountered a red light?

22   A.   Yes.

23   Q.   What lane of traffic are you in, are you in

24   the curb lane or are you in the second lane?

1          Jacqueline Bradley - Direct - Schwegler    130

2      A.    Curb lane.

3      Q.    Okay.  What happens as you're stopped at the

4  red light at Fillmore and East Delavan?

5      A.    The car pulled next to us, our window was

6  down.

7      Q.    Speak way up.

8      A.    Our window was down, they rolled the window

9  down, he quoted, "You lucky you ain't no Nigger,"

10  twice.

11      Q.    Let me stop you now.  Who made that comment,

12  "You lucky you ain't no Nigger"?  Who said that?

13      A.    He did.

14      Q.    The passenger or the driver?

15      A.    The passenger.

16      Q.    Okay.  He said that across to --

17      A.    Both to me and Tomika.

18      Q.    Did either of you make a response?

19      A.    No.

20      Q.    On hearing that?

21      A.    No.

22      Q.    After hearing that comment -- you say that the

23  person that said that to you said it twice?

24      A.    Yes.

25      Q.    On hearing that, did you decide to continue on

EPPS 00856

1    and have something to eat or not?

3      A.   No, we decided to go home.  So we made a right

4    on Fillmore and a right on Appenheimer, that's when I

5    noticed they was in back of us.  I told her, "They in

6    back of us."  She said, "Don't worry about it."  She

7    said, "Okay."

8           THE COURT:  I'm sorry, I don't think

9           that's a good place to -- to be developing the

10          testimony.  You may develop her path of travel

11          up to Chelsea.

12    BY MR. SCHWEGLER:

13      Q.   All right.  Let's do that, Miss Bradley, if

14    you would.  Go ahead and draw what your route was.  You

15    went across Appenheimer, you turned right on Chelsea,

16    almost made it to Delavan, is that correct?

17      A.   Yes.

18      Q.   Go ahead and resume your seat so we have the

19    microphone, then we'll perhaps have you come back.

20    You've told us as you reached Fillmore and East Delavan

21    that that particular comment was made to you.  What did

22    you take that to mean when that was made to you and

23    Tomika?

24      A.   We wasn't a guy.

25           MR. LoTEMPIO:  Objection.

OFFICIAL  SUPREME  COURT  REPORTER

1
2          THE COURT:  Excuse me, I'll allow her to
3      testify what her mindset was with respect to
4      that remark so that it's solely her state of
5      mind as to its meaning.  Go ahead.
6  BY MR. SCHWEGLER:
7      Q.   What did that mean to you when he made that
8  remark?
9      A.   We wasn't a guy, a dude, men.
10      Q.   Okay.  You're lucky you're women, not men?
11      A.   Right.
12      Q.   Okay.  As you made your turn on Appenheimer --
13  strike that, on Fillmore, then down Appenheimer, you
14  say you became aware that a car was then behind you?
15      A.   Yes.
16      Q.   Did you recognize it as the same car that had
17  just pulled alongside of you?
18      A.   Yes.
19      Q.   Let me take you back to the intersection for a
20  moment.  At Fillmore and East Delavan, is that a well
21  lit intersection?
22      A.   Yes.
23      Q.   If you were on the inside lane and the car
24  pulled up, the passenger would have been directly next
25  to Tomika, Tomika's driving here, then the car pulled

EPPS 00858

1                   Jacqueline Bradley - Direct - Schwegler      133

2      up on your left?

3            A.    Right.

4            Q.    Okay.   The passenger in that car was a man?

5            A.    Yes.

6            Q.    That made the comment?   He would have been

7      right next to Tomika at that point?

8            A.    Right.

9            Q.    Okay.   And you're sitting next to Tomika in

10     her car?

11           A.    Yes.

12           Q.    And you heard clearly the remark that he made?

13           A.    Yes.

14           Q.    Did you have a good view of that man?

15           A.    Yes.

16           Q.    At that point?   Okay.   Was it an unobstructed

17     view, nothing in your way?

18           A.    No.

19           Q.    You were looking right in front of Tomika and

20     were able to see?

21           A.    Right.

22           Q.    Okay.   As you're going down Appenheimer, you

23     notice the same car is following you and you bring that

24     to Tomika's attention?

25           A.    Yes.

Jacqueline Bradley - Direct - Schwegler     134

1

2      Q.   And what does she say?

3      A.   She said, "Don't worry about it, okay."

4      Q.   Okay.  Tell the jury what happened after you

5   made your turn onto Chelsea and were proceeding up

6   toward the intersection of East Delavan Avenue.

7      A.   We turned on Chelsea and before we got to the

8   intersection, the car pulled up and cut us off.  He got

9   out of the car, came on my side.  When he got out of

10  the car, he pulled the gun out.  We saw him pull the

11  gun out.  He came on my side, leaned in through the

12  window.  I reached over and looked at him, I touched

13  him.  I said, "It ain't worth it."  He said:  F that,

14  you know, B.  And then he shot.

15     Q.   Let me just interrupt you and ask you, for the

16  sake of clarity, would you state specifically what he

17  said without just the initials?  He leaned in the

18  window, what did he say?

19     A.   "Fuck that, bitch."

20     Q.   Okay.  Immediately after saying that, what

21  happened?

22     A.   He shot.

23     Q.   Okay.  How far away from you was the person

24  that shot your friend Tomika Means?

25     A.   Just inches away.

EPPS 00860

1          Jacqueline Bradley - Direct - Schwegler     135

2      Q.   Okay.   Did you get a look at the gun that he

3   had used?

