```
 1                    R. Putnam - Direct                    6
 2      conversation with Jackie Bradley, at any time did
 3      she recant her testimony saying that it was not, in
 4      fact, Cory Epps who fired the fatal shot?
 5                 THE WITNESS:  She did not.
 6                 MR. SCHWEGLER:  She never said it was not.
 7      Thank you.  That's all I have.
 8                 THE COURT:  Any redirect?  Any further
 9      inquiry?
10                 MR. COTTER:  No redirect.
11                 THE COURT:  All right.  Thank you.
12                 MR. COTTER:  At this time the movant rests.
13                 THE WITNESS:  I may step down?
14                 THE COURT:  Yes.  There's no further
15      questions.
16                 MR. SCHWEGLER:  People call Mark Stambach.
17                 THE CLERK:  Thank you.  Please be seated.
18                 THE WITNESS:  Thank you.
19                 THE CLERK:  Please state your name for the
20      record, spelling your last name.
21         M A R K    R.     S T A M B A C H, being duly called and
22      sworn as a witness on behalf of the People, took the stand
23      and testified as follows:
24                 THE CLERK:  City, town or village in which you
25      reside or work?
```

EXHIBIT 102 6/18/21

EPPS-DA 01353  E-9

```
 1                    M. Stambach - Direct                    7
 2              THE WITNESS:  City of Buffalo.
 3              THE CLERK:  Thank you.
 4    DIRECT EXAMINATION
 5    BY MR. SCHWEGLER:
 6        Q.    Sir, you are currently a Buffalo homicide
 7    detective, is that correct?
 8        A.    Yes sir.
 9        Q.    How long have you been working homicide?
10        A.    For over a period of ten years.
11        Q.    How long have you been a Buffalo police officer
12    all told?
13        A.    Since 1971.  Over thirty years.
14        Q.    Detective, let me direct your attention back to
15    April 27th of 1998.  Were you working in your capacity as a
16    hom -- I'm sorry, April 17th of 1998.  Were you working in
17    your capacity as a homicide detective the early morning hours
18    of that date?
19        A.    Yes sir, I was.
20        Q.    And on that date, in the early morning hours,
21    approximately seven thirty a.m., was a young black woman, age
22    twenty-three, at the time in your presence?
23        A.    Yes, she was.
24        Q.    And is her name known to you as Wymeka Anderson
25    with a street name of Pumpkin?
```

|     |    |                                                              |
|----:|----|--------------------------------------------------------------|
|   1 |    | M. Stambach - Direct                                    8    |
|   2 | A. | Yes.                                                         |
|   3 | Q. | At that time, did you take a sworn statement from Pumpkin regarding -- Ms. Anderson regarding the homicide of one, Paul Pope, who had been killed the day before? |
|   6 | A. | Yes sir, I did.                                              |
|   7 | Q. | She had a personal relationship with Mr. Pope, is that correct, did you come to find that out? |
|   9 | A. | Yes. Mr. Pope, the deceased, was her boyfriend for over a period of ten years. |
|  11 | Q. | How much time did you spend with Ms. Anderson that morning -- let me go back. You took a statement from her, is that correct? |
|  14 | A. | Yes sir.                                                     |
|  15 | Q. | Do you know --                                               |
|  16 | A. | At seven thirty in the morning.                              |
|  17 | Q. | How much time did you spend with Miss Anderson prior to the statement beginning? |
|  19 | A. | About five or ten minutes. We had reported for duty at approximately seven p.m., we came into the briefing room and were told that there had been a homicide that occurred, there were several witnesses to take statements from. We gathered up Miss Anderson and placed her into an interview room. That would be myself and Detective James Giardina. That's G-i-a-r-d-i-n-a. Myself, Detective |

EPPS-DA 01355 E-11

M. Stambach - Direct                                           9

Giardina and Miss Anderson were the only ones that walked into the interview room.

Q. And how long was the -- did it take to get this written statement from Ms. Anderson? And let me show you 3 for identification, do you recognize this statement, or that document?

