1                    J. Giardina - Recross                37

2           of who, if anyone, killed Paul Pope, and both

3           disclaim any reference, or any claim that she made

4           mention of the homicide of Tamika Means.  That's in

5           contrast to Miss Anderson's testimony and I

6           understand that.  That's what we're here for is to

7           resolving of that conflict.  Anything further from

8           Officer Giardina?

9                    MR. SCHWEGLER:  Not for the People, your

10          Honor.

11                   THE COURT:  Okay.  Thank you, sir.

12                   THE WITNESS:  Thanks.

13                   MR. SCHWEGLER:  Sergeant Costantino.

14                   THE CLERK:  Thank you.  Please be seated.

15          Please state your name for the record, spelling

16          your last name.

17     A N T H O N Y    C O S T A N T I N O, being duly called

18     and sworn as a witness on behalf of the People, took the

19     stand and testified as follows:

20                   THE CLERK:  City, town or village in which you

21          reside?

22                   THE WITNESS:  Buffalo.

23                   THE CLERK:  Thank you.

24     DIRECT EXAMINATION

25     BY MR. SCHWEGLER:



1                    A. Costantino - Direct            38

2        Q.      Sir, you're a Detective-sergeant with the Buffalo

3   Police Department currently assigned to the Homicide Unit, is

4   that correct?

5        A.      Yes, I am.

6        Q.      How long have you been working the Homicide

7   Squad?

8        A.      About six and a half years.

9        Q.      And how long have you been a Buffalo police

10  officer in your career?

11       A.      Thirty-three years.

12       Q.      Sergeant, were you involved in the investigation

13  of the homicide of Tamika Means?

14       A.      Yes, I was.

15       Q.      When did you first become aware of a claim by a

16  young woman by the name of Wymeka Anderson that she had made

17  statements to members of the Homicide Squad advising them

18  that a person other than Cory Epps was actually the killer?

19       A.      I came aware I guess in your office but I don't

20  remember the date.

21       Q.      Did you have any contact with Miss Anderson prior

22  to the conviction of Mr. Epps?

23       A.      I did not.

24       Q.      Subsequent to that conviction, were you provided

25  with a copy of an anonymous, so-called anonymous letter dated

EPPS-DA 01385  41

```
 1                    A. Costantino - Direct              39
 2   April 27, 1998?
 3        A.    Yes sir.
 4        Q.    Do you recall how you obtained that?
 5        A.    In your office.
 6        Q.    Had you heard anything at all prior to that being
 7   sent over to your office or delivered to you that would
 8   indicate that Russell Montgomery was the killer of Tamika
 9   Means and not Cory Epps?
10        A.    No.
11        Q.    Did you receive any reports from any of your
12   colleagues, be it homicide detectives or other officers that
13   Ms. Anderson or anyone else had come forward and said wait,
14   you have the wrong person, it was really Russell Montgomery
15   that killed Tamika Means and not Cory Epps?
16        A.    Did not.
17        Q.    Once you became aware of this so-called anonymous
18   letter, did you investigate the contents of that letter?
19        A.    Yes.
20        Q.    Did you speak with Jackie Bradley, the passenger
21   in the vehicle in which Miss Means was driving the night she
22   was shot?
23        A.    Yes, I did.
24        Q.    Did Miss Bradley ever renounce her identification
25   of Cory Epps as the killer?
```

1                      A. Costantino - Cross                    40

2        A.      Never.

3        Q.      Is it your sworn testimony that the first time

4    you as a police officer became aware of this claim that

5    Russell Montgomery had killed Tamika Means was after the

6    conviction, jury verdict had been rendered against Cory Epps

7    for that killing?

8        A.      That's correct.  That's my sworn testimony.

9                MR. SCHWEGLER:  Nothing further.

10   CROSS EXAMINATION

11   BY MR. COTTER:

12       Q.      Detective, when you first became aware of an

13   anonymous letter, and I show you what's Defendant's 5 and ask

14   you if this is the anonymous letter that you are referencing?

15       A.      Yes, it looks like a copy of the letter, sir.

16       Q.      And you've indicated that it was at 25 Delaware

17   in Mr. Schwegler's own office?

