*Dup&Date 1/0 1-80*

COUNTY COURT OF THE STATE OF NEW YORK     Wade/Huntley
COUNTY OF ERIE : CRIMINAL TERM : PART 2     Hearing

------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK     Indictment No.:
                                       97-1542

       - against -

CORY EPPS,

                 Defendant.

------------------------------------------

                           92 Franklin Street
                           Buffalo, New York
                           December 9, 1997

B e f o r e :

                HONORABLE JOSEPH P. McCARTHY,
                         Justice.

A p p e a r a n c e :

                FRANK J. CLARK, III., ESQ.,
                Erie County District Attorney,
                BY: PATRICIA I. CARRINGTON, ATTORNEY AT LAW,
                Assistant District Attorney,
                Appearing on behalf of the People.

                ANDREW C. LoTEMPIO, ATTORNEY AT LAW,
                Appearing on behalf of the Defendant.

                Maureen C. Laughlin, CSR, RPR, RMR
                Official Court Reporter

I N D E X

PEOPLE'S WITNESSES:


JOHN BOHEN
Direct Examination by Ms. Carrington ........... page  5
Cross-Examination by Mr. LoTempio ..............       10
Redirect Examination by Ms. Carrington .........       17
Recross-Examination by Mr. LoTempio ............     . 20


HENRY SMARDZ
Direct Examination by Ms. Carrington ........... page 22
Cross-Examination by Mr. LoTempio ..............       35


RANIERO MASECCHIA
Direct Examination by Ms. Carrington ........... page 43
Cross-Examination by Mr. LoTempio ..............       52




PEOPLE'S EXHIBITS:                                 ID   EVD

1 - Photo array                                     2     9
2 - Photo of lineup #1                              2    30
3 - Photo of lineup #2                              2    30
4 - One-page document                              26    33
5 - One-page record of lineup                      28    33
6 - One-page lineup attendance record              32    32
7 - Miranda warning card                           42    47
8 - Three-page statement of Cory Epps              48

7/98D

FORM LASER BOND A  ®  PENGAD · 1-800/631-6609

2

```
 1
 2          (Whereupon, a photo array was marked People's
 3     Exhibit 1 for identification.)
 4          (Whereupon, a photograph of lineup number one
 5     was marked People's Exhibit 2 for identification.)
 6          (Whereupon, a photograph of lineup number 3
 7     was marked People's Exhibit 3 for identification.)
 8          THE COURT:   I was scheduled for a hearing in
 9     the matter of People versus Cory Epps.  People
10     ready?
11          MS. CARRINGTON:   Yes, Your Honor.
12          THE COURT:   Defense ready?
13          MR. LoTEMPIO:   Yes, Your Honor.  We need Mr.
14     Epps brought over.
15          THE COURT:   Yes.
16          THE DEPUTY:   I'll call again.
17          (Recess.)
18          MR. LoTEMPIO:   Judge, can we have Mr. Epps'
19     cuffs off?
20          THE COURT:   Please, yes.
21          This is the matter of People versus Cory Epps.
22     We're here for the purposes of conducting what form
23     of omnibus hearing?
24          MS. CARRINGTON:   A Wade and Huntley hearing,
25     Your Honor.
```

3

 1

 2        THE COURT:   Let's proceed.

 3        MS. CARRINGTON:   Your Honor, for the record,

 4   I'd like to indicate that I've turned over to Mr.

 5   LoTempio approximately half an hour ago a number

 6   of documents in this matter: P-73 from Officers

 7   Hoefler and Bratton, also one from Officers

 8   O'Donnell and Piech; a report from Officers Bohen

 9   and Minor regarding showing the photograph array;

10   report from Officer Minor regarding a phone call he

11   received from the witness in this case concerning

12   an identification that was not part of any

13   procedure; police report from Detectives Masecchia

14   and Constantino from December 6th regarding

15   possible Brady material and identification of

16   another possible defendant in this matter, not in

17   particular related to this hearing; also, a P-73

18   from Officers Littere and Gizzo two reports from

19   Officer Bohen, one dated June 9 and one dated June

20   25th, regarding show-up and a photograph array of

21   another individual thought to be a suspect in the

22   case in which the witness did not identify; a P-73

23   from Detective Ray Masecchia; lineup sheets and

24   witness sheets from Detective Henry Smardz; a

25   photograph of the rights card that Mr. Epps signed

4

1
2        before Detective Masecchia questioned him; a
3        schematic and evidence report from Detective Smardz
4        pertaining to the lineup; a redacted statement from
5        the witness to this crime; and, also, a redacted
6        activity report from Detective John Bohen
7        indicating how this individual's name came to light
8        in regard to his preparing the photographic array
9        that was shown in this case.
10               Your Honor, up to this point in time the
11        People have not released the name of the -- there's
12        only one witness in this case at this time.  And we
13        have not released her name based on the fact that
14        she was the victim of an assault in which she was
15        threatened with regards to testifying against this
16        defendant.  No one was ever arrested for that
17        assault.  She was not able to identify anyone.  But
18        I've redacted all the police reports I gave to Mr.
19        LoTempio in regard to her name and in regard to her
20        address.  I do not intend to call her as a witness
21        based on the testimony that the Court will be
22        hearing regarding the identification, both through
23        the photo array and through the lineup.
24               And, pursuant to People versus Chipp, which
25        the Court is well aware, it's our position that

EPPS 01699

```
 1                 Bohen - Direct - Carrington          5

 2            neither of those identifications were at all

 3            suggestive and, therefore, we don't need to call

 4            her.  And she also had independent basis, but we

 5            don't believe that's necessary to prove at this

 6            time.  I just wanted to make the Court aware that

 7            all the documents -- I believe all the documents

 8            I've provided Mr. LoTempio do not contain the name

 9            of that witness.

10                 MR. LoTEMPIO:   That's incorrect, Your Honor.

11            There is a photo lineup sheet that has her

12            signature at the bottom.  I just noticed her name

13            and wrote it down.

14                 THE COURT:   Let's proceed.

15                 MS. CARRINGTON:   All right.  Thank you, Your

16            Honor.  People call Detective John Bohen.

17   J O H N    B O H E N , having first been duly sworn,

18   testified as follows:

19                 THE CLERK:   Please state your name and

20            address for the record.  Would you spell your last

21            name.

22                 THE WITNESS:   John Bohen, B-O-H-E-N.   74

23            Franklin Street, Buffalo, New York.

24                 THE CLERK:   Thank you.

25                 THE WITNESS:   You're welcome.
```

EPPS 01700

```
1                    Bohen - Direct - Carrington              6

2    DIRECT EXAMINATION BY MS. CARRINGTON:

3        Q.       Sir, how are you employed?

4        A.       The Buffalo Police Department.

5        Q.       What is your rank there?

6        A.       Detective.

7        Q.       What bureau?

8        A.       Homicide.

9        Q.       In May through July of this year did you have

10   occasion to investigate a shooting which took place on May

11   26th at Delavan and Chelsea in the City of Buffalo?

12       A.       Yes, I did.

13       Q.       And, in connection with your duties in regard to

14   that case, did you have occasion to prepare a photographic

15   array?

16       A.       Yes, I did.

17       Q.       Showing you what's been marked for identification

18   as People's Exhibit 1, could you examine that and tell the

19   Court if you recognize it?

20       A.       Yes.  This is the photo array I set up.

21       Q.       On June 6th of this year did you have occasion

22   to show that array to a witness in the case involving the

23   shooting of Tomika Means at Delavan Chelsea?

24       A.       I thought it was July 6th that I showed this.

25       Q.       I believe that's what I stated.
```

EPPS 01701

<pre>
 1                    Bohen - Direct - Carrington          7

 2                    THE COURT:   No.  Excuse me.  You said June

 3          6th.

 4                    MS. CARRINGTON:   I'm sorry.  Yes, July 6th.

 5                    THE WITNESS:  July 6th.  Yes.

 6      Q.      Who was with you when you showed that array to

 7   the witness?

 8      A.      Detective Reginald Minor.

 9      Q.      And how did you come to show her that array?

10      A.      Went to her house and, while in her kitchen,

11   opened up the array to her, asked her if she wore glasses.

12   She stated no.  Told her to take her time, look the array

13   over very careful.  If she sees anyone in the photo array

14   that looks familiar to her, to point to that person and state

15   what that person did.

16      Q.      Was anyone else present in the room besides

17   yourself and Detective Minor when you conducted this

18   procedure?

19      A.      No.

20      Q.      Did Detective Minor say anything to her prior to

21   her viewing the array?

22      A.      No.

23      Q.      Can you explain for the Court how you showed her

24   that array?

25      A.      Yes.  I opened up the array, basically, like it
</pre>

```
 1                Bohen - Direct - Carrington          8

 2   is right now, and showed it to her, told her to take her

 3   time, look it over very careful.  She pointed to the

 4   photograph in number five slot.  In a very excited voice, she

 5   grabbed her chest, she said, that's him.  That's the man who

 6   shot -- that's the guy who shot Tomika.  I swear to God

 7   that's him.

 8        Q.     Approximately how long did she look at People's

 9   Exhibit 1 prior to making that statement?

10        A.     Oh, probably, maybe, less than two minutes.

11        Q.     Did either you or Detective Minor say anything to

12   her to influence her which individual to point out?

13        A.     Not at all.

14        Q.     What did you do then?

15        A.     I then had her sign, date and put the time on the

16   white sticker that appears behind the photo in slot number

17   five.  I also had her sign a photo array affidavit, which is

18   a standard procedure, and she signed that.

19        Q.     Is People's Exhibit 1, which has been marked for

20   identification, in the same condition now as it was at the

21   time you showed it to the witness?

22        A.     Yes, other than the small red sticker, People's

23   Exhibit sticker.

24        Q.     Grand Jury Exhibit.

25        A.     That was, obviously, not on there when I showed
```

```
 1                    Bohen - Direct - Carrington              9
 2   her that, but the condition is the same.
 3                  MS. CARRINGTON:   Your Honor, at this time I
 4             would ask that People's Exhibit 1 be moved into
 5             evidence.
 6                  THE COURT:   You wish an examination on the
 7             exhibit?
 8                  MR. LoTEMPIO:   No, Your Honor.   I have no
 9             objections to its entrance.
10                  THE COURT:   Received.
11                  MR. LoTEMPIO:   I'll do it as part of my
12             cross-examination.
13                  (Whereupon, People's Exhibit 1 was received
14             and marked in evidence.)
15        Q.    Approximately how long were you at the witness'
16   home prior to showing her the array?
17        A.    Probably five minutes.
18        Q.    And then after she made the identification, what
19   did you do further?
20        A.    I asked her if she knew him.   She stated no.   I
21   told her what his name was.   She said, I -- I don't know him,
22   but I've heard of him.
23        Q.    After showing the witness the array, did you say
24   anything to her to indicate whether or not she had picked,
25   quote unquote, the right person, or did you make any
```

1                    Bohen - Direct - Carrington          10

2    statement to her regarding the individual she had picked?

