UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CORY EPPS,

                                   Plaintiff,

       v.                                                  Case No. 1:19-cv-00281

THE CITY OF BUFFALO,
DETECTIVE JOHN BOHEN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY COSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES ARONICA,
AND CHIEF JOSEPH RIGA,

                                   Defendants.

---

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF <br> <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

        Defendants the City of Buffalo, Detective John Bohen, Detective Reginald Minor, Detective Mark Stambach, Detective James Giardina, Detective Anthony Costantino, Detective Robert Chella, Detective Raniero Massechia, Detective Charles Aronica, and Chief Joseph Riga by their attorneys, Hodgson Russ LLP, submit the following Statement of Undisputed Facts pursuant to Local Rule of Civil Procedure 56(a)(2). The facts stated herein are "undisputed" for purposes of this motion only, and defendants reserve the right to dispute and/or contradict any of these facts at any subsequent trial of this action or in any other proceeding which is unrelated to the current motion.

- 2 -

**The Tomika Means Homicide**

       1.      In the early morning hours of May 27, 1997, a then unidentified perpetrator murdered Tomika Means near the corner of Chelsea and East Delevan Avenue in the City of Buffalo.  Declaration of Peter A. Sahasrabudhe ("Decl."), Exhibit 11 at p. 127-138.

       2.      The only eye witness to the murder was Jaqueline Bradley, who was in the passenger seat of the car where Means was shot.  (*Id.*).

       3.      The unidentified perpetrator shot means at near point blank range.  (*Id.*).

       4.      Bradley was able to view the perpetrator of the homicide but she was not able to identify him following the shooting.  (*Id.* at p. 152).

**Detective Bohen's Investigative Activities**

       5.       In connection with his investigation of the Means homicide, Detective John Bohen showed Jaqueline Bradley a photo array containing Epps's photograph on July 6, 1997.   (Decl., Ex. 3 at p. 83); (Decl., Ex. 35).

       6.      Prior to showing Bradley the photo array, Detective Bohen had been told by Linda Means, the aunt of the homicide victim, that Epps resembled a composite sketch that Bradley had helped create shortly after the shooting.  (Decl., Ex. 3 at p. 72); (Decl., Ex. 35).

       7.      Linda Means also relayed that she had heard rumors that Epps may have been the perpetrator.  (Decl., Ex. 35).

       8.      The photo array Bohen showed to Bradley contained Epps's photograph and five filler photographs.  (Decl., Ex. 28); (Decl., Ex. 16 at p. 6-7).

- 3 -

9.      The five filler photographs were the same ethnicity as Epps and were of the same relative age and appearance as Epps.  (Decl., Ex. 28).

10.      The only people present when Bradley viewed the photo array on July 6, 1997 were Bradley, Detective Bohen, and Detective Reginald Minor.  (Decl., Ex. 16 at p. 7).

11.      Bradley signed an affidavit attesting to the fact that she identified the photograph in slot number five of the array as depicting the individual who committed the Means homicide.  (Decl. Ex. 28).

12.      The photograph in slot number five of the photo array was Epps's photo. (Decl. Ex. 35).

13.      When Detective Bohen showed Bradley the array, he told her to take her time, look through the photos, and to let her know if she recognized anyone in the array. Detective Bohen did not suggest that Bradley should choose Epps's photo, and he did not tell Bradley that the perpetrator's photo would be present in the array.  (Decl., Ex. 16 at p. 7-8).

14.      Prior to showing Bradley a photo array with Epps's picture present, Detective Bohen had shown Bradley a photo array with another suspect's photo included in the array.  (Decl., Ex. 3 at p. 60-61); (Decl., Ex. 29); (Decl. Ex. 38).   Epps's photo was not included in this photo array.  (Decl., Ex. 29).

15.      Bradley did not identify the other suspect in the first array put together by Detective Bohen.  (Decl., Ex. 35).  Further, she did not identify any photograph in the first array as the perpetrator of the Means homicide.  (Decl., Ex. 35).

