UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CORY EPPS,

                                    Plaintiff,

        v.                                                          Case No. 1:19-cv-00281

THE CITY OF BUFFALO,
DETECTIVE JOHN BOHEN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY COSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES ARONICA,
AND CHIEF JOSEPH RIGA,

                                    Defendants.

---

# MEMORANDUM OF LAW SUPPORT OF
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for Defendants*
Hugh M. Russ, Esq.
Peter A. Sahasrabudhe, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

    A.    The Tomika Means Homicide ..................................................................3

    B.    The Individual Defendants........................................................................3

    C.    Detective Bohen's Investigative Activities.............................................4

    D.    Detective Minor's Investigative Activities .............................................5

    E.    Potential Identification Procedures in Addition to Detective Bohen's Photo-Array......................................................................................6

    F.    Lineup Conducted at the Request of the Erie County DA's Office........................7

    G.    Grand Jury Proceedings ..........................................................................9

    H.    Detective Stambach's Investigative Activities .......................................9

    I.    Detective Giardina's Investigative Activities ........................................11

    J.    Detective Sergeant Costantino's Investigative Activities......................11

    K.    Epps's Trial.............................................................................................12

    L.    Epps's Pre-Sentencing Motion ..............................................................12

    M.    Post-Conviction Proceedings in 2000....................................................13

    N.    Newly Discovered Evidence Revealed Over a Decade Later Leads to the Reversal of Epps's Conviction................................................15

    O.    The Claims in this Action ......................................................................16

ARGUMENT ...........................................................................................................................17

POINT I.    EPPS'S MALICIOUS PROSECUTION CLAIMS FAIL AS A MATTER OF LAW .............................................................................17

    A.    Detectives Stambach, Giardina, and Costantino did not cause Epps to be indicted..........................................................................18

i

## <u>TABLE OF CONTENTS - cont'd</u>

<u>PAGE</u>

B.     There is no evidence of bad faith misconduct by Detectives Bohen and Minor................................................................................................19

C.     Bradley's independent identification of Epps created probable cause .................21

D.     The City of Buffalo is not vicariously liable for any malicious prosecution.........23

POINT II.     EPPS CANNOT MAINTAIN HIS DUE PROCESS CLAIM PREMISED UPON BRADY VIOLATIONS ..................................................................23

A.     Epps's claims premised upon Brady must be dismissed against Detectives Bohen and Minor ....................................................................24

B.     Anderson's alleged statement is not Brady material...............................................25

C.     Defendants are entitled to qualified immunity with respect to Anderson's alleged double hearsay statement even if it is Brady material..............................26

POINT III.     EPPS'S POST-TRIAL DUE PROCESS CLAIM FAILS AS A MATTER OF LAW ........................................................................................29

POINT IV.     EPPS'S STATE LAW CONSTITUTIONAL CLAIM AGAINST THE CITY OF BUFFALO FAILS AS A MATTER OF LAW ....................................30

CONCLUSION................................................................................................32

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Federal Cases**

*Beaman v. Freesmeyer*,
  776 F.3d 500 (7th Cir. 2015) ................................................................................28

*Bermudez v. City of New York*,
  790 F.3d 368 (2d Cir. 2015) ...........................................................................20, 22

*Bradley v. Nagle*,
  212 F.3d 559 (11th Cir. 2000) .............................................................................27

*Brady v. Maryland*,
  373 U.S. 83 (1963) ...............................................1, 2, 14, 16, 23, 24, 25, 26, 27, 28, 29

*Briscoe v. LaHue*,
  460 U.S. 325 (1983) ..............................................................................................30

*Brown v. Sheehan*,
  17-CV-213, 2021 WL 6113947 (W.D.N.Y. Dec. 2021) (Vilardo, J.) ...................20

*Burgess v. Dejoseph*,
  14-CV-1371, 2017 WL 1066662 (N.D.N.Y. Mar. 2017) ......................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..............................................................................................17

*Coleman v. City of Rochester*,
  No. 16-CV-6179, 2018 WL 6727535 (W.D.N.Y. Dec. 2018) ...............................31

*Collins v. City of New York*,
  923 F. Supp. 2d 462 (E.D.N.Y. 2013) ..................................................................30

*Conway v. Vill. of Mount Kisco*,
  750 F.2d 205 (2d Cir. 1984) .................................................................................17

*Dennis v. Sec'y, Pa. Dep't of Corr.*,
  834 F.3d 263 (3d Cir. 2016) .................................................................................27

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*,
  557 U.S. 52 (2009) ................................................................................................29

## TABLE OF AUTHORITIES - cont'd

PAGE

*Downs v. Hoyt*,
    232 F.3d 1031 (9th Cir. 2000) ........................................................................25, 26

*Ellsworth v. Warden*,
    333 F.3d 1 (1st Cir. 2003) (*en banc*)...............................................................27, 28

*Fappiano v. City of New York*,
    640 Fed. App'x 115 (2d Cir. 2016)....................................................................21, 23

*Hoke v. Netherland*,
    92 F.3d 1350 (4th Cir. 1996) ....................................................................................27

*Issac v. City of New York*,
    No. 16-CV-472, 2018 WL 5020173 (E.D.N.Y. Aug. 2018)....................................31

*Jardine v. Dittmann*,
    658 F.3d 772 (7th Cir. 2011) ....................................................................................27

*Johnson v. Folino*,
    705 F.3d 117 (3d Cir. 2013)......................................................................................27

*Luna v. Pico*,
    356 F.3d 481 (2d Cir. 2004)......................................................................................26

*Maldonado v. City of New York*,
    11–CV-3514, 2014 WL 787814 (S.D.N.Y. Feb. 26, 2014)....................................23

*McClennon v. City of New York*,
    13-CV-128, 2018 WL 2943565 (E.D.N.Y. Jun 2018)............................................18

*Newton v. City of New York*,
    640 F. Supp. 2d 426 (S.D.N.Y. 2009)..............................................................17, 22

*Pierre v. City of Rochester*,
    16-CV-6428, 2018 WL 10072453 (W.D.N.Y. Sep. 2018)......................................29

*Poventud v. City of New York*,
    750 F.3d 121 (2d. Cir. 2014).....................................................................................25

*Reid v. Simmons*,
    163 F. Supp. 2d 81 (D.N.H. 2001)............................................................................24

## TABLE OF AUTHORITIES - cont'd

PAGE

*Savino v. City of New York*,
    331 F.3d 63 (2d Cir. 2003)................................................................................17

*Sykes v. James*,
    13 F.3d 515 (2d Cir. 1993)................................................................................30

*Townes v. City of New York*,
    176 F.3d 138 (2d Cir. 1999)..............................................................................22

*U.S. v. McGee*,
    99–CR–150, 2000 WL 1520957 (W.D.N.Y. Oct. 2000) .......................................19

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002)....................................................................25, 27, 28

*United States v. Morales*,
    746 F.3d 310 (7th Cir. 2014) ...................................................................27, 28

*United States v. Morgan*,
    690 F. Supp. 2d 274 (S.D.N.Y. 2010) .............................................................19

