UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CORY EPPS,

                                          Plaintiff,

          -against-

THE CITY OF BUFFALO, DETECTIVE
JOHN BOHAN, DETECTIVE REGINALD
MINOR, DETECTIVE MARK
STAMBACH, DETECTIVE JAMES
GIARDINA, DETECTIVE ANTHONY
CONSTANTINO, DETECTIVE ROBERT
CHELLA, AND RANIERO MASSECHIA,

                                          Defendants.

Dkt. No. 19-cv-00281

---

## PLAINTIFF'S 46.1 COUNTER-STATEMENT OF FACTS

Plaintiff Cory Epps, by and through his undersigned counsel, responds to Defendants'

Statement of Undisputed Facts in Support of Summary Judgment (Dkt. 79) as follows:

**The Tomika Means Homicide**

**1.D**    In the early morning hours of May 27, 1997, a then unidentified perpetrator

murdered Tomika Means near the corner of Chelsea and East Delevan Avenue in the City of

Buffalo. Declaration of Peter A. Sahasrabudhe ("Decl."), Exhibit 11 at p. 127-138.

**RESPONSE:** Disputed as to the date of the Means Murder. *See* Pl.Ex. A at 83–84.

**2.D**    The only eye witness to the murder was Jaqueline Bradley, who was in the

passenger seat of the car where Means was shot. (*Id*.).

**RESPONSE:** Undisputed.

**3.D**    The unidentified perpetrator shot means at near point blank range. (Id.).

**RESPONSE:** Undisputed.

1

**4.D**  Bradley was able to view the perpetrator of the homicide but she was not able to identify him following the shooting. (*Id.* at p. 152).

**RESPONSE:** Incomplete. Bradley gave a detailed description of the perpetrator to police, although that description was not translated into the subsequent composite sketch of the suspect. Bradley also told police that she knew recognized the man, but did not know his name. *See* Pl.Ex. A at 152, 138; Pl. Ex. H.

**5.D**  In connection with his investigation of the Means homicide, Detective John Bohen showed Jaqueline Bradley a photo array containing Epps's photograph on July 6, 1997. (Decl., Ex. 3 at p. 83); (Decl., Ex. 35).

**RESPONSE:** Disputed. Bradley was not shown a photo array; instead, she was shown binders of books with pages and pages of photos. Bradley testified that she was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. *See* Def.Ex. 9 at 6–12.

**6.D**  Prior to showing Bradley the photo array, Detective Bohen had been told by Linda Means, the aunt of the homicide victim, that Epps resembled a composite sketch that Bradley had helped create shortly after the shooting. (Decl., Ex. 3 at p. 72); (Decl., Ex. 35).

**RESPONSE:** Disputed. While Bohen made a notation that he spoke with Linda Means and was told that the composite looked like Epps, Bohen also testified that he does not remember ever interviewing Linda means, and that he never found how Linda Means knew of Cory Epps. Def.Ex. 3 at 72–74; Pl.Ex. G.

**7.D**  Linda Means also relayed that she had heard rumors that Epps may have been the perpetrator. (Decl., Ex. 35).

**RESPONSE:** Undisputed that Bohen testified that he made a notation indicating he spoke with Linda Means and was told that "she heard people were saying it was Cory Epps did the

shooting." Det. Bohen, however, could not recall ever conducting an interview with Linda Means. He would, however, be called to testify about these events. Pl.Ex. A; Pl.Ex. I; Def.Ex. 3 at 72–74; Def.Ex. 35; Pl.Ex. G.

**8.D**     The photo array Bohen showed to Bradley contained Epps's photograph and five filler photographs. (Decl., Ex. 28); (Decl., Ex. 16 at p. 6-7).

**RESPONSE:** Disputed. Bradley was shown mug books she flipped through until she made an identification. Bradley testified that she was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. *See* Def.Ex. 9 at 6–12.

**9.D**     The five filler photographs were the same ethnicity as Epps and were of the same relative age and appearance as Epps. (Decl., Ex. 28).

**RESPONSE:** Disputed inasmuch as the make-up of the photo array is self-evident, and shows 6 persons of varying skin colors, heights, and facial characteristics. The photo array, however, was not how Bradley identified Epps, as Bradley testified that he was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. *See* Def.Ex. 9 at 7–10; Pl.Ex. L; Def.Ex. 28 at 1.

**10.D**     The only people present when Bradley viewed the photo array on July 6, 1997 were Bradley, Detective Bohen, and Detective Reginald Minor. (Decl., Ex. 16 at p. 7).

**RESPONSE:** Disputed. The photo array, however, was not how Bradley identified Epps, as Bradley testified that he was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. *See* Def.Ex. 9 at 7–10; Pl.Ex. L; Def.Ex. 28 at 1.

**11.D**     Bradley signed an affidavit attesting to the fact that she identified the photograph in slot number five of the array as depicting the individual who committed the Means homicide. (Decl. Ex. 28).

**RESPONSE:** Undisputed inasmuch as Bradley signed an affidavit that was prepared for her by the Defendants, which indicated that she picked photo #5 from a photo array. However, otherwise Disputed. Bradley was not shown a photo array; instead, she was shown binders of books with pages and pages of photos. Bradley testified that she was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page, and that the officers told her #5 was Cory Epps. This was after Bradley was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. *See* Def.Ex. 9 at 6–12; Pl.Ex. L; Def.Ex. 28 at 3.

**12.D** The photograph in slot number five of the photo array was Epps's photo. (Decl. Ex. 35).

**RESPONSE:** Undisputed inasmuch as Bradley signed an affidavit that was prepared for her by the Defendants, which indicated that she picked photo #5 from a photo array. However, otherwise Disputed. Bradley was not shown a photo array; instead, she was shown binders of books with pages and pages of photos. Bradley testified that she was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page, and that the officers told her #5 was Cory Epps. This was after Bradley was shown "a lot of pictures" in a "binder-like books," some of which had 10 people per page. Moreover, the purported photo array produced in discovery is missing a photo from slot 5. *See* Def.Ex. 9 at 6–12; Pl.Ex. L; Def.Ex. 28 at 3.