4      A.   Yes.

5      Q.   What did the gun look like?

6      A.   It was silver with the revolver, and a gray

7   handle -- like a brown handle.

8      Q.   When that car pulled in front of you, where

9   were the headlights of Tomika Means' car pointing?

10     A.   Straight ahead.

11     Q.   Did they light up that car in front of you?

12     A.   Yes.

13              MR. LoTEMPIO:   Objection, leading.

14              THE COURT:   Sustained as to leading.

15   BY MR. SCHWEGLER:

16     Q.   All right.   Describe what you saw in the

17   headlights of Tomika's car, if you would.

18     A.   I saw him, when he got out, when he pulled the

19   gun out and when he came towards the car.

20     Q.   Do you see the man in the court that shot your

21   friend Tomika Means on May 26th?

22     A.   Yes.

23     Q.   Would you please point at him and tell us what

24   he's wearing?

25     A.   Right here with the white shirt and the

1           Jacqueline Bradley - Direct - Schwegler     136

2    colored tie.

3        Q.   Let the record reflect the identification of

4    defendant Cory Epps.   Immediately on seeing and hearing

5    that shot, what do you observe next?

6        A.   He ran back to the car.   I grabbed the

7    cellular phone and I tried it, 911.   She looked over at

8    me and came towards me, blood was everywhere.   I'm

9    trying to still dial 911, it wouldn't go through.   I

10   told her to keep breathing.   And, I got out and ran to

11   the pay phone.   This lady from two houses down heard me

12   screaming.   I told her to call my mother.   And, by then

13   I was on the phone with 911.   He told me to go back

14   over to see if she was breathing or if she had a pulse.

15   When I went back over, she was laying on the steering

16   wheel and that's when the ambulance and police came.

17   They pulled me away.

18       Q.   They were there relatively quickly?

19       A.   Yes.

20       Q.   Weren't they?

21       A.   Yes.

22       Q.   Miss Bradley, I'm going to show you a couple

23   of these photos, then I'm going to move on.   Let me

24   just put up here People's 10 in evidence.   Would you

25   tell us what that photograph shows us, please?

Jacqueline Bradley - Direct - Schwegler        137

1

2      A.    The red Alfa Romeo that she was driving that

3  night.

4      Q.    That shows us the passenger side, is that

5  where you were seated?

6      A.    Yes.

7      Q.    Okay.  And as we look kitty-corner across the

8  street to the southeast corner, do you recognize that

9  as Sam's Delicatessen?

10     A.    Yes.

11     Q.    Okay.  Let me put up People's -- well, let me

12  show you People's 13, first of all.

13          THE COURT:  Has 13 been marked?

14          MR. SCHWEGLER:  Only for identification,

15      Your Honor.

16          MR. LoTEMPIO:  Judge, I have no objection

17      to the photo being entered into evidence.

18          THE COURT:  It may be received.

19          (Whereupon People's Exhibit 13 was

20          received in evidence.)

21  BY MR. SCHWEGLER:

22     Q.    Would you tell us what that shows, please?

23     A.    The store where the pay phone was at.

24     Q.    Is that the pay phone that you ran across the

25  street to and made that 911 call?

1               Jacqueline Bradley - Direct - Schwegler     138

2       A.   Yes.

3       Q.   Once the officers and medical people began

4  arriving on the scene, were there quite a few of them

5  coming one after the other, do you recall?

6       A.   Yes.

7       Q.   All right.  Does one -- or, does one officer

8  approach and ask you can you describe what happened

9  and/or the vehicle that they were in?

10      A.   Yes.

11      Q.   What do you tell that initial officer at this

12  point?

13      A.   Told him exactly what the guy was wearing, how

14  he looked, that I knew him, I didn't know his name but

15  I knew who he was because I seen him before.  I told

16  him the description of the car.

17      Q.   Okay.  How did you describe the vehicle at

18  that point?

19      A.   It was a gray to a light blue Oldsmobile Delta

20  88 or could have been a Pontiac 6000.  It was close to

21  an Oldsmobile.

22      Q.   All right.  Would it be fair to say that you

23  were quite distraught and upset at that point?

24      A.   Yes, I was.

25      Q.   All right.  Did there come a point in time

EPPS 00864

Jacqueline Bradley - Direct - Schwegler     139

1    when you recall meeting Officer Bratton, the lady who

2    testified here first, and her partner, Officer Deane

3    Hoefler, that morning?

4        A.   Yes.

5        Q.   And did you go with them back to their patrol

6    car as it was parked up on East Delavan?

7        A.   Yes.

8        Q.   In talking with them, are you able to compose

9    yourself more and start calming down in the course of

10   that?

11       A.   Yes, a little, yes.

12       Q.   All right.  And while you're with Officer

13   Bratton, does your mother not show up?

14       A.   Yes, she did.

15       Q.   Okay.  Did you find that helpful, also?

16       A.   Yes.

17       Q.   As you're at Officer Bratton's car and your

18   mom arrives, do you get out to greet her and vice

19   versa?

20       A.   Yes.

21       Q.   Okay.  And at that point does a police officer

22   bring back a person and say is this the guy or can you

23   identify him?