A. Yes. This is a sworn statement of Miss Anderson. The statement started at seven thirty a.m. in the morning, and it was stopped at eight twenty a.m. that morning and then she then read it, it was initialled by all of us, whereas she affixed her signature to it after she read each page.

Q. All right. How much time was Ms. Anderson in your presence or in your -- and in your office after the completion of that statement at eight twenty?

A. I would say -- after the statement?

Q. Correct.

A. A matter of ten or twenty minutes and then she was taken home.

Q. She was given a ride home?

A. Yes sir.

Q. Okay. So from the time you first -- was that the first time you met Miss Anderson?

A. Yes. I -- again, I had just walked in and reported for duty and I was informed that they had some

```
 1                    M. Stambach - Direct                    10
 2   witnesses, we took one of them into the -- an interview room
 3   and we took a statement from her.
 4        Q.    During any of your time or contact with Ms.
 5   Anderson, did she mention anything whatsoever about another
 6   homicide, that being the homicide of a young lady by the name
 7   of Tamika Means?
 8        A.    No sir.
 9        Q.    I don't mean just specific information,
10   Detective, I mean any comment whatsoever, was any comment
11   remotely associated with another homicide made to you by
12   Ms. Anderson?
13        A.    No, not in my presence.  No.
14        Q.    Detective Giardina was present through the entire
15   statement?
16        A.    Yes, he was.
17        Q.    And then acted as a witness?
18        A.    Yes.  I swore her in, and Detective Giardina was
19   the witness.
20        Q.    All right.  Did any detective in your squad or
21   any Buffalo police officer, anyone else for that matter, ever
22   say to you any comment about Ms. Anderson speaking of the
23   Tamika Means homicide?
24        A.    No sir.
25              MR. SCHWEGLER:  That's all I have.  Nothing
```

```
 1                      M. Stambach - Cross                      11
 2           further.
 3   CROSS EXAMINATION
 4   BY MR. COTTER:
 5           Q.   Detective Stambach?
 6           A.   Yes.
 7           Q.   Now, you reported for duty at seven p.m. did you
 8   say?
 9           A.   Seven a.m.
10           Q.   Seven a.m. that morning?
11           A.   Yes sir.
12           Q.   On April 17th?
13           A.   Yes sir.
14           Q.   Your partner was James Giardina?
15           A.   We reported for duty that day together.
16           Q.   Together?
17           A.   Yes sir.
18           Q.   You're positive of that day?  Can I ask you what
19   you're looking at?
20           A.   That statement that's directly in front of you.
21           Q.   Which is?
22           A.   The statement of Wymeka Anderson.
23           Q.   Okay.
24           A.   I believe that is my tour of duty, seven o'clock
25   until five o'clock in the afternoon.
```

M. Stambach - Cross                                                12

2   Q.   And the two of you, Giardina and Stambach, would
3   have reported for duty at the same time?
4   A.   I'm Detective Stambach. Detective Giardina, my
5   partner, we did report for duty at the same time, we're
6   partners.
7   Q.   Okay. That's -- I just wanted to make sure
8   that's true.
9   A.   Yes.
10  Q.   Okay. Now is it -- it's your practice not to
11  keep any handwritten notes during an interview, correct?
12  A.   I don't have any, no.
13  Q.   Is it your practice to keep handwritten notes?
14  A.   On some occasions when I go to a crime scene I do
15  make handwritten notes, yes.
16  Q.   Your testimony is you have no handwritten notes?
17  A.   Not on this particular case, no, not that I could
18  find.
19  Q.   You didn't tape record this interview?
20  A.   No, I did not tape record the interview or the
21  sworn statement.
22  Q.   And other than this document that is Defendant's
23  3, you didn't issue any reports relative to your interview of
24  Wymeka Anderson on April 17th, '98?
25  A.   I believe there's a P-73, which is an