18       A.      When I first became aware of it?

19       Q.      Yes.

20       A.      That's correct.

21               THE COURT:  Is the letter itself dated?

22               MR. COTTER:  It is, Judge, 4/27/98.

23               THE COURT:  4/27/98?

24       Q.      Is that correct?

25       A.      4/27/98, sir.

```
1                      A. Costantino - Cross                    41

2         Q.     And as you sit here today, you don't recall what

3    date it was that you became aware of that letter?

4         A.     Well, it was sometime after April 27th.

5         Q.     Of 1998?

6         A.     Right.

7         Q.     Okay.  Now when did you -- have you ever learned

8    the identity of the person who wrote that letter?

9         A.     Well, I guess Wymeka Anderson wrote this letter.

10        Q.     That's your understanding?

11        A.     Yes.

12        Q.     When did you get this understanding?

13        A.     The same time I guess we were talking in Mr.

14   Schwegler's office.

15        Q.     Okay.  Now subsequent to that, you went to see

16   Miss Anderson, correct?

17        A.     That's correct.

18        Q.     And that you did on June 4th of 1998?

19        A.     I believe that's the date, yes.

20        Q.     Now showing you Defendant's 7 for identification,

21   can you identify the handwriting?

22        A.     It's not my handwriting.  It possibly could be

23   Detective Masecchia's.

24        Q.     Okay.  He's your partner?

25        A.     Yes.
```

E-44

```
 1                      A. Costantino - Cross              42

 2      Q.    Okay.

 3                  THE COURT:  What is it, a P-73 or something?

 4                  THE WITNESS:  No sir, it's a P-88.  It's --

 5                  THE COURT:  P-88?

 6                  THE WITNESS:  P-88.  It's a photo array

 7           identification affidavit.

 8                  THE COURT:  Okay.  And this is you think by

 9           your colleague?

10                  THE WITNESS:  Detective Masecchia's

11           handwriting.

12                  THE COURT:  Masecchia's?

13                  THE WITNESS:  I think it is, sir.

14                  THE COURT:  And what is the date of this?

15                  THE WITNESS:  6/4/98.

16                  THE COURT:  Were you with Masecchia when he

17           interviewed Anderson on June 4th?

18                  THE WITNESS:  That's correct.

19                  THE COURT:  You were?

20                  THE WITNESS:  Yes, I was.

21                  THE COURT:  Were you privy to whatever is

22           contained within that report, P-88 --

23                  THE WITNESS:  Yes sir.

24                  THE COURT:  -- and its contents?  Okay.  You

25           are but I'm not.  I'm just getting squared away
```

```
 1                    A. Costantino - Cross                43

 2          here as to what we're talking about.

 3                  THE WITNESS:  Okay.

 4                  THE COURT:  Did you interview her and there

 5          was some kind of a photographic presentation made

 6          to her?

 7                  THE WITNESS:  That's correct.

 8                  MR. COTTER:  And the purpose -- I'm sorry,

 9          Judge, may I?

10                  THE COURT:  Yes, by all means.  I'm sorry.

11      Q.    Can I have this back?

12      A.    Sure.

13      Q.    Both.  May I have both back?  Thank you.  Now you

14   and Masecchia went to go see Wymeka Anderson on June 4th,

15   1998, correct?

16      A.    That's correct.

17      Q.    And that was shortly after Mr. Epps' sentencing

18   had been adjourned, is that your recollection?

19      A.    Has been adjourned?

20      Q.    Had been adjourned.

21      A.    I guess so, yes.

22      Q.    Are you speculating or do you remember?

23      A.    It was after that.  Yes.

24      Q.    Okay.  Now the purpose of going to see Wymeka

25   Anderson was to show her a picture of Russell Montgomery's
```

1          A. Costantino - Cross                44

2    girlfriend to see whether Jackie Bradley could identify

3    Russell Montgomery's girlfriend as the driver of the vehicle

4    in which the killer of Tamika Means sat, is that correct?

5         A.    Well, the purpose was also to find out if we're

6    talking about the same Constance Ferguson, to ascertain if

7    it's the same person.  We didn't know, there may be a few

8    Constance Fergusons, so we had to make sure that Jackie

9    Bradley -- or not Jackie Bradley, Wymeka Anderson could

10   identify Connie Ferguson as the girlfriend of Russell

11   Montgomery.  That was the purpose to find out if it was the

12   same person.

13        Q.    Now -- and then if the same person -- then to see

14   whether or not this Connie Ferguson was the driver of the

15   vehicle in which the killer of Tamika Means was, correct?

16        A.    Yes.  That was the premise.

17             THE COURT:  Connie Ferguson was said to be the

18        girlfriend of Russell Montgomery?

19             THE WITNESS:  That's correct.

20             THE COURT:  And what was the result of the

21        array presentation?

22             THE WITNESS:  Mrs. Anderson did say yes,

23        that's the Constance Ferguson I know to be the

24        girlfriend of Russell Montgomery.

25             THE COURT:  Okay.  So they were in effect both



A. Costantino - Cross                                           45

2    girlfriends of, not -- strike that.  I'll withdraw

3    that.  Means was the -- strike that.  Anderson was

4    the girlfriend of Paul Pope and Connie Ferguson was

5    the girlfriend of Russell Montgomery, is that now

6    correct?