3         A.      Nothing.

4         Q.      And did Detective Minor make any such statement?

5         A.      No, he did not.

6              MS. CARRINGTON:    Thank you.   Nothing further

7         of this witness.

8    CROSS-EXAMINATION BY MR. LoTEMPIO:

9         Q.      Detective, the incident that was the subject of

10   this photo array occurred on the 25th of May, 1997?

11        A.      Correct.

12        Q.      And the photo array --

13             MS. CARRINGTON:    Objection.

14             THE COURT:    Excuse me?

15             MS. CARRINGTON:    Objection, Your Honor.   I

16        believe it was the 26th.

17             THE COURT:    26th is the date --

18             THE WITNESS:    Right.

19             THE COURT:    -- that was provided to me as the

20        basis of this offense.

21             MR. LoTEMPIO:    I'd ask that be stricken and

22        I'll rephrase the question.   I misspoke.

23        Q.      On the 26th this event occurred of May, 1997?

24        A.      That's correct.

25        Q.      Okay.   And the photo array that you showed to

1                    Bohen - Cross - LoTempio                11

2    this witness was shown on the 6th of July, 1997?

3        A.    That's correct, sir.

4        Q.    Approximately a month and a half afterwards?

5        A.    Yes, sir.

6        Q.    What date was it that you actually put the photo

7    array together?

8                 MS. CARRINGTON:    Objection.  Relevance.

9                 THE COURT:    Overruled.  I think counsel has a

10               right to know under what circumstances Mr. Cory's

11               photograph entered the array and formed the basis

12               of it.

13       Q.    Do you remember what day you put the array

14   together?

15       A.    No, not exactly, sir.

16       Q.    Okay.  You've conducted various other photo

17   arrays prior to this date?

18       A.    I believe I conducted one.

19       Q.    This is the first time you've actually put a

20   photo array together?

21       A.    No, sir.

22                 MS. CARRINGTON:    Objection, Your Honor.

23                 THE COURT:    Overruled.

24                 MS. CARRINGTON:    I'm not clear as to whether

25               he's referring to this case or all cases.

```
 1                    Bohen - Cross - LoTempio            12

 2                 THE COURT:   I said it was overruled because

 3              the question was all right.  Do you want to repeat

 4              it?

 5                 (Whereupon, the above-requested question and

 6              answer were read by the Court Reporter.)

 7        Q.     You've done other photo arrays in other cases in

 8     the past, true?

 9        A.     That's true.

10        Q.     Okay.  And would it be fair to say that when you

11     put the photo arrays together, as a course of conduct, you

12     take the original description and try and find photos that

13     match the description given of a perpetrator?

14        A.     That's correct.

15        Q.     In this particular case, prior to preparing the

16     photo array that contained Cory Epps' picture, did you review

17     this particular witness' statements to the police given the

18     night of the incident?

19        A.     No, I did not.

20        Q.     Okay.  In other words, Mr. Epps' photograph was

21     not taken randomly out of a photo book due to the fact that

22     his description matched the description that was given the

23     night of the incident?

24        A.     It was -- his photograph was picked by me.  It

25     was not on any conversation that I knew that the witnesses
```

```
 1                   Bchen - Cross - LoTempic              13

 2  gave.  It was by description, yes.

 3       Q.    Okay.  My question to you is this.  Did you put

 4  Mr. Epps' picture in the photo array because somebody told

 5  you his name or because his pedigree information, his

 6  description of his weight, height, color of skin, complexion,

 7  matched the description that was given the night of the

 8  incident?

 9       A.    Yes.

10       Q.    That's why you did it?

11       A.    Yes.

12       Q.    Okay.  You filled out a P-73, did you not?

13             THE COURT:   Excuse me.  I missed the point as

14             to which of the two he was responding to in your

15             question.  Did you take Cory's picture and put it

16             in a lineup and then try to get stand-ins or

17             similarities of stand-ins within the photo array?

18             THE WITNESS:   No.  I took his picture and

19             found other pictures that looked similar to him and

20             then made up --

21             THE COURT:   That's what I was trying to say.

22             As opposed to, as Mr. LoTempio asked you, reviewing

23             the witness' statement relative to a description

24             of a person on the night in question and then

25             utilizing Mr. Epps' photograph among others
```

EPPS 01708

```
 1                   Bohen - Cross - LoTempio              14
 2           similar?
 3                   THE WITNESS:   Yes.  I went by his -- the
 4           physical description given by the witness as to
 5           matching his photograph to other photos being used.
 6                   THE COURT:   You want to try again.
 7                   MR. LoTEMPIO:   I'll ask again.
 8       Q.    When you put Cory Epps' picture in the photo
 9   array, did you have a name?
10       A.    Yes.
11       Q.    It was Cory Epps, was it not?
12       A.    Correct.
13                   THE COURT:   See.  That's the point we're
14           asking.  Did you put Epps' photograph as the
15           starting point of your array?
16                   THE WITNESS:   Yes.
17                   THE COURT:   And, I guess, the answer to that
18           is yes
19                   MR. LoTEMPIO:   Okay.
20       Q.    So, in other words, it wasn't just a blanket
21   description and then you went through a mug book and tried to
22   find people who match the description?
23       A.    That's correct.
24       Q.    That's not what happened?
25       A.    No.  I had his name.
```

Bohen - Cross - LoTempio                    15

1
2    Q.    Okay.  So, in other words, at no time prior to

3    the July 6th showing of the photo array did you alone by

4    description pull Cory Epps' photograph out of a book?

5    A.    Prior to July 6th?

6    Q.    Right.  Only after his name was given to you?

7    A.    No.  Right.

8    Q.    Okay.

9    A.    Only after his name was mentioned, yes.

10   Q.    Okay.  On what date was it that Cory Epps' name

11   was given to you?

12   A.    I believe it was June 26th of this year.

13   Q.    Okay.  Would it be fair to say that the person

14   who gave Cory Epps' name to you was related to the victim,

15   Tomika Means?

16   A.    Yes, it would be.

17   Q.    It was also somebody who was not on the scene of

18   the shooting?

19   A.    Yes.

20   Q.    Now, prior to showing the witness in this case

21   the photo array, what investigation did you conduct to

22   determine whether or not that particular witness knew Cory

23   Epps prior to showing the photo array?

24   A.    That -- the person that called me, you mean?

25   Q.    No.

```
1                    Bohen - Cross - LoTempio              16

2        A.      Or the witness to the shooting?  I'm sorry.

3        Q.      The witness to the shooting name is Jackie

4   Bradley, true?

5        A.      Correct.

6        Q.      Prior to showing Jacqueline Bradley the photo

7   array on July 6th, 1997, did you conduct any investigation to

8   determine whether or not she knew Cory Epps?

9        A.      No, I don't believe we did.

10        Q.      Okay.  You testified on direct examination that

11   she told you in her kitchen that she did not know the

12   individual in the photo array, true?

13        A.      That's correct.

14        Q.      And that she had heard his name before, but never

15   saw him before?

16        A.      Her words were, I don't know him, but I've heard

17   of him.

18        Q.      Okay.  She didn't tell you that she's seen him

19   around or seen him in bars before, but didn't know what his

20   name was prior to you telling her?

21        A.      She didn't tell me that.

22        Q.      Did you ever review her statement from the night

23   of the incident?

24        A.      No, I didn't.

25        Q.      Are you aware -- did anybody make you aware
```

1                    Bohen - Cross - LoTempio              17

2    that she said that the person, who did the shooting, she was

3    familiar with and had seen him out in bars on previous

4    occasions?

5                    MS. CARRINGTON:   Objection.

6                    THE COURT:   Sustained.

7         Q.    She told you in the kitchen that she never saw

8    the person before the shooting, true?

9         A.    No.  She said, I don't know him, but I've heard

10   of him.

11        Q.    On direct examination Ms. Carrington asked you a

12   question as to what conversations you had with him and you

13   said that -- or the conversations you had with her, and you

14   said that, I don't know him, but I've heard of him before,

15   true?

16        A.    That's correct.

17        Q.    Okay.  And that's what you're repeating now?

18        A.    Correct.

19        Q.    True.  Okay.  Now, in your practice as a police

20   officer in showing these photo arrays, did you usually make

21   inquiry of the witnesses to determine whether or not the

22   witness knows the individual who was the subject of the

23   identification?

24        A.    Usually I do.

25        Q.    Okay.  What is the purpose of that?

```
 1                  Bohen - Cross - LoTempio            18

 2            MS. CARRINGTON:   Objection.

 3            THE WITNESS:   Well --

 4            THE COURT:   I'll allow for it.   Go ahead.

 5      Q.    Why do you ask them if they know the person?

 6      A.    I honestly don't know why I do.

 7      Q.    Okay.  Would it be fair to say, if they already

 8 know the person, and you're giving him a multiple choice

 9 test, they already know the answer to the test?

10      A.    That's possible, yes.

11      Q.    All right.  In this case, prior to you showing

12 the photo array, somebody related to the victim called you

13 and gave you the name Cory Epps, true?

14      A.    That's correct.

15      Q.    All right.  Did you make any inquiry of that

16 person as to whether or not they had discussions with

17 Jacqueline Bradley?

18      A.    I didn't ask that.

19      Q.    Okay.  Did you ask Jacqueline Bradley, prior to

20 showing her the photo array, if she had discussions with the

21 person who gave you the name Cory Epps?

22      A.    No, I didn't.

23      Q.    Okay.  You had no discussion as to whether or not

24 there was any communication between those two people?

25      A.    Correct.
```

```
 1              Bohen - Cross - LoTempio            19
 2      Q.    You don't know and can't testify as to whether or
 3 not the names were passed back and forth?
 4      A.    I don't know that.
 5            MR. LoTEMPIO:   I have no further questions.
 6       Thank you.
 7            THE COURT:   Anything on redirect?
 8            MS. CARRINGTON:   Just one question to
 9       clarify.
10 REDIRECT EXAMINATION BY MS. CARRINGTON:
11      Q.    When you were given the information that led you
12 to put Cory Epps in the photographic array, which is People's
13 Exhibit 1, did you also check the description and compare it
14 to the description given by the witness that night?
15      A.    Yes.
16      Q.    And did it generally fit the description?
17      A.    Yes, it did.
18            MS. CARRINGTON:   Thank you.
19            THE COURT:   I thought you told Mr. LoTempio
20       that you never reviewed the statement that was
21       given by the witness.
22            THE WITNESS:   I didn't review the statement,
23       sir.
24            THE COURT:   You reviewed something else that
25       made reference to the statement?
```

1              Bohen - Redirect - Carrington          20

2              THE WITNESS:   Yes.   I had prior information

3       of what Mr. Epps looked like -- or not what Mr.