- 4 -

**Detective Minor's Investigative Activities**

16.     Detective Minor was present with Detective Bohen and Bradley on July 6, 1997 when Bradley identified Epps in a photo array. (Decl. Ex. 16, at p. 7).

**Potential Identification Procedures in Addition to Detective Bohen's Photo Array**

17.     Jaqueline Bradley remembers identifying Epps's picture in a mug book. (Decl., Ex. 9 at p. 7-12).

18.     Jaqueline Bradley remembers being given a mug book where she could not identify anyone's photograph as the perpetrator of the Means homicide.  (*Id.* at p. 11).

19.     Jaqueline Bradley remembers being given a second mug book wherein she was able to identify Epps's photograph.  (*Id.*).

20.     Jaqueline Bradley claims that, when she was given the mug book, she was told to take her time, look through the photographs, and let police officers know if she recognized any of the photographs.  (*Id.* at p. 10).

21.     Jaqueline Bradley testified that no one told her the photo she had identified in the mug book was Cory Epps.  (*Id.* at p. 13).

22.     Jaqueline Bradley testified that, when she saw Epps's photo, she started crying because she recognized the person in the photograph as the individual who committed the Means homicide.  (*Id.* at p. 12).

- 5 -

23.     At some point, Homicide Detective Juan Morales assembled a photo array with Epps's picture present.  (Decl. Ex. 30).

24.     There is no evidence that Detective Morales ever showed this photo array to Jaqueline Bradley or any other witness.

**Lineup Conducted at the Request of the Erie County District Attorney's Office**

25.     After Bradley identified Epps's photograph, Assistant District Attorney Patricia Carrington made an application for an order requiring Epps to participate in an in person lineup.  (Decl. Ex. 23).

26.     New York County Court Judge Timothy Drury granted ADA Carrington's application and ordered Epps to appear for an in person lineup.  (Decl. Ex. 24).

27.     On July 30, 1997, Detective Sergeant Henry Smardz, who is not a party to this action, oversaw an in person lineup where Epps observed Bradley next to five fillers.  (Decl., Ex. 16 at p. 23-42).  Detective Sergeant Smardz was a member of BPD's Evidence Collection Unit.

28.     ADA Carrington was present at the in person lineup.  (Decl. Ex. 16 at p. 24-25).

29.     Salvatore Abate, Esq., who at the time was representing Epps, was also present at the lineup.  (Decl., Ex. 16 at p. 24-25).

30.     Neither ADA Carrington nor Mr. Abate objected to the procedures implemented during the lineup.  (*Id.*).

31.     During the lineup, Bradley viewed Epps standing next to five fillers.  (*Id.* at p. 23-42).  The fillers were the same ethnicity as Epps and were of the same relative age and appearance.  (*Id.*).

32.     On two occasions during the in person lineup, Bradley identified Epps as the individual who had committed the Means homicide.  (*Id.*).

33.     Epps was in a different position in the lineup each time that Bradley identified him.  (*Id.*).

34.     Bradley began crying and shaking once she identified Epps at the lineup. (*Id.* at p. 32).

35.     In an affidavit submitted by ADA Carrington in later proceedings, she described Bradley's identification at the lineup as one of the most convincing and compelling identifications she had ever seen.  (Decl., Ex. 17).

**Grand Jury Proceedings**

36.     A grand jury indicted Epps on August 7, 1997.  (Decl., Ex. 31); (Decl., Ex. 40).

37.     The indictment was issued based on the testimony of Bradley, which was elicited by ADA Carrington's questioning.  (Decl., Ex. 10).

38.     During the grand jury proceedings, ADA Carrington's questions of Jaqueline Bradley focused exclusively on Bradley's account of the murder and her identification of Epps at the in person lineup ordered by Judge Drury.  (*Id.*).

39.     Based on Bradley's testimony, a grand jury indicted Epps.  (Decl., Ex. 31).

**Detective Stambach's Investigative Activities**

40.     Detective Stambach did not investigate the Means homicide.  (Decl., Ex. 5 at p. 25).  He played no role whatsoever in procuring the indictment that was issued against Epps.  (*Id.*).