*United States v. Rivera*,
    19- Cr.-131 2019 WL 6497504 (S.D.N.Y. Dec. 2019).........................................19

*United States v. Rodriguez*,
    12–CR–45, 2013 WL 6057862 (W.D.N.Y. 2013) ................................................19

*United States v. Santos*,
    CR–01–537, 2010 WL 2985913 (E.D.N.Y. 2010) .........................................25, 26

*United States v. Wagner*,
    20-CR-410, 2022 WL 19181 (S.D.N.Y. 2022)....................................................19

*United States v. Wilson*,
    15-CR-00142, 2017 WL 1456984 (W.D.N.Y. Apr. 2017)....................................25

*Valentin v. City of Rochester*,
    11-CV-6238, 2018 WL 5281799 (W.D.N.Y. Oct. 2018) ......................................23

*Vasquez v. City of New York*,
    14-CV-491, 2014 WL 5810111 (S.D.N.Y. Nov 2014)..........................................20

## <u>TABLE OF AUTHORITIES - cont'd</u>

<u>PAGE</u>

*Walker v. City of New York*,
   974 F.2d 293 (2d Cir. 1992)...................................................................................24

**State Cases**

*Brown v. State of New York*,
   89 N.Y.2d 172 (1996) .......................................................................................31

*Colon v. City of New York*,
   60 N.Y.2d 78 (1983) .........................................................................................18

*Martinez v. City of Schenectady*,
   97 N.Y.2d 78 (2001) .........................................................................................31

*Wilson v. City of New York*,
   161 A.D.3d 1212 (2d Dep't 2018) .......................................................................25

**Federal Statutes**

42 U.S.C. § 1983 ...........................................................................................16, 17, 23

**State Statutes**

New York Criminal Procedure Law 330 ...................................................................13

New York Criminal Procedure Law 440 ...............................................................14, 15

**Rules**

Fed. R. Civ. P. 56 .............................................................................................17

## PRELIMINARY STATEMENT

The reversal of Cory Epps's 1998 conviction for the murder of Tomika Means is no doubt sensational. But the court that overturned Epps's conviction did so because of newly discovered evidence which was uncovered over a decade after Epps's conviction. The court did not overturn Epps's conviction based on a finding of police misconduct or a finding that any police officer had violated Epps's constitutional rights. Since filing suit against multiple retired homicide detectives and the City of Buffalo, Epps has still adduced no evidence of any actionable police misconduct or constitutional violation. Defendants are thus entitled to summary judgment on each of Epps's claims in this action –regardless Epps's guilt or innocence.

Under well-established precedent, the identification procedures employed by the individual defendants were not unduly suggestive. Jaqueline Bradley's repeated and unequivocal identifications of Epps were brought about by permissible and accepted procedure. Thus, Bradley's identification created ample probable cause for Epps's arrest and subsequent prosecution, and the probable cause was not tainted by any bad faith or fraudulent conduct by the individual defendants. For this reason alone, Epps's federal and state law malicious prosecution claims fail.

Defendants are also entitled to qualified immunity when it comes to their alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This is true even if the Court fully credits the testimony of Wymiko Anderson. The *Brady* "evidence" alleged to have been revealed by Anderson to detectives before Epps's trial was inadmissible ***double hearsay***. Anderson's account of Paul Pope's statement, which described yet another out of court statement allegedly made by Russell Montgomery, would never have been admissible at Epps's trial. Moreover, it

was not clearly established in 1998, when Anderson's interview took place, that inadmissible double hearsay evidence constituted *Brady* material.  Anderson's statement is not even *Brady* material under today's standards.  But even it if is, homicide detectives in 1998 could reasonably have concluded that Anderson's statement did not constitute evidence that needed to be turned over to the prosecution given its lack of admissibility.  Thus, Epps's cause of action premised upon alleged violations of *Brady* fails.

Epps's post-conviction due process claim also fails.  The Constitution does not afford *Brady* like disclosure rights to an individual after he has been convicted.  So Epps's claim must be dismissed to the extent it is premised on the individual defendants' failure to disclose *Brady* material ***after*** his conviction.  To the extent Epps's post-conviction claim is premised upon the testimony of various individual defendants during post-conviction proceedings held in 2000, the individual defendants are entitled to ***absolute immunity***.  Police officers are absolutely immune from civil liability stemming from their sworn testimony in judicial proceedings. Defendants are thus entitled dismissal of Epps's post-conviction due process claim.  Finally, Epps's cause of action based on alleged deprivations of his due process rights under the New York State Constitution cannot be maintained.  New York State's Criminal Procedure Law provides adequate alternative remedies for someone in Epps's position to address the constitutional violations which allegedly occurred.  Epps continuously utilized those procedures, which ultimately led to his conviction being overturned.  Thus, Epps's state-law constitutional claim also fails as a matter of law.

For these reasons, the Court should grant Defendants' motion for summary judgment and grant such other relief as the Court may deem just and proper.

2

## STATEMENT OF FACTS

**A.    The Tomika Means Homicide**

The parties do not dispute that in the early morning hours of May 27, 1997, a then unidentified perpetrator murdered Tomika Means near the corner of Chelsea and East Delevan Avenue in the City of Buffalo.[1]  The parties further do not dispute that the then unidentified perpetrator committed the murder in a road range incident by shooting Means at near point blank range.[2]  The parties also agree that Jaqueline Bradley was in the car with Means when she was shot.  Bradley was the only eyewitness to the murder.[3]

**B.    The Individual Defendants**

There are five relevant individual defendants, all of whom are retired Buffalo Police Department ("BPD") homicide detectives.[4]  The relevant individual defendants are: John Bohen, Reginald Minor, Mark Stambach, and James Giardina, and Anthony Costantino.  The pertinent investigative activities of each of these defendants are detailed below.  Plaintiff has also asserted two causes of action against the City of Buffalo.

---

[1]    Declaration of Peter A. Sahasrabudhe ("Decl."), Exhibit 11 at p. 127-138.

[2]    (*Id.*).

[3]    (*Id.*).

[4]    Epps has agreed to dismissal of all claims against the following individual defendants: Robert Chella, Raniero Masecchia, Charles Aronica, and former Chief of Homicide, Joseph Riga.  Epps is still pursuing his first, second, third, and fourth cause of action against the following individual defendants: John Bohen, Reginald Minor, Mark Stambach, James Giardina, and Anthony Costantino.  Epps is pursuing his third cause of action against the City of Buffalo as well as the remaining individual defendants.  Epps has agreed to dismissal of his fifth cause of action, which alleges a violation of his due process rights under the New York State Constitution, against all individual defendants.  Epps continues to pursue his fifth cause of action against the City of Buffalo only.