**13.D** When Detective Bohen showed Bradley the array, he told her to take her time, look through the photos, and to let her know if she recognized anyone in the array. Detective Bohen did not suggest that Bradley should choose Epps's photo, and he did not tell Bradley that the perpetrator's photo would be present in the array. (Decl., Ex. 16 at p. 7-8).

**RESPONSE:** Disputed. Bradley was not shown an array to identify Epps. Bradley was shown multiple photographs in mug books until she made an identification of Epps. The

identification was then improperly bolstered by the Detectives when they explicitly stated that she Bradley had identified Corey Epps. Moreover, the testimony cited by Defendants in support of this assertion does not reflect the conclusion above. The only indication that Bohen gave such instructions comes from Bohen's own self-serving testimony, and Bradley has never corroborated that account in her description of the process. Bradley herself testified that the officers did not say anything other than asking if she recognized anyone. *See* Def.Ex. 9 at 6–12; Pl.Ex. E at 6–7.

**14.D**    Prior to showing Bradley a photo array with Epps's picture present, Detective Bohen had shown Bradley a photo array with another suspect's photo included in the array. (Decl., Ex. 3 at p. 60-61); (Decl., Ex. 29); (Decl. Ex. 38). Epps's photo was not included in this photo array. (Decl., Ex. 29).

**RESPONSE:** Disputed. Bradley was not shown an array. Bradley was shown multiple photographs in mug books until she made an identification of Epps. The identification was then improperly bolstered by the Detectives when they explicitly stated that she Bradley had identified Corey Epps. Defendants citation to pages 61 and 62 Bohen's deposition testimony does not state what Defendants conclude. Det. Bohen explicitly testified that he did not remember showing the photo array containing a different suspect to Bradley, but confirmed that the paperwork indicated that he put together the photo arrays for Bradley to view. *See* Def.Ex. 3 at 64–65; *See* Def.Ex. 9 at 6–12; Pl.Ex. L; Pl.Ex. M.

**15.D**    Bradley did not identify the other suspect in the first array put together by Detective Bohen. (Decl., Ex. 35). Further, she did not identify any photograph in the first array as the perpetrator of the Means homicide. (Decl., Ex. 35).

**RESPONSE:** Disputed inasmuch as Bradley was not shown a photo array, but was shown books of photos of men in a mug book. *See* Def.Ex. 9 at 6–12.

**Detective Minor's Investigative Activities**

**16.D**    Detective Minor was present with Detective Bohen and Bradley on July 6, 1997 when Bradley identified Epps in a photo array. (Decl. Ex. 16, at p. 7).

**RESPONSE:** Disputed inasmuch as Bradley was not shown a photo array, but was shown books of photos of men in a mug book. Bohen did claim, and draft a P73 with this information that was provided to the prosecution, that Bradley, "in a very exited voice states, that's him, that's the guy who shot Tomika. I swear to god that's him." *See* Def.Ex. 9 at 6–12;

**Potential Identification Procedures in Addition to Detective Bohen's Photo Array**

**17.D**    Jacqueline Bradley remembers identifying Epps's picture in a mug book. (Decl., Ex. 9 at p. 7-12).

**RESPONSE:** Incomplete. Bradley testified in her deposition that she remembers the officers brought her a second mug book several weeks after she viewed the first, and made an identification, which she later learned was Cory Epps. *See* Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3.

**18.D**    Jacqueline Bradley remembers being given a mug book where she could not identify anyone's photograph as the perpetrator of the Means homicide. (*Id*. at p. 11).

**RESPONSE:** Undisputed as to the first mug book, disputed as to the second mug book. *See* Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3.

**19.D**    Jacqueline Bradley remembers being given a second mug book wherein she was able to identify Epps's photograph. (*Id*.).

**RESPONSE:** Incomplete. Bradley testified in her October 29, 2021 deposition that she remembers the officers brought her a second mug book several weeks after she viewed the first. She also testified that she made an identification in the second mug book, which the officers then

told her was Cory Epps. *See* Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3.

**20.D**    Jaqueline Bradley claims that, when she was given the mug book, she was told to take her time, look through the photographs, and let police officers know if she recognized any of the photographs. (*Id*. at p. 10).

**RESPONSE:** Disputed. Bradley's testimony does not so state. Bradley testified that the officers did not tell her anything prior to being given the photo array except that she should say something if she recognized anyone. *See* Def.Ex. 9 at 9–10.

**21.D**    Jaqueline Bradley testified that no one told her the photo she had identified in the mug book was Cory Epps. (*Id*. at p. 13).

**RESPONSE:** Disputed. Bradley only remembers the officers saying that they would contact her if they needed anything else. The signature page of the identification affidavit, however, indicates that Bradley was told the identity of Epps after she made the identification. *See* Def.Ex. 9 at 13; Pl.Ex. L; Def.Ex. 28 at 3.

**22.D**    Jaqueline Bradley testified that, when she saw Epps's photo, she started crying because she recognized the person in the photograph as the individual who committed the Means homicide. (*Id*. at p. 12).

**RESPONSE:** Incomplete. Bradley testified she "broke down crying" when she saw a particular photo in the second mug book. *See* Def.Ex. 9 at 12.

**23.D**    At some point, Homicide Detective Juan Morales assembled a photo array with Epps's picture present. (Decl. Ex. 30).

**RESPONSE:** Undisputed.

**24.D**    There is no evidence that Detective Morales ever showed this photo array to Jaqueline Bradley or any other witness.

**RESPONSE:** Incomplete. Bohen testified during his deposition that the photo array he purportedly showed to Bradley was the array created by Detective Morales, and that it was possible Bradley was shown multiple arrays with Epps' photo included. Bradley, however, does not remember looking at an array, only at mug books, and Bohen was unable to explain the discrepancies. *See* Def.Ex. 3 at 76–80; Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3.