24       A.   Yes.

EPPS 00865

```
 1              Jacqueline Bradley - Direct - Schwegler    140
 2      Q.   And what do you say?
 3      A.   No, it wasn't him.
 4      Q.   Were you certain of that?
 5      A.   Yes, positive.
 6      Q.   Does a similar thing occur one or more times
 7   in addition to that first one, that is that an
 8   individual is brought back in your presence or in that
 9   vicinity and you walked over and looked in to see if
10   that was the person that shot your friend?
11      A.   Two others.
12      Q.   And on each occasion, what did you say?
13      A.   It wasn't him.
14      Q.   Okay.  As distraught as you were at that
15   point, were you certain?
16      A.   I was positive.
17      Q.   Do you go with Officer Bratton and her partner
18   and your mom in the patrol car and begin heading
19   downtown to the homicide office in order that you might
20   speak with those detectives, give a statement?
21      A.   Yes.
22      Q.   Okay.  And in going downtown with Officer
23   Bratton, do you then give a physical description of the
24   persons you saw, the driver who cut you off and the
25   person that got out and shot your friend?
```

Jacqueline Bradley - Direct - Schwegler     141

1
2      A.    Yes.

3      Q.    Once you arrived at homicide, did you give a

4    statement to the officers there?

5      A.    Yes.

6      Q.    Then you and your mom went home?

7      A.    Yes.

8      Q.    Now, that was early Monday morning.  I'd like

9    to now move you ahead a day, direct your attention to

10   Tuesday, shortly after noon.  Do you recall going out

11   to the Town of Tonawanda Police Department with members

12   of the Buffalo Homicide Squad?

13     A.    Yes.

14     Q.    What was your purpose in going there?

15     A.    I was doing a sketch.

16     Q.    Did you meet Detective Robert Vanderwerf out

17   at the Town of Tonawanda Police Department?

18     A.    Yes.

19     Q.    Okay.

20            THE COURT:  Do you have any problem with

21        this area of proof, Mr. LoTempio?

22            MR. LoTEMPIO:  No.

23   BY MR. SCHWEGLER:

24     Q.    Describe to the jury the way -- did you, in

25   fact, compose a composite sketch?

OFFICIAL SUPREME COURT REPORTER

1              Jacqueline Bradley - Direct - Schwegler      142

2        A.   Yes.

3        Q.   With his assistance?

4        A.   Yes.

5        Q.   Tell the jury how that's done, what you did,

6   what he did?

7        A.   They showed me different pictures of noses,

8   mouths, ears, eyes.  I picked out the noses and

9   everything.  He had to do some coloring in, added a

10  hat, this still wasn't right.  The face was too thin.

11  Then he widened the face and there it was.

12       Q.   Okay.  Did you direct him to do each of those

13  things?

14       A.   Yes.

15       Q.   To put in different eyes, to widen the face

16  and so forth?

17       A.   Yes.

18       Q.   Once the face was widened, was that the last

19  change that you made?

20       A.   Yes.

21       Q.   And what did you say at that point?

22       A.   That was him.

23       Q.   Okay.

24            MR. LoTEMPIO:  No objection.

25            MR. SCHWEGLER:  Your Honor, I understand

EPPS 00868

Jacqueline Bradley - Direct - Schwegler     143

1          counsel has no objection.  I'd like to move
2          People's 16 into evidence, the composite.
3               MR. LoTEMPIO:  There is no objection.
4               (Whereupon People's Exhibit 16 was
5               received in evidence.)
6   BY MR. SCHWEGLER:
7        Q.   Miss Bradley, I'd like you to take a look at
8   People's 16 now in evidence on the monitor.  Is that
9   the composite drawing that you composed with the
10  assistance of Detective Vanderwerf out in Tonawanda?
11       A.   Yes.
12       Q.   All right.  That was one day after the
13  shooting of your friend?
14       A.   Yes.
15       Q.   Let us move ahead from May 27th, I'd like to
16  direct your attention now to July 30, 1997.  Did you
17  attend a line-up procedure at Buffalo Police Department
18  Headquarters?
19       A.   Yes.
20       Q.   Would you describe that room and what
21  happened, to the ladies and gentlemen of the jury,
22  please.
23       A.   It was like an auditorium with a one-way
24  glass.  It was like they came out of a room and they

1              Jacqueline Bradley - Direct - Schwegler      144

2    all just stood in line.

3         Q.   Okay.  Were the -- well, if I may.

4              MR. LoTEMPIO:  I have no objection.

5              MR. SCHWEGLER:  No objection.  Your

6         Honor, I would offer People's 18 and 19.

7              MR. LoTEMPIO:  Judge, they're line-up

8         photographs, I have no objection.

9              THE COURT:  Received.

10             (Whereupon People's Exhibits 18 and 19

11             were received in evidence.)

12   BY MR. SCHWEGLER:

13        Q.   Miss Bradley, as you attended the line-up,

14   you're behind the one-way glass, did you see two

15   separate line-ups of six men?

16        A.   Yes.

17        Q.   Okay.  And after the first line-up, did the

18   men switch positions?

19        A.   Yes.

20        Q.   They were all similarly attired in blue

21   sweatsuits?

22        A.   Yes.

23        Q.   All right.  Let me put up on the display

24   People's 18 now in evidence.  Do you recall that

25   photograph as being a true and accurate depiction of

EPPS 00870

Jacqueline Bradley - Direct - Schwegler     145

1  the first phase of the line-up you attended on July 30,

2  1997?

3  A.   Yes.

4  Q.   And on viewing that line-up, did you identify

5  one of those individuals as the man who shot your

6  friend Tomika?

7  A.   Yes.

8  Q.   Which man did you pick?

9  A.   Number 3.

10  Q.   Is that the defendant Cory Epps?

11  A.   Yes.

12  Q.   Approximately ten minutes later -- well,

13  strike that.  After the first phase, did those six men

14  then leave your viewing area and go into a back area?