EPPS-DA 01359  E-15

|     | M. Stambach - Cross | 13 |

1  
2  interdepartmental correspondence indicating that we took her
3  statement.  That's all that that would say, that we met with
4  her and took a statement.
5      Q.    Now you were not at 239 Dewey prior to Miss
6  Anderson coming to the homicide bureau chief, or bureau
7  office?
8      A.    No sir, I don't believe so.
9      Q.    Now at some point is it fair to assume that at
10 some point after April of 1998, you became aware that Wymeka
11 Anderson was stating her belief that Russell Montgomery
12 killed Tamika Means?
13     A.    I don't follow you, Counselor.
14     Q.    Okay.
15           MR. SCHWEGLER:  Your Honor, I would object to
16     the relevance at this point.  Our focus I believe
17     is as to whether or not there was Brady material
18     generated.  Her claim was that she made this
19     statement in the Homicide Office to these
20     detectives.  I think subsequent statements are --
21     are irrelevant.
22           THE COURT:  Well, we're not speaking of Brady
23     material per se.  We're speaking of whether or not
24     there was or was not such information conveyed to
25     the Homicide Squad by Miss Anderson and when.  So

EPPS-DA 01360    E-16

|     | M. Stambach - Cross | 14 |
|---|---|---|

```
 2   right now dealing with 4/17/98, which would have
 3   paralleled or preceded -- paralleled I guess is the
 4   word, the trial of Mr. Epps, and that's our focus
 5   as to -- as to whether any information was conveyed
 6   to the Homicide Bureau relative to Miss Anderson's
 7   subsequent claim of information and I think his
 8   question was did there ever come a time later and I
 9   believe there was following an anonymous -- perhaps
10   an anonymous letter received at the time of
11   sentence or either the 330.30 motion, it was my
12   general understanding that the homicide department
13   may have looked into that and whether or not he did
14   or did not would have been the area of relevance.
15   Is that where your inquiry takes you or not?
16           MR. COTTER:  I think --
17           THE COURT:  I'll allow the question to be
18   asked.  Up until the time that this hearing was
19   generated, had anybody advised you that Miss
20   Anderson had indicated that she had claimed
21   information of hearsay character coming from Paul
22   Pope that Russell Montgomery was responsible for
23   the death of Tamika Means?
24           THE WITNESS:  I did not get that information.
25   The only information I got was that there was a
```

```
                    M. Stambach - Cross              15
```

1  hearing today and prior to that in regards to a
2  letter written by Tamika -- I'm sorry, by Miss
3  Anderson. I just learned of it just recently. I
4  had no other information about it. That's why
5  we're here for today.
6        MR. COTTER: You're talking about sometime in
7  May or June of 2001?
8        THE WITNESS: No. I was notified for this
9  hearing and another hearing that was adjourned and
10 I was asked specifically about this statement and
11 it's the same as my testimony right now. That's
12 the first I became aware of the letter. It wasn't
13 addressed to me. I never knew anything about it.
14 This was not my homicide case.
15       THE COURT: I was about to ask you whether or
16 not you participated in the investigation into the
17 Tamika Means homicide.
18       THE WITNESS: No, I just took a statement in
19 this particular case from a witness. That's my
20 involvement, that's why I'm here today.
21  Q.   Do you ever take handwritten notes of an
22 interview at the Homicide Bureau?
23  A.   Yes. Sometimes I do.
24  Q.   Okay. To be -- so I can be clear, you reported



EPPS-DA 01362 — 18

|   |   | M. Stambach -- Cross | 16 |

```
 1                    M. Stambach -- Cross                    16
 2   for duty at seven a.m.?
 3        A.    That is correct.
 4        Q.    Shortly before taking the statement?
 5        A.    Yes.
 6        Q.    You weren't at Ms. Anderson's house when the
 7   alarm went off?
 8        A.    We did respond to an address over on Leroy Street
 9   near the corner of Fillmore and there was an alarm, that one
10   had been gone off at that particular address.
11        Q.    And that was on the 16th?
12        A.    That would be on the 17th, prior to the
13   statement.  I believe that's the day that it happened.
14        Q.    Well, is there any recollection -- let me try --
15   excuse me.  Do you recall a time when you and Detective
16   Giardina stood up and exited the witness room during the
17   course of Miss Anderson's statement on April 17th, '98?
18        A.    It's on the statement itself.
19        Q.    Perhaps this is a bad photocopy.
20        A.    Do you have a copy?
21        Q.    Yes, I do.  Can you direct my attention?
22        A.    Sure.  It says eight twenty a.m., it also says it
23   started at seven thirty a.m.  Excuse me, that's about ten
24   minutes different than my testimony.
25        Q.    Okay.  My question to you, sir, was whether you
```

M. Stambach - Cross                                17

recall a particular time during your interview of Miss Anderson when you and Detective Giardina left the witness room?