7              THE WITNESS:  That's the information we had.

8              THE COURT:  All right.  Go ahead.

9    Q.    If I could just back up for a second, Detective.

10   You indicated that the first that you had heard of any

11   connection between Russell Montgomery and the death of Tamika

12   Means was after Cory Epps' conviction, do you recall that

13   testimony?

14   A.    Yes.

15   Q.    What do you mean by conviction when you use that

16   word?

17   A.    What do I mean by conviction?

18   Q.    Yeah.

19   A.    When he was convicted in the court of law of the

20   death of Tamika Means.

21   Q.    And by conviction you mean jury verdict?

22   A.    That's correct.

23   Q.    Now did you have any involvement in the

24   investigation of the Paul Pope homicide?

25   A.    Very little bit.

A. Costantino - Cross                                     46

1

2      Q.      Can you tell me what it was?

3      A.      I went to Niagara Falls to interview someone that

4  may have had information on that homicide.

5      Q.      And if you can, Detective, tell me when you

6  learned the identity of the authoress of the letter that I

7  showed you, which is Defendant's 2 -- whoops, 5, I believe?

8  Defendant's 5.

9      A.      That was prior to June 4th, before we met her to

10 show her a photo array.

11     Q.      And who told you who the authoress of that letter

12 was?

13     A.      I think it was Mr. Schwegler.

14     Q.      Mr. Schwegler told you?

15     A.      That's correct.

16     Q.      That the person who wrote that letter is Wymeka

17 Anderson?

18     A.      That's correct.

19     Q.      Prior to June 4th?

20     A.      That's correct.

21     Q.      Do you have any idea how Mr. Schwegler would have

22 known that?

23     A.      No, I don't.

24     Q.      You didn't learn it from Andy LoTempio?

25     A.      I didn't talk to Andy LoTempio.  I did not learn

1              A. Costantino - Cross                    47

2    it from Andy LoTempio.

3        Q.     Now on June 4th of 1998, did you bring Wymeka

4    Anderson down to the Homicide Bureau?

5        A.     Well, what does the photo array show where that

6    photo array was shown?  Can I look at the P-88 again?

7        Q.     Defendant's 7 says that it took place at

8    74 Franklin Street, Room 304 I believe.

9        A.     Well, that's where it took place then.

10       Q.     Okay.

11       A.     If that's what it says.

12       Q.     How did Wymeka Anderson get there?

13       A.     I don't recall, but we probably picked her up and

14   brought her there.

15       Q.     And on June 4th, did Miss Anderson tell you that

16   she wrote the letter that was Defendant's 5 that you just

17   looked at?

18       A.     You mean on June 4th?  She may have in a

19   conversation that we might have had prior to showing her the

20   photo array.  We knew that supposedly she wrote it and she

21   might have told us as well on that date.

22       Q.     Okay.  Did you yourself ever ask her, Miss

23   Anderson, did you write the letter that you gave to Andy

24   LoTempio?

25       A.     No, I don't recall -- I think -- I think it was a



A. Costantino - Cross                    48

foregone conclusion that she had written it and we weren't,

you know, discussing it.  I think she knew that we knew she

wrote it so no questions were asked, well, did you write this

letter.  I think it was we knew that she wrote it and she

knew that we knew that she wrote it.  Do you understand?  So

there was no need to ask that question.

Q.     Now other than June 4th, did you ever have any

contact with Wymeka Anderson?  June 4th, '98.

A.     After June 4th?

Q.     Or prior.

A.     After June 4th I did but not prior.

Q.     Okay.  And was your contact with Miss Anderson

after June 4th relative to Cory Epps' case?

A.     No, it was on another one.

Q.     Now on your June 4th contact, did you issue any

kind of memorandum?  Did you write anything?  Any notes?

A.     Not that I recall.  This is probably what we did,

showed her a photo array.  There may be a P-73 explaining the

procedure on the 4th on the photo array presentation.

Q.     Did you tape record it?

A.     No.

Q.     Now were you present with Miss Anderson and

several members of the Homicide Squad when she disclosed that

she had written the letter?



```
1                    A. Costantino - Cross              49

2       A.    No.

3       Q.    Do you recall ever losing your temper with her?

4       A.    When are you talking about?  When?

5       Q.    At any point in time.  I think the only day that

6   we have established on this case is June 4th, 1998.

7       A.    No.  Did I lose my temper with her?

8       Q.    Yeah.  Get cross, get short?

9       A.    No, not at all.

10      Q.    Where is the photo array?

11      A.    Probably in the file somewhere.

12      Q.    Prior to coming here today, did you go through

13  the Montgomery file to see if there were any handwritten

14  notes or any memoranda?

15      A.    I did not investigate the Russell Montgomery,

16  Paul Pope case.  Just one statement that I took in Niagara

17  Falls.  I did not go through that file, no.

18      Q.    Prior to testifying today, did you go through the

19  Cory Epps' file?

20      A.    I looked at it.

21      Q.    And when did you do that?

22      A.    Last week, week before.

23      Q.    Did you see any mention in there that Wymeka

24  Anderson disclosed that she was the authoress of that letter?

25      A.    No, I did not.
```

2      Q.      But it's your understanding that she did at some

3   point?