4       Epps looked; what the suspect looked like, the

5       description of him.

6              THE COURT:   You can press the point, if you

7       want.

8              MR. LoTEMPIO:   Thank you, Your Honor.

9  RECROSS-EXAMINATION BY MR. LoTEMPIO:

10     Q.     Can you tell us what it is that you looked at

11  that magnified or documented the description that Ms. Bradley

12  gave on the night of the incident of the shooter of Ms.

13  Means?

14     A.     I don't think I looked at anything specifically.

15  It was -- it was people talking in the office, you know.   It

16  was nothing that I looked at personally as to a description.

17  It was other detectives talking about this case and the

18  description of the suspect.

19              THE COURT:   Okay.   So that you had verbal

20              references as to the general description of the

21              shooter?

22              THE WITNESS:   That's correct.

23     Q.     Was the general description of the shooter as

24  being a person 5'8", 5'9" in height?

25     A.     I think it was -- they were saying maybe six

7/9BD

FORM LASER BOND A   ⑯   PENGAD • 1-800-631-6989

Bohen – Recross – LoTempio                 21

foot, little shorter, heavyset, medium skin.

Q.      Anything about pimples on his face?

A.      Yes.

Q.      Anything --

A.      Pockmarked face, they put that.

Q.      Anything about a goatee?

A.      Not that I recall.

Q.      Anything about his clothing?

A.      Not that I recall.

Q.      How about the weight of the individual?

A.      Heavyset.

Q.      Okay.  Not a distinct weight of 250 pounds?

A.      Not that I remember.

Q.      Not a distinct height described as being 5'8",
5'9"?

A.      No.

Q.      Nothing about a blue pea coat?

A.      Not that I recall.

Q.      Nothing about a Pontiac 6000 car?

        MS. CARRINGTON:   Objection.

        THE WITNESS:   I --

        MS. CARRINGTON:   Relevance to this.

        THE COURT:   I don't know about the car having
        relevance.

7/90D

FORM LASER BOND A ® PENGAD · 1-800-631-6989

1               Bohen - Recross - LoTempic              22

2        Q.    Do you remember descriptions of clothing?

3        A.    Do I remember?

4        Q.    Yes.  In this talk back and forth, since you

5   didn't review documents?

6        A.    No, I don't.  I don't recall if there was any

7   description of clothing being brought up.

8               MR. LoTEMPIO:   I have no further questions.

9          Thank you.

10               MS. CARRINGTON:   Nothing further.

11               THE COURT:   Thank you, Detective.

12               MS. CARRINGTON:   People call Detective Henry

13          Smardz.

14   H E N R Y   S M A R D Z , having first been duly sworn,

15   testified as follows:

16               THE CLERK:  Please state your name and

17          address, and spell your last name for the record.

18               THE WITNESS:   Henry Smardz, S-M-A-R-D-Z.  74

19          Franklin, Buffalo.

20               THE CLERK:   Thank you.

21               MS. CARRINGTON:   Your Honor, prior to

22          Sergeant Smardz's testimony regarding this lineup,

23          I just wanted to place on the record the fact that

24          previous counsel in this case, Mr. Abbate, who

25          represented this defendant at the time of the

```
1                  Smardz - Direct - Carrington        23

2            lineup, made a tape of the proceedings that

3            occurred during the lineup.  I have a copy of the

4            tape.  Mr. Abbate has a copy of the tape.  He told

5            me that he informed Mr. LoTempio that he had it and

6            was willing to give it to him, but that Mr.

7            LoTempio had not requested it.  It's not anything I

8            prepared.  It's not anything the police prepared.

9            I just wanted to place it on the record so that the

10           Court is aware that that does exist and that Mr.

11           LoTempio has been given the opportunity to obtain

12           it from the previous attorney.

13                  THE COURT:   Thank you for the information.

14                  MS. CARRINGTON:   Okay.

15   DIRECT EXAMINATION BY MS. CARRINGTON:

16      Q.     Sir, how are you employed?

17      A.     A detective sergeant with the Buffalo Police

18   Department.

19      Q.     And what unit do you work in?

20      A.     I'm presently assigned to the Evidence Collection

21   Unit.

22      Q.     Is one of your duties as sergeant in the Evidence

23   Collection Unit the conducting of lineups?

24      A.     Yes.

25      Q.     And did you have occasion to conduct a lineup on
```

July 30th of this year?

    A.    Yes, I did.

    Q.    Was that in a case involving the shooting death of Tomika Means on May 26th of this year?

    A.    Yes.

    Q.    Could you describe briefly for the Court how this lineup was conducted?

    A.    First of all, it was notified that there would be a court-ordered lineup through the District Attorney's Office, and the Buffalo Police Homicide Section would be the unit involved, that I would be assisting. And on such and such a date I would make the room available and make sure that we have a stenographer present, make sure the room is available, make sure we have a photographer available and that I have someone assist me with the stand-ins, as far as the stand-ins go. The, you know, the Homicide Section would be the investigating body, who would be in charge of, let's say, rounding up or gathering the individuals who would be stand-ins, along with the suspect-defendant in the lineup, which would be shown on that particular day.

    Q.    When the defendant came to participate in the lineup, was he represented by counsel?

    A.    Yeah. Mr. Abbate was his attorney at the time.

    Q.    And prior to putting the lineup together, did Mr.

Smardz - Direct - Carrington          25

1  Abbate have the opportunity to view the stand-ins?

3      A.     Yes.  Initially, the lineup did go off with six

4  individuals.  Six black males were viewed.  Originally there

5  were eight black males that were present, which would mean

6  seven individuals who would be stand-ins and the defendant

7  himself.  So prior to the lineup, two of the stand-ins were

8  excused and then the defendant, along with five others, the

9  total is six, those were the ones we agreed upon and they

10 were the ones that were viewed that particular day in

11 question.

12     Q.     Now, was it your understanding that there was one

13 witness to the shooting who was present to view the lineup on

14 that day?

15     A.     Yes.  There were only, all told, aside from

16 myself, and in the gallery portion to view the lineup were a

17 witness to view, Mr. Abbate and an intern, I believe, from

18 his office, yourself and someone from the DA's Office.  There

19 was only four individuals all told -- five individuals all

20 told were there.

21     Q.     Do you recall where you placed the witness who

22 was the eyewitness to the event?

23     A.     I'm pretty sure she sat in seat number four in

24 our lineup room, which would be in the center of the room,

25 one of the aisle seats, which would be the front row of the

1                   Smardz - Direct - Carrington          26

2    lineup seating area.

3                  (Whereupon, a one-page document was marked

4             People's 4 for identification.)

5        Q.     Detective Sergeant, showing you what's been

6    marked as People's Exhibit 4 for identification, which

7    defense has a copy, could you review that, please, and

8    indicate to the Court if you know what it is?

9        A.     Yes.  This particular piece of paper is a form

10   which I make up after the conclusion of the lineup, which

11   gives the seating arrangements of the individual who would be

12   present during the viewings of the lineups.

13       Q.     Does that indicate that the witness, Jacqueline

14   Bradley, sat in seat number four?

15       A.     Yes, it does.

16       Q.     Prior to the lineup being conducted, what, if

17   anything, did you say to Ms. Bradley?

18       A.     Nothing, except for the normal instructions,

19   which would be given as far as filling out the report.  So

20   there's a report that we fill out and, basically, I would

21   have them fill out the reports with the information that I

22   give them and --

23                  THE COURT:   What are your normal

24             instructions, Detective?

25                  THE WITNESS:   Normal instructions are to

Smardz - Direct - Carrington                    27

2 fill out the report and, then, if there's any

3 questions to be asked, to bring it up to me and I

4 would take it up with the defense attorney and the

5 District Attorney, if it's a question that would

6 need to be -- a legal matter to be answered.

7   THE COURT:   Did you advise in what method the

8 show-up was to be conducted?

9   THE WITNESS:   Yes, yes.

10   THE COURT:   Would you tell us that?

11   THE WITNESS:   Well, there's two lineups run.

12 So after the lineups, I would tell her that this

13 would be the conclusion of lineup number one.  And

14 if there was anybody on stage who they recognize to

15 be the individual that was involved in a particular

16 crime from such and such a date and such and such a

17 time, to fill in that number, because the stand-ins

18 all wear numbered placards around their neck.  And

19 she did so.  And then she did the same thing in the

20 second lineup, as requested.

21 Q. Now, you've indicated that there were two lineups

22 conducted.  Did the two differ in any way, other than

23 placement of the stand-ins?

24 A. Not that I know of.

25 Q. Was anyone required to speak at all during this?

EPPS 01722

```
 1                    Smardz - Direct - Carrington        28
 2        A.      I would have to take a look at my note real
 3   quick.  It would be included on the bottom of the one report.
 4                       (Whereupon, a one-page record of lineup was
 5               marked People's Exhibit 5 for identification.)
 6        Q.      Showing you what's been marked as People's
 7   Exhibit 5, of which defense counsel also has a copy, does
 8   that refresh your recollection, Detective Sergeant, as to
 9   whether or not anyone was required to speak?
10        A.      Yes, it does.  The record of lineup, which is
11   kept in the normal course of business by our department for
12   show-ups, there was no -- no verbal statements were repeated
13   during either lineup one or two.
14                       THE COURT:  What do you call that document?
15                       THE WITNESS:   It's called P-1362, also known
16               as a record of lineup.
17        Q.      And does that record of lineup also indicate that
18   the stand-ins were required to do a turn on the first lineup
19   that they weren't required to do on the second?
20        A.      Yes.  This is, as we call, attitudes being
21   viewed. The first lineup all the individuals stepped forward.
22   They all did a series of quarter turns so they could be
23   viewed forward, their right side of their face could be
24   viewed, the left side of their face and the back of their
25   head could be viewed and, also, every individual walks the
```

Smardz – Direct – Carrington                    29

1  stage.  The second lineup was the same, except the

2  individuals didn't walk.  They just stepped forward, did

3  quarter turns and then returned to their positions.

4

5      Q.      Detective Sergeant, showing you what's been

6  marked as People's Exhibit 2 for identification, can you look

7  at that and tell the Court if you recognize it?

8      A.      Yes, I do.

9      Q.      And what do you recognize that to be?

10      A.      This particular photograph shows the lineup,

11  which would be lineup number one, conducted on 30th of June.

12      Q.      And does that photograph fairly and accurately

13  depict the way the defendant and all the stand-ins appeared

14  on -- excuse me, July 30th, when that lineup was conducted?