41.     On April 17, 1998, Detective Stambach interviewed Wymiko Anderson while investigating the recent murder of Paul Pope.  (*Id.* at p. 32).

42.     At the time of Anderson's interview, Paul Pope was dead.  (Decl., Ex. 32) (noting that interview was taken in connection with the murder of Paul Pope).

43.     During the interview, Anderson relayed that she believed Russell Montgomery may have murdered Pope.  (*Id.*).

44.     Anderson also claims that, during the interview, she relayed that the composite sketch Bradley had helped create looked similar to Montgomery.  (Decl., Ex. 8 at p. 24-25).

- 8 -

45.     Anderson also claims that, during her interview, she relayed that Montgomery came to retrieve Pope from a home where she and Pope had been staying the morning of the Means murder.  (*Id.* at p. 25); (Decl., Ex. 12 at p. 47-50).

46.     Anderson claims that she told Detective Stambach and another detective during her interview that, when Pope returned home after leaving with Montgomery, he told Anderson that Montgomery had confessed to being the perpetrator of the Means murder.  (Decl. Ex. 12 at p. 47-50).

47.     Detective Stambach denies that Anderson ever relayed any information relevant to the Means homicide during her April 17, 1998 interview.  (Decl., Ex. 13 at p. 10); Decl., Ex. 20).

**Detective Giardina's Investigative Activities**

48.     Detective Giardina played no meaningful role in investigating the Means homicide.  (Decl., Ex. 6 at p. 22-23).

49.     Detective Giardina did not play any role in procuring the indictment issued against Epps.  (*Id.*).

50.     Detective Giardina was present during Anderson's April 17, 1998 interview. (Decl., Ex. 21).

51.     Detective Giardina denies that Anderson relayed any information relevant to the Means homicide during her April 17, 1997 interview.  (*Id.*).

- 9 -

**Detective Sergeant Costantino's Investigative Activities**

52.    There is no dispute that Detective Sergeant Costantino interacted with Wymiko Anderson at some point.  (Decl., Ex. 15 at p. 43).  Defendants contend that Detective Sergeant Costantino only spoke with Anderson after Epps had been convicted.  (*Id.* at p. 40).

53.    Although Detective Sergeant Costantino investigated the Means murder, there is no evidence that he conducted any photo identification procedures with Jaqueline Bradley prior to the in person lineup requested by the Erie County District Attorney's Office.

**Epps's Trial**

54.    Epps's trial began on April 20, 1998.  (Decl. Ex. 1 at ¶ 53).[1]

55.    Epps was convicted by a jury based on the testimony of Jaqueline Bradley. (Decl., Ex. 11).

56.    At Epps's trial, Bradley confidently identified Epps as the perpetrator of the Means homicide.  (Decl., Ex. 11 at p. 148).

57.    Bradley did not testify about any of the photo identification procedures implemented by the defendant detectives.  Her testimony focused only on her account of the homicide and the in person lineup that had been requested by the District Attorney's Office. (*See generally,* Decl., Ex. 11).

---

[1]    The Complaint contains a typo given that it alleges that the trial began on April 20, 1997. However, there is no real dispute that Epps's trial did not begin until April of 1998.

- 10 -

58.     Based on Bradley's testimony, a jury convicted Epps on April 24, 1998. (Decl. Ex. 1 at ¶ 61).

**Wymiko Anderson' Anonymous Letter**

59.     After Epps was convicted, Wymiko Anderson wrote an anonymous letter to Epps's trial counsel, Andrew Lotempio, Esq.  (Decl., Ex. 33).

60.     Anderson's anonymous letter did not mention Paul Pope or any of her alleged statements made to the police on April 17, 1998.  (*Id.*).

61.     There is no evidence that any of the defendant detectives or anyone from the Buffalo Police Department knew that Anderson was the author of this letter prior to Epps's sentencing.  Nor is there any evidence that any of the defendant detectives tried to conceal Anderson's identify from Lawrence Schwegler, the ADA who had handled Epps's criminal trial. (Decl. Ex. 15 at p. 42) (noting that ADA Schwegler shared with homicide detectives that Anderson was the author of the anonymous letter).