**C.      Detective Bohen's Investigative Activities**

Detective Bohen's relevant investigative activities consist largely of showing Bradley a photo array with Epps's photo present.  Detective Bohen conducted this procedure in early July, approximately a month and a half after the Means murder.[5]  Detective Bohen conducted the photo array after he was told by Linda Means, the homicide victim's aunt, that she had heard people claim that Epps may have been the perpetrator.[6]  Linda Means also relayed that the composite sketch of the perpetrator Bradley had previously helped create looked similar to Epps.[7]

The photo array shown to Bradley by Detective Bohen consisted of five filler photos and Epps's photo.[8]  Each of the filler photographs are mugshots of males who are the same age and ethnicity as Epps.[9]  The photo array was conducted at Bradley's home without anyone else present besides Bradley, Detective Bohen, and Detective Reginald Minor.[10]  Bradley picked out Epps's photo from the photo array.[11]  She did so confidently and without qualification.[12]  Detective Bohen did not suggest to Bradley that she should pick Epps's photo.

---

[5]      (Decl., Ex. 3 at p. 83); (Decl., Ex. 35).

[6]      (Decl. Ex. 35).

[7]      (*Id.*).

[8]      (Decl., Ex. 28); (Decl., Ex. 16 at p. 6-7).

[9]      (Decl., Ex. 28).

[10]     (Decl., Ex. 16 at p. 7).

[11]     (Decl. Ex. 28); (Decl. Ex. 35).

[12]     (*Id.*).

Nor did Detective Bohen tell Ms. Bradley that the perpetrator's photo would be in the array.[13]
He simply asked her to look at the array, to take her time, and let him know if she recognized any
of the photographs shown in the photo array.[14]   Bradley does not remember picking Epps's photo
out from a photo array, but she does not deny that it happened.   When shown the photo array put
together by Bohen at her deposition, Bradley testified that it had been so long since the
investigation that she could not remember whether or not she had seen the array.[15]   Bradley did,
however, identify her signature attached to the array, which states that she picked out Epps's
photograph.

Prior to showing Bradley a photo array with Epps's photo present, Detective
Bohen showed Bradley a photo array with a different suspect's photograph present along with
five other "filler" photographs.[16]   Bradley did not identify any individual in this photo array as
the perpetrator of the Means homicide.[17]   She did, however, positively identify Epps in the
subsequent photo array put together by Detective Bohen a few weeks later.

**D.   Detective Minor's Investigative Activities**

Detective Reginald Minor's only pertinent investigative activity is that he was
present with Detective Bohen when Bradley identified Epps in a photo array.[18]   Detective Minor

---

[13]      (Decl. Ex. 16 at p. 7-8).

[14]      (*Id.*).

[15]      (Decl. Ex. 9 at p. 16).

[16]      (Decl., Ex. 3 at p. 60-61); (Decl., Ex. 29); (Decl. Ex. 38).

[17]      (Decl. Ex. 35).

[18]      (Decl. Ex. 16, at p. 7).

was not involved in any other relevant investigative activity that led to Epps's arrest and prosecution.

**E.      Potential Identification Procedures in Addition to Detective Bohen's Photo-Array**

At her deposition, Bradley claimed that she identified Epps's photograph in a large book filled with a plethora of male mugshots.[19]  Her description of these books at her deposition approximates that which is known in law enforcement as "mug books."  Bradley testified that she was shown one mug book wherein she was not able to identify anyone as the perpetrator of the Means murder.[20]  She claims that she was then shown a second mug book containing Epps's photo a few weeks later.[21]

Bradley testified that, when given the second mug book, she affirmatively picked out Epps's photograph and identified Epps as the perpetrator.[22]  Bradley testified that these are the only two instances she remembers being shown photographs.  Bradley testified that when she viewed Epps's photograph in the second mug book, she started crying because she recognized Epps as the perpetrator.[23]  The mug books contained many pages of photographs, with each page holding around ten photographs.  According to Bradley, police officers did not tell her who she had picked when she identified Epps's photograph from the mug book.[24]  She testified that the

---

[19]      (Decl., Ex. 9 at p. 7-12).

[20]      (*Id.* at p. 11).

[21]      (*Id.*).

[22]      (*Id.*).

[23]      (*Id.* at p. 12).

[24]      (*Id.* at p. 10).

officers who showed her the book told her to take her time, to look through the photos, and tell them know if she recognized anyone.  No officer told Bradley that the perpetrator's photo would be present in the mug book.[25]  Bradley is unable to identify which detectives or officers may have shown her mug books.  She did testify, however, that the alleged identification from the second mug book occurred before any in person line up was conducted.[26]

Homicide Detective Juan Morales, who is not a party to this action, appears to have put together a photo array with Epps's mugshot included.[27]  This photo array was created in addition to the photo array put together by Detective Bohen.  There is no evidence that the photo array put together by Detective Morales was ever shown to Bradley or any other witness.

## F.    Lineup Conducted at the Request of the Erie County DA's Office

After Bradley had identified Epps's photograph, Assistant District Attorney Patricia Carrington made an application to Erie County Court for an order directing Epps to appear for an in person lineup.[28]  ADA Carrington based her request off of Bradley's identification of Epps's photo in the photo array shown to her by Detective Bohen.  There is no dispute that Bradley did in fact identify Epps's photo as depicting the person who had committed the Means murder prior to ADA Carrington's application.  New York County Court Judge Timothy Drury granted ADA Carrington's application and ordered Epps to appear for an in

---

[25]    (*Id.*).

[26]    (*See id.* at p. 17-18).

[27]    (Decl., Ex. 30).

[28]    (Decl., Ex. 23).

person lineup.[29]  Prior to Judge Drury's order, Epps had indicated in a statement given to detectives that he would be willing to appear for an in person lineup and would voluntarily appear.[30]

Pursuant to Justice Drury's order, on July 30, 1997, Detective Sergeant Henry Smardz of BPD's Evidence Collection Unit oversaw and conducted an in person lineup wherein Bradley observed Epps standing next to five fillers.[31]  Detective Sergeant Smardz is not a party to this action.  The fillers were the same ethnicity as Epps, were of the same relative age, and were of the same relative appearance.  Salvatore Abate, Esq., represented Epps and was present throughout the entire lineup.  ADA Carrington was also present throughout the entire lineup.  Neither Mr. Abate nor ADA Carrington objected to or took issue with any of the procedures implemented during the in person lineup.

After viewing Epps standing next to the five fillers, Bradley picked out Epps.  After viewing him amongst the fillers again but in a different position, Bradley identified Epps a second time.  Seeing Epps in person caused such an emotional response from Bradley that she began to shake and cry.[32]  In later proceedings, ADA Carrington described Bradley's identification at the lineup as one of the most compelling and convincing identifications she had

---

[29]    (Decl., Ex. 24).

[30]    (Decl., Ex. 34).

[31]    (Decl., Ex. 16 at p. 23-42).

[32]    (*Id.* at p. 32).

ever seen a witness make.[33]  Based on Bradley's identification at the in person lineup, Epps was arrested and arraigned one day later on July 31, 1997.

**G.      Grand Jury Proceedings**

A grand jury indicted Epps on August 7, 1997.[34]  The indictment was issued based on the testimony of Bradley, which was elicited through the questioning of ADA Carrington.[35]  ADA Carrington's questions focused exclusively on Bradley's account of the murder and her  identification of Epps at the in person lineup ordered by Judge Drury.[36]  There was no questioning regarding photo array procedures conducted by BPD homicide detectives. Based on this testimony, the grand jury decided there was probable cause to believe that Epps had committed the Means homicide.[37]

**H.      Detective Stambach's Investigative Activities**

Detective Stambach did not investigate the Means homicide.[38]  He played no role in gathering any evidence which was the basis for Epps's arrest and prosecution.  The only relevant involvement Detective Stambach has in this case stems from an interview he took of Wymiko Anderson on April 17, 1998.  The interview occurred almost a year after the Means homicide, many months after Epps was indicted, and only days before Epps's trial was set to

---

[33]      (Decl., Ex. 17).