**Lineup Conducted at the Request of the Erie County District Attorney's Office**

**25.D**   After Bradley identified Epps's photograph, Assistant District Attorney Patricia Carrington made an application for an order requiring Epps to participate in an in person lineup. (Decl. Ex. 23).

**RESPONSE:** Undisputed.

**26.D**   New York County Court Judge Timothy Drury granted ADA Carrington's application and ordered Epps to appear for an in person lineup. (Decl. Ex. 24).

**RESPONSE:** Undisputed.

**27.D**   On July 30, 1997, Detective Sergeant Henry Smardz, who is not a party to this action, oversaw an in person lineup where Epps observed Bradley next to five fillers. (Decl., Ex. 16 at p. 23-42). Detective Sergeant Smardz was a member of BPD's Evidence Collection Unit.

**RESPONSE:** Incomplete. Det. Smardz previously testified that he was part of the BPD's Evidence Collection Unit, and that he helped set up an in-person identification procedure that with six black males, including Epps. and *See* Pl.Ex. A at 23–25.

**28.D**   ADA Carrington was present at the in person lineup. (Decl. Ex. 16 at p. 24-25).

**RESPONSE:** Undisputed.

**29.D**   Salvatore Abate, Esq., who at the time was representing Epps, was also present at the lineup. (Decl., Ex. 16 at p. 24-25).

**RESPONSE:** Undisputed.

**30.D**    Neither ADA Carrington nor Mr. Abate objected to the procedures implemented during the lineup. (*Id.*).

**RESPONSE:** Disputed. Defendants' citation does not indicate whether or not any party objected, only that these parties were present during the identification procedure. *See* Pl.Ex. E at 24–26.

**31.D**    During the lineup, Bradley viewed Epps standing next to five fillers. (*Id.* at p. 23-42). The fillers were the same ethnicity as Epps and were of the same relative age and appearance. (*Id.*).

**RESPONSE:** Incomplete. Bradley was shown two separate line-ups after identifying Epps in a prior photo array. In each of the in-person lineups, Epps was included with five different fillers. The testimony cited by Defendant indicates that the only difference between these two line-ups was the position and movement of the fillers, but Epps was present in both. *See* Pl.Ex. E at 28–35.

**32.D**    On two occasions during the in person lineup, Bradley identified Epps as the individual who had committed the Means homicide. (*Id.*).

**RESPONSE:** Incomplete. Bradley identified Epps in the line-up *after* the detectives conducted a suggestive photo array and bolstered the identification of Epps. After Bradley identified Epps in the line-up, the detectives inexplicably placed Epps in another line-up within minutes of the first one. *See* Pl.Ex. E at 28–35.

**33.D**    Epps was in a different position in the lineup each time that Bradley identified him. (*Id.*).

**RESPONSE:** Incomplete. Bradley identified Epps in the line-up *after* the detectives

conducted a suggestive photo array and bolstered the identification of Epps. After Bradley identified Epps in the line-up, the detectives inexplicably placed Epps in another line-up within minutes of the first one. *See* Pl.Ex. E at 28–35.

**34.D**    Bradley began crying and shaking once she identified Epps at the lineup. (*Id.* at p. 32).

**RESPONSE:** Disputed. The testimony cited by Defendant does not state anything about Bradley crying or shaking upon identification of Epps. Instead, Smardz's testimony was that, "prior to the first lineup" Bradley was "a bit distraught." When asked if this reaction was in response to seeing Epps, Smardz responded that he "believed" this was the case. *See* Pl.Ex. E at 32.

**35.D**    In an affidavit submitted by ADA Carrington in later proceedings, she described Bradley's identification at the lineup as one of the most convincing and compelling identifications she had ever seen. (Decl., Ex. 17).

**RESPONSE:** Incomplete. In 2000, over a decade after the line-up, ADA Carrington made an affidavit stating that she had "never witnesses such a sire and chilling identification." Smartz, by contrast, described Bradley as "a bit distraught" at the start of the line-up process. *See* Pl.Ex. E at 32; Def.Ex. 17 at ¶3.

**<u>Grand Jury Proceedings</u>**

**36.D**    36. A grand jury indicted Epps on August 7, 1997. (Decl., Ex. 31); (Decl., Ex. 40).

**RESPONSE:** Undisputed.

**37.D**    The indictment was issued based on the testimony of Bradley, which was elicited by ADA Carrington's questioning. (Decl., Ex. 10).

**RESPONSE:** Undisputed that ADA Carrington relied on Bradley's testimony to secure an

indictment. Disputed otherwise, as the grand jury indictment was secured using the photo array, purportedly identifying Epps, which was not actually the way Epps was identified, and the lineup was suggestive. *See* Pl.Ex. E at 8, Ex. R at 14-15.

**38.D**   During the grand jury proceedings, ADA Carrington's questions of Jaqueline Bradley focused exclusively on Bradley's account of the murder and her identification of Epps at the in person lineup ordered by Judge Drury. (*Id.*).

**RESPONSE:** Disputed as to the characterization that the ADA's questions were "exclusively" about Bradley's account of the murder and the in-person identification. *See* Pl.Ex. Def. Ex. 10.

**39.D**   Based on Bradley's testimony, a grand jury indicted Epps. (Decl., Ex. 31).

**RESPONSE:** Undisputed that ADA Carrington relied on Bradley's testimony to secure an indictment. Disputed otherwise, as the grand jury indictment was secured using the photo array, purportedly identifying Epps, which was not actually the way Epps was identified, and the lineup was suggestive. *See* Pl.Ex. E at 8, Ex. R at 14-15.

**Detective Stambach's Investigative Activities**

**40.D**   Detective Stambach did not investigate the Means homicide. (Decl., Ex. 5 at p. 25). He played no role whatsoever in procuring the indictment that was issued against Epps. (Id.).