15  A.   Yes.

16  Q.   Okay.  And then they came out about ten

17  minutes later?

18  A.   Yes.

19  Q.   And had switched the numbers and so forth,

20  apparently?

21  A.   Yes.

22  Q.   Showing you now People's 19, phase two of that

23  same line-up, did you pick out the individual in phase

24  two that shot your friend Tomika Means on May 26th?

1

2     A.   Yes.

3     Q.   Which one did you pick out?

4     A.   Number 1.

5     Q.   That is the defendant Cory Epps?

6     A.   Yes.

7     Q.   I have but a few more questions I'm going to

8  ask you.  If you would step down, we're going to use

9  the other drawing briefly, then return for one or more

10 questions, then you'll have some from counsel.  All

11 right.  Miss Bradley, I'm showing you now People's 3 in

12 evidence, do you recognize that as a rough drawing of

13 the intersection of Chelsea Place and East Delavan

14 Avenue?

15    A.   Yes.

16    Q.   And do you recognize Sam's Market there on the

17 southeast corner?

18    A.   Yes.

19    Q.   Okay.  Do you see at Chelsea Place there, just

20 before East Delavan, a hand drawn diagram?

21    A.   Yes.

22    Q.   Okay.  Would that approximate where Tomika's

23 vehicle was?

24    A.   I think it's up a little bit too far.

25    Q.   Okay.  So in your mind it would be back a

1          Jacqueline Bradley - Direct - Schwegler      147

2    little bit farther?

3        A.   Yes.

4              THE COURT:  Miss Bradley, I'm going to

5          have to ask if you would speak up in light of

6          the large size of this room, please.

7    BY MR. SCHWEGLER:

8        Q.   In your opinion, the drawing is a bit too far,

9    close to the intersection?

10       A.   Yes.

11       Q.   Okay.  Having said that, why don't you draw

12   right next to it where you say the car was.  Okay.

13   Now, draw in, if you would, the vehicle that came next

14   to Tomika's vehicle and cut you off, show this jury how

15   that vehicle cut you off.  Put your initials in that,

16   would you, please.  And would that, in fact, have the

17   passenger's side of that cut-off vehicle facing

18   directly at Tomika's headlights?

19       A.   Yes.

20       Q.   And close to the passenger's side of Tomika's

21   car where you were seated?

22       A.   Yes.

23       Q.   All right.  Thank you.  When those men were

24   brought back to the police vehicle and you said no, it

25   wasn't them, do you have any doubt in your mind now

EPPS 00873

1
2   that you made a mistake or that you were incorrect in
3   saying it was not them?
4       A.   No.
5       Q.   Is there any doubt in your mind as you point
6   at Cory Epps and identify him as the shooter, that he
7   is, in fact, the shooter?
8       A.   Yes.
9       Q.   That he is the shooter?
10      A.   Yes.
11              MR. SCHWEGLER:   Thank you.   Nothing
12          further.
13              MR. LoTEMPIO:   Would you mark this?
14              (Whereupon a statement was received and
15              marked Defense Exhibit F for
16              identification.)
17  CROSS-EXAMINATION BY MR. LoTEMPIO:
18      Q.   Ms. Bradley, the night of the shooting or the
19  early morning hours of the shooting, at some point you
20  were taken back to police headquarters, correct?
21      A.   Yes.
22      Q.   Okay.   And by the time you're taken back to
23  police headquarters, some female officers have come to
24  the scene to console you?
25      A.   Yes.

Jacqueline Bradley - Cross - LoTempio        149

1   Q.   Okay.  And then they put you in their police

2   car?

3   A.   Yes.

4   Q.   Continued to try and calm you down?

5   A.   Yes.

6   Q.   Okay.  At some point your mother comes to the

7   scene of the crime?

8   A.   Yes.

9   Q.   She came right to where Tomika was shot in the

10  face, correct?

11  A.   Yes.

12  Q.   Okay.  And you said that some bystander from

13  the street, you asked to call her?

14  A.   Yes.

15  Q.   Okay.  At that point in time, she got in the

16  car with you and the police?

17  A.   Yes.

18  Q.   Okay.  And Mr. Schwegler asked you about

19  whether or not that had a calming effect on you, can

20  you tell the jury, you know, what was the difference in

21  your demeanor once your mother got there?

22  A.   It calmed me down a little bit.

23  Q.   Okay.  While you talked to the male officers

24  on the scene, you gave a description of the car that

EPPS 00875

Jacqueline Bradley - Cross - LoTempio          150

1   was involved, true?

2        A.   Yes.

3        Q.   Has Mr. Schwegler, Miss Carrington or anyone

4   from the DA's office ever played you the 911 tapes from

5   this case?

6        A.   Yes.

7        Q.   Okay.  Did you hear on the 911 tapes that the

8   car that was continually described for the first three-

9   quarters of the transmissions was a Pontiac 6000?

10       A.   I didn't hear it up to that.

11       Q.   So they didn't play you that part of the tape?

12       A.   No.

13       Q.   Today you tell the jury that the first car you

14  used is an Oldsmobile, correct?

15       A.   Right.

16       Q.   Nobody ever played you the portions of the

17  tapes that they were pulling over Pontiac 6000's?

18       A.   I didn't hear it up to that far because I was

19  getting upset by hearing the beginning.

20       Q.   Now, that night when you went back to the

21  police station, would you say that you had calmed down

22  significantly by the time you gave a statement to the

23  police?