A. I don't believe so, no.

Q. Your testimony is you don't recall?

A. That's correct.

Q. Okay. Now do you recall Miss Anderson referencing an Identi-sketch after you had asked her what Russell Montgomery looks like?

A. I'm not familiar with an Identi-sketch.

Q. You don't know what an Identi-sketch is?

A. No sir, I don't.

Q. Okay. If I were to show you Defendant's 1, what would you characterize that document as being?

A. Identi-kit.

Q. Identi-kit?

A. Yes.

Q. Do you recall when she mentioned an Identi-kit?

A. No. Absolutely not. I have never seen this.

Q. Never before?

A. Never.

Q. Okay. Okay. Now who did the typing of Ms. Anderson's statement?

A. I did.

EPPS-DA 01354

```
 1                    M. Stambach - Cross                      18

 2        Q.    And who asked her questions?

 3        A.    Some of them by me and some of them by Detective
 4   Giardina.

 5        Q.    And over the course of the fifty minutes that the
 6   statement was taken, how many breaks did you take?

 7        A.    Not very many.

 8        Q.    What would you do during the break or what did
 9   you do during the breaks?

10        A.    Sit there and formulate our next question.

11        Q.    Subsequent to April 17th, 1998, did you ever run,
12   or meet Wymeka Anderson again?

13        A.    Subsequent to April 17th?

14        Q.    Yes.

15        A.    I believe I did.  Yes.

16        Q.    Was that in the beginning of June?

17        A.    I can't recall.  It was in regards to a dog bite
18   case.  A child had been bitten by a dog.  It was a civil
19   case.

20        Q.    Were you present when Miss Anderson told members
21   of the Homicide Bureau that she was the authoress of an
22   anonymous letter --

23        A.    No.

24        Q.    -- that had been submitted in this case?

25        A.    No sir, I was not present.
```

EPPS-DA 04365

```
                    M. Stambach - Cross                    19
```

MR. COTTER: Nothing further, Judge.

MR. SCHWEGLER: No redirect, your Honor.

THE COURT: When you spoke to Miss Anderson, and I don't wish to mischaracterize her prior testimony, but I seem to recall her saying that she was queried by a homicide detective as to what Russell Montgomery looked like and that somehow she responded he looks just like the sketch of the person who committed the murder or --

MR. SCHWEGLER: That was her letter, Judge, I believe.

THE COURT: Pardon?

MR. SCHWEGLER: I believe that was the letter that she sent anonymously to Mr. LoTempio, not the statement.

THE COURT: Like I said, I don't mean to mischaracterize her testimony, but there was reference to the fact, either in the letter or in her conversations with the police, that the police apparently are now looking for Russell Montgomery because he was the person who is said to have killed Paul Pope, that they queried her what he looked like inasmuch as she is his girlfriend and at this point it is alleged that she said, he looks

```
                      J. Giardina - Direct                          20
```

 exactly like this sketch or words to that effect.
 I seem to recall that from the testimony. I could
 stand corrected. My only question is, do you
 recall any such conversation or any such
 references?

      THE WITNESS: No sir, it wasn't given to me in
 the interview or in the statement.

      THE COURT: Anything further?

      MR. SCHWEGLER: No, your Honor. Detective
 Giardina, please.

      THE CLERK: Thank you. Please be seated.
 Please state your name for the record, spelling
 your last name.

J A M E S   G I A R D I N A, being duly called and
sworn as a witness on behalf of the People, took the stand
and testified as follows:

      THE CLERK: City, town or village in which you
 reside?

      THE WITNESS: Amherst, New York.

      THE CLERK: Thank you.

DIRECT EXAMINATION
BY MR. SCHWEGLER:

   Q.   Sir, you're a detective in the Buffalo Police
Department Homicide Squad?