4      A.      Did what?

5      Q.      Disclosed that she was the authoress.

6      A.      Of this letter?

7      Q.      (Indicated affirmatively).

8      A.      She never told me personally she wrote the

9   letter.  Mr. Schwegler had told me she wrote the letter.

10  When we picked her up, it was an understanding that she had

11  written the letter and that's as far as it went.  Did I ever

12  ask, did you write the letter?  No.  Did she personally tell

13  me she wrote the letter?  No.

14                   THE COURT:  That's been dealt with.

15                   THE WITNESS:  Yeah, I thought so, too, sir.

16      Q.      I think finally, Detective, when you went, or

17  brought Miss Anderson in on June 4th of '98, there's a

18  specific reference to the possibility of Russell Montgomery's

19  involvement in Tamika Means' death, is that correct?

20      A.      To ascertain if we're talking about the right

21  Constance Ferguson and to see if this Constance Ferguson may

22  have been with the person, Mr. Epps, or when Mr. Epps shot

23  Tamika Means.

24      Q.      Whomever shot Tamika Means.

25      A.      Whomever shot Tamika Means.  Who was convicted of

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313



A. Costantino - Redirect                    51

1  shooting Tamika Means.

2       Q.     I understand that, but whoever shot Tamika Means,

3  correct?

4       A.     Well, in my mind I know who shot Tamika Means.

5       Q.     Is my understanding correct that on June 4th, '98

6  when you brought Miss Anderson in, it was in direct relation

7  to her disclosure of some connection of Russell Montgomery to

8  Tamika Means homicide?

9       A.     That's correct.

10          MR. COTTER:  Thank you.

11 REDIRECT EXAMINATION

12 BY MR. SCHWEGLER:

13      Q.     Sir, after you had -- after you had shown the

14 photo array contained of females to Miss Anderson and she

15 picked out Connie Ferguson, did you then show that same photo

16 array to Jackie Bradley?

17      A.     Yes, we did.

18      Q.     And what was the response in showing that same

19 photo array to Jackie Bradley, looking for the driver of the

20 killer's vehicle?

21      A.     She did not pick out anyone in that photograph.

22      Q.     All right.  In Exhibit, Defendant's 8, which is

23 together with a fastener, I'm going to show you the last two

24 pages and ask if you can identify those for us.

E-54

1

2     A.     It's a fax sheet from the District Attorney's

3  Office.

4     Q.     What's the date on that, sir?

5     A.     June 3rd.  It's a fax to Chief Riga.

6     Q.     Was that -- look at the next page.  Was that and

7  the next page given to you either on or before June 4th --

8  either on the 3rd or the 4th?

9     A.     Yes.  I remember Chief Riga bringing this to our

10  attention.

11     Q.     Is that the manner in which you received

12  information concerning --

13     A.     The letter.

14     Q.     -- the possible author of the letter?

15     A.     That is, sir, that is correct.

16     Q.     And I relayed to you information that I had

17  received from Andy LoTempio who claimed the author might be

18  Pumpkin?

19     A.     That's correct.

20              MR. SCHWEGLER:  I have nothing further of this

21          witness.  Thank you.

22              THE COURT:  All right.  Thank you.

23              MR. COTTER:  If I may.

24              MR. SCHWEGLER:  Detective -- sorry.  Go ahead.

25              MR. COTTER:  If you have more --



A. Costantino - Recross                              53

1

2          MR. SCHWEGLER:  With Detective Masecchia and

3     then I'll rest.

4          MR. COTTER:  Does the Court -- I would like to

5     ask him a couple more questions.

6          THE COURT:  Well, okay, but there's a time for

7     these inquiries and it's taking an awful long time

8     to extract that which is not basically contested

9     here and I can proceed.  Go ahead.

10    RECROSS EXAMINATION

11    BY MR. COTTER:

12         Q.     Directing your attention to the last two pages --

13         A.     Yes sir.

14         Q.     -- the name Wymeka Anderson does not appear,

15    correct?

16         A.     No, just the name Pumpkin.

17         Q.     Do you recall how you connected the two?

18         A.     I guess some other detectives knew that Pumpkin,

19    or Wymeka Anderson goes by the nickname of Pumpkin.

20         Q.     And that she, at this point, had given statements

21    in the Russell Montgomery, or the Paul Pope homicide?

22         A.     That's correct.

23         Q.     Okay.  And you knew at this point on June 4th who

24    wrote the letter?

25         A.     That's correct.