15      A.      July 30th, yes.  Yes, it does.

16      Q.      They were all dressed in navy blue sweatsuits?

17      A.      Yes.  Well, they were coveralls.

18      Q.      Showing you what's been marked as People's

19  Exhibit 3 for identification, could you tell the Court if you

20  recognize that?

21      A.      This is the second viewing or lineup number two,

22  which, once again, was a photograph showing how lineup number

23  two looked when it was viewed.

24      Q.      And when were those photographs taken?

25      A.      They were taken on that date and the clock on the

1                      Smardz - Direct - Carrington          30

2   wall indicates the time, also.  We've got lineup number two

3   went off shortly after two o'clock.  The previous one went

4   off shortly before two o'clock.

5        Q.    Would that -- would those two photographs have

6   been taken just prior to the walking and turning that you

7   referred to?

8        A.    Yes.  The photographs were taken right after the

9   individuals are paraded upon stage before they have to go

10  through any motions or report any statements or anything like

11  that.

12       Q.    And does People's Exhibit 3 for identification

13  fairly and accurately depict the way lineup number two

14  appeared to July 30th of 1997?

15       A.    Yes.

16            MS. CARRINGTON:  Your Honor, at this time I

17        would ask that People's 2 and 3 be moved into

18        evidence.

19            MR. LoTEMPIO:  No objection, Your Honor.

20            THE COURT:  Received.

21            (Whereupon, People's Exhibit 2 and 3,

22        respectively, were received and marked in

23        evidence.)

24       Q.    Did the witness, Ms. Bradley, make an

25  identification in regard to lineup number one?

Smardz - Direct - Carrington                    31

    A.     Yes.

    Q.     How was that done?

    A.     On the record of attendance, the lineup form, she indicated stand-in number three in the first lineup as the individual whom she identified.  And in the second lineup she indicated the individual who was in position number one.

    Q.     And is the person that she identified as number three in the first lineup here in the courtroom today?

    A.     Yes, ma'am.

    Q.     Would you point to him and describe something he's wearing for the Court?

    A.     It's the black gentleman with the denim jacket and glasses, sitting next to Mr. LoTempio at the defense table.

          (Whereupon, a one-page lineup attendance
          record was marked People's Exhibit 6 for
          identification.)

    Q.     Did Mrs. Bradley identify that same gentleman in lineup number two?

    A.     Yes.

    Q.     In that lineup he was in position number one?

    A.     Yes, he was.

    Q.     Now, prior to lineup number two being conducted, did you have any conversation with her?

1                    Smardz - Direct - Carrington          32

2        A.     No.

3        Q.     Did she have any questions to ask you about the

4   lineup or about the stand-ins?

5        A.     Not really.  She was a bit distraught.  That I

6   can recall.

7        Q.     When do you recall her becoming distraught?

8        A.     Prior to the first lineup, when the individuals

9   were paraded upon stage, just about the same time the first

10  photograph was taken when all the individuals were facing

11  forward.

12       Q.     When she first saw the defendant?

13       A.     I would believe so, she began sobbing.

14                    THE COURT:  What is 6?

15                    THE WITNESS:  What do you want to call that?

16                    MS. CARRINGTON:  That's her affidavit, a copy

17             of her affidavit.

18                    THE COURT:  Affidavit of identification.

19                    MR. LoTEMPIO:  I have no objection to that,

20             either, Your Honor.

21                    THE COURT:  Received.

22                    (Whereupon, People's Exhibit 6 was received

23             and marked in evidence.)

24                    MS. CARRINGTON:  Your Honor, at this time I'm

25             also going to ask that People's 4 and 5, which are

1
2       the schematic of the room, that's People's Exhibit
3       4 for identification and People's Exhibit 5, which
4       indicates the names of the stand-ins and
5       descriptive information, that those items also be
6       admitted into evidence at this hearing.  I believe
7       Mr. LoTempio indicated to me he had no objection.
8            MR. LoTEMPIO:   I do not have an objection to
9       those documents.
10           THE COURT:   Received.
11           (Whereupon, People's Exhibit 4 and 5,
12       respectively, were received and marked in
13       evidence.)
14  Q.    Was anything said to Ms. Bradley after her
15  identification of the defendant in lineup number one
16  regarding that identification; did you say anything to her
17  at all?
18  A.    No, I didn't.
19  Q.    And approximately do you recall how long it took
20  her to make that identification?
21  A.    It wasn't too long, that I can recall.
22  Q.    And did you say anything to her prior to lineup
23  number two, give her any further instructions?
24  A.    No.  I just -- she had calmed down a little bit
25  more by then and I just said that, you know, lineup number

1                    Smardz – Direct – Carrington          34

2    two would proceed and then once again make sure that she

3    looked on stage at the stand-ins and to make her

4    identification after they had gone through the motions,

5    which, when they went through that, they were viewed, and

6    after their picture was taken and everything.

7         Q.    And it was promptly that she identified number

8    one in the second show-up?

9         A.    Yes, she did.

10        Q.    Was any other individual seated near her speaking

11   to her at all during this time?

12        A.    No.   The closest individual seated to her would

13   be Mr. Abbate.   He was in the first row, also.   I was

14   standing near the door, which is connected to the one-way

15   viewing glass, which separates the people who would be

16   viewing the lineup from the stage itself.   So the closest

17   individual would be myself, Mr. Abbate and then the witness.

18        Q.    Did you say anything to her to influence her

19   about what individual to choose in the lineup?

20        A.    No.

21        Q.    Did Mr. Abbate?

22        A.    No.   No, he didn't.

23        Q.    He was defense counsel for Mr. Epps at that time?

24        A.    Yes.   He was the representative defense counsel

25   of the day.

```
 1                    Smardz - Direct - Carrington        35
 2                    MS. CARRINGTON:    Thank you.  Nothing further.
 3    CROSS-EXAMINATION BY MR. LoTEMPIO:
 4         Q.    Detective Smardz, were you made aware that Ms.
 5    Bradley had seen a photograph in a photo array of Mr. Epps
 6    prior to the lineup?
 7         A.    No, sir.
 8         Q.    You've conducted many lineups, have you not?
 9         A.    Yes.
10         Q.    In the hundreds?
11         A.    Several hundred, yes.
12         Q.    And often times when lineups are conducted the
13    stand-ins that are used are Buffalo Police Officers?
14         A.    If the individuals fit the description of the
15    suspect, it's not uncommon for us to use them.
16         Q.    In this particular lineup three or four of the
17    individuals were law enforcement officers?
18         A.    To my knowledge, yes, they were, sir.
19         Q.    Okay.  And on People's Exhibit 5, which is
20    the police department record of lineup, it indicates the
21    names of the individuals that stood in the lineup, true?
22         A.    Yes.  That's part of the information which we
23    receive, would be the names of the individuals standing in
24    and some other bits of information, also.
25         Q.    In the box about two-thirds of the way down the
```

1              Smardz – Cross – LoTempio          36

2    sheet of People's Exhibit 5, there's a listing of names,

3    addresses, dates of birth and approximate sizes, true?

4         A.     Yeah.   That's a standard operating procedure when

5    we do a lineup.   The girl who's the stenographer, secretary,

6    she obtains the information which you have just said.

7         Q.     Okay.   And on that document in the first column

8    it says, number one, and that would indicate the number that

9    that person wore in the first phase of the lineup, true?

10        A.     This would be, Yes.

11        Q.     And number two would be the number they wore in

12   the second phase of the lineup, true?

13        A.     Yes.

14        Q.     Okay.   In lineup number one the person wearing

15   number one was Thomas Mayes of 1285 Genesee Street, true?

16        A.     According to that information I would say it

17   would be true, sir.

18        Q.     He's a Buffalo Police Officer, is he not?

19        A.     Yes.   I know Tommy Mayes.

20        Q.     Number two, Vern Beatty of 2747 Bailey Avenue is

21   a Buffalo Police Officer, is he not?

22        A.     Vern Beatty, yes, I believe so.

23        Q.     Number three was Cory Epps, the defendant?

24        A.     Correct.

25        Q.     Number four was Jerel Martin, who is a civilian,

```
 1                    Smardz - Cross - LoTempio              37
 2   true?
 3        A.     Yes.  I do not know Jerel.
 4        Q.     Okay.  Mr. Jerel Martin, do you remember, was,
 5   for lack of a better term, cross-eyed?
 6        A.     He did look like it and the photographs would
 7   indicate that, yes.
 8        Q.     Okay.  And Mr. Arthur Burgin of 74 Franklin
 9   Street was a law enforcement official, but not a police
10   officer, or was he a police officer?
11        A.     No, he's not a police officer.  I believe he's a
12   departmental -- he works for the police department.  He's a
13   civilian.
14        Q.     And Rickey Larke number six, was also a police
15   officer, true?
16        A.     Rickey Larke, yes.  Rickey Larke is a police
17   officer.
18        Q.     And he was of 2747 Bailey Avenue, true?
19        A.     Yes.
20        Q.     So, of the four law enforcement officials, Mr.
21   Larke, Mr. Burgin, Mr. Beatty and Mr. Mayes, three of them
22   gave the Bailey Avenue or Genesee Street addresses, true?
23        A.     Yes.
24        Q.     Those are the precincts that they work out of,
25   are they not?
```

1                        Smardz – Cross – LoTempio          38

2          A.     Precinct or district houses, I believe, yes.

3          Q.     Okay.  The last man, Mr. Burgin, gave 74

4     Franklin, which is police headquarters, true?

5          A.     Yes.

6          Q.     Did you make any inquiry of these individuals as

7     to whether or not they frequent a bar on the east side known

8     as Birchfield's?

9          A.     Myself, no, sir.

10         Q.     Did anybody do that prior to putting them in this

11    lineup?

12                     MS. CARRINGTON:   Objection.

13                     THE WITNESS:   I couldn't answer that, sir.

14              No, I couldn't answer that.

15                     THE COURT:   Well, he's testing to see if --

16              are you asking whether Mayes, Beatty, Larke and

17              these other people went to Birchfield's bar?

18                     MR. LOTEMPIO:   Yes.

19                     THE COURT:   Do you have any such knowledge?

20                     THE WITNESS:   No, sir.

21         Q.     Were you made aware that the witness in this

22    case, Miss Bradley, had told police officers the night of the

23    shooting that she, in effect, frequents Birchfield's bar?

24         A.     Myself, I had no knowledge of that, sir, no.

25         Q.     Was any inquiry made to determine whether or not

1

2   she knew any of these police officers or law enforcement

3   officials on sight?

4        A.      Speaking secondhand, I would have to say one

5   of the officers that assisted me in the lineup, I believe,

6   Detective Masecchia, had made a request of the witness

7   regarding that.