**Epps's NYCPL 440 Motions**

62.     After Epps's counsel learned Anderson's identity, Epps applied for post-conviction relief pursuant to New York Criminal Procedure Law 440.  (Decl., Ex. 18).

63.     In connection with Epps's NYCPL 400 applications, Anderson claimed that she told the police, that Paul Pope told her, that Russell Montgomery confessed to being the perpetrator of the Means murder.  (*Id.*).

- 11 -

64.     Based largely on Anderson's allegations, Epps sought to overturn his conviction on two grounds: (1) newly discovered evidence that was previously unavailable demonstrated his innocence; and (2) Anderson's statement demonstrated that homicide detectives had violated the tenets of *Brady v. Maryland*, 373 U.S. 83 (1963).  (Decl., Ex. 25); (Decl., Ex. 26).

65.     In connection with Epps's motion, Acting New York Supreme Court Justice Joseph McCarthy, who presided over Epps's criminal trial, held a hearing to determine whether homicide detectives had violated *Brady*.  (Decl., Ex. 26).

66.     Anderson testified at the hearing and claimed that she told police that Pope told her that Montgomery had confessed to the Means homicide.  (Decl., Ex. 12).

67.     Detectives Stambach and Giardina both testified that Anderson never gave any pertinent information regarding the Means homicide when she was interviewed on April 17, 1997.  (Decl., Ex. 13); (Decl., Ex. 14).

68.     Justice McCarthy denied Epps's motion to the extent it was premised upon homicide detectives' alleged violation of *Brady*.  (Decl., Ex. 26)  Justice McCarthy found Detective Stambach and Giardina's testimony to be credible.  (*Id.* at p. 4-5).  In contrast, Justice McCarthy found Ms. Anderson's testimony lacking in credibility and consistency.  (*Id.*).

69.     Justice McCarthy also denied Epps's motion premised upon the discovery of previously unavailable evidence.  (Decl., Ex. 25).  Because Anderson's statement was inadmissible hearsay, Epps could not use Anderson's statement to overturn his conviction.  (*Id.*).

- 12 -

**Over a Decade Later, Witness 1 Comes Forward With New Information**

70.     Over a decade after Epps's post-conviction efforts were unsuccessful, a witness came forward with new information tending to show that Montgomery was the true perpetrator of the Means homicide.  (Decl., Ex. 36).  This witness, whose identity is being kept confidential, has been referred to throughout these proceedings as Witness 1.

71.     Witness 1 did not interact with the police prior to Epps's conviction.  (*Id.*).

72.     In or about 2017, Joseph Riga, the former Chief of Homicide for the Buffalo Police Department interviewed Witness 1 in his capacity as an investigator for the Eire County District Attorney's Office.  (Decl. Ex. 38 at p. 62-70).

73.     Investigator Riga found Witness 1 to be credible.  (*Id.* at p. 68).

74.     Epps filed a new NYCPL 440 motion in 2017 based on a sworn affidavit and testimony from Witness 1.  (Decl. Ex. 39).

75.     The Erie County District Attorney's Office ultimately did not oppose Epps's motion.

76.     As a result of Epps's unopposed motion, his 1998 conviction was vacated. (*Id.*).

77.     Despite the reversal of Epps's conviction, Jaqueline Bradley has never recanted her identification of Epps as the perpetrator of the Means homicide.  (Decl. Ex. 9 at p.

- 13 -

25) (Bradley noting that she does not recognize Russell Montgomery as the perpetrator of the

Means homicide).

Dated:       Buffalo, New York
              October 7, 2022

                            **HODGSON RUSS** LLP
                            *Attorneys for Defendants*

                            By:  //s Peter A. Sahasrabudhe
                                Peter Sahasrabudhe
                            The Guaranty Building
                            140 Pearl Street – Suite 100
                            Buffalo, New York 14202-4040
                            Telephone: 716-848-1508
                            Email:  psahasra@hodgsonruss.com