[34]      (Decl., Ex. 40).

[35]      (Decl., Ex. 10).

[36]      (Decl., Ex. 10).

[37]      (Decl., Ex. 31).

[38]      (Decl., Ex. 5 at p. 25).

begin.  Anderson was not being interviewed in connection with the Means murder.  Detective Stambach was interviewing Anderson because she was an on and off romantic partner of a recent murder victim, Paul Pope.[39]  Anderson and Pope shared children together and Anderson was a witness who may have had pertinent information to give in connection with Pope's murder.

During her April 17, 1998 interview, Anderson relayed to Detective Stambach that she suspected Russell Montgomery was responsible for murdering Pope.[40]  This much is undisputed.  Anderson also claims that, after detectives asked what Montgomery looked like, she relayed to them that he looked like the composite sketch created in connection with the Means investigation, which had been broadcast on the news and in local newspapers.[41]  Anderson also claims that she relayed to Detective Stambach that the morning of the Means murder, Montgomery, who was an associate of Pope's, came to get Pope from the home where he was staying with Anderson.[42]  Anderson claims that when Pope returned, he told her that Montgomery had confessed to him that he was the perpetrator of the Means homicide.[43]  Anderson alleges that Detective Stambach did not write down this part of her statement, and that this information was omitted from her sworn statement given in connection with the Pope homicide.  The parties dispute whether Anderson actually made this statement, but for purposes of this motion, Anderson's allegations are assumed to be true.

---

[39]    (Id. at p. 32).

[40]    (Decl., Ex. 32).

[41]    (Decl., Ex. 8 at p. 24-25).

[42]    (*Id.* at p. 25); (Decl., Ex. 12 at p. 47-50).

[43]    (Decl. Ex. 12 at p. 47-50).

I.      **Detective Giardina's Investigative Activities**

Detective Giardina also did not play any meaningful role in the investigation of the Means homicide.[44]  He played no role in gathering any evidence which was the basis for Epps's arrest and prosecution.[45]  The only relevant involvement Detective Giardina has in this case stems from the fact that he was present with Detective Stambach when Anderson was interviewed on April 17, 1998.[46]  Thus, Detective Giardina's only involvement here is his alleged suppression or failure to record Anderson's statement regarding what Paul Pope told her about what Russell Montgomery told him the morning of the Means murder.

J.      **Detective Sergeant Costantino's Investigative Activities**

Detective Sargent Costantino was active in investigating the Means murder.  He was present during the in person lineup where Bradley identified Epps.   He was also present during various interviews with Wymiko Anderson that took place after Epps was convicted.  Detective Sargent Costantino's testimony during post-conviction proceedings establishes that he was not present with Ms. Anderson when she allegedly made her statement implicating Montgomery in the Means murder to Detectives Stambach and Giardina.[47]  Epps is expected to argue that Detective Sargent Costantino was present during Anderson's April 17 interview based on his subsequent deposition testimony given in connection with this case.  While this fact is very much in dispute, it is not dispositive for purposes of this motion, given the legal

---

[44]      (Decl., Ex. 6 at p. 22-23).

[45]      (*Id.*).

[46]      (Decl., Ex. 21).

[47]      (Decl., Ex. 15 at p. 43).

11

consequences of Anderson's alleged statement.  Despite having investigated the Means murder, there is no evidence that Detective Sergeant Costantino conducted any photo identification procedures with Jaqueline Bradley prior to the in person line up requested by ADA Carrington.

### K.      Epps's Trial

Epps's trial began on April 20, 1998, a few days after Anderson's alleged statement.[48]  At Epps's trial, he was convicted based on the testimony of Bradley.[49]  Bradley confidently identified Epps as the perpetrator of the Means murder during her trial testimony.[50]  Bradley's testimony consisted of her account of the murder as well as her identification of Epps during the in person line up.  No testimony or other evidence was elicited regarding any photo identification procedures employed by detectives or officers prior to the in person lineup.[51]  Based on Bradley's testimony, a jury convicted Epps on April 24, 1998.[52]

### L.      Epps's Pre-Sentencing Motion

After Epps was convicted but before he was sentenced, Anderson wrote an anonymous letter to Epps's trial counsel, Andrew Lotempio, Esq.[53]  Anderson's letter mentioned that she suspected that Montgomery was the true perpetrator of the Means homicide, but did not

---

[48]      (Decl. Ex. 1 at ¶ 53).

[49]      (Decl., Ex. 11).

[50]      (Decl., Ex. 11 at p. 148).

[51]      (*See generally,* Decl., Ex. 11).

[52]      (Decl. Ex. 1 at ¶ 61).

[53]      (Decl., Ex. 33).

mention Paul Pope or any of her alleged statements to the Buffalo Police Department.[54]  Nothing about the letter suggested with certainty that Anderson was its author.  The only overlap between the letter and Anderson's alleged statement to the police are that they implicate Montgomery.  However, the information given to implicate Montgomery is completely different in the letter than the alleged information relayed by Anderson in her interview with Detectives Stambach and Giardina.

Before Epps was sentenced, based on the anonymous letter, Mr. Lotempio made a motion to vacate Epps's conviction pursuant to New York Criminal Procedure Law 330.  Acting New York Supreme Court Justice Joseph McCarthy denied the motion given that the letter contained no admissible evidence.  Evidence produced in discovery reveals that the ADA who first chaired Epps's criminal trial, Lawrence Schwegler, became aware later on that Anderson may have been the author of the anonymous letter.[55]  There is certainly no evidence that any defendant knew that Anderson was the author of the letter and actively tried to keep this information hidden from ADA Schwegler.[56]

## M.   Post-Conviction Proceedings in 2000

Eventually, Epps's other counsel, David Cotter, Esq., learned of Anderson's identity.[57]  Mr. Cotter subsequently learned that Anderson claimed she had told detectives days

---

[54]   (*Id.*).

[55]   (Decl. Ex. 15 at p. 42) (noting that ADA Schwegler shared with homicide detectives that Anderson was that author of the anonymous letter).

[56]   (*Id.*).

[57]   Mr. Cotter replaced Mr. Lotempio as Epps's lead counsel after Mr. Lotempio was elected to the bench.

before Epps's trial that Paul Pope had told her that Russell Montgomery had admitted he was the

perpetrator of the Means murder.[58]   Based on Anderson's allegations, Mr. Cotter filed New York

Criminal Procedure Law 440 motion to vacate Epps's conviction.[59]   The motion was based on

the detectives' alleged withholding of *Brady* material and newly discovered evidence

demonstrating Epps's innocence.[60]   Justice McCarthy denied the motion to the extent it sought to

set aside the conviction based on newly discovered evidence because the "evidence" conveyed

by Anderson was inadmissible double hearsay.[61]   As part of the post-conviction motion practice,

Epps submitted an affidavit from Bradley.   Bradley, after viewing a photo of Montgomery,

acknowledged that he and Epps looked alike.   However, Bradley did not recant her identification

of Epps, nor has she ever done so to this day.