**RESPONSE:** Disputed. Stambach and Giardina spoke with Wymiko "Pumpkin" Anderson, the mother of Pope's child, on April 17, 1998, and learned about Montgomery's involvement in the Means murder. After learning that Montgomery matched the description of the assailant, Stambach and Giardina left the room, and when Stambach returned, he dismissed Anderson's information and told her that they already knew who committed the crime. Anderson also told Stambach and Giardina that Montgomery had confessed to the murder. Both detectives

also worked together to cover up this connection to Montgomery by excluding Montgomery's involvement in the murder from any records and failing to tell the prosecution, defense, or the Court that they possessed a wealth of information connecting Montgomery to the Means murder. *See* Pl.Ex. V; Pl.Ex. HH; Def.Ex. 32.

**41.D**   On April 17, 1998, Detective Stambach interviewed Wymiko Anderson while investigating the recent murder of Paul Pope. (*Id*. at p. 32).

**RESPONSE:** Undisputed.

**42.D**   At the time of Anderson's interview, Paul Pope was dead. (Decl., Ex. 32) (noting that interview was taken in connection with the murder of Paul Pope).

**RESPONSE:** Undisputed.

**43.D**   During the interview, Anderson relayed that she believed Russell Montgomery may have murdered Pope. (*Id.*).

**RESPONSE:** Incomplete. During the April 17, 1998 interview, Anderson told the detectives that Montgomery looked just like the composite sketch of the person who killed Tomika Means and that, on May 26, 1997—the day of the Means Murder—Montgomery came to a house where Anderson and Pope were sleeping, and that Pope left the room to speak to Montgomery. After Pope returned to bed, he told Anderson the Montgomery confessed to the murder. All of this information were discussed during the interview. *See* Pl.Ex. S; Pl. Ex. X; Pl.Ex. HH; Def.Ex. 32.

**44.D**   Anderson also claims that, during the interview, she relayed that the composite sketch Bradley had helped create looked similar to Montgomery. (Decl., Ex. 8 at p. 24-25).

**RESPONSE:** Incomplete. Anderson did not say that the composition and Montgomery were merely similar, but that they looked just alike, but the detectives disregarded this information in favor of inculpating Epps. *See* Def.Ex. 8 at 23–25; Def.Ex. 32; Pl.Ex. HH.

**45.D** Anderson also claims that, during her interview, she relayed that Montgomery came to retrieve Pope from a home where she and Pope had been staying the morning of the Means murder. (*Id.* at p. 25); (Decl., Ex. 12 at p. 47-50).

**RESPONSE:** Undisputed.

**46.D** Anderson claims that she told Detective Stambach and another detective during her interview that, when Pope returned home after leaving with Montgomery, he told Anderson that Montgomery had confessed to being the perpetrator of the Means murder. (Decl. Ex. 12 at p. 47-50).

**RESPONSE:** Undisputed.

**47.D** Detective Stambach denies that Anderson ever relayed any information relevant to the Means homicide during her April 17, 1998 interview. (Decl., Ex. 13 at p. 10); (Decl., Ex. 20).

**RESPONSE:** Undisputed that Stambach denies Anderson's statements.

**Detective Giardina's Investigative Activities**

**48.D** Detective Giardina played no meaningful role in investigating the Means homicide. (Decl., Ex. 6 at p. 22-23).

**RESPONSE:** Disputed. Stambach and Giardina spoke with Wymiko "Pumpkin" Anderson, the mother of Pope's child, on April 17, 1998, and learned about Montgomery's involvement in the Means murder. After learning that Montgomery matched the description of the assailant, Stambach and Giardina left the room, returned, and dismissed Anderson's information, telling her that they already knew who committed the crime. Anderson also told Stambach and Giardina that Montgomery had confessed to the murder. Both detectives also worked together to cover up this connection to Montgomery by excluding Montgomery's involvement in the murder from any records and failing to tell the prosecution, defense, or the Court that they possessed a

wealth of information connecting Montgomery to the Means murder. Def.Ex. 8; Def.Ex. 32; Def.Ex. 43; Pl.Ex. HH.

**49.D**    Detective Giardina did not play any role in procuring the indictment issued against Epps. (*Id.*).

**RESPONSE:** Disputed. Stambach and Giardina spoke with Wymiko "Pumpkin" Anderson, the mother of Pope's child, on April 17, 1998, and learned about Montgomery's involvement in the Means murder. After learning that Montgomery matched the description of the assailant, Stambach and Giardina left the room, returned, and dismissed Anderson's information, telling her that they already knew who committed the crime. Anderson also told Stambach and Giardina that Montgomery had confessed to the murder. Both detectives also worked together to cover up this connection to Montgomery by excluding Montgomery's involvement in the murder from any records and failing to tell the prosecution, defense, or the Court that they possessed a wealth of information connecting Montgomery to the Means murder. Moreover, during the post-conviction § 440 litigation, Minor provided an affidavit with false claims, undermining Epps' efforts to overturn his wrongful conviction. Def.Ex. 43; Pl.Ex. Y; Pl.Ex. BB; Pl.Ex. HH.

**50.D**    Detective Giardina was present during Anderson's April 17, 1998 interview. (Decl., Ex. 21).

**RESPONSE:** Undisputed.

**51.D**    Detective Giardina denies that Anderson relayed any information relevant to the Means homicide during her April 17, 1997 interview. (*Id.*).

**RESPONSE:** Undisputed that Giardina denies Anderson's statements.

## Detective Sergeant Costantino's Investigative Activities

**52.D**   There is no dispute that Detective Sergeant Costantino interacted with Wymiko Anderson at some point. (Decl., Ex. 15 at p. 43). Defendants contend that Detective Sergeant Costantino only spoke with Anderson after Epps had been convicted. (*Id.* at p. 40).

**RESPONSE:** Disputed. Costantino testified he was there when Anderson gave her statement on April 17, 1998. Def.Ex. 7 at 101-102.

**53.D**   Although Detective Sergeant Costantino investigated the Means murder, there is no evidence that he conducted any photo identification procedures with Jacqueline Bradley prior to the in person lineup requested by the Erie County District Attorney's Office.