24       A.   Yes.

EPPS 00876

```
 1              Jacqueline Bradley - Cross - LoTempio      151
 2        Q.   Okay.  And when you gave a description to the
 3   police, you told the police how tall you thought the
 4   man was that shot Tomika, true?
 5        A.   Right.
 6        Q.   Do you remember how tall you said the man was?
 7        A.   About five-nine, six foot.
 8        Q.   Showing you what's been marked as Defendant's
 9   Exhibit F for identification, asking you to look where
10   my finger is, does that refresh your recollection as to
11   how tall you said the man was?
12        A.   About five nine.
13        Q.   Five eight or five nine, true?
14        A.   That's what it say.
15        Q.   You signed that statement at the end, true?
16        A.   Yes.
17        Q.   They asked you to read through it before you
18   signed it?
19        A.   Yes.
20        Q.   Okay.  And you told the police that night that
21   the man was about five eight, five nine, true?
22        A.   Yes.
23        Q.   Okay.  Now, today as you testified before the
24   jury and Mr. Epps sits in front of you in the
25   courtroom, you have had an opportunity to reflect on
```

1            Jacqueline Bradley - Cross - LoTempio    152

2   whether or not you know Mr. Epps, true?

3       A.   Right.

4       Q.   Do you know when it was the first time that it

5   dawned on you that you knew Mr. Epps?

6       A.   When I picked him out on a line-up.

7       Q.   Okay.  When you sat in the back seat of the

8   car with the female police officers and your mother,

9   you never told them that you knew the man who shot

10  Tomika, did you?

11      A.   I told them that I knew him but I did not know

12  his name.

13      Q.   You told the female officer, Officer Bratton,

14  who testified before you today, that you knew the man,

15  is that your testimony?

16      A.   That I knew him but I did not know his name.

17      Q.   Did you see her in the hall before you came in

18  here today?

19      A.   Yes.

20      Q.   You're aware that she testified before you?

21      A.   Yes.

22      Q.   Now, at some point before the line-up --

23  withdrawn.  You just told the jury that when you looked

24  at the line-up, you recognized Mr. Epps as somebody you

25  knew from the street aside from this shooting, correct?

EPPS 00878

```
 1                    Jacqueline Bradley - Cross - LoTempio        153
 2        A.   I recall that I seen him a few times out at
 3   Birchfield's but I never knew his name.
 4        Q.   But you knew who he was on sight?
 5        A.   No, I didn't know his name, I knew by seeing
 6   him, yes, by face, but I did not know his name.
 7        Q.   How many times did you think that you saw him
 8   at Birchfield's before you saw him in the line-up?
 9        A.   A few times.
10        Q.   Can you tell us the number?
11        A.   A few times.  We went out a majority of
12   weekends, it was some weekends, maybe not, I noticed a
13   few times that I saw him.
14        Q.   After you made that composite sketch with the
15   Tonawanda Police, were any of the men that were brought
16   to you on the scene ever placed in a line-up for you?
17        A.   No.
18        Q.   Were they any of the participants in the line-
19   up that Cory Epps was in?
20        A.   No.
21        Q.   So you told the police in your police
22   statement that the person that did the shooting was
23   either five eight or five nine.  Showing you what's
24   been previously marked as People's Exhibit 19 which is
25   now in evidence, pointing to Number 1, which is Mr.
```

OFFICIAL  SUPREME  COURT  REPORTER

1              Jacqueline Bradley - Cross - LoTempio          154

2      Epps, does it appear that he is approximately six foot

3      two or six foot three?

4           A.   I can't see that far.

5           Q.   Looking at People's Exhibit 18 in evidence,

6      looking at Number 3, that's Mr. Epps, isn't it?

7           A.   Yes.

8           Q.   The person you had seen in Birchfield's on

9      prior occasions, true?

10          A.   Yes.

11          Q.   And does it appear in that photograph that he

12     appears to be over six foot two?

13          A.   That's what it say, I can't see that far

14     exactly what those numbers is.

15          Q.   Letting you hold People's exhibit in your hand

16     and looking at it, there are demarcations behind each

17     of the men standing in the line-up, true?

18          A.   Yes.

19          Q.   And those appear to be the height of the

20     individual?

21          A.   Yes.

22          Q.   Where does Mr. Epps' head reach, what line?

23          A.   Say six-two, I guess, six-two.

24          Q.   It's not around the five eight, five nine

25     mark, is it?

EPPS 00880

Jacqueline Bradley - Cross - LoTempio          155

1

2     A.   No.

3     Q.   When you looked at that line-up, it dawned on

4  you that Mr. Epps is somebody you've seen in

5  Birchfield's before, true?

6     A.   Yes.

7     Q.   Any of the other people in the line-up, can

8  you be sure that they're not the people that were

9  brought back to you at the scene?

10    A.   Positive.

11    Q.   Have you ever seen any of them again?

12    A.   No.

13    Q.   Now, when you told the police about the facial

14  features of the man, you told them something about his

15  complexion, didn't you?

16    A.   Yes.

17    Q.   You told them that he had pimples on his face

18  or blemishes?

19    A.   It was like slightly, you know, how you have

20  pimples, some of them turn into little brown or black

21  marks.

22    Q.   Do you see any of those pimples or blemishes

23  on Mr. Epps' face now today, almost a year later?