8        Q.      What was that request?

9                MS. CARRINGTON:    Objection.

10               THE COURT:    No.  I guess hearsay is

11          admissible in these proceedings and what Masecchia

12          spoke to the witness about, whether or not the

13          witness had any familiarity with the what?

14               THE WITNESS:    With the police officers.

15          That's all I --

16       Q.      When did that happen, before or after the lineup?

17       A.      I would assume before, sir.

18       Q.      She asked -- he asked her if she knew these

19   names?

20       A.      No.  I couldn't answer that.  All I know is that

21   Ray had told me, due to the fact that we had -- did have

22   police officers in there, which were agreed upon between the

23   DA's Office and Mr. Abbate because of the physical likeness

24   and the description as to Mr. Epps, I believe Mr. Masecchia

25   had asked of the witness if she knew the police officers.

7/8BD

FORM LASER BOND A   ®   PENGAD • 1-800-631-6989

```
 1                     Smardz - Cross - LoTempio              40

 2        Q.    Did he show them to her and ask her, did she know

 3   this guy?

 4        A.    No.

 5        Q.    He asked if she knew them by name?

 6              MS. CARRINGTON:   Objection.

 7              THE WITNESS:   I can't answer that, sir.   I

 8         don't believe he mentioned that.

 9              THE COURT:   I'm going to sustain, unless he

10         has a specific recall of what it was that Masecchia

11         said or didn't say, rather than being guessing and

12         speculating.

13        Q.    Do you know if, after -- did you personally,

14   after the lineup, ask this witness whether or not she could

15   exclude four of the individuals in the lineup because she

16   knows they're Buffalo Police Officers?

17        A.    I didn't ask that question.

18        Q.    Did you know if Mr. Masecchia did that or did he

19   tell you anything about that?

20        A.    I know Ray wouldn't have asked because Ray was on

21   the other side of the glass at the time.   He wouldn't have

22   had any contact with her.

23        Q.    You were not made aware that Mr. Epps' photograph

24   in a photo array was shown to the witness prior to the

25   lineup?
```

Smardz - Cross - LoTempio                    41

2    THE COURT:  Asked and answered.

3    THE WITNESS:  No, sir.

4    Q.    Okay.  In the lineup room there's a board behind

5    the subjects that indicates heights of the suspects?

6    A.    That's written -- that's the height indications,

7    which are right on the wall.

8    Q.    Okay.  And that measures in feet and inches how

9    tall the individual is that is standing on the stage, true?

10   A.    Yes.  That would give the height of the

11   individuals, right.

12   Q.    Okay.  Mr. Epps in People's Exhibit Number 3 in

13   evidence stands at six foot two inches tall, does he not?

14   A.    Yes, sir.

15   Q.    And in People's Exhibit Number 2 in evidence, Mr.

16   Epps is in number three position and he also there appears to

17   stand at six foot two inches tall, does he not?

18   A.    Yes, sir.

19   Q.    Okay.  Did Mr. Epps -- when you looked for

20   stand-ins, did you notice whether or not Mr. Epps had

21   pockmarks or pimples on his face?

22   A.    That was not my part of the job, sir.  That would

23   have come down to the people in homicide.  They are the

24   individuals who go out and secure the stand-ins.

25   Q.    Okay.  But the pictures that are in evidence

FORM LASER BOND A   ®   PENGAD · 1-800-631-6989        7/90D

```
 1                 Smardz - Cross - LoTempio              42
 2   fairly and accurately represent the complexion of Mr. Epps at
 3   the time of the lineup, true?
 4        A.    Yes.
 5              MR. LoTEMPIO:   I have nothing further.  Thank
 6         you, Detective.
 7              MS. CARRINGTON:   Nothing further of this
 8         witness.
 9              THE COURT:   Thank you.
10              MS. CARRINGTON:   Your Honor, may I have a
11         moment?
12              THE COURT:   Yes.  Why don't we take five or
13         ten minutes.  How many more witnesses do you
14         anticipate?
15              MS. CARRINGTON:   Just one.
16              THE COURT:   Why don't we take ten minutes.
17              (Whereupon, a recess was taken at 3:31 P.M.)
18              (Whereupon, a Miranda warning card was marked
19         People's Exhibit 7 for identification.)
20              (Proceedings resumed at 3:50 P.M.)
21              THE CLERK:   Defendant, both counsel present,
22         Your Honor.
23              THE COURT:   Do you want to swear the next
24         witness.
25   R A N I E R O    M A S E C C H I A , having first been duly
```

7/88D

FORM LASER BOND A    PENGAD · 1-800-631-6989

```
 1                Masecchia - Direct - Carrington        43
 2   sworn, testified as follows:
 3              THE CLERK:  Would you state your name and
 4         address, and spell your first and last names for
 5         the record.
 6              THE WITNESS:   Raniero Masecchia,
 7         R-A-N-I-E-R-O, M-A-S-E-C-C-H-I-A.  74 Franklin
 8         Street.  Buffalo, New York.
 9              THE CLERK:   Thank you.
10   DIRECT EXAMINATION BY MS. CARRINGTON:
11        Q.    Sir, directing your attention to July 9th of
12   1997, were you working in your capacity as a homicide
13   detective for the City of Buffalo on that day?
14        A.    Yes, I was.
15        Q.    Did you have occasion to come into contact with a
16   Cory Epps on that day?
17        A.    Yes.
18        Q.    Do you see Mr. Epps in the courtroom here today?
19        A.    Yes, I do.
20        Q.    Please point to him and describe something he's
21   wearing for the Court?
22        A.    He's seated to my right, wearing a blue jean
23   jacket and glasses.
24        Q.    How did you happen to come into contact with Mr.
25   Epps on July 9th?
```

7/96D

FORM LASER BOND A  ⊕  PENGAD · 1-800-631-6989

```
 1                    Masecchia - Direct - Carrington        44
 2          A.      We came into contact with him twice that day;
 3     once over at 720 East Amherst Street, and then again back at
 4     the homicide office.  He was out in the hallway of our
 5     building at 74 Franklin Street.  He came with his girlfriend,
 6     Jerriah Johnson, I believe her name is.
 7                    THE COURT:    Well, 720 East Amherst, what was
 8               the occasion of you making contact there?
 9                    THE WITNESS:    We went there to observe a car
10               that was parked in that area.  It was parked,
11               actually, behind the home at 720 East Amherst and
12               our initial reason for going there was to talk to
13               Jerriah.
14                    THE COURT:    Okay.  You went to observe a car
15               that was parked.  Go ahead.
16                    THE WITNESS:    In the rear of the home there.
17                    THE COURT:    Parked in the rear of 720 East
18               Amherst.
19                    THE WITNESS:    That's correct.
20                    THE COURT:    And that is the alleged residence
21               of who?
22                    THE WITNESS:    Of Jerriah Johnson, I believe
23               her name was.
24                    THE COURT:    Do you know how to spell it?
25                    THE WITNESS:    You got me.  Johnson I can.
```

7/80D

FORM LASER BOND A   ®   PENGAD · 1-800-631-6989

```
1                        Masecchia - Direct - Carrington        45

2                   THE COURT:   Johnson, Jerriah?

3                   THE WITNESS:   Jerriah is how you pronounce

4          it.

5                   THE COURT:   Okay.  Go ahead.  I'm sorry.

6        Q.     When Mr. Epps came down to 74 Franklin, was he

7   brought down by the police or did he come of his own accord?

8        A.     No.  He came with his girlfriend on his own

9   accord.

10        Q.     And was he placed into custody at any time on

11   July 9th?

12        A.     No.

13        Q.     When he came downtown, did you have occasion to

14   speak with him?

15        A.     Yes.

16        Q.     And at approximately 2:50 in the afternoon did he

17   agree to speak to you regarding the shooting of Tomika Means?

18        A.     Yes, he did.

19        Q.     How did that come about?

20        A.     We brought him into our interview room, explained

21   to him we wanted to talk to him in regards to the shooting of

22   Tomika Means.

23        Q.     Did he indicate he was willing to cooperate with

24   you?

25        A.     Yes.
```

1                     Masecchia - Direct - Carrington           46

2          Q.      Did you, nonetheless, read him his so-called

3    Miranda warnings at that time?

4          A.      Yes, I did.  I did it from a rights card.

5          Q.      Showing you what's been marked as People's

6    Exhibit 7 for identification, would you please examine that

7    and tell the Court if you recognize it?

8          A.      Yes.  This is the rights card that was read to

9    Cory Epps by myself on July 9th, 1997.

10         Q.      Did he sign and initial that card for you?

11         A.      Both sides, yes.

12         Q.      And did you also initial the card?

13         A.      Yes, I did.

14         Q.      Now, after reading him that card, did you

15   indicate to him -- did you ask him if he understood his

16   rights?

17         A.      Yes.

18         Q.      What did he say to you?

19         A.      I asked him after every question and he said he

20   understood.

21         Q.      Other than the exhibit marker placed on this

22   document by the stenographer, is this document in the same

23   condition as it was the day you used it to read Mr. Epps his

24   rights?

25         A.      That's correct.

Masecchia - Direct - Carrington          47

1

2          MS. CARRINGTON:   At this time I would ask

3     that People's 7 be moved into evidence.

4          MR. LoTEMPIO:   No objection, subject to

5     cross-examination.

6          (Whereupon, People's Exhibit 7 was received

7     and marked in evidence.)

8     Q.    Using what's been marked People's 7 in evidence,

9     can you indicate to the Court how you used that document to

10    inform Mr. Epps of his rights?

11    A.    I read them to him one at a time:  You have the

12    right to remain silent.  Do you understand that?  I would

13    wait for a response.  If he nodded or said yes, I would

14    continue to the next question, and he did.  Anything you say

15    can and will be used against you in a court of law.  Do you

16    understand that?  He replied that he did.  You have the right

17    to talk to a lawyer and have him present with you while you

18    are being questioned.  I asked him if he understood that.  He

19    responded.

20    Q.    How did he respond?

21    A.    Affirmative, that he understood.  If you cannot

22    afford to hire a lawyer, one will be appointed to represent

23    you before any questioning, if you wish one.  I asked him if

24    he understood these rights that I have explained to him.  He

25    said he did.  Having these rights in mind, do you wish to

```
 1                    Masecchia - Direct - Carrington        48
 2   talk to us now, and he implied that he would talk to us.
 3        Q.     Did he tell you that he wished to speak to an
 4   attorney prior to talking to you?
 5        A.     No.
 6        Q.     Did you then take a three-page statement from Mr.
 7   Epps?
 8        A.     Yes.
 9        Q.     How was that statement conducted?
10        A.     In the interview room on a typewriter, it was
11   typed by my partner, Detective Juan Morales, and the
12   questions were asked by myself.
13        Q.     At the close of that statement did Mr. Epps sign
14   it?
15        A.     Yes, he did.  He reviewed it first, then signed
16   it.
17        Q.     And after the statement was completed, what did
18   Mr. Epps do?
19        A.     He left.
20        Q.     So he was free to leave?
21        A.     Yes, he was.
22        Q.     Did you -- you did not place him under arrest at
23   that time?
24        A.     That's correct, we did not.
25                    (Whereupon, a three-page statement of the
```

EPPS 01743

Masecchia - Direct - Carrington                49

2               defendant was marked People's Exhibit 8 for

3               identification.)