   With respect to the claim that *Brady* evidence had been withheld, Justice

McCarthy ordered a hearing.   After hearing testimony from Anderson and then hearing

testimony from Detectives Costantino, Stambach, Giardina, and Massechia, Justice McCarthy

found that a *Brady* violation had not occurred.[62]   Justice McCarthy found the testimony of the

detectives was consistent and credible.[63]   The detectives testified consistently that Anderson had

never relayed the double hearsay evidence to them prior to Epps's trial.   In contrast, Justice

---

[58]      (Decl., Ex. 18).

[59]      (Decl., Ex. 25); (Decl., Ex. 26).

[60]      (Decl., Ex. 25); (Decl., Ex. 26).

[61]      (Decl., Ex. 25).

[62]      (Decl. Ex. 26).

[63]      (*Id.* at p. 4-5).

14

McCarthy found that Anderson's testimony, taken together with the claims she made in her anonymous letter, were neither consistent nor credible.  Accordingly, Epps's conviction was upheld.

### N.   Newly Discovered Evidence Revealed Over a Decade Later Leads to the Reversal of Epps's Conviction

Over a decade after Epps was convicted, a witness reached out to one of Epps's relatives.  This witness has been referred to as "Witness 1" throughout these proceedings to protect her identity.  Eventually, based on an affidavit submitted by Witness 1 in 2014 and testimony given in 2017, Epps was able to successfully have his conviction overturned based on the discovery of previously unavailable evidence.[64]

Based on information given by Witness 1, Joseph Riga, who was acting in his capacity as an investigator for the Erie County District Attorney's Office, concluded that Russell Montgomery may have been responsible for the Means homicide as opposed to Epps.[65]  Importantly, Investigator Riga made this determination based on his finding that Witness 1 was credible.[66]  In fact, in conducting a re-investigation on behalf of the District Attorney's Office, Investigator Riga found that Witness 1 was far more credible than Anderson, and that the two accounts given by these witnesses were not consistent with each other.[67]  Eventually, the District Attorney's Office did not oppose a subsequent New York Criminal Procedure Law 440 motion

---

[64]     (Decl., Ex. 36).

[65]     (Decl. Ex. 38 at p. 62-70).

[66]     (*Id.* at p. 68).

[67]     (Decl. Ex. 38 at p. 62-70).

brought by Epps in 2017.[68]  This motion was based on the sworn affidavit and testimony of Witness 1.  Epps's unopposed motion was granted and his conviction was overturned.

**O.     The Claims in this Action**

Based on the investigative activities of the five individual defendants, Epps has asserted five claims for: (1) deprivation of his due process rights based on suppression of *Brady* evidence before he was convicted; (2) deprivation of his due process rights based on the detectives' conduct after his conviction; (3) malicious prosecution under New York state law; (4) malicious prosecution under federal law; and (5) deprivation of his due process rights under the New York State Constitution.[69]  Epps has agreed to dismissal of his state constitutional claim against the individual defendants and is proceeding with that claim against the City of Buffalo only.  In addition to pursuing his state-law malicious prosecution claim against the individual defendants, Epps is also pursuing that claim against the City of Buffalo under a theory of *respondeat superior*.  Epps is pursuing his first, second, third, and fourth claims against all five remaining individual defendants.

---

[68]        (Decl. Ex. 39).

[69]        Claims 1, 2, and 4, are brought pursuant to 42 U.S.C. § 1983.

16

## ARGUMENT[70]

### POINT I.   EPPS'S MALICIOUS PROSECUTION CLAIMS FAIL AS A MATTER OF LAW

Epps has asserted both a federal and state-law malicious prosecution claim, but the elements of both claims are the same.[71]  In order to establish that defendants are liable for malicious prosecution, Epps must show that: (1) the defendants initiated a criminal proceeding against him; (2) the criminal proceeding terminated in his favor; (3) there was a lack of probable cause to initiate the proceeding; and (4) the defendants acted with malice in initiating the proceeding.  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  Because Epps was indicted by a grand jury, there is a presumption that there was probable cause for his prosecution. *Id.*  In order to overcome the presumption of probable cause, Epps is required to show that the grand jury indictment was obtained by "fraud, perjury, the suppression of evidence, or police conduct undertaken in bad faith."  *Newton v. City of New York*, 640 F. Supp. 2d 426, 447 (S.D.N.Y. 2009).

Here, the indictment against Epps was brought about by Bradley's identifications of Epps and her subsequent grand jury testimony.  Because neither Bradley's identification nor

---

[70]   The standard of review applied to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56 are well established.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986).

[71]   A § 1983 malicious prosecution claim requires that each of the New York State law elements of the tort are met in addition to a showing that the individuals being sued were acting under the color of state law. *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984).  Here, there is no real dispute that the individual defendants were acting under the color of state law, so there is no real difference between the analysis of the state-law malicious prosecution claim and the malicious prosecution claim brought pursuant to 42 U.S.C. § 1983.

17

Bradley's grand jury testimony were brought about by any bad faith misconduct on the part of the individual defendants, Epps's malicious prosecution claims fail.

**A.      Detectives Stambach, Giardina, and Costantino did not cause Epps to be indicted**

As an initial matter, there is no proof of Detectives Stambach, Giardina, and Costantino gathering any evidence against Epps which led to his arrest, arraignment, or indictment.  In fact, there is no evidence that these three defendants caused or contributed to Epps's indictment in any way.  Thus, it cannot be argued that the indictment against Epps was caused by any bad faith misconduct on the part of these three defendants.  *McClennon v. City of New York*, 13-CV-128, 2018 WL 2943565, *15 (E.D.N.Y. Jun 2018);  *Burgess v. Dejoseph*, 14-CV-1371, 2017 WL 1066662, at *7 (N.D.N.Y. Mar. 2017) (explaining that malicious prosecution claim cannot be based on evidence which comes to light after the plaintiff has been arraigned); *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983) (explaining that, in analyzing the viability of a malicious prosecution claim, "the trial court may not weigh evidence upon which the police acted . . . ***after the indictment has issued***") (emphasis added).

There is no dispute that Detectives Stambach and Giardina's only involvement in this matter came well after Epps was indicted.  And while Detective Sergeant Costantino investigated the Means homicide prior to Epps's indictment, he was not involved in the photo identification procedures which led to ADA Carrington applying for the in person lineup.  Thus, nothing Detective Sergeant Costantino did caused Epps to be indicted or prosecuted.  Accordingly, because they did not cause Epps to be arrested or prosecuted, the malicious prosecution claims against Detectives Stambach, Giardina, and Costantino should be summarily dismissed.