**RESPONSE:** Disputed. Costantino testified he was there when Anderson gave her statement on April 17, 1998. Def.Ex. 7 at 101-102.

## Epps's Trial

**54.D**   Epps's trial began on April 20, 1998. (Decl. Ex. 1 at ¶ 53).

**RESPONSE:** Undisputed.

**55.D**   Epps was convicted by a jury based on the testimony of Jaqueline Bradley. (Decl., Ex. 11).

**RESPONSE:** Incomplete. Bradley's trial testimony was tainted by the wrongful conduct of the Defendants, and to the extent the conviction relied upon this testimony, the officers' acts and omissions were the central driving force behind the conviction. *See* Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3; Pl. Ex. R.

**56.D**   At Epps's trial, Bradley confidently identified Epps as the perpetrator of the Means homicide. (Decl., Ex. 11 at p. 148).

**RESPONSE:** Incomplete. While Bradley testified that she was "certain" about Epps' culpability, she did so after being unduly influenced by the Defendants, and despite that fact that

she had been drinking and only briefly saw the perpetrator in dark and stressful circumstances. *See* Pl.Ex. Q, Pl.Ex. R.

**57.D**    Bradley did not testify about any of the photo identification procedures implemented by the defendant detectives. Her testimony focused only on her account of the homicide and the in person lineup that had been requested by the District Attorney's Office. (*See generally,* Decl., Ex. 11).

**RESPONSE:** Incomplete. Bradley was cross-examined with photos of other suspects that had emerged, and about how Epps did not have acne and was much taller than the description she gave to police. *See* Pl.Ex. A at 148–169.

**58.D**    Based on Bradley's testimony, a jury convicted Epps on April 24, 1998. (Decl. Ex. 1 at ¶ 61).

**RESPONSE:** Incomplete. Bradley's trial testimony was tainted by the wrongful conduct of the Defendants, and to the extent the conviction relied upon this testimony, the officers' acts and omissions were the central driving force behind the conviction. *See* Def.Ex. 9 at 11–12; Pl.Ex. L; Def.Ex. 28 at 3; Pl. Ex. R.

## Wymiko Anderson's Anonymous Letter

**59.D**    After Epps was convicted, Wymiko Anderson wrote an anonymous letter to Epps's trial counsel, Andrew Lotempio, Esq. (Decl., Ex. 33).

**RESPONSE:** Undisputed.

**60.D**    Anderson's anonymous letter did not mention Paul Pope or any of her alleged statements made to the police on April 17, 1998. (*Id.*).

**RESPONSE:** Undisputed, to the extent that the letter does not specifically say she communicated her information to the detectives; she does repeat many of the facts that she did

communicate to the detecitves in the letter itself. *See* Def.Ex. 33.

**61.D** There is no evidence that any of the defendant detectives or anyone from the Buffalo Police Department knew that Anderson was the author of this letter prior to Epps's sentencing. Nor is there any evidence that any of the defendant detectives tried to conceal Anderson's identify from Lawrence Schwegler, the ADA who had handled Epps's criminal trial. (Decl. Ex. 15 at p. 42) (noting that ADA Schwegler shared with homicide detectives that Anderson was the author of the anonymous letter).

**RESPONSE:** Disputed. In addition to initially suppressing the information from Anderson about Montgomery's role in the Pope and Means murders, the Defendant Detectives were forwarded the anonymous letter by the prosecution, and Det. Chella followed up with Anderson over the phone. During the conversation, she admitted that the was the author of the letter, and reiterated the information she reported on April 17, 1998 concerning Montgomery's culpability. Further, given Anderson's April 17, 1998 statement to detecives, it is highly likely they figured out who wrote the letter, given how specific the subject matter was. Pl.Ex. X at 57–59; Pl.Ex. C at 78–79; Pl.Ex. HH; Def.Ex. 8.

**Epps's NYCPL 440 Motions**

**62.D** After Epps's counsel learned Anderson's identity, Epps applied for postconviction relief pursuant to New York Criminal Procedure Law 440. (Decl., Ex. 18).

**RESPONSE:** Undisputed.

**63.D** In connection with Epps's NYCPL 400 applications, Anderson claimed that she told the police, that Paul Pope told her, that Russell Montgomery confessed to being the perpetrator of the Means murder. (*Id.*).

**RESPONSE:** Undisputed.

**64.D**    Based largely on Anderson's allegations, Epps sought to overturn his conviction on two grounds: (1) newly discovered evidence that was previously unavailable demonstrated his innocence; and (2) Anderson's statement demonstrated that homicide detectives had violated the tenets of *Brady v. Maryland*, 373 U.S. 83 (1963). (Decl., Ex. 25); (Decl., Ex. 26).

**RESPONSE:** Undisputed.

**65.D**    In connection with Epps's motion, Acting New York Supreme Court Justice Joseph McCarthy, who presided over Epps's criminal trial, held a hearing to determine whether  homicide detectives had violated *Brady*. (Decl., Ex. 26).

**RESPONSE:** Undisputed.

**66.D**    Anderson testified at the hearing and claimed that she told police that Pope told her that Montgomery had confessed to the Means homicide. (Decl., Ex. 12).

**RESPONSE:** Undisputed.

**67.D**    Detectives Stambach and Giardina both testified that Anderson never gave any pertinent information regarding the Means homicide when she was interviewed on April 17, 1997. (Decl., Ex. 13); (Decl., Ex. 14).

**RESPONSE:** Undisputed.

**68.D**    Justice McCarthy denied Epps's motion to the extent it was premised upon homicide detectives' alleged violation of *Brady*. (Decl., Ex. 26) Justice McCarthy found Detective Stambach and Giardina's testimony to be credible. (*Id.* at p. 4-5). In contrast, Justice McCarthy found Ms. Anderson's testimony lacking in credibility and consistency. (*Id.*).