24    A.   No.

25    Q.   Did you see them on his face in the line-up

EPPS 00881

```
1              Jacqueline Bradley - Cross - LoTempio        156

2    picture?

3         A.    I wasn't that close so, no, I mean, I wasn't

4    that close to seeing him.

5         Q.    Looking at him now, do you see any blemishes

6    on his face?

7         A.    No.

8         Q.    When they brought the first couple of people

9    back to you at the scene of the crime again, this is

10   before your mother got there?

11        A.    Two of them was.

12        Q.    Do you know what the names of the men were?

13        A.    No.

14        Q.    Were you ever told?

15        A.    Yes.

16        Q.    What were their names?

17        A.    I don't recall.

18        Q.    Did one of them end up being somebody you had

19   known from the street, also?

20        A.    Yes, Patrick.

21        Q.    Patrick Bush?

22        A.    Yes.

23        Q.    And he's the first one they showed you, true?

24        A.    No, he was the last one.

25        Q.    He was the last one.  And that's while the
```

Jacqueline Bradley - Cross - LoTempio         157

1   female officer was there?

2   A.   Yes.

3   Q.   And you told the female officer that you knew

4   that guy from the street, didn't you?

5   A.   No, I told her I knew who he was, I knew who

6   Patrick was, that's what I told her.

7   Q.   You told the female officer that?

8   A.   Yes.

9   Q.   You told her that's how you could eliminate

10  him as being the suspect?

11  A.   No, I knew who shot her, I was there and I

12  know it wasn't none of them.

13  Q.   It wasn't Patrick Bush?

14  A.   It wasn't none of them.

15  Q.   You knew Patrick Bush prior to him being

16  showed up to you?

17  A.   I been knowing him for years.

18  Q.   Patrick Bush have anything to do with that red

19  Alfa Romeo?

20  A.   No.

21  Q.   Who owns that?

22  A.   Kenyon Edwards.

23  Q.   What does Kenyon Edwards do for a living?

24  A.   I don't know.

EPPS 00883

1          Jacqueline Bradley - Cross - LoTempio      158

2      Q.   Do you know where he got the money to pay for

3   an Alfa Romeo?

4      A.   No.

5      Q.   The other two people that were brought to see

6   -- for you to see, that was done before the female

7   officer got there, isn't that true?

8      A.   Pardon me?

9      Q.   That was done before the female officer got

10  there?

11     A.   Repeat the question again.

12     Q.   The other two people who were brought for you

13  to view --

14     A.   No, that was during, while she was there.

15     Q.   While the female officer was there?

16     A.   Yes.

17     Q.   All three of them were done while the female

18  officer was there?

19     A.   Yes.

20     Q.   And your name -- their name's were disclosed

21  to you, also?

22     A.   Yes, but I don't recall their names.

23     Q.   Donald Faison one of them?

24     A.   I don't recall their names.

25     Q.   Damien Morgan one of them?

Jacqueline Bradley - Cross - LoTempio                159

1

2      A.    I heard of that, I heard that name.

3      Q.    How did you hear that name?

4      A.    It was mentioned to me, the names, the ones

5   they brought back.

6      Q.    Who told you their names?

7      A.    Their attorney, the district attorney.

8      Q.    Mr. Schwegler told you their names?

9      A.    Yes.

10     Q.    He show you pictures of those people?

11     A.    No.

12     Q.    Anyone ever show you a single photograph, a

13  mug shot of Cory Epps?

14     A.    Pardon me?

15     Q.    Anyone show you a single photograph alone of

16  Cory Epps, a mug shot?

17     A.    No, not alone.

18     Q.    How about the other people that were brought

19  back to the scene?

20     A.    No.

21     Q.    When is it that somebody told you Cory Epps'

22  name?

23     A.    The day of the line-up.

24     Q.    Showing you what's been previously marked as

25  Defense Exhibit C for identification, who is that?

EPPS 00885

Jacqueline Bradley - Cross - LoTempio          160

1   A.   That's Patrick.

2   Q.   And you have known Patrick a long time?

3   A.   Yes.

4   Q.   That's one of the people they brought back in

5   the show-up?

6   A.   Yes.

7   Q.   And the female office, Officer Bratton, was

8   there when that occurred?

9   A.   Yes.

10   Q.   Showing you what's been marked as Defense

11   Exhibit D, who is that?

12   A.   I don't know.

13   Q.   You said the district attorney showed you

14   photographs or told you names?

15   A.   He told me names, never showed me photographs.

16   Q.   Okay.   Is this one of the people that was

17   brought back in the show-up?

18   A.   Yes.

19        THE COURT:   You want to stipulate as to

20        the name?   You can ask Mr. Schwegler that.

21   BY MR. LoTEMPIO:

22   Q.   Who is that, Defense Exhibit A?

23   A.   I don't know.

24   Q.   Never saw the person before?

1                    Jacqueline Bradley - Cross - LoTempio        161

2        A.   No.

3        Q.   Not one of the people that was brought back?

4        A.   Yes, he was one of the persons brought back,

5   but I never saw him other than that.

6        Q.   Which one, when was he brought back?

7        A.   He was the first one.

8        Q.   Okay.  And that's the first one in time?

9        A.   Yes.

10       Q.   And you claim that that is -- when you claim

11   that the female officer, Officer Bratton was there when

12   that happened?

13       A.   When all of them came, they was there.

14       Q.   She was there?

15       A.   Yes.

16       Q.   So you weren't hysterical anymore when you saw

17   that person?

18       A.   No.

19       Q.   Was that person ever placed in a line-up?

20       A.   No, not that I recall.

21       Q.   Was he one of the stand-ins in the line-up

22   when you saw Cory Epps?

23       A.   Not that I recall.

24       Q.   Had you ever seen that person out at the bars

25   before?

1           Jacqueline Bradley - Cross - LoTempio       162

2      A.   Yes.

3      Q.   That person you've seen, also?

4      A.   Yes.

5      Q.   The night of this incident, you told the

6  police that you had seen the person, when you gave the

7  statement hours later in the police headquarters, hours

8  after the shooting, you told them that you had seen the

9  person in the bars before, true?