4    Q.    Detective, showing you what's been marked

5 People's Exhibit 8 for identification, which defense counsel

6 has a copy, would you please examine that three-page document

7 and tell the Court if you recognize it?

8    A.    Yes.  This is the typewritten statement that was

9 taken on July 9th, 1997, of Cory Epps in my presence at the

10 interview room at the Homicide Office.

11    Q.    Is that a Xerox copy of the --

12    A.    That appears to be.

13    Q.    And is it identical in every way to the actual

14 statement that was signed by Mr. Epps in your presence?

15    A.    Yes, it is.

16    Q.    Did you make any promises to him at any time

17 during the course of that statement to induce him to talk to

18 you?

19    A.    Absolutely not.

20    Q.    Did he at any time indicate he wanted to stop

21 talking to you and retain an attorney?

22    A.    No, he did not.

23    Q.    Did your partner in your presence make any

24 promises to him?

25    A.    No.

EPPS 01744

Masecchia - Direct - Carrington          50

1

2      Q.     Did either of you threaten Mr. Epps at any time?

3      A.     No.

4      Q.     After that statement was completed, he was free

5  to leave?

6      A.     Yes, he was.

7      Q.     Reviewing that statement, does that contain any

8  errors that have since come to your attention?

9      A.     The date, May 26th, is correct, but it was

10  supposed to be a Sunday night and it's marked on here as a

11  Saturday night.

12     Q.     So all the references to Saturday in that

13  statement really refer to Sunday into Monday morning?

14     A.     Into Monday morning, when she was found, yes.

15     Q.     And approximately what time was that statement

16  concluded?

17     A.     1600 hours, which is four P.M.

18     Q.     So Mr. Epps was in your office for approximately

19  how long?

20     A.     One hour and ten minutes, an hour and a half,

21  approximately.

22     Q.     And he at no time during that hour and a half

23  indicated that he wished to leave or stop the statement?

24     A.     No.

25     Q.     Was he completely cooperative with you?

EPPS 01745

1                    Masecchia - Direct - Carrington        51

2       A.      He appeared to be, yes.

3       Q.      Now, did you have occasion to attend a lineup

4    that was conducted in this case on July 30th of this year?

5       A.      Yes, I was.

6       Q.      And where were you when the stand-ins were being

7    put together for that lineup?

8       A.      I was with the stand-ins.

9       Q.      Did the witness in this case, Jacqueline Bradley,

10   ever have an opportunity to view the stand-ins in the lineup

11   prior to the actual lineup taking place behind the one-way

12   mirror?

13      A.      No.

14      Q.      Did you have any discussion with her regarding

15   whether she knew any Buffalo Police Officers?

16      A.      Yes.

17      Q.      When was that discussion; when did that

18   discussion take place?

19      A.      Several days before the lineup at Jacqueline, the

20   witness' home.

21      Q.      Did you discuss with her any particular police

22   officers?

23      A.      No.  What I asked her was, that if she knew any

24   police officers who would hang around at Birchfield or

25   O'Boys, because we knew some policemen did hang out there and

EPPS 01746

1                    Masecchia - Direct - Carrington       52

2    we wanted her to give us names, if she knew of any.  And she

3    stated she didn't know any policemen.

4         Q.    Was any indication ever made to her during the

5    course of the lineup being conducted that some of the

6    stand-ins were police officers?

7         A.    No.

8         Q.    Does People's Exhibit 8 for identification fairly

9    and accurately depict the entire statement that you took from

10   Mr. Epps on that day --

11        A.    Yes, it does.

12        Q.    -- July 9th.

13              MS. CARRINGTON:    Nothing further.

14   CROSS-EXAMINATION BY MR. LoTEMPIO:

15        Q.    Detective, you said when you went to 720 East

16   Amherst Street, it was what day?

17        A.    It was July 9th.

18        Q.    And that's approximately a month and two weeks

19   after the shooting?

20        A.    I believe so.

21        Q.    Okay.  And when you went to that address at

22   720 East Amherst Street, did that post-date a call from the

23   victim's aunt, wherein she disclosed that a sketch, composite

24   sketch in the paper allegedly looked like Cory Epps?

25        A.    Was that after we received the information that

Masecchia - Cross - LoTempio                53

Cory Epps could have been the shooter?

    Q.    Yes.

    A.    Yes.

    Q.    Okay.  And when you went over to 720 East Amherst Street, you told the Judge that you went there to observe a car that was parked behind that residence?

    A.    And to speak to Jerriah Johnson, Yes.

    Q.    Okay.  The car that was parked behind that residence was a blue car?

    A.    I don't recall.  I believe it might have been a green car that was parked there that day.

    Q.    Okay.  Did you take a picture of the car?

    A.    Yes, I did.

    Q.    Picture of that car was then shown to the witness, Jacqueline Bradley, at some point?

            MS. CARRINGTON:  Objection.  Relevance.

            THE COURT:  I'll take it, if he knows, only because I'd like to know.

            THE WITNESS:  We showed her pictures of several cars.  That one was included, I believe it was.

    Q.    She said that wasn't the car involved in the incident; isn't that true?

    A.    None of the cars we showed her.

1     Masecchia – Cross – LoTempio   55

2 speak to first?

3   A.  The girlfriend.

4   Q.  Okay.  And did you inform her, before you spoke

5 to her, that she may be a suspect in the crime?

6       MS. CARRINGTON: Objection.

7       THE COURT: Sustained.

8       MR. LoTempio: Was there any communication

9      that could have been transferred from Jerriah

10      Johnson to Cory Epps that either of them were

11      suspected as being involved in the shooting?

12       MS. CARRINGTON: Objection.

13       THE COURT: Speculative.  Sustained.

14   Q.  Did you tell Mr. Epps at the time that you spoke

15 to Jerriah Johnson that he was a suspect in the shooting?

16   A.  Did I tell Mr. Epps that?

17   Q.  Yes.

18   A.  That day?

19   Q.  Yes.

20   A.  Yes.

21   Q.  That's prior to speaking to the girlfriend?

22   A.  No.

23   Q.  Okay.  After you spoke to the girlfriend?

24   A.  Yes.

25   Q.  But prior to speaking to Mr. Epps?

EPPS 01749

Masecchia - Cross - LoTempio                    56

2      A.      Yes.

3      Q.      Okay.  Prior to reading him his Miranda rights?

4      A.      Yes.

5      Q.      Okay.  Now, when you asked Mr. Epps questions

6   about what happened, you asked him whether or not he knew

7   Tomika Means, true?

8      A.      Yes.

9      Q.      Okay.  And he told you that, in fact, he did know

10  Tomika Means, true?

11     A.      He said he didn't know her, but he had seen her

12  and knew of her.

13     Q.      And that he knew her because he was friendly with

14  her boyfriend?

15     A.      That he knew the boyfriend better, right.

16     Q.      Okay.  That he would see Tomika Means in

17  Birchfield's and another nightclub by the name of O'Boys,

18  true?

19     A.      That's correct.

20     Q.      Okay.  And that often times, when he saw Tomika

21  Means, she was with many of her girlfriends or some of her

22  girlfriends?

23     A.      Yes.

24     Q.      Were any of the girlfriends' names given to him

25  at that time to see whether or not he knew them?

Masecchia – Cross – LoTempio          57

A.    No.

Q.    Okay.  Was there any questioning of Mr. Epps done that would indicate or would disclose to you whether or not he knew Jacqueline Bradley?

A.    No.

Q.    Okay.  So at that point that you questioned him you left it at the fact that he knew Tomika Means and seen her out at Birchfield's with her friends?

A.    That's correct.

    THE COURT:  Well, he said he didn't know her. So the word know, I understand, has different meanings.

    Would you read his question to see if my objection is accurate.

    (Whereupon, the above-requested question was read by the Court Reporter.)

    THE COURT:  I don't know that he said he knew her.  He would see her.  He had heard of her.  He didn't know her.  I mean, again, what is meant by the word know has many meanings to many people.

Q.    In your statement that you took from Mr. Epps you asked the question:  If you had seen Tomika out at either Birchfield's or O'Boys that night, would you have recognized her if you saw her?  Answer:  Yeah, I know Tomika.  I see her

```
 1              Masecchia - Cross - LoTempio          58
 2    out all the time.  You established that he knew in some
 3    fashion who Tomika Means was, true?
 4        A.    Yes.
 5        Q.    Okay.  Then you went on to ask him, do you
 6    remember, I see her with Kenyon once in a while.  I usually
 7    see her with some girls when she be out.  Do you remember
 8    that?
 9        A.    Yes.
10        Q.    Okay.  So when you spoke to Mr. Epps on July 9th,
11    1997, approximately a month and two weeks after the incident,
12    you established that he did know Tomika Means, true?
13        A.    Knew her by sight, yes.
14        Q.    In some fashion.  That he had often seen her out
15    with some friends?
16        A.    On occasion, yes.
17        Q.    You didn't follow through with -- follow through
18    at that point in time with any questions to establish whether
19    or not he could identify Jacqueline Bradley on sight?
20        A.    No, we did not.
21        Q.    Okay.  Prior to June -- or July 6th, 1997, did
22    you make any inquiry of Jacqueline Bradley to determine
23    whether or not she was one of the friends who would be in the
24    presence of both Cory Epps and Tomika Means in Birchfield's?
25              MS. CARRINGTON:   Objection.
```

EPPS 01752

1               Masecchia - Cross - LoTempio           59

2               THE COURT:   Does not the statement represent

3          the conversation you had with the defendant?

4               THE WITNESS:   Yes.

5               MR. LoTEMPIO:   It's not my question.

6     Q.     My question is, did you do any investigation

7    prior to the photo array being shown to Jacqueline Bradley

8    to determine whether or not Jacqueline Bradley knew who Cory

9    Epps was?  Did you personally do any investigation?

10    A.     I believe I interviewed and took a statement from

11   --

12    Q.     From Jacqueline Bradley?

13    A.     -- from Jacqueline Bradley.

14    Q.     That's my question.  That was done prior to the

15   photo array being showed to her, true?

16    A.     Yes.

17    Q.     Okay.  It also predated the lineup that she

18   viewed, true?