18

**B.        There is no evidence of bad faith misconduct by Detectives Bohen and Minor**

While Detectives Bohen and Minor conducted certain photo identification procedures which arguably contributed to Epps's indictment, there is no evidence that either Detective Bohen or Minor acted in bad faith.  There is no evidence that the procedures implemented by these defendants were unduly suggestive.  The photo array shown to Bradley by Detective Bohen is not unduly suggestive because the five fillers have the same relative appearance as Epps.  Courts routinely hold that similar photo arrays are not unconstitutionally suggestive.  *See, e.g., U.S. v. McGee*,  99–CR–150,  2000 WL 1520957, at *16 (W.D.N.Y. Oct. 2000); *United States v. Wagner*, 20-CR-410, 2022 WL 19181, at *3 (S.D.N.Y. 2022);  *United States v. Morgan*, 690 F. Supp. 2d 274, 283 (S.D.N.Y. 2010) ("Courts in this Circuit have held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive").  Thus, it cannot be said that Detectives Bohen and Minor acted in bad faith or committed any misconduct in showing Bradley the photo array from which she identified Epps.

Further, there is no evidence that either Detective Bohen or Detective Minor had Bradley identify Epps through use of mug books.  If mug books were shown to Bradley, it remains a mystery who showed them to her.  But even if Detectives Bohen and Minor had used mug books either before or after the photo array, this would not constitute bad faith misconduct or unconstitutionally suggestive procedures.   In addition to photo arrays, courts within this Circuit routinely uphold photo identifications by witnesses through use of mug books.  *United States v. Rodriguez*, 12–CR–45, 2013 WL 6057862, at *1 (W.D.N.Y. 2013) (holding that use of mug book containing 35 photos was not unconstitutionally suggestive); *United States v. Rivera*, 19- Cr.-131 2019 WL 6497504, at *5 (S.D.N.Y. Dec. 2019) (collecting cases).  And courts have

19

also held that photo identification procedures are not unconstitutionally suggestive simply because one or more procedures are repeated after a witness makes an identification.  In a recent decision, this Court reviewed an instance where officers showed two photo arrays to an eye witness and followed those two photo arrays with an in person lineup.  *Brown v. Sheehan*, 17-CV-213,  2021 WL 6113947, at *8-*9 (W.D.N.Y. Dec. 2021) (Vilardo, J.).  In holding that the identification procedures implemented by the officers were permissible, this Court noted that "successive identification procedures are not *per se* unduly suggestive, even where the accused is the only common denominator among them."  *Id.*

Thus, under the most plaintiff-friendly interpretation of the evidence, Detectives Bohen and Minor did nothing more than have Bradley repeat her identification of Epps through two constitutionally permissible procedures.  This does not render Bradley's identification of Epps illegitimate, and it certainly does not demonstrate bad faith misconduct on the part of Detectives Bohen and Minor.  *See, e.g., Vasquez v. City of New York*,  14-CV-491, 2014 WL 5810111, at *10 (S.D.N.Y. Nov 2014) (holding that plaintiff failed to overcome presumption of probable cause because he failed to show that identification was the result of unduly suggestive procedures).[72]  Accordingly, the malicious prosecution claims against Detectives Bohen and Minor must be dismissed.

---

[72]    Because there is no evidence of suggestive identification procedures, Epps also cannot premise his pre-trial due process claim on the conduct of Detectives Bohen and Minor prior to the issuance of the indictment. *Cf. Bermudez v. City of New York*, 790 F.3d 368, 374-375 (2d Cir. 2015) (dismissing malicious prosecution claim but allowing due process claim to proceed where there was concrete evidence of illegitimate identification procedures undertaken in bad faith which were intentionally concealed from the assigned prosecutor).  Unlike the factual scenario presented in *Bermudez*, there is no evidence of unduly suggestive identification procedures implemented in bad faith by Detectives Bohen and Minor, let alone evidence that such procedures were hidden or concealed from the prosecution.

**C.      Bradley's independent identification of Epps created probable cause**

Because Bradley independently identified Epps through photo identification procedures, there was probable cause for Epps's arrest and prosecution.  A witness's identification is typically sufficient to provide probable cause.  *Fappiano v. City of New York*, 640 Fed. App'x 115, 119 (2d Cir. 2016).  In *Fappiano*, the exonerated plaintiff had been identified through legitimate, non-suggestive identification procedures implemented by police detectives.  *Id.*  In arguing that the identification procedures were unconstitutionally suggestive, the plaintiff resorted only to speculation.  The Second Circuit held that such speculation was insufficient to overcome the presumption of probable cause created by the evidence of the legitimate, untainted identification and subsequent grand jury indictment.  *Id.*  Thus, the Second Circuit upheld the District Court's grant of summary judgment to the officers on the exoneree's malicious prosecution claim.  *Id.*

As in *Fappiano*, Epps has adduced no concrete evidence that any identification procedures conducted by the individual defendants were unconstitutionally suggestive. Accordingly, as in *Fappiano*, any argument by Epps that the initial identification by Bradley was the product of bad faith police misconduct would be purely speculative, and the malicious prosecution claims must be dismissed.  *Id.*

Further, the individual defendants cannot be held liable to the extent that Epps's malicious prosecution claim is premised upon Bradley's identification at the in person line up.

Even if the lineup was unduly suggestive (which it was not),[73] the lineup was conducted and introduced into evidence at trial based on the decisions of intervening decision makers –ADA Carrington, ADA Schwegler, and Justice McCarthy.  "Where an intervening decision maker permits the admission of eyewitness testimony resulting from suggestive identification procedures, in order to preserve causality a plaintiff must prove that the defendant misled or coerced the intervening decision maker." *Newton*, 640 F. Supp. 2d at 441.  There is no evidence that any individual defendant deceived or misled ADA Carrington and ADA Schwegler with respect to what took place during the lineup.  Thus, the lineup cannot be a basis for Epps's malicious prosecution claim.  *Id.*

Moreover, ADA Carrington's decision to apply for a lineup and her independent decision to present evidence to a grand jury after seeing Bradley's compelling identification at the line up constitute superseding causes of Epps's prosecution that are unrelated to the individual defendants.  *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999).  Thus, because there was a superseding cause of Epps's indictment over which the individual defendants had no control, the individual defendants cannot be said to have initiated the prosecution against Epps.  *Id.*  This provides an additional, independent basis for dismissal of the malicious prosecution claims.

In sum, Bradley's independent, untainted identifications of Epps created probable cause for his arrest and prosecution.  Moreover, Epps's prosecution was caused by the

---

[73]     Bradley's identification of Epps at the lineup in ADA Carrington's presence actually provides an additional basis for probable cause independent of any acts taken by the individual defendants. *Bermudez*,790 F.3d at 377.

independent decisions and acts of prosecutors who handled this case.  The evidence simply does not support Epps's allegation that he was maliciously prosecuted by any of the individual defendants.  As such, the malicious prosecution claims against the individual defendants must be dismissed.

**D.      The City of Buffalo is not vicariously liable for any malicious prosecution**

Because Epps cannot maintain his state-law malicious prosecution claim against any of the individual defendants or show that any police officer maliciously prosecuted him, his malicious prosecution claim against the City of Buffalo must also be dismissed.  Epps cannot obtain *respondeat superior* liability against the City when no City agent or employee maliciously prosecuted him to begin with.  *Maldonado v. City of New York*, 11–CV-3514, 2014 WL 787814, at *13 (S.D.N.Y. Feb. 26, 2014) (dismissing claims against municipality when state law malicious prosecution claims were dismissed against the individual defendants).  Epps's third cause of action must therefore be dismissed against the City as well.