**RESPONSE:** Incomplete. Justice McCarthy's ruling was based on the strategic omissions and lies of the Defendants Giardina, Stambach, Constantino, and Minor, who lied in affidavits and on the stand about the underlying conversation with Anderson. Nor was the Court made aware that

Montgomery had actually confessed to the means murder. Thus, the determinations of the Court were tainted by the wrongdoing of the Defendants. *See* Pl.Ex. Y–EE

**69.D**    Justice McCarthy also denied Epps's motion premised upon the discovery of previously unavailable evidence. (Decl., Ex. 25). Because Anderson's statement was inadmissible hearsay, Epps could not use Anderson's statement to overturn his conviction. (*Id.*).

**RESPONSE:** Incomplete. Justice McCarthy's ruling was based on the strategic omissions and lies of the Defendants Giardina, Stambach, Constantino, and Minor, who lied in affidavits and on the stand about the underlying conversation with Anderson. Nor was the Court made aware that Montgomery had actually confessed to the means murder. Thus, the determinations of the Court were tainted by the wrongdoing of the Defendants. *See* Pl.Ex. Y–EE.

### Over a Decade Later, Witness 1 Comes Forward With New Information

**70.D**    Over a decade after Epps's post-conviction efforts were unsuccessful, a witness came forward with new information tending to show that Montgomery was the true perpetrator of the Means homicide. (Decl., Ex. 36). This witness, whose identity is being kept confidential, has been referred to throughout these proceedings as Witness 1.

**RESPONSE:** Undisputed.

**71.D**    Witness 1 did not interact with the police prior to Epps's conviction. (*Id.*).

**RESPONSE:** Undisputed.

**72.D**    In or about 2017, Joseph Riga, the former Chief of Homicide for the Buffalo Police Department interviewed Witness 1 in his capacity as an investigator for the Erie County District Attorney's Office. (Decl. Ex. 38 at p. 62-70).

**73.D    RESPONSE:** Incomplete. Joseph Riga testified in his deposition that, as part of the reinvestigation into the Means murder, he interviewed Witness 1 approximately three times in either 2016 or 2017. *See* Def.Ex. 38 at 66:23–67:4.

**74.D**    Investigator Riga found Witness 1 to be credible. (*Id.* at p. 68).

**RESPONSE:** Undisputed.

**75.D**    Epps filed a new NYCPL 440 motion in 2017 based on a sworn affidavit and testimony from Witness 1. (Decl. Ex. 39).

**RESPONSE:** Undisputed.

**76.D**    The Erie County District Attorney's Office ultimately did not oppose Epps's motion.

**RESPONSE:** Undisputed.

**77.D**    As a result of Epps's unopposed motion, his 1998 conviction was vacated. (*Id.*).

**RESPONSE:** Undisputed.

**78.D**    Despite the reversal of Epps's conviction, Jaqueline Bradley has never recanted her identification of Epps as the perpetrator of the Means homicide. (Decl. Ex. 9 at p. 25) (Bradley noting that she does not recognize Russell Montgomery as the perpetrator of the Means homicide).

**RESPONSE:** Incomplete. It is undisputed that, during her October 2021 deposition, Bradley did not explicitly recant the identification of Epps. But Bradley also testified that it was Means' mother who asked Bradley not to get involved in the reinvestigation of the murder when police approached her in 2016 or 2017, and that Bradley did not involve herself out of respect for this request. Further, Bradley testified that the officers did not inquire into the underlying murder during the reinvestigation, but only asked her to testify again, which she declined to do. *See* Def.Ex. 9 at 25:9–27:25.

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

**Russell Montgomery Kills Tomika Means and the Initial Investigation**

**1.P**    On Monday, May 26, 1997, Tomika Nicole Means was murdered following a "road rage" incident while driving home from Birchfield's in Buffalo, New York. *See* Pl.Ex A at 83–86,

**2.P**    While Means was driving with her friend, Jaqueline Bradley, in the passenger seat, a gray or light blue Oldsmobile Delta 88 or Pontiac 6000 cut them off. Means honked her horn and continued driving. *See* Pl.Ex. A 118-168.

**3.P**    The same car pulled up next to Means' car, leaned out of the passenger seat, and begin yelling. As the cars approached East Delevan and Chelsea Street, the car cut in front of Means and stopped. *See* Pl.Ex. A 118-168.

**4.P**    A man, later identified as Russell Montgomery, stepped out of the car, and leaned into the passenger side window where Bradley was seated. *See* Pl.Ex. A 118-168.

**5.P**    Bradley told Montgomery "it ain't worth it." Montgomery replied, "Fuck that, bitch," and shot Tamika Means in the head before fleeing the scene. *See* Pl.Ex. A 118-168.

**6.P**    Bradley told police that the shooter was approximately 5'8" or 5'9, 250 lbs., with visible acne scars on his face, with a light goatee or beard, wearing a baseball cap. *See* Pl.Ex. A 118-168.

**7.P**    At the time of the murder, it was dark outside, Bradley had four drinks earlier in the night, and the traumatic experience happened very quickly, with the gun directly in front of her face when Means was killed. *See* Pl.Ex. A 118-168.

**8.P**    The next day, Bradley gave her description to police to assist with a composite sketch of the suspect, which was stored in a common file at the homicide unit with all documents related to the investigation. The composite was also placed on a board in the stations and was

widely distributed to officers in the homicide unit. *See* Pl.Ex. A at 141–143; Pl.Ex. B at 19–21; Pl.Ex. H; Def.Ex.3.

**9.P**    The sketch, however, did not include the acne scarring, and drew the man wearing a hat different than the cap Bradley described. *See* Pl.Ex. A at 141–143; Pl.Ex. H.

**10.P**    Bradley told police that she recognized the man from a local bar, Birchfield's, which both Russell Montgomery and Cory Epps frequented. Pl.Ex. A at 138, 152–153.

**Cory Epps is Falsely Identified**

**11.P**    The police had no suspects or leads in the investigation for approximately seven months. Def.Ex 3, Def.Ex. 4, Def.Ex. 5.Def.Ex.6, Def.Ex.7.