10     A.   Yes.

11     Q.   But at that point you had no names, did you?

12     A.   Right.

13     Q.   Showing you what's marked and in evidence as

14  People's 16, I'm leaving it on the bench for you,

15  that's the composite sketch that was developed the day

16  after the shooting, true?

17     A.   Yes.

18     Q.   Okay.  Was there another composite sketch

19  developed?

20     A.   No.

21     Q.   Was -- did you assist in the development of a

22  composite sketch of the person who was driving the

23  shooter's car?

24     A.   Yes, I did, a picture of her.

25     Q.   So there was another composite?

EPPS 00888

Jacqueline Bradley - Cross - LoTempio          163

1

2       A.   Well, yes.

3       Q.   In your statement to the police that you

4   signed, did you say anything about the witness or the

5   shooter's driver having a baseball hat on?

6       A.   Yes.

7       Q.   Did you say anything about her having a

8   moustache or a beard?

9       A.   No.

10      Q.   Did you tell them that she had blemishes on

11  her face?

12      A.   Yes, she had like bumps and marks on her face.

13      Q.   So you told them the day after the shooting

14  that both the shooter and the driver had baseball hats

15  on?

16      A.   Which they did.

17      Q.   Both of them had blemishes all over their

18  face?

19      A.   Which they did.

20      Q.   You described, putting Defense Exhibit A for

21  identification in front of you next to the composite

22  sketch, you described the shooter as having a light

23  goatee or beard, true?

24      A.   Light goatee.

25      Q.   Looking at Defense Exhibit A for

EPPS 00889

1          Jacqueline Bradley - Cross - LoTempio          164

2    identification, does that man have a light goatee or

3    beard?

4          A.   If you call it that, a goatee, it's not a

5    complete goatee.

6          Q.   Does he have a beard and a goatee?

7          A.   Yes, if you want to call it a goatee.

8          Q.   Does he have a moustache?

9          A.   Moustache, yes.

10         Q.   Do you know how tall he is?

11         A.   No.

12         Q.   Do you know how much he weighs?

13         A.   No.

14         Q.   Has anybody placed that picture next to the

15   composite sketch for you before?

16         A.   No.

17         Q.   Jackie, how long did this whole incident take,

18   the actual shooting part of it?

19         A.   It happened seconds, minutes.

20         Q.   Have you ever been witness to a shooting

21   before?

22         A.   No.

23         Q.   The car you described basically is involved in

24   some type of vehicle altercation with you and Tomika

25   for about eight to fifteen blocks, would that be fair?

EPPS 00890

```
 1              Jacqueline Bradley - Cross - LoTempio        165
 2        A.    Pardon me?
 3        Q.    How many blocks, how long was it, the mileage
 4   that you and this other car, Tomika and this other car
 5   were engaged in this altercation?
 6        A.    Like I said, we was just like right around the
 7   block.
 8        Q.    How long did all of that take?
 9        A.    I don't know, I wasn't counting.  I don't
10   know, I can't say.
11        Q.    Give us an estimate.
12        A.    Um, like I said, it was like minutes apart,
13   just minutes.
14        Q.    Okay.  And most of the time that you're
15   driving around on the streets, that car drove alongside
16   the driver's side of Tomika's vehicle, true?
17        A.    No.
18        Q.    Didn't you tell us that you were --
19        A.    The car, when we got to the corner of Fillmore
20   and Delavan, that's when the car pulled next to us.  It
21   was never like side to side until then.
22        Q.    When it -- when it did, for that period of
23   time that it pulled next to you, it was on the driver's
24   side of your vehicle?
25        A.    Yes.
```

EPPS 00891

1          Jacqueline Bradley - Cross - LoTempio          166

2     Q.   Okay.   Across the car from you?

3     A.   Right.

4     Q.   And it's still dark out at that point in time?

5     A.   Right.

6     Q.   Did you tell the police that this car had

7  tinted windows?

8     A.   Slightly tinted windows.

9     Q.   How did you know it had tinted windows?

10    A.   You can look at them.

11    Q.   Okay.   Now, eventually the car pulls up in

12  front and blocks Tomika's route, true?

13    A.   Right.

14    Q.   And the man gets out of the driver's side of

15  the car, true?

16    A.   Right.

17    Q.   Pulls a gun out of his waistband?

18    A.   Right.

19    Q.   Describe the gun for the jury.

20    A.   It was gray with a revolver and a handle part

21  was brown.

22    Q.   Okay.   And from the time he pulled the gun out

23  from his waistband till the time he shot Tomika in the

24  face, how long was it?

25    A.   It was a matter of seconds.

EPPS 00892

Jacqueline Bradley - Cross - LoTempio          167

1

2   Q.   How many seconds, estimate for us?

3   A.   A couple of seconds, it happened so fast, I

4   mean, I wasn't counting.  It happened so fast.  He came

5   straight to the car, I mean, he stood there for a

6   minute with the gun, I say he had the gun in my face

7   for a good five, ten minutes -- well, five, ten

8   seconds, then he fired, after I said, "It ain't worth

9   it."  He said, "Fuck that, bitch."  Excuse my language,

10  then he fired.

11  Q.   Is it your testimony that while some man is

12  leaning in the car with a gun in front of your face,

13  that you were looking at his face?

14  A.   I looked at his face and I looked at the gun.

15  Q.   You looked back and forth, back and forth at

16  his face?