19    A.     Yes.

20    Q.     Okay.  Now, you're aware that another detective

21   from homicide testified today?

22    A.     Yes.

23    Q.     Detective Bohen?

24    A.     Yes.

25    Q.     Okay.  In the information that you gathered from

```
 1                  Masecchia - Cross - LoTempio          60
 2  Tomika -- or from Jacqueline Bradley, would it be fair to say
 3  that she told you that in some fashion she knew Cory Epps
 4  from Birchfield's?
 5       A.    Never mentioned the name.
 6       Q.    Did she say that she knew the shooter from
 7  Birchfield's?
 8       A.    Yes.
 9       Q.    Okay.  Do you know if she then went on to tell
10  Detective Bohen that she didn't know the guy she was picking
11  out of the photo array until she saw the photograph?
12       A.    I don't know.
13       Q.    So you're indicating to us that when the
14  statement was taken from her the night of the shooting, that
15  she said that she did know the shooter from Birchfield's?
16       A.    Yes.
17       Q.    Now, you said that at some point prior to the
18  lineup date you had discussions with Jacqueline Bradley,
19  wherein there was questions asked of her surrounding Buffalo
20  Police Officers that hang out at Birchfield's?
21       A.    That's correct.
22       Q.    At that point in time, when you spoke to her,
23  were you aware of who the stand-ins were going to be at the
24  lineup?
25       A.    No.  We were aware that we were going to try to
```

2  use several police officers in the lineup because they fit

3  the general description of Mr. Epps.  We referred that

4  information to the DA's Office, who then requested us to go

5  over and see if Jacqueline Bradley had any knowledge of any

6  police officers.

7       Q.     Okay.  Prior to the lineup actually being

8  conducted, did anybody inquire of Jacqueline Bradley whether

9  she knew Thomas Mayes, Vern Beatty, Arthur Burgin or Rickey

10  Larke by names?

11      A.     No names were mentioned.

12      Q.     So you just blanketly asked her if she knew

13  Buffalo Police Officers?

14      A.     And give me the names of any police officers that

15  you knew or hung around at Birchfield's or that you know

16  personally.  She said she knew none.

17      Q.     So no further inquiry was made of her to find out

18  if she knew these people, but didn't know they were police

19  officers?

20      A.     That's correct.

21      Q.     No further inquiry was made to see whether she

22  knew these people from Birchfield's, but weren't aware that

23  they were police officers?

24      A.     No.

25      Q.     Did you have conversations with Detective Bohen

```
 1                  Masecchia - Cross - LoTempio          62

 2   prior to the photo array being put together?

 3        A.    I may have.

 4        Q.    Okay.  And do you remember relaying to him a

 5   description that was given by Ms. Bradley on the night of the

 6   incident?

 7        A.    There was the description in the statement.

 8   There were descriptions on different reports.

 9        Q.    Okay.

10        A.    Whether I told him personally, I don't recall.

11        Q.    Would it be fair to say that the description in

12   the statement given by Jacqueline Bradley and the description

13   that was then repeated -- withdrawn and I'll rephrase it.

14   The description in the statement given by Jacqueline Bradley

15   is repeated in the P-73s; in other words, nobody changed that

16   description, true?

17        A.    I don't know.  I'd have to look at the P-73s.

18              THE COURT:   What's the question, whether the

19          description data changed or didn't change during

20          the course of the investigation?

21              MR. LoTEMPIO:   Yes.  I'll move on.

22        Q.    Prior to him putting the photo array, are you

23   aware of any description wherein the perpetrator was

24   described as being six feet tall or taller?

25        A.    No, not offhand.
```

```
 1              Masecchia - Cross - LoTempio           63

 2      Q.     The only person who ever gave a description was

 3   Jacqueline Bradley, true?

 4      A.     Yes.

 5      Q.     She's the only one who was in the car when the

 6   shooting occurred, true?

 7      A.     That's correct.

 8      Q.     The description she gave was of a man five foot

 9   eight, five foot nine, true?

10      A.     Again, I'd have to look at the statement, look at

11   the --

12              THE COURT:   His looking at it won't change

13           it.

14              THE WITNESS:   I don't know what it says.   It

15           could have been anywhere from five eight to five

16           ten.

17              MR. LoTEMPIO:   Thank you.   Nothing further.

18           Thank you, Officer, or Detective.

19              MS. CARRINGTON:   Nothing further, Your Honor.

20              THE COURT:   Okay.   Thank you, Detective,

21           retired Detective.

22              THE WITNESS:   Not yet.

23              THE COURT:   Not yet.   Okay.

24              MS. CARRINGTON:   Your Honor, the document

25           that's been marked as People's Exhibit 8 is
```

EPPS 01757

64

appended to the file.  That's a statement annexed
to the 710.30 Notice, so --

THE COURT:   It's part of the pleadings.  Do
you have any objection to its admission?

MR. LoTEMPIO:   None at all.  I was going to
ask to move it in, anyway.

THE COURT:   It's received.

MS. CARRINGTON:   Nothing further.

THE COURT:   Any further witnesses either on
the Wade or on the Huntley?

MS. CARRINGTON:   No, Your Honor.

THE COURT:   Any witnesses by the defense?

MR. LoTEMPIO:   Judge, I would request the
opportunity to call Jacqueline Bradley to the
stand.  Her statement to the police indicates that,
as Mr. Masecchia has disclosed, that she knew the
individual shooter, she said, on the night of the
incident from Birchfield's.  The other -- the other
officer said he told her -- she told him that she
didn't know the individual.  If, in fact, she knew
Mr. Epps by sight prior to showing the photo array,
it would affect the independent source, and I
believe I'm entitled to inquire of her as to her
knowledge of Mr. Epps either by sight or by name

65

1

2          prior to viewing the photo array.

3               There also seems to be indication that there

4          was some discussion had with her surrounding other

5          occupants of the lineup slots as being possible

6          people who hang out at Birchfield's or being

7          Buffalo Police Officers, and I'd like to clarify

8          those issues.

9               THE COURT:   What's the People's position

10         relative to the defense's interest in calling

11         Miss Bradley?

12              MS. CARRINGTON:   Your Honor, it's our

13         position that the photographic array and the lineup

14         photos, which are in evidence, show no evidence of

15         taint.   That both the array and the lineups

16         conducted were fair and that all the stand- ins

17         were similar to the defendant.   Ms. Bradley

18         indicated in her statement to the police that she

19         had seen the shooter around before at Birchfield's.

20         She told Detective Bohen, as he testified, after

21         she made the identification in the photographic

22         array, that she did not know the name of the

23         person.   Once he gave her the name, that was the

24         first time she was aware of the name as the person

25         whom she had seen before at Birchfield's and who

EPPS 01759

66

1

2      was the shooter in this case.

3              Also, I think Detective Masecchia's testimony

4      was clear.  He simply asked her if she knew any

5      police officers that hung out at Birchfield's and,

6      if so, did she know their names; and she said, no,

7      she didn't know any police officers.  He didn't

8      give her any specific names.  There's no situation

9      that she was in any way apprised that there were

10     going to be police officers in the lineup or who

11     they would be.  I think it's clear from reviewing

12     photographs of the lineup that there's no way to

13     distinguish by looking at it who the police

14     officers are and are not.

15             So, based on all the testimony and the

16     exhibits that we've adduced at this point, I would

17     submit that the issues regarding the Bradley

18     identification are trial issues and that the

19     fairness of the identification has been shown.  So

20     I would object and, also, as I said before,

21     pursuant to People versus Chipp, to calling her as

22     a witness at this hearing.

23             THE COURT:  Do you intend any other

24     witnesses?

25             MR. LoTEMPIO:  No, Your Honor.

67

1

2       THE COURT:    I'm going to review the evidence

3   in this case, to wit:   The lineup, and determine

4   its fairness, as well as reviewing the testimony

5   developed during the proceeding, and make the

6   conclusion with respect to it, and review the

7   authority of People versus Chipp and its language

8   to determine whether there's a basis, based upon

9   this record, to allow for the defense's calling of

10  the complainant as their witness.

11       Obviously, they would call that person as an

12  adverse witness and I presume would wish to conduct

13  a leading examination.   My recollection is the

14  authority of the Court of Appeals in People versus

15  Chipp is that that process is not essential to

16  pretrial hearings if the Court otherwise concludes

17  that the identification procedures were conducted

18  fairly.   And that the basis of her independent

19  observation and ability to effect identification,

20  where the identification procedures engaged in by

21  the police were fair, is a matter left for trial.

22  So I want to review the submissions first.   I'll

23  make a ruling as to it and your ability to call or

24  not call the witness.

25       MR. LoTEMPIO:    Just so that my position is

68

1
2  laid out appropriately on the record for purposes

3  of appeal, it's my position that the record does

4  not establish that the identifications were fair

5  because, in fact, if Ms. Bradley knew Mr. Epps by

6  sight prior to seeing the photo arrays and could

7  connect the name -- or his face with the name, or

8  his face with someone she sees in Birchfield's,

9  then it would make the identification procedures

10  unfair, and that's why I would like to question her

11  as to her knowledge of Mr. Epps prior to viewing

12  the photo array.  That's all.  That's the reason I

13  want to call her.

14      THE COURT:   If I knew somebody from seeing

15  him around a bar without knowing their name, why

16  would it be unfair to present that person's picture

17  to me for purposes of identification as to whether

18  that person committed a shooting?

19      MR. LoTEMPIO:   Because there's information

20  now in the record that what happened prior to his

21  picture being put in the photo array was that an

22  aunt of the victim called Ms. Bradley on the phone

23  and said, I know someone who looks like the

24  composite sketch.

25      THE COURT:   No.  The record doesn't say she

69

talked to the complainant.  That she talked to the

police.

MR. LoTEMPIO:   Well, what actually happened

here --

THE COURT:   Excuse me.  When you say what

actually happened, I'm talking about the record

here.

MR. LoTEMPIO:   I would like to bring it out

from Mrs. Bradley what did happen is that this aunt

called Ms. Bradley on the phone and Ms. Bradley

called the police and gave them Cory Epps' name.

That's what's indicated in the police P-73.

THE COURT:   Well, I don't know what's in

the P-73.  All of those are part of the general

investigation and they don't constitute evidence in

a hearing, unless they're admitted in a hearing.

What I have before me is that, I believe, from Mr.

Masecchia, was that the victim's aunt, after seeing

a sketch, sketch by whom, I don't know, sketch,

indicated that the sketch looked like a person she

knew to be Cory Epps and, therefore, suggested that

Epps' photograph or, at least, Epps' name enter

into the investigative process and, apparently,

did, and it brought about this identification.