**POINT II.      EPPS CANNOT MAINTAIN HIS DUE PROCESS CLAIM PREMISED UPON *BRADY* VIOLATIONS**

To establish liability for a 42 U.S.C. 1983 claim premised upon a *Brady* violation, a plaintiff must establish three elements: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was intentionally suppressed; and (3) prejudice ensued because of the material nature of the evidence.  *Valentin v. City of Rochester*, 11-CV-6238, 2018 WL 5281799, at *12-*13 (W.D.N.Y. Oct. 2018).  Police officers may be held liable for *Brady v*iolations only when they ***intentionally*** suppress exculpatory evidence.  *Id.* (citing *Fappiano*, 640 F. App'x at 118) (emphasis added).  On the other hand,

23

police officers satisfy their obligations under *Brady* when they turn exculpatory evidence over to prosecutors, who in turn have an obligation to turn over exculpatory evidence to defense counsel. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992).  A police officer's negligent or inadvertent violation of *Brady* is insufficient for a plaintiff to establish liability, the plaintiff must also show that the officer acted in bad faith or with the intent of violating the plaintiff's constitutional rights.  *Reid v. Simmons*, 163 F. Supp. 2d 81, 90 (D.N.H. 2001) (discussing police officers obligations when potentially exculpatory evidence is revealed while investigating a different offense).

Here, there was no *Brady* violation because Anderson's statement to detectives was not admissible exculpatory or impeachment evidence, and was not likely to have led the discovery of any such evidence.  Further, even if Anderson's statement did constitute *Brady* material, the detectives are entitled to qualified immunity, as it was not clearly established in 1998 that inadmissible double hearsay evidence needed to be turned over to the prosecution. Thus, Epps's claims which are premised upon *Brady* must be dismissed.

A.    **Epps's claims premised upon *Brady* must be dismissed against Detectives Bohen and Minor**

Initially, Epps's *Brady* based claim must be summarily dismissed to the extent it is asserted against Detectives Bohen and Minor.  There is no evidence that these two detectives were present during the April 17, 1998 interview with Anderson.  Nor is there evidence that these two ever learned of anything allegedly said by Anderson in her interview.  Thus, it cannot be argued that these two defendants suppressed any allegedly exculpatory evidence from

24

prosecutors.  *Wilson v. City of New York*, 161 A.D.3d 1212, 1215 (2d Dep't 2018) (citing *Poventud v. City of New York*, 750 F.3d 121, 133 (2d. Cir. 2014).

## B.     Anderson's alleged statement is not *Brady* material

The *Brady* based claims against the three remaining defendants must also be dismissed because Anderson's alleged statement is not *Brady* material –even under today's standards.  Since 2002, the clearly established law in this Circuit has been that that inadmissible exculpatory evidence needs to be turned over under *Brady* if its disclosure could lead to the discovery of admissible evidence.  *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *United States v. Wilson*, 15-CR-00142, 2017 WL 1456984, at *4 (W.D.N.Y. Apr. 2017).  However, an inadmissible statement given by a witness that is totally unsupported by the witness's personal knowledge is not *Brady* evidence where the witness is unable to provide a viable source to confirm the information they have passed along.  *United States v. Santos*, CR–01–537, 2010 WL 2985913, at *8 (E.D.N.Y. 2010).  Further, a *Brady* violation cannot be shown where courts must resort to speculation to determine what admissible evidence may have been discovered through the disclosure of materials which themselves are not admissible.  *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (upholding denial of *Brady* claim where petitioner resorted to speculation regarding what admissible evidence ***might*** have been discovered) (emphasis added).

Under this standard, Anderson's alleged double hearsay statement about what a recently murdered person said to her eleven months prior is not *Brady* evidence.  Anderson's statement was not based on her personal knowledge, and there was no viable source that the detectives, prosecution, or defense counsel might have gone to in order to confirm the information she provided.  Paul Pope, of course, was not an option, as he had been murdered

25

before Anderson's interview.  Russell Montgomery would have been incredibly reluctant to

cooperate in any investigation by law enforcement or defense counsel, and it is highly unlikely

that speaking to him could have led defense counsel to admissible evidence to use at Epps's trial.

There is no readily apparent source that would have been available to defense counsel in 1998

that could have confirmed Anderson's statement, let alone confirmed her statement in a manner

that would have been admissible at Epps's trial.  Thus, Anderson's statement, although

exculpatory, is not *Brady* evidence, because there is no way to determine how its disclosure

could have led to admissible evidence without resorting to rampant speculation.  *Santos*, 2010

WL 2985913 at \*8; *Downs*, 232 F. 3d at 1037.  For this reason, Epps's *Brady* based claim

asserted against Detectives Stambach, Giardina, and Costantino must be dismissed.

**C.**     **Defendants are entitled to qualified immunity with respect to Anderson's alleged double hearsay statement even if it is *Brady* material**

Even if Anderson's alleged statement could somehow be construed as *Brady*

material, Detectives Stambach, Giardina, and Costantino are protected by qualified immunity.

"The doctrine of qualified immunity protects officers from civil liability for actions performed in

the course of their duties if their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Luna v. Pico*, 356 F.3d

481, 490 (2d Cir. 2004).  Thus, a defendant is not liable if he did not violate clearly established

law ***or*** it was objectively reasonable for him to believe that he was not violating clearly

established law.  *Id.* (emphasis added).  "A right is clearly established if: (1) the law is defined

with reasonable clarity; (2) ***the Supreme Court or the Second Circuit has recognized the right***;

and (3) a reasonable defendant would have understood from the existing law that his conduct

was unlawful."  *Id.* (emphasis added).

26

There is no definitive Supreme Court precedent on the issue of whether inadmissible evidence can nonetheless be *Brady* material despite its lack of admissibility.  In *Wood v. Bartholomew*, the Supreme Court held that an inadmissible polygraph test was not *Brady* material because the results were undoubtedly inadmissible and disclosure of the results could have had no direct effect on the outcome of the trial.  516 U.S. 1, 6 (1995).  *Wood*, however, left open the question of whether some inadmissible evidence might still be *Brady* material under certain circumstances, or whether inadmissible evidence is *per se* non-*Brady* evidence.

Since *Wood* was published in 1995, a circuit split has developed on this issue. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 310 (3d Cir. 2016) (describing circuit split); *United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (same).  The Fourth and Seventh Circuits, for example, have a *per se* rule establishing that all inadmissible evidence is by definition not *Brady* evidence.  *See, e.g., Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996); *Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011).  Other circuits, including the Second Circuit, have since adopted a less restrictive rule that inadmissible evidence may nonetheless be *Brady* material if its disclosure could lead to the discovery of admissible evidence.  *See, e.g., Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013) ("[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence."); *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (*en banc*); *Gil*, 297 F.3d at 104; *Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000).