**12.P**    Defendants Bohen and Minor were assigned to the investigation, despite Bohen having very little experience working homicides. *See* Def.Ex. 3 at 25–29, 35–36, 69.

**13.P**    Bohen had just entered the homicide unit, and was able to collect more overtime, increasing his pension upon retirement. *See* Pl'sEx. B at 25–29.

**14.P**    Bohen knew very little of the facts underlying the murder investigation prior to approaching Bradley, and did not take steps to personally learn of the specifics of Bradley's description of the assailant. He merely heard people talking in the office about the crime. *See* Def.Ex. 3 at 25–29, 35–36, 69; Pl.Ex. E.

**15.P**    Several weeks after Means was killed, Bohen and Minor went to Bradley's house with large plastic binders full of dozens of photographs of suspects. *See* Def.Ex. 9 at 6–12.

**16.P**    Bradley did not make an identification during this first mug book viewing. *See* Def.Ex. 9 at 9.

**17.P**    A few weeks later, Bradley was brought another book, at which point she recognized Cory Epps. *See* Def.Ex. 9 at 11–12.

**18.P**    She believed him to be the assailant, but also admits that she recognized him as a regular at Birchfield's bar, where she and Means were hanging out the night of the murder. *See* Pl.Ex. A at 153–169.

**19.P**    Bradley was never shown a single photo array of six individuals. Instead, she was asked to make various identifications on several occasions, and remembers signing paperwork related to these identifications "nine or ten" separate times. *See* Def.Ex. 9 at 6–12, 31.

**20.P**    The photograph of Epps used in the array shown to Bradley did not match the description Bradley gave to police after the murder. *See* Def.Ex. 9 at 31–32; Pl.Ex. H; Pl.Ex. L.

**21.P**    Epps is approximately 6 inches taller that the description Bradley gave to police. *See* Pl.Ex. A at 151, 163–164, 168–169.

**22.P**    Epps has smooth skin, and does not have acne scarring on his face. *See* Pl.Ex. A at 155–156, 163.

**23.P**    There were no leads suggesting Epps' involvement in the murder prior to this identification, and the officers did not investigate Epps' whereabouts at the time the crime was committed, or whether or not Bradley knew Epps prior making this identification. Moreover, there were no witnesses in the area *See* Pl.Ex. B at 43; Pl.Ex. C at 75; Pl's Ex. E, 15–16, 20–22; Pl.Ex. N at 21–22; Pl.Ex. R at 15; Def.Ex. 3 at 67, 87–88; Def.Ex. 4 at 15–16.

**24.P**    At least two photo arrays containing different photographs of Epps were shown to Bradley on at least two separate occasions: March 22, 1994 and May 18, 1997. *See* Def.Ex. 9 Def.Ex. 3; Pl.Ex. B 74–85; Pl.Ex. L; Pl.Ex. DD.

**25.P**    One of these arrays was created by Bohen, while the other was created by Det. Juan Morales. A third array included the second photo of Epps, and was used in another investigation. No officer can explain why there were two arrays with two different photos of Epps. *See* Pl.Ex. B

at 74–85; Pl.Ex. L; Pl.Ex. DD; Def.Ex. 9; Def.Ex. 3.

**26.P**    Bohen testified that he gave Morales' photo array to Bradley, but Morales' array is unsigned. *See* Pl's Ex. B 74–85; Def.Ex. 9.

**27.P**    At her deposition, Bradley gave a completely different account that the one Bohen shared with the prosecution. A few weeks after Means was killed, officers came with, "these big books with a lot of pictures and stuff in them." The books were like large binders with plastic over the photos to hold them in. There were probably over a hundred photos in the books, with about ten photos per page. And she would just, "keep flipping," through them. The first time officers brought her one of these books, she did not recognize anyone. A few weeks later, the second time, she recognized Epps in the book and testified that, "I just zoned right in, heart start beating, crying. And I'm like that's him." She testified that she did not remember ever seeing a photo array with six photos in it, but signed documents related to an identification, "nine or ten times." Bradley said she did not learn Epps's name until after the lineup, although she admitted that she did recognize him from Birchfield's. *See* Def.Ex. 9.

**28.P**    The photo array produced in discovery that was signed by Bradley does not include a photograph of Cory Epps. All three arrays have the target suspect in spot number five. *See* Def.Ex. 4; Def. Ex. 9; Def.Ex. 28–30; Pl.Ex. L.

**29.P**    On July 30, 1997, Epps agreed to be placed in a lineup. He was, in fact, placed in two back-to-back line-ups. *See* Pl.Ex. U at 48–49.

**30.P**    This identification procedure was deeply flawed under the circumstances: Bradley viewed the shooter for a very short time, in the dark, under the type of stress that does not allow a brain to create clear memories. *See* Pl.Ex. R at 14.

**31.P**    The photographs shown to Bradley were also problematic, because these

photobooks did not have a target suspect included, allowing any the Bradley to choose any person she recognized without the benefit of a developed identification procedure based on the description given to police just after the crime was committed. Using mug books raises the "risk of misidentification, and there are no protections there for the person who has been identified to basically push back"—the person chosen in the book will simply become a suspect, like Epps did. *See* Pl.Ex. Q at 29–36.

**32.P** Repeated identification procedures, like the ones used here, essentially taught Bradley's brain to remember Epps, and the fact that she previously encountered him at the bar would further confuse these memories. *See* Pl.Ex. Q at 33–34, 87, 102–103, 118–119.; Pl.Ex. R at 15.

**33.P** Using these improper identification procedures casts doubt on the accuracy of the identification. *See* Pl.Ex. R at 15.

**34.P** On April 16, 1998, Russell Montgomery killed Paul Pope (a former associate who Montgomery sold drugs with) after he heard that Pope was telling people about Montgomery's involvement in the Tomika Means murder. Def.Ex. 8; Def.Ex. 32.