17  A.   I looked at him when I made the statement,

18  okay, the gun was in my -- the gun was like right at my

19  face when I made the statement, "It ain't worth it."

20  He said F that, bitch, and then shot it, the gun right

21  in my face, he's right in my face, of course I'm going

22  to look at him and I'm going to look at the gun.

23  Q.   How many drinks did you have?

24  A.   Four, it was four altogether, but I didn't

25  finish one of them.

EPPS 00893

1   

2   Q.   Now you're telling us on direct that you had

3   four drinks, now you're saying it was three, maybe

4   three and a half?

5   A.   It was four altogether, we ordered four

6   drinks.  I had four, like I said, we didn't finish the

7   one at Birchfield's because that's when the fight broke

8   out and we left.

9   Q.   Didn't you say on direct examination that you

10  had two drinks at Birchfield's, two drinks at O'Boy's?

11  A.   Right, but we didn't finish the one at

12  Birchfield's.

13  Q.   When you told the police how many drinks and

14  where you had them in your statement, do you remember

15  that that's not how you described where you had the

16  drinks and how many?

17  A.   At Birchfield's and at O'Boy's, two drinks

18  there, two drinks at O'Boy's.

19  Q.   I'd ask you to read the middle portion of your

20  statement, see if that refreshes your recollection?

21  A.   He must have -- like I said, he must have

22  misprinted it or whatever, said four drinks at

23  Birchfield's, no, it was two at Birchfield's and two at

24  O'Boy's.

25  Q.   So today you're saying that you told the

Jacqueline Bradley - Cross - LoTempio          169

1   police that the man was six feet tall and that there is

2   a mistake in here where it says five eight or five

3   nine?

4       A.   I said five nine, six feet, two hundred fifty

5   pounds.

6       Q.   That's not what's reflected in your statement,

7   is it?

8       A.   That's what I told him.

9       Q.   And today you're saying that you told them you

10  had two drinks at Birchfield's and two drinks at

11  O'Boy's but that's not what they typed in your

12  statement, either?

13      A.   Yes, two drinks at Birchfield's and two drinks

14  at O'Boy's.

15              MR. LoTEMPIO:  I have nothing further,

16          thank you.

17  REDIRECT EXAMINATION BY MR. SCHWEGLER:

18      Q.   Miss Bradley, in fact, is there another error,

19  at least one in this statement relative to the address

20  of Shaneel?

21      A.   Yes.

22      Q.   That you looked at?  What street does Shaneel

23  live on?

24      A.   Shaneel lives on Delaware but we dropped her

Jacqueline Bradley - Redirect - Schwegler   170

1   off on Wyoming.

2   Q.   And the statement says what street?

3   A.   Wait a minute, I'm trying to find it.

4           THE COURT:   The statement says what

5           street in connection with what question or

6           what context?

7   BY MR. SCHWEGLER:

8   Q.   What street were they going to meet Shaneel

9   at?

10  A.   Moselle, it said Moselle.

11  Q.   Did you ever say that you were going to

12  Moselle?

13  A.   No.

14  Q.   That's a mistake, as well?

15  A.   Yes.

16  Q.   The description you gave the officers at the

17  scene immediately after the shooting, was that the

18  defendant was how -- or, strike that.   The shooter was

19  how tall?

20  A.   About five nine, six foot.

21  Q.   Counsel has shown you several mug shots, in

22  looking at those mug shots does that inject any doubt

23  in your mind as to maybe that was the guy, maybe it's

24  him?

EPPS 00896

Jacqueline Bradley - Redirect - Schwegler   171

1

2   A.   No.

3   Q.   You're certain it's none of those men?

4   A.   Positive.

5   Q.   In fact, you did tell the officers that you

6   had seen the shooter from a club, but you didn't know

7   his name, correct?

8   A.   Yes.

9   Q.   Did you undertake with one or more officers to

10  go to that club quasi-undercover capacity, if you will,

11  to see if you could spot the shooter?

12  A.   Yes.

13  Q.   Did you have any good luck in locating the

14  shooter?

15  A.   No.

16       MR. SCHWEGLER:   Nothing further.

17  RECROSS-EXAMINATION BY MR. LoTEMPIO:

18  Q.   Just for clarification purposes, Defense

19  Exhibit A for identification, one mug shot that you

20  said you had seen at Birchfield's before, have you

21  learned that his name is Damien Morgan?

22  A.   I don't recall his name.

23  Q.   So you remember everybody else's name but you

24  don't remember this one?

25  A.   I don't recall his name.

EPPS 00897

Jacqueline Bradley - Recross - LoTempio     172

1

2    Q.   But you remember Donald Faison's name?

3    A.   Like I said, I'm not really good with the

4    names.

5              MR. LoTEMPIO:  Nothing further.

6              THE COURT:  Okay.  Thank you, Miss

7    Bradley.

8              (Whereupon the witness then excused.)

9              THE COURT:  I guess this would be a good

10   time to take a mid morning break for about

11   fifteen minutes or so.  Ask the jury again to

12   refrain from discussion of the case.

13             (Whereupon a short recess was then taken

14             at approximately 3:10 P.M.)

15             (Proceedings commencing after short

16             recess at approximately 3:40 P.M.  All

17             counsel, defendant present.  Jury not

18             present.)

19             MR. SCHWEGLER:  Your Honor, if I may

20   advise the Court as to scheduling, my next

21   witness will be Detective Masecchia.  I

22   contacted the medical center, my last witness

23   will be Dr. Baik, he's unavailable this

24   morning.  I've asked that he be in for 9:30

25   court tomorrow.

EPPS 00899