EPPS 01763

70

1

2      That's what the record reflects.

3           MR. LoTEMPIO:   Then I should, perhaps, recall

4      the police officer who did the P-73, which was

5      Bohen, who took the phone call from Ms. Bradley

6      and Ms. Bradley gave the name of the aunt who said

7      it looked like Cory Epps.  I better do that to

8      straighten the record out.

9           THE COURT:   Well, Andy, I only know --

10          MR. LoTEMPIO:   I understand, and I thought

11     that was -- from Mr. Bohen' testimony, that it was

12     established that Ms. Bradley is the one who made

13     the call that said that Mr. Epps' name was being

14     brought up.  I have some other requests of the

15     prosecutor, as far as discovery, Your Honor, aside

16     from that issue.

17          THE COURT:   Well, you can review this record

18     and see what it is that you do or do not want to do

19     relative to calling witnesses, and I will reserve

20     for the moment this question about whether you have

21     the -- either the authority or the permission to

22     compel the complainant to testify at this hearing.

23     We'll put a period to the day on the question of

24     who can and who cannot and who will and who will

25     not be offered as a defense witness.

71

Now, that aside for the moment, what else is
at hand here?

MR. LoTEMPIO:   Today Ms. Carrington handed
over what she has, herself, classified as possible
Brady material, that being P-73 reports, wherein
other names were brought up as suspects in this
case prior to Mr. Epps' name being mentioned.  They
were Carlos Wiggins, Patrick Bush, Donald Faison,
F-A-I-S-O-N, Michael Carr, and Damion Morgan.  I
believe that Donald Faison's picture was also
placed in a photo array and shown to Ms. Bradley.

I would at this point request a copy of Mr.
Epps' mug shot, which is contained in the photo
array, and mug shots of the other individuals who
were identified as possible perpetrators in this
case.

THE COURT:   You want a copy of the photograph
contained in the array?

MR. LoTEMPIO:   And photographs of Carlos
Wiggins, Patrick Bush, Donald Faison, Michael Carr
and Damion Morgan.  Donald Faison's picture
appeared in a photo array.

THE COURT:   An array, not part of these
proceedings?

EPPS 01765

72

1

2          MR. LoTEMPIO:   Yes, part of these procedures.

3     His picture was also --

4          THE COURT:   Part of this hearing?

5          MR. LoTEMPIO:   Not part of this hearing.

6          THE COURT:   I don't know anything about

7     Faison.  Only one of the names you've alluded to as

8     being, quotes, possible suspects, rings a bell with

9     me.  I believe he's accused here in a trial that I

10    have scheduled for, I think, Thursday afternoon.

11    Be that as it may, what you're asking for is

12    photographs of other people who were presented to

13    the witness and the witness declined or indicated

14    that those were not people involved in the

15    shooting?

16         MR. LoTEMPIO:   Some of the photographs were

17    presented to her.  Others, for some reason or

18    another, the police chose not to show her the

19    photograph and said to themselves, this isn't the

20    person; one of them being Damion Morgan, who

21    matched the description, was caught in a car

22    matching the description the same night, and they

23    did not show his picture to Ms. Bradley.  I would

24    like these pictures for purposes of strategizing a

25    defense and conducting my own investigation into

7/99D

FORM LASER BOND A   ®   PENGAD • 1-800-631-6989

73

this case.

Patrick Bush I know has an arrest record and has a mug shot, because I've represented him at least six times.  Damion Morgan has an arrest record, because I've had him as a witness in another case.  And Michael Carr, I believe, from information from the defendant's family, has an arrest record.  And Donald Faison I know has a mug shot, because they showed his mug shot in one of the photo arrays used in this case.

THE COURT:  Do you have any objection to providing photographs of any of these defendants -- strike that, any of these potential, quotes, suspects, close quotes, that were utilized by police in attempting to effect an identification?

MS. CARRINGTON:  Well, Your Honor, first of all, I don't have any of those photographs.  That's --

THE COURT:  No.  But it's a simple -- if the police can get them, the prosecution can get them.

MS. CARRINGTON:  I don't see the relevance because she's viewed these people in person or the photographs and has said this is not the shooter.

THE COURT:  Well, on the grounds it is

74

suggested somewhere that they were, quotes,

suspects.  I see no harm in providing photographs

of people that the police may have thought were

involved to a point that in one instance they

showed a photograph of that individual to the

witness, to wit:  Mr. Faison.  What use Mr.

LoTempio wishes to make of those photographs, I

don't know, or I don't care.  We're here to see to

it that the person accused is properly accused,

properly prosecuted and not the wrong man being

prosecuted.  I don't know what use these other

photographs -- how they entered into the

investigation.  Do you, Mr. LoTempio?

MR. LoTEMPIO:  No, not really, other than

from the P-73s it would appear that single

photographs were either shown, or these people were

brought to the woman in person, or a determination

was made that they weren't going to show them to

her, for what reason the police came up with, I

don't know, but I would like to look at the

photographs.  There is a composite sketch in this

case.  There are other potential witnesses that I

have been speaking to.

THE COURT:  Well, one can only speculate

1                                                          75

2           that, perhaps, the sketch generated general police

3           comment that maybe it's this and maybe it's that

4           and maybe it's somebody else on the grounds of the

5           sketch.  I haven't seen the sketch.

6                MR. LoTEMPIO:   Including Mr. Epps.

7                THE COURT:   Please.  I don't interrupt you.

8                MR. LoTEMPIO:   I'm sorry, Your Honor.

9                THE COURT:   I've lost my thought.

10               I can only guess that the sketch may have

11          generated within the police community general

12          people who might possibly come within the purview

13          of that sketch and, perhaps, that's how these names

14          began to generate, because, as far as I know, any

15          of those names are not connected to the event under

16          scrutiny here by way of car or anyone else; is

17          there, Miss Carrington?

18               MS. CARRINGTON:   Well, Donald Faison and

19          Patrick Bush, I believe, were both stopped driving

20          in the area that night in cars similar to the cars

21          described.  And it's my understanding that they

22          were both brought back to the witness and she said

23          it was not the person, particularly not Mr. Bush.

24          Mr. Faison, apparently, she was upset when she saw

25          him and so that's why they showed a photo array of

EPPS 01769

76

1

2   him later and she said, no, that's definitely not

3   the person.  The only person that she ever saw a

4   photo array of was Donald Faison.  Mr. Bush was,

5   like I said, brought back in person --

6          THE COURT:   Show-up situation?

7          MS. CARRINGTON:   -- that night and she said

8   that was not the individual.  And I believe Mr.

9   Wiggins, that's referred to in a P-73 dated

10   December 6th, that's some information that came

11   up very much after the indictment and the

12   identification procedures that were conducted here,

13   and she has never been shown a photograph of him.

14          THE COURT:   I would direct that you obtain

15   the photographs that the police utilized as to

16   these other --

17          MS. CARRINGTON:   That would be just --

18          THE COURT:   Excuse me.

19          MS. CARRINGTON:   I'm sorry.

20          THE COURT:   -- as to these people who were,

21   at least, speculated on as being a potential

22   suspect and that were utilized by the police in

23   attempting to effect identification or whose names

24   came up immediately surrounding the event, I guess,

25   the names that Mr. LoTempio has enumerated.

77

1

2          MS. CARRINGTON:   Well, the only photograph

3      that was shown is one of Donald Faison.

4          THE COURT:   I understand that.   What I'm

5      saying, the other photographs or copies of them can

6      be provided to Mr. LoTempio and we'll see if they

7      have any viability in the proceeding.   They had

8      viability at some point in the police mind,

9      correct?

10         MR. LoTEMPIO:   That's my position, Your

11     Honor.

12         THE COURT:   And if they had viability within

13     the police mind as being a potential prospect, I

14     don't understand why the photographs of them

15     couldn't be shared with the defense, first of all,

16     especially the ones that were shown to the witness,

17     so that Mr. LoTempio can know what that person

18     looked like and the rejection of that person as

19     being the person who participated in the shooting.

20         So, as to Mr. Faison, you have one already,

21     don't you, or have you been shown that array?

22         MR. LoTEMPIO:   I've never seen it.

23         MS. CARRINGTON:   No.

24         THE COURT:   Okay.   That's clear.   As to two

25     men stopped in the immediate area and were taken

78

back and evidenced as a show-up, if we have

photographs of them that's relatively recent or

even their last photograph, I don't see any harm in

sharing that with the defense, inasmuch as they

were people questioned relative to their potential

involvement in this incident and rejected by the

witness, as such, but were in the area at the time

it occurred in a car not unlike the one that was

used.   Therefore, their photographs can be utilized

by the defense in some means and, therefore, I

would allow for their release.

Who else, now, did you have?   That's three of

them.

MR. LoTEMPIO:   I've spoke of Carlos Wiggins,

Patrick Bush and Donald Faison, Damion Morgan.

Michael Carr was driving a car owned by the

defendant's cousin, Marvina Epps, and it was   a

Pontiac J-6000, which was described in this

incident.   In that car was a man by the name of

Damion Morgan, who seems to also match the

description of the shooter, and I would like a

picture of him.

THE COURT:   Damion Morgan is before the Court

on a separate matter, in fact, to be resolved by a

79

plea on Thursday afternoon on a matter that's

before this Court.  It's on a drug event.  I see no

harm in releasing his photograph for the defense

for whatever purposes they see fit.  I mean, it's

not as if we're intruding into the confidentiality

of photographs of people who the police utilized

or thought to utilize in terms of investigating

this event.  And, therefore, limited to those I'd

allow for it.  Okay.

    MR. LoTEMPIO:   Thank you, Your Honor.

    THE COURT:   I'll reserve on this question of

future witnesses.  Your claim is you want to call

her and you want to call Bohen back --

    MR. LoTEMPIO:   Yes.

    THE COURT:   -- to affirm or establish how

Epps' name first entered the picture and by whom?

    MR. LoTEMPIO:   The actual procedure in which

it was -- the call came in.  It was a P-73 that

seems to indicate that the aunt called Bradley, who

called Bohen.

    THE COURT:   Well, if that can be stipulated

to --

    MR. LoTEMPIO:   By Miss Carrington?

    THE COURT:   Just, if it can be stipulated to

1
2          as being an accurate statement that both parties

3          can concur in, you won't require his re-attendance.

4          Check it out and see if you both agree that's the

5          way it went down.  If that's the way it went down,

6          perhaps you can stipulate and avoid his

7          re-attendance.  Fair enough.

8                    (Proceedings adjourned at 4:33 P.M.)

9                    *         *         *         *

10

11

12  I hereby certify that the foregoing is a true and accurate
    transcript of the proceedings in the matter of the People of
13  the State of New York against Cory Epps, indictment number
    97-1542.

14

15

                    Maureen C. Laughlin, CSR, RPR, RMR
16                  Official Court Reporter

17

18

19

20

21

22

23

24

25