The less restrictive approach adopted by the Second Circuit, however, had not been clearly pronounced until 2002, when the Second Circuit issued its decision in *Gil*. 297 F.3d

27

at 104.  Indeed, the cases that discuss the circuit split all cite to *Gil* as the instance where the Second Circuit first made its position known on this issue.  *See, e.g.*, *Morales*, 746 F.3d at 314; *Ellsworth*, 333 F.3d at 5, n.4.  Arguably, the Second Circuit established its approach in the case of *United States v. Persico*, where the Court held that certain inadmissible materials did not need to be turned over under *Brady* because they could only speculatively lead to admissible evidence. 164 F.3d 796, 805 (2d Cir. 1999).  In reality, *Persico* is open to interpretation in a way that *Gil* is not, so *Gil* really does signify the tipping point where it became clearly established in the Second Circuit that inadmissible evidence could nonetheless subject law enforcement to *Brady* like disclosure obligations.

For purposes of this motion though, it does not matter whether *Gil* or *Persico* are used to determine when the substantive constitutional right at issue became clearly established. Both decisions were published after Anderson's interview in April of 1998 and after Epps's conviction which occurred ten days later.  There can be no dispute that, in 1998, there was no clear Second Circuit or Supreme Court authority setting forth that the individual defendants were required under *Brady* to disclose Anderson's double hearsay statement to the prosecutors handling Epps's case.  For this reason too, the *Brady* based claims against Detectives Stambach, Giardina, and Costantino must be dismissed.

"The question of whether and when inadmissible evidence can be *Brady* material remains an open question in many jurisdictions to this day."  *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).  It certainly cannot be said that the detectives investigating the Means and Pope homicides should have known over two decades ago that Anderson's double hearsay statement was *Brady* material.  As such, even if Anderson's testimony is fully credited, and even

if the detectives did intentionally suppress Anderson's statement, they are entitled to qualified immunity and cannot be held liable for violating *Brady*.

### POINT III.   EPPS'S POST-TRIAL DUE PROCESS CLAIM FAILS AS A MATTER OF LAW

Epps's due process claim premised upon the individual defendants' post-conviction conduct cannot be maintained. "There is no freestanding substantive due process right to *Brady*-like disclosure post-conviction." *Pierre v. City of Rochester*, 16-CV-6428, 2018 WL 10072453, at *17 (W.D.N.Y. Sep. 2018) (citing *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)) (explaining that "New York law does not provide for post-conviction disclosure of potentially exculpatory evidence"). Thus, Epps cannot maintain a cause of action based on the individual defendants' failure to disclose Anderson's double hearsay statement to prosecutors after Epps was convicted. *Id.*

Moreover, even if Epps did have a constitutional right to *Brady* like disclosure after he was convicted, which he does not, the individual defendants would be entitled to qualified immunity. *Pierre*, 2018 WL 10072453, at *19 (even assuming arguendo that plaintiff had Brady like rights post-conviction, defendants were entitled to qualified immunity). It certainly stands to reason that, if the individual defendants are entitled to qualified immunity with respect to Epps's pre-conviction due process claim based upon a *Brady* violation, they are most certainly entitled to qualified immunity with respect to Epps's post-conviction claim.

Epps cannot base his post-conviction due process claim on the defendants' alleged failure to disclose Anderson's statement or identity to prosecutors. Thus, with respect to his post-conviction claim, he is left to rely on the allegedly perjurious and deceitful testimony

29

given by Detectives Stambach, Giardina, and Costantino given while his post-conviction motions were being adjudicated.  But Epps's reliance on these individuals' testimony dooms his post-conviction due process claim.  These three defendants are absolutely immune from liability stemming from testimony given in judicial proceedings.  *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983); S*ykes v. James*, 13 F.3d 515, 519-520 (2d Cir. 1993).  When these three defendants submitted affidavits and testified at Epps's post-conviction hearing, they were not initiating a prosecution as complaining witnesses, but were giving testimony as fact witnesses in connection with a judicial proceeding.  Thus, they are absolutely immune from liability, even if there testimony and affidavits were, as Epps claims, perjurious.  *Collins v. City of New York*, 923 F. Supp. 2d 462, 473 (E.D.N.Y. 2013).

For all of these reasons, Epps's post-conviction due process claim must be dismissed.

**POINT IV.   EPPS'S STATE LAW CONSTITUTIONAL CLAIM AGAINST THE CITY OF BUFFALO FAILS AS A MATTER OF LAW**

Epps's state law due process claim must also be dismissed.  This claim, which is asserted against the City of Buffalo only under a theory of *respondeat superior*, fails on two independent grounds.

First, Epps cannot recover against the City on his state-law due process claim because none of the individual defendants violated his constitutional rights or committed any state-law torts against him.  Thus, because there is no individual liability on the part of any individual defendant or on the part of any unnamed individual acting as an employee or agent of

the City, Epps cannot obtain liability against the City under a theory of *respondeat superior*.
*Coleman v. City of Rochester*, No. 16-CV-6179, 2018 WL 6727535 at *6 (W.D.N.Y. Dec. 2018)
(dismissing plaintiff's state constitutional claims where he had "not demonstrated any basis for
liability on the part of any of the City's agents or employees").

Second, even if Epps were able to show that his constitutional rights were
violated, he cannot maintain a state-law due process claim against the City.  Plaintiffs can assert
*respondeat superior* claims under the New York State Constitution only when no other state laws
provide an "adequate alternative remedy."  *Issac v. City of New York*, No. 16-CV-472, 2018 WL
5020173 at *19-20 (E.D.N.Y. Aug. 2018).

Here, New York law provides someone in Epps's position with an adequate
alternative remedy to seek redress for the alleged constitutional violations at issue.  Epps was
prosecuted and convicted.  As such, New York's post-conviction remedies provided him with an
adequate alternative way to address the alleged unconstitutional activities by the defendant
detectives.  This is not a situation where Epps was never prosecuted and thus has no means of
seeking redress other than through an action for damages. *Cf. Brown v. State of New York*, 89
N.Y.2d 172, 192, (1996).  Epps can and did use New York's post-conviction remedies in an
effort to seek recompense for the individual defendants' alleged misconduct.  In one instance, he
was unsuccessful.  Years later, he was able to obtain a reversal of his conviction.  Because Epps
was not left in a "damages or nothing" situation, he cannot maintain his state-law due process
claim.  *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83-84 (2001) (dismissing identical claim
where plaintiff had shown "no grounds that would entitle her to a damage remedy in addition to

the substantial benefit she already had received from dismissal of the indictment and release from incarceration").  For this reason too, Epps's final cause of action must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court grant their motion for summary judgment in its entirety, and grant such other relief as the Court may deem just and proper.

Dated:      Buffalo, New York
            October 7, 2022

                              **HODGSON RUSS LLP**
                              *Attorneys for Defendants*

                              By: //s Peter A. Sahasrabudhe
                                     Hugh M. Russ, Esq.
                                     Peter A. Sahasrabudhe, Esq.
                              The Guaranty Building
                              140 Pearl Street, Suite 100
                              Buffalo, NY  14202-4040
                              716.856.4000