**35.P** This murder followed a May 26, 1997 incident in which Montgomery came to the home of Paul Pope and his girlfriend, Wymiko "Pumpkin" Anderson, while they were asleep in bed. The two men left together, and when Pope returned, he told Anderson that Montgomery had confessed to killing Tomika Means. Def.Ex. 8; Def.Ex. 32.

**36.P** After Pope was killed, Defendants Stambach and Giardina spoke with Anderson at her home on April 17, 1998 and then brought her to the police station, where they were joined by Det. Constantino. *See* Pl.Ex. X at 38–39, 42; Def.Ex. 6 at 66–67; Def.Ex. 8.

**37.P** After hearing Anderson's belief that Montgomery killed Pope, the officers asked

Anderson what Montgomery looked like. Anderson , who was also friends with Means' boyfriend and had an interest in both murders, replied that Montgomery looked just like the sketch she saw on the news depicting Tamika Means' murderer. Stambach and Giardina left the interview room, returned, and told Anderson that they were pretty sure they already had the person who killed Means, and it was Cory Epps. Anderson, who knew of both men, replied that Montgomery and Epps look alike. *See* Def.Ex. 32; Def.Ex.8; Pl.Ex. X at 27–32.

**38.P**    Stambach and Giardino prepared a statement for Anderson to sign concerning the Pope murder, but left out all of the details about Montgomery's connection to the Means killing. *See* Def.Ex. 43; Pl.Ex. EE; Pl.Ex. Y.

**39.P**    None of the Defendants disclosed Anderson's true and full statements to the prosecution, defense, or the Court, despite knowing the Epps was about to face a trial for murder, and despite a specific request from defense counsel calling for the production of witness statements just like the one Anderson gave to police about Montgomery. In fact, all evidence pointed to Montgomery: he fit the description of the composite sketch; he was the correct height; he had acne scars on his face; he lived one mile away from the murder scene; he frequented the bar where Bradley said she had previously seen the shooter; he had the type of car described; he was engaged in ongoing criminal activity; he carried a gun; the murders were similarly cold-blooded; and the Pope was purportedly killed because he was telling people that Montgomery killed Tamika Means. Pl.Ex. A; Pl. Ex H; Pl.Ex. X; Def.Ex. 8; Def. Ex. 32.

**40.P**    At trial, Epps' criminal attorney was permitted to cross-examine Bradley about her identification of Epps, including the differences in her initial description to police and the photograph of Epps, as well as with alternate suspects. *See* Pl.Ex. A at 148–169..

**41.P**    But defense counsel knew nothing about Montgomery due to the suppressed

Anderson statements, and Epps lost his opportunity to cross-examine his accuser about these details. *See* Pl.Ex. A at 148–169; Pl.Ex. V.

**42.P**    Epps also presented an alibi at trial, which demonstrated that he was across town meeting his girlfriend for breakfast when the Means murder occurred. The owner of the restaurant confirmed that the waiter on duty that night matched the description that Epps gave in support of his alibi. There was also a receipt from the restaurant corroborating this testimony. *See* Pl.Ex. A at 239–273.

**43.P**    The defense also demonstrated that Epps drove a four door green Chevy malibu— nothing like the car involved in the road rage incident. *See* Pl.Ex. A at 194, 243, 270, 369.

**Post-Conviction Revelations and Epps' Post-Trial Motions**

**44.P**    Three days after the Epps trial ended, Anderson learned of the conviction from her local news. She immediately wrote an anonymous letter to Epps' criminal attorney recounting her belief that Montgomery killed Pope to silence him after Montgomery confessed to killing Tamika Means. She also mentioned the similarities between Montgomery and Epps' appearances. *See* Pl.Ex. S; Pl.Ex. T; Def.Ex. 8.

**45.P**    The anonymous letter then became the subject of a C.P.L. § 330 motion to reverse the outcome of Epps' trial. The motion was argued at Epps' June 10, 1998 sentencing hearing. The court denied the motion on the grounds that the letter was unsigned and unsworn, and because the Court did not find the account credible under the circumstances. *See* Pl.Ex I; Pl.Ex. T; Pl.Ex. X; Def.Ex. 32.

**46.P**    Epps was sentenced to twenty-five years to life in prison. At sentencing, the Court told the District Attorney that: "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a general premise that

eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom . . . the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case." *See* Pl.Ex. I.

**47.P**    After Epps' criminal defense attorney identified Anderson as the author of the letter, he filed a C.P.L. § 440 motion. *See* Pl.Ex Y.

**48.P**    Stambach, Gunter, Giardina, and Minor undermined this motion by lying in their sworn affidavits, which wrongly stated they never learned about Montgomery from Anderson when they spoke to her the day after the Paul Pope murder. Instead, they claimed that the information was discovered after the trial ended, eliminating their need to turn over the information to the prosecution. The court held a hearing on these issues. *See* Pl.Ex. Y–EE.

**49.P**    Anderson testified at the § 440 hearing in a manner consistent with her earlier statements to the detectives and in the letter sent to defense counsel, including the fact that all of her suspicions about Montgomery were shared with Giardina, Stamback, and Constantino before Epps ever went to trial. *See* Pl.Ex. X; Pl.Ex. T; Pl.Ex. HH.

**50.P**    On September 13, 2001, the court found that the officers' version of events were credible, that Anderson was not, and denied Epps's motion because Anderson's statement had not surfaced before trial. Pl.Ex. X.

**51.P**    Two decades after his arrest, Epps' post-conviction counsel received new evidence from a new witness indicating that Montgomery killed Tomika Means. This new witness, "Witness 1," heard Montgomery's confession to Pope. Def.Ex. 36; Def.Ex. 39.

**52.P**    The new evidence caused the Erie County District Attorney's Office to consent to Epps' release from custody, and Epps was finally released on December 1, 2017. When Epps was exonerated, Erie County District Attorney John Flynn noted the Epps and Montgomery look

"eerily similar" and referenced photographs that could have been used by Epps's criminal attorney to demonstrate this. *See* Def.Ex. 39; Pl.Ex. D.


_____/s/_____
Rob Rickner, Esq.