**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**CORY EPPS,**

                          **Plaintiff,**

           **-against-**

**THE CITY OF BUFFALO, DETECTIVE**                 **Dkt. No. 19-cv-00281**
**JOHN BOHAN, DETECTIVE**
**REGINALD MINOR, DETECTIVE**
**MARK STAMBACH, DETECTIVE**
**JAMES GIARDINA, DETECTIVE**
**ANTHONY CONSTANTINO,**
**DETECTIVE ROBERT CHELLA, AND**
**RANIERO MASSECHIA,**

                          **Defendants.**

---

**PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND**
**RECPOMMENDATIONS REGARDING THE DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ...............................................................................................i

**TABLE OF AUTHORITIES** .......................................................................................ii

**PRELIMINARY STATEMENT** ................................................................................1

**THE FACTS ALLEGED** .............................................................................................2

    a.   Russell Montgomery Kills Tomika Means and the Initial Investigation. ........................2

    b.   Cory Epps is Falsely Identified. ..........................................................................3

    c.   Wymiko "Pumkin" Anderson Tells Police That Russell Montgomery Is the Shooter. ....7

    d.   Epps's Trial and Sentencing. ...............................................................................9

    e.   Post-Conviction Revelations and Epps's Post-Trial Motions. ........................................10

    f.   Epps's Exoneration. .............................................................................................11

**ARGUMENT** ..............................................................................................................12

  I.    STANDARDS ....................................................................................................12

  II.   THE MAGISTRATE JUDGE ERRED IN RECOMMENDING THAT THE *BRADY* CLAIMS BE DISMISSED. ...........................................................12

    a.   Defendants are not protected by qualified immunity. ....................................................12

    b.   Anderson's statement was Brady material and needed to be disclosed. ..........................18

  III.  THE MAGISTRATE JUDGE FAILED TO ADDRESS EPPS'S ACTUAL POST-TRIAL DUE PROCESS CLAIMS. ...........................................................22

    a.   The law regarding fabrication of evidence. ..................................................................23

    b.   The identification fabrication. ........................................................................................25

    c.   The false statements that undermined Epps's post-trial motions and hearings. .............26

  IV.  THE MAGISTRATE JUDGE ERRED IN FINDING THAT THE STATE LAW CONSTITUTIONAL CLAIMS AGAINST THE CITY OF BUFFALO MUST BE DISMISSED IF THE FEDERAL CLAIMS AGAINST THE OFFICERS ARE. ..............27

**CONCLUSION** ..........................................................................................................**29**

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Youngblood*, 488 U.S. 51 (1988) .................................................................21

*Ashley v. City of N.Y.*, 992 F.3d 128 (2d Cir. 2021) .......................................................25

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015)......................................................17

*Bradley v. Nagle*, 212 F.3d 559 (11th Cir.2000) .............................................................17

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ......................................................................15

*Brown v. State*, 89 N.Y.2d 172 (N.Y. 1996)....................................................................28

*Buari v. City of New York*, 530 F. Supp. 3d 356 (S.D.N.Y. 2021) .............................24, 28

*Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) ..........................................................24

*Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) ...............................................................21

*Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) ..................17

*Dukes v. City of Albany*, 289 F. Supp. 3d 387 (N.D.N.Y. 2018) .....................................21

*Ellsworth v. Warden*, 333 F.3d 1 (1st Cir.2003)..............................................................17

*Espinal v. Bennett*, 588 F.Supp.2d 388 (E.D.N.Y. 2008) ...............................................15

*Fappiano v. City of New York*, 640 F. App'x 115 (2d Cir. 2016) ....................................21

*Frost v. New York City Police Dep't*, 980 F.3d 231 (2d Cir. 2020) ...........................23, 25

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................................13, 14, 20

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007)..........................................................24

*Hincapie v. City of New York*, 434 F. Supp. 3d 61 (S.D.N.Y. 2020)................................20

*Hoke v. Netherland,* 92 F.3d 1350 (4th Cir. 1996) ..........................................................16

*Hope v. Pelzer,* 536 U.S. 730 (2002) ...............................................................................15

*Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021) ........................................................... 14

*Hudson v. New York City*, 271 F.3d 62 (2d Cir. 2001) ..................................................... 21

*Johnson v. Folino*,705 F.3d 117 (3d Cir. 2013) ............................................................... 17

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir.1988) .................................................... 25

*Miller v. Angliker,* 848 F.2d 1312 (2d Cir. 1988) ............................................................ 17

*Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112 (2d Cir. 2022)............................................ 12

*People v Smith,* 127 A.d.2d 864 (2d Dept. 1987) ............................................................. 13

*People v. Lumpkins*, 141 Misc. 2d 581 (Sup. Ct., Kings, Co. 1988) ................................. 13

*Rucks v. City of New York*, 96 F. Supp. 3d 138 (S.D.N.Y. 2015)..................................... 24

*Shabazz v. Kailer*, 201 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................... 24

*Smalls v. Collins*, 10 F.4th 117 (2d Cir.2021) ................................................................. 23

*Spence v. Johnson,* 80 F.3d 989 (5th Cir.1996) ............................................................... 16

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................................................ 20

*Taylor v. Rojas,* __ U.S. __, 141 S.Ct. 52 (2020) ........................................................... 15

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ........................................................... 15

*Tolan v. Cotton*, 572 U.S. 650 (2014)............................................................................. 21

*Triolo v. Nassau Cnty.*, 24 F.4th 98 (2d Cir. 2022) ......................................................... 28

*United States ex rel. Meers v. Wilkins*, 326 F.2d 135 (2d Cir. 1964) .............................. 17

*United States v. Bagley,* 473 U.S. 667 (1985) ................................................................. 13

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) ............................................................. 16

*United States v. Gleason,* 265 F.Supp. 880 (S.D.N.Y.1967)............................................ 16

*United States v. Phillip*, 948 F.2d 241 (6th Cir.1991) ..................................................... 17

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)................................................ 20

*Victory v. Pataki*, 814 F.3d 47 (2d Cir. 2016), as amended (Feb. 24, 2016) ............................24, 25

*Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992)..............................................................14

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) ............................................................................25

## STATUTES

C.P.L. § 330 ...........................................................................................................................10

C.P.L. § 440 ....................................................................................................................passim

Federal Rule of Civil Procedure 72(b)........................................................................................12

Plaintiff Cory Epps ("Epps") hereby submits this Memorandum of Law in Support of his

Objections to the Report and Recommendations of Magistrate Judge Leslie G, Foschio regarding

the Motion for Summary Judgment filed by the City of Buffalo ("City"), Detective John Bohen

("Bohen"), Detective Reginald Minor ("Minor"), Detective Mark Stambach ("Stambach"),

Detective James Giardina ("Giardina"), and Detective Anthony Constantino.

## PRELIMINARY STATEMENT

Cory Epps is entirely innocent of the murder of Tomika Means but he spent almost two

decades in prison—wrongfully convicted because the individual Defendants, detectives in the

Buffalo Police Department homicide unit, failed to disclose to the prosecution that Russell

Montgomery, now known to be the real killer, had surfaced as an alternate suspect through

statements by Wymiko Anderson shortly before trial, a key piece of exculpatory evidence that

could have changed the course of the entire prosecution. And then when Epps discovered this

evidence, after his trial, detectives lied about when they learned about it, falsely claiming it only

emerged after the trial, meaning that it was not *Brady* material and Epps could not use it to

secure a new trial. This exacerbated the detectives' other misconduct during the investigation,

where they used an improper identification procedure with eyewitness Jacqueline Bradley—the

only evidence against Epps at trial—and then lied to make the identification seems strong than it

was.

This misconduct gives rise to multiple claims under the United States and New York

Constitutions. *First*, this statement, made before trial, identifying Montgomery as the real killer,

was exculpatory *Brady* material under clearly established law and no reasonable officer would

have ever thought otherwise. No detective would have ever thought that an alternative suspect in

a murder case was the type of statement that could be withheld from the prosecution. *Second*, the

detectives lies about when Anderson made the statement (before rather than after the trial) which

1

deprived Epps of a chance to overturn his conviction in a post-trial hearing. Not only did they undermine Epps's legal theory, by falsely stating that Anderson's statement was made after trial, meaning it was not *Brady* material, they discredited Anderson entirely, leading the criminal court to simply disregard what we now know are truthful statements that would have led directly to Montgomery, the true killer. Similarly, they lied about how Bradley identified Epps, making her identification seem more reliable than it actually was. *And third*, these two sets of claims may be brought directly against the City of Buffalo, under *respondeat superior*, because this misconduct also violates the New York State Constitution. The Magistrate Judge's recommendations otherwise, in the Report and Recommendations ("RR"), should not be accepted and each of these claims should be allowed to advance to trial.

**THE FACTS ALLEGED[1]**

**a.  Russell Montgomery Kills Tomika Means and the Initial Investigation.**

On Monday, May 26, 1997, shortly after four o'clock in the morning, Tomika Nicole Means was murdered while driving home from Birchfield's, a popular Buffalo nightclub. 1.D. It occurred in a "road rage" incident. 1.P. She was with her friend Jacqueline Bradley, who was in the passenger seat, when a car cut them off nearly causing an accident. 2.D, 2.P. Means honked the car horn and continued driving. 2.P. The same car that had cut in front of them then pulled up alongside, and Montgomery leaned out of the front passenger seat and yelled at Means.  3.p.

When Means and Bradley reached the intersection of East Delevan and Chelsea Street, the same car cut in front of them again and stopped. 3.P. Montgomery exited the passenger seat of the vehicle, a gray or light blue Oldsmobile Delta 88 or Pontiac 6000, and approached the

---

[1] Citations to the Plaintiff's 56.1 Counterstatement of Material Facts are cited as "_.D" for Defendants' statements, which should be deemed to include Plaintiff's response, and "_.P" for the Plaintiff's additional statements of fact.

passenger side window of Means' car. 4.P. He leaned in, drew a gun, and pointed it at Means. Bradley said, "It ain't worth it," but he replied, "Fuck that, bitch," and shot Means once in the head before returning to his car and fleeing the scene. 5.P.

Bradley described the shooter as a black male, five feet eight inches or five feet nine inches tall, and weighing approximately 250 pounds, with noticeable pockmarks on his face, and a light goatee or beard. The pockmarks—scarring from acne—were particularly visible because Montgomery was leaning into the passenger side, just inches away from Bradley. 4.D, 6.P. He was also wearing a baseball cap. 6.P. She saw the shooter when it was dark, after she had had four drinks; it happened very quickly, she was scared, and the gun was right in front of her face. 3.D, 7.P.

The next day, Bradley helped police create a composite, Identikit sketch of the male shooter and female driver. 8.P. The composite sketch of the shooter (now known to be Montgomery) did not include the pockmarks which Bradley had initially described. 9.P. The sketch also had the shooter wearing a hat. 9.P. Bradley also said that she knew the shooter from a popular local bar, Birchfield's. 10.P.

### b. Cory Epps is Falsely Identified.

Several months went by, and the police were out of leads. 11.P, 23.P. Bohen and Minor were partners and tasked with trying to get Bradley to identify the shooter. 12.P. Bohen had little experience in working a homicide case, and was assigned to homicides at the very end of his career so he could get more overtime, leading to a higher pension. 12.P., 13.P. Bohen admitted, in the suppression hearing, that he knew little about Epps, and had not reviewed any documents related to the case, before approaching Bradley to make an identification, he just heard, "people talking in the office." 14.P.

3

According to Bohen, on June 26, 1997, he got a call from the victim's aunt, Linda Means, although he did not interview her, saying the composite Bradley made looked like Epps. 6.D. He recorded this alleged conversation on a P-73 police form. 6.D. He also stated that he created a photo array of Bradley on July 3, 1997, showed it to her on July 6, 1997, and that after about two minutes she, "in a very exited voice states, that's him, that's the guy who shot Tomika. I swear to god that's him." 16D. And then she signed the back of the array, and signed an affidavit with Epps's name on it, saying that is who she identified. 11.D., 12.D. Bohen also said that he had a conversation about Epps with Bradley, where she said she did not know him, but she knew of him. 18.P. These documents were provided to the prosecution and Bohen would have told the prosecution the information in them as well. Later, the prosecution called Bohen to testify as to this chain of events in the grand jury and at the suppression hearing. 7.D.

At her deposition, however, Bradley gave a completely different account. A few weeks after Means was killed, officers came with, "these big books with a lot of pictures and stuff in them." 27.P. The books were like large binders with plastic over the photos to hold them in. There were probably over a hundred photos in the books, with about ten photos per page. And she would just, "keep flipping," through them. 27.P. The first time officers brought her one of these books, she did not recognize anyone. 27.P. A few weeks later, the second time, she recognized Epps in the book and testified that, "I just zoned right in, heart start beating, crying. And I'm like that's him." 27.P. She testified that she did not remember ever seeing a photo array with six photos in it. 27.P. And she did not remember signing the photo array. In fact, she said she signed documents related to an identification, "nine or ten times." 27.P. Finally, Bradley said she did not learn Epps's name until after the lineup, although she admitted that she did recognize

4

him from Birchfield's. 27.P. Bradley's account was not presented in the documents, grand jury testimony, or suppression hearing.

Bradley's identification is problematic because Epps did not match the description Bradley gave to the police earlier. *First*, he is six foot two inches tall – roughly six inches taller than Montgomery, and six inches taller than the description provided by Bradley. 21.P. *Second*, Epps has smooth skin, unlike Montgomery, who has acne scars, scars that Bradley saw first-hand when he leaned into the car to shoot Means. 22.P. *And third*, there was no other evidence, whatsoever, to connect Epps to the Means murder. 23.P. There were no leads suggesting he was involved. *Id*. No witnesses said he was in the area. *Id*. And officers also did nothing to investigate whether Epps knew Bradley, before giving his name to the prosecution, which was an important fact, given that Bradley claimed she knew the shooter. *Id*.

There are also substantial questions about the photo arrays themselves. There were two photo arrays created for Epps, with two different pictures of Epps taken on two different dates (March 22, 1994 and May 18, 1997). 24.P. One photo array was created by Bohen. 25.P. The second photo array states that it was created by a Detective Juan Morales, but it also repeats a mug shot from another array Bohen created for suspect Donald Faison (mug number 210027). 25.P. Bohen could not explain why there were two photo arrays created using two different photos of Epps. 25.P. At his deposition, he testified that he thought the photo array created by Morales was the one he showed to Bradley, based on the mug shot numbers, but that is not the one that Bradley allegedly signed. 26.P. The copy of the photo array she did sign, that was produced in discovery, does not have Epps's picture in it. 28.P. And all three photo arrays have the target in spot 5. 28.P.

Epps cooperated with the police and on July 30, 1997, he agreed to be placed in a lineup. 31.D. He was, in fact, placed in a lineup twice, back-to-back. 31.D. And Bradley identified him in both. 32.D.

According to Dr. Margaret Bull Kovera, retained by Epps, this identification process was deeply flawed. 30.P. Given the short duration of time Bradley had to view the shooter, the conditions present, and the stress she was under, among other factors, Bradley would not have had a chance to develop a clear memory of the actual perpetrator. 30.P. The mug books are problematic because there is no true suspect, developed through the identification, whose is being tested against innocent fillers, and anyone chosen will be pursued as a suspect, even though there is no other reason to connect them to the crime. 31.P. Using mug books raises the "risk of misidentification, and there are no protections there for the person who has been identified to basically push back"—the person chosen in the book will simply become a suspect, like Epps did. 31.P. Further, the identification from the mug book, and other repeated identification procedures, would have taught Bradley what Epps looked like, and made her unduly confident she had the right person. 32.P. And the fact Bradley may have seen Epps previously raises the possibility that she was choosing who she saw before, not who she remembered from the crime. 32.P. Further, the fact that she was never told that it was possible, both in the mug books, the photo arrays (that may never have been used) and the lineup, that the shooter may not be present at all, rather than implying that one of the pictures of or people presented is the shooter, makes the identification even more suggestive. 32.P–33.P. And finally, if there was no concrete evidence tying Epps to the crime, it was simply reckless to put him into any identification procedure. *Id*.

6

**c. Wymiko "Pumkin" Anderson Tells Police That Russell Montgomery Is the Shooter.**

Russell Montgomery murdered Paul Pope on April 16, 1998. Pope's body was found stuffed in the trunk of his white 1992 Grand Am. 34.P. Montgomery and Pope had dealt drugs together for several years, but Pope had been gossiping about how Montgomery killed Means, so Montgomery shot Pope to silence him and to intimidate anyone else who knew the truth into silence. 34.P.

This information came from Wymiko "Pumkin" Anderson, one of Pope's girlfriends. Stamback and Giardina, first talked to her at her home on April 17, 1998, and then brought her to the homicide unit, where they were joined by Constantino. 36.P. During the interview (three days before Epp's trial), they asked her what Montgomery looked like, and she said that he looked just like the sketch of the guy who killed Means, the sketch that had been on the news. 37.P. Anderson was friends with Means' boyfriend, so she had a particular interest in the case. 37.P.

After hearing that Montgomery looked just like the composite sketch Bradley generated during the Means investigation, Stambach and Giardina left the room. When they came back into the room, Stambach said they were pretty sure that they had the right guy for the Means murder, because all the evidence pointed to Epps. 37.P. Anderson responded that they (Epps and Montgomery) look alike. 37.P.

Anderson also told Stambach and Giardina that at 9 a.m. on May 26, 1997—the day Means was murdered—Montgomery came to where she was asleep with her boyfriend, Pope. 34.P. Montgomery and Pope left for a while, and when Pope came back, Pope told Anderson that Montgomery had confessed to killing Means earlier that morning. 34.P, 44.P.

At this point, there were multiple reasons to believe that Montgomery killed means:

- Montgomery fit the description in the composite sketch;

- Montgomery was 5'10", much closer to Bradley's initial description than Epps;

- Montgomery, unlike Epps, had acne scars, just like the ones described by Bradley when she saw the shooter from only inches away;

- Montgomery lived at 1118 East Delevan Avenue, less than a mile from where Means was killed, and only half a mile from where Bradley saw a similar looking suspect in a white car, who recognized her and quickly turned a corner;

- Montgomery frequented Birchfield's, the same club Bradley says she recognized the shooter from;

- Montgomery had a Buick Park Avenue, possibly tan, which is similar to the car Bradley described the night of the shooting;

- Montgomery was engaged in criminal activity, including dealing large quantities of illegal drugs;

- Montgomery regularly carried a gun;

- Montgomery murdered Pope in an awful act of cold-blooded violence, much like the Means murder, and stuffed him into the trunk of a car; and

- Montgomery's motive for killing Pope was that Pope was gossiping about the Means murder.

34.P–39.P.

Detectives Stambach and Giardino prepared a statement about the Pope murder that did not include these details about Montgomery, and Anderson signed. 38.P. They did not disclose the Anderson statement to the prosecution, even though they knew Epps was going to trial. 39.P. There were only about ten detectives in the City's homicide unit, and when a homicide case went to trial, everyone would know about it. 39.P. There was also a common file with all the

8

documents related to homicide investigations maintained in the homicide unit. 8.P And the composite Bradley made of the shooter was widely distributed in the homicide unit—there was a board at the homicide unit that had all the composites up on it. 8.P.

### d. Epps's Trial and Sentencing.

Epps's trial started on April 20, 1998. 54.D. At trial, Bradley identified Epps as the person she observed shoot and kill Means. 56.D. She claimed to be certain that Epps was the shooter even though she had been drinking that night and only saw the shooter very briefly in the dark under terribly stressful circumstances when he exited his vehicle and approached Means' car with a gun in his hand. 56.D., 7.P.

Epps's criminal attorney was allowed to cross examine Bradley with photos of other suspects that had emerged, and about how Epps did not have acne and was much taller. 40.P. But Epps's attorney did not know about Montgomery, so he could not cross Bradley with his photo or otherwise try to prove an alternate suspect defense—even though he had made a specific discovery request for this information. 39.P, 41.P. Notably, when Epps was exonerated Erie County District Attorney John Flynn noted the Epps and Montgomery look "eerily similar" and referenced photographs that could have been used by Epps's criminal attorney to demonstrate this. 52.P.

In addition, Epps had an alibi which showed that he was on his way to Perkins, a restaurant across town, to eat breakfast with his girlfriend Jerriah Johnson, when Means was killed. 42.P. Johnson testified that Epps drove her to Perkins at around 4:30 a.m. in his car, a "four-door hunter green Chevy Malibu" (a different car as the one the killer was described as driving). 43.P. She recalled where they had sat in the restaurant, what their server looked like, and what they ordered. 42.P. Joseph Murphy, a manager at Perkins, testified that he examined the schedule and learned that Mike Strasser, who was still new at the restaurant, was on duty that

night, and confirmed that Strasser matched the description of the waiter Johnson provided. 42.P. Murphy also located a receipt in the Perkins computer system which corroborated Johnson's testimony. 42.P.

Nevertheless, on April 24, 1998, Epps was convicted of murder. 58.D.

e. **Post-Conviction Revelations and Epps's Post-Trial Motions.**

Three days after the verdict against Epps, after seeing it on the news, Anderson wrote an anonymous letter to Epps's attorney, telling him that Montgomery killed Means. 59.D. She also pointed out the similarities between Epps and Montgomery. 59.D. After Epps's counsel received this letter, the anonymous letter became the subject of a C.P.L. § 330 motion which was argued at Epps sentencing on June 10, 1998. 45.P. Epps's criminal attorney asked the court to grant a new trial so that he could present an alternate perpetrator defense. 45.P. But the court denied the motion. 45.P.

The court sentenced Epps to twenty-five years to life in prison. 46.P. But notably, it directed the district attorney, "in light of the defendant's protestations of innocence and at least this suggestion that there may be someone else responsible, and based upon a general premise that eyewitness testimony in and of itself, without corroboration, is not the most satisfying of evidence that can be received in a courtroom, and that therefore the district attorney has an ongoing obligation to continue to make sure that justice has been done in this case." 46.P.

Once the defense learned that Anderson wrote the letter, Epps filed a post-conviction C.P.L. § 440 motion. 47.P. But Stambach, Giardina, and Minor undermined this motion by providing the prosecution with false affidavits that stated that Anderson did not tell them about Montgomery on April 17, 1998—which would have made the statement *Brady* material, as it was before trial—instead claiming this information surfaced afterwards. 48.P. The judge had a hearing to determine whether Anderson's statement was provided on April 17, 1998, making it

*Brady* material that was suppressed, requiring a new trial, or whether it was disclosed afterwards, at which point it was not *Brady*, and not the basis for granting a new trial. 48.P.

At the hearing, Anderson testified first, detailing how she had first told Stambach and Giardina that Montgomery looked just like the composite sketch from the Means murder. 49.P 49.P. She explained that they left the room right after, came back, and said she was wrong. 49.P She argued with them, and then told them about how Montgomery had confessed to Pope only hours after the Means murder. 49.P. The prosecution called Giardina, Stamback, and Constantino, who falsely testified that Anderson had not told them about Montgomery's link to the Means murder before Epps was convicted. 48.P.

On September 13, 2001, the court found that the officers were credible, Anderson was not, and denied Epps's motion. 50.P.

### f. Epps's Exoneration.

Almost two decades after he was first arrested, the Exoneration Initiative, Epps's most recent post-conviction attorneys, received new information proving that Montgomery killed Means. 51.P. A new witness, referred to as Witness 1 to protect their identity, overheard Montgomery confess to Pope. This evidence, against the backdrop of the weak case, secured Epps's release.  The Erie County District Attorney, ultimately concluded that:

> After reviewing this case, it has become clear to me that Mr. Epps should not spend one more night in prison…This Office is committed to not only convicting the guilty, but protecting the innocent.

Epps was released from custody on December 1, 2017, finally a free man after two decades of being wrongfully imprisoned.

## ARGUMENT

### I.   STANDARDS.

Objections made to a magistrate judge's ruling regarding a dispositive determination pursuant to Federal Rule of Civil Procedure 72(b) should be evaluated *de novo* by the district judge. *See* Fed. R. Civ. P. 72(b); *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022).

### II.   THE MAGISTRATE JUDGE ERRED IN RECOMMENDING THAT THE *BRADY* CLAIMS BE DISMISSED.

The magistrate erred in recommending that the *Brady* claim – Detectives Stambach, Giardina, and Constantino's failure to inform the prosecution about Anderson's exculpatory statement implicating Montgomery as the real killer – be dismissed.  Contrary to the magistrate's view, Epps's constitutional right to this information at his criminal trial was "clearly established" in 1998. The magistrate was also wrong to conclude that Anderson's statement was unimportant and not even *Brady* material.

#### a.   Defendants are not protected by qualified immunity.

It was obvious in 1998 that Anderson's disclosure about the true killer had to be turned over to the prosecution, whether technically admissible as direct evidence or not; and no reasonable officer at the time would have thought otherwise.

The post-conviction motion in state court was litigated with the understanding that Anderson's statement, if made prior to Epps's trial, could not be withheld. In granting an evidentiary hearing about the timing of Anderson's statement, the court referenced the defense's argument:

> that this information could have been used on cross-examination of the People's eyewitness had it been timely divulged; and that the failure to disclose deprived him of the opportunity to show a photograph of Montgomery to the eyewitness, and to make an informed decision concerning the trial strategy most beneficial to his interests.

March 2, 2001, Memorandum and Order, McCarthy, J.; Def. Ex. 25 at 6-7. The decision then cited *People v Smith,* 127 A.d.2d 864 (2d Dept. 1987) and *People v. Lumpkins*, 141 Misc. 2d 581 (Sup. Ct., Kings, Co. 1988). Both cases deal with *Brady* violations that were decided at least a decade before Epps trial, and largely turn on federal law. *Smith* found that withholding information that the police had a grudge against the defendant violated *Brady* because it could have affected trial strategy; and *Lumpkins* held that evidence, even though hearsay, had to be turned over under *Brady.* It is thus perplexing in the context of the record that the magistrate recommends a determination that is was unclear in 1998 that *Brady* covered Anderson's statement.   It is not as if federal law in 1998 sent a different message and gave police reason to withhold Anderson's statement. *Brady,* decided in 1963, speaks of "exculpatory evidence," and does not draw a line between admissible and inadmissible exculpatory evidence. *Giglio v. United States*, 405 U.S. 150 (1972), decided more than twenty-five years before the relevant point in Epps's case, expanded *Brady* to impeachment evidence, which by its nature is not necessarily admissible evidence. Indeed, confronting a witness with a document or out-of-court statements that may be hearsay is commonplace, even if the underlying material is not accepted into evidence and physically shown to the jury.

   *United States v. Bagley,* 473 U.S. 667, 676-77 (1985), decided twelve years before Epps's trial, made clear that the touchstone of materiality for *Brady* purposes, is whether the evidence could "in any reasonable likelihood have affected the judgment of the jury," (citing *Giglio,* at 154).  It also described "'evidence favorable to an accused' (citing *Brady,* at 87)… that, if disclosed and *used effectively...* may make the difference between conviction and acquittal."(emphasis added). This is suggestive of impeachment

evidence and far more expansive than evidence admitted at trial. Then, in *Kyles v. Whitley,* 514 U.S. 419 (1995), handed down on April 19, 1995, three years before Epps's trial, the Supreme Court reiterated that it is the effect of the exculpatory evidence on the outcome of the trial, not necessarily the nature of the evidence, that is important.[2]

Certainly nothing in *Kyles* indicates a restriction to admissible evidence.  On the contrary, it confirmed that a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police*." *Id.* at 437 (emphasis added). And the Court harkened back to *Giglio,* 23 years earlier, and reiterated that to avoid police from missing things, "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* (citing *Giglio, at* 154) (brackets in original).  In 1992, six years before Epps's trial the Second Circuit observed that the prosecutors, not police, "possess the requisite legal acumen" and therefore should "be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense." *Walker v. City of New York,* 974 F.2d 293, 299 (2d Cir. 1992); *see also Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021) (explaining that the rule noted in *Walker* makes "good sense.").

It would not only be contrary to law, but odd, indeed, to leave it to the police to make evidentiary decisions such as whether a statement is hearsay or admissible when

---

[2] While the Supreme Court, in *Wood v. Bartholomew,* 516 U.S. 1, 5 (1995), ruled that a failed polygraph did not have to be disclosed under *Brady,* it noted that in addition to being inadmissible as direct evidence, under state law, it was also "inadmissible… even for impeachment purposes." The Court's inquiry continued, and ultimately turned on the fact that the information, "would not have affected the scope of his cross-examination," which trial counsel conceded. *Id*. at 7.

14

deciding to turn it over. We would not expect police to withhold exculpatory evidence on their independent view that it is cumulative, or irrelevant, when such decisions are in the purview of prosecutors, and ultimately the courts, which make the rulings on admissibility or the extent of the defense's use of the material.[3] But it is under this overly narrow and erroneous perspective that the magistrate analyzed the issue here.

The focus is not so tight. "[T]he salient question ... is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). A right is clearly established if its scope is "sufficiently clear that a reasonable  official  would understand  that  what  he  is  doing  violates  that right." 536  U.S.  730, 739 (2002). *See Taylor v. Rojas,* __ U.S. __, 141 S.Ct. 52, 53-54 (2020) (circumstances, even if not encountered by prior courts, may still be "obvious[ly]" unconstitutional). "[O]fficials can still be on notice that their conduct violates [clearly] established law even in novel factual circumstances." *Pelzer*, at 741. "Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (addressing Fourth Amendment violations); *see also Terebesi v. Torreso*, 764 F.3d 217, 237, n.20 (2d Cir. 2014) (rejecting "pointing to the absence of prior case law concerning the precise weapon, method, or technology employed by the police" to confer qualified immunity for excessive force).

---

[3] In *Espinal v. Bennett*, 588 F.Supp.2d 388, 409-411 (E.D.N.Y. 2008), the court found that at a trial in 1991, defense counsel was ineffective for failing to offer a declaration against penal interest, even though hearsay, because it could have been admitted under New York's constitutional exception to the hearsay rule (the functional equivalent of the residual hearsay exception under FRE 807). Arguably, Anderson's statement could have been admitted on this basis.

Fine-line distinctions, like whether a police officer would think that exculpatory hearsay may not be inadmissible, is misplaced. No *reasonable officer* can be expected to engage in this type of highly technical and speculative analysis. And the magistrate's recommendation, which turns on this flawed standard, cannot be upheld. *Brady* and its progeny, prior to Epps's trial, more than notified the police that Anderson's statement had to be turned over.

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002), the case the RR hinges on, did not outline any new legal ruling at all. Rather, the Second Circuit went through a straightforward analysis under *Kyles*, finding that a memo, while ultimately hearsay, "had the potential to subvert [the prosecution's] background assumption radically," and thus could have potentially resulted in a different trial outcome. *Id*. at 102.  Even *Gil* referenced cases, before 1998, for the proposition that inadmissible evidence must be turned over under *Brady. Gil,* at 104 (citing *United States v. Gleason,* 265 F.Supp. 880, 886 (S.D.N.Y.1967) ("[P]rosecution's duty of disclosure as affirmed in *Brady,* cannot be limited to materials or information demonstrated in advance to be 'competent evidence.'") (quotation omitted); *Spence v. Johnson,* 80 F.3d 989, 1005 n.14 (5th Cir.1996) ("[I]nadmissible evidence may be material under *Brady."*) (content in parentheticals appear in the original).[4] *Gleason* one of the cases cited in *Gil* recognized that as early as 1964, the Second Circuit found that the duty under *Brady "*surely extends to favorable information unknown to the defense— e.g., the existence of witnesses." *Gleason*, at 886, citing *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 138 (2d Cir.

---

[4] *But see Hoke v. Netherland,* 92 F.3d 1350, 1356, n.3 (4th Cir. 1996) (ruling that inadmissible evidence, as a matter of law, is "immaterial" for *Brady* purposes)(cited as *but see* in *Gil*).

1964). It can hardly be found that *Gil* was the frontrunner and marked some sort of ground shift on the reach of *Brady.*

Anderson's statement also needed to be provided because it raised a potential alternate perpetrator defense, irrespective of it being hearsay. In *Miller v. Angliker,* 848 F.2d 1312 (2d Cir. 1988), decided ten years before Epp's trial, the Second Circuit made clear that evidence someone committed the crime, although circumstantial, had to be turned over pursuant to *Brady* and the right to present a defense.

The out-of-circuit cases cited by Defendants only further confirm that the Anderson statement was *Brady* material. In *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 304 (3d Cir. 2016), the Third Circuit overruled the district court's denial of a writ of habeas corpus because the lower court, "unreasonably disregarded the impeachment value of the evidence in discrediting the Commonwealth's key eyewitness and the adequacy of the investigation," in a sexual assault case from 1991. The alleged circuit split, and questions as to whether this was clearly established law, only appears in the dissent. *Id*. at 310. *Johnson v. Folino*, 705 F.3d 117, 130 (3rd Cir. 2013), undermines Defendants argument even more, as there the Third Circuit agrees with the Second Circuit in *Gil*, and the First, Sixth and Eleventh Circuits in *Ellsworth v. Warden* (333 F.3d 1, 5 (1st Cir.2003) (en banc)), *United States v. Phillip* (948 F.2d 241, 249 (6th Cir.1991)), and *Bradley v. Nagle* (212 F.3d 559, 567 (11th Cir.2000)), respectively, that "inadmissible evidence may be material if it could have led to the discovery of admissible evidence." In *Beaman v. Freesmeyer*, 776 F.3d 500, 507 (7th Cir. 2015), the Seventh Circuit applied *Kyles*, dismissing the plaintiff's claim because, "he has not shown a reasonable probability that the result of his criminal trial would have been different."

There the polygraph was inadmissible, and the plaintiff did not show that the polygraph could have been used for impeachment or would have otherwise undermined the government's case. *Id*. at 509.

Here, Anderson went to the police station and gave detectives a detailed statement about an alternate suspect in a murder case that was about to go to trial against the wrong person. No reasonable police officer in 1998 would have ever thought that they should do anything but run to the district attorney's office and tell them about it; and Detectives Stambach, Giardina, and Constantino's failure to do so should not be protected by qualified immunity.

### b. Anderson's statement was Brady material and needed to be disclosed.

The Magistrate Judge also provided a series of disconnected reasons as to why failing to disclose Anderson's statement did not violate Epps's constitutional rights. Each of these points does not withstand scrutiny.

*First*, the Magistrate Judge found that Anderson's statement "does not mention Epps or Means." RR at 36. But actually, Anderson's statement mentioned both. Anderson told the detectives that her boyfriend Pope had been told her that Montgomery had killed Means. Def. Ex. 8 at 26-28. Anderson also told detectives that Montgomery looked just like the Identikit composite Bradley made during the Epps investigation: "[T]he picture that they had on the news, that's Russell right there." *Id*. at. 24. And the officers, during that same interview before the trial, told her that they were ignoring what she said because they had evidence against Epps, and even accused her of lying to try and help him. *Id*. at 25-27. Her statement directly linked Montgomery to the Means murder and the investigation into Epps, and the RR, which finds to the contrary, is wrong.

*Second,* the magistrate concluded that Anderson's statement would not have "led to exculpatory or impeachment evidence." RR at 36. This conclusion is plainly undermined by the record. Epps's defense attorney argued at the C.P.L. § 440 proceeding that Anderson's statement would have affected his cross-examination, and trial strategy, and he would have confronted the eyewitness with a picture of Montgomery. Def. Ex. 25 at 7. Here, one of Epps's defense attorneys has detailed all the ways they would have been able to use this information at trial in his sworn declaration. Pl. Ex. V. At trial, the defense impeached Bradley with the photos of other potential perpetrators that had surfaced during the investigation. Def. Ex. 11 at 39-44. And Anderson's disclosure, once it was discovered after the trial, was important enough to warrant an entire C.P.L. § 440 hearing. Pl. Ex. GG. There was every reason to believe the Montgomery information would have been used at trial, and effectively.

In fact, the Montgomery evidence was much more compelling than the other perpetrator evidence. Montgomery not only looked like Epps ("eerily similar" as stated by the District Attorney when publicly discussing the exoneration), Montgomery was closer to Bradley's description of shooter than Epps height wise, and Montgomery, had blemishes on his face, as Bradley described, and Epps did not. Moreover, Montgomery lived near the crime scene. Epps had an alibi that he was nowhere near the shooting when it occurred. Both Montgomery, Epps and Bradley frequented the same bars, raising a reason why Bradley could mistake Epps for Montgomery. And Montgomery killed Pope to silence him about revealing his confession that he killed Means, which corroborates his admission.

Had the Anderson information been disclosed, it would have led to scathing impeachment, and a strong alternate perpetrator defense. Given the weakness of the case against Epps, it created more than a reasonable likelihood it would have affected the outcome. The

19

magistrate was simply wrong to conclude that there was no question of fact as to the importance of Anderson's statement. At a minimum, it is a question for the jury.

*Third*, the magistrate was wrong to find that there was no *Brady* violation simply because the detectives who spoke to Anderson never wrote her statement down. RR at 39. This is not the law. The detectives were required to disclose Anderson's statement to the prosecution, so it could be turned over to the defense, whether they wrote it down or not. *Giglio,* the seminal Supreme Court case on the need to turn over impeachment evidence, involved oral promises made by a prosecutor to a witness. Moreover, *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007), the case the magistrate cited clearly makes an important distinction, finding that, "[w]hether the Government was obligated to make notes of a potential witness's statements and whether it was required to disclose the witness's lies are very different questions," and explaining that even if there were no notes the prosecution was required, "to inform the accused of information that materially impeaches its witness." The police were obligated to disclose Anderson's exculpatory statement, whether it was written down or not, and RR's conclusion to contrary is incorrect. *See Hincapie v. City of New York*, 434 F. Supp. 3d 61, 76 (S.D.N.Y. 2020) (allowing a due process claim to go forward where an officer suppressed *Brady* material by failing to include it in his police report or otherwise inform the prosecution).

*And fourth*, the magistrate was wrong in concluding that there is no issue of fact as to whether or not the failure to disclose the statement was "undertaken in bad faith." RR at 39. Bad faith is not the correct standard. The Supreme Court long ago ruled that, "an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler v. Greene*, 527 U.S. 263, 288 (1999). Indeed, in *Arizona v. Youngblood*, cited by the magistrate, the Supreme Court clearly distinguished between, "preserv[ing] evidentiary material"

20

(semen samples) that "could have been subjected to tests, the results of which might have exonerated the defendant," and "exculpatory evidence," where "the good or bad faith of the State" is "irrelevant." 488 U.S. 51, 57 (1988); *see also Fappiano v. City of New York*, 640 F. App'x 115, 120 (2d Cir. 2016) (finding that the bad faith standard only applies to physical evidence).

In any event, there is more than enough evidence here to show the detectives acted in bad faith. If Anderson is believed, which is for the jury to decide, the detectives tried to minimize the significance of her disclosure when she made it, and then never followed up with her. They also lied to the prosecutor, in affidavits in opposition to the 440 motion and during their testimony at the 440 hearing.[5] Even if lack of bad faith was a defense, which it is not, there is substantial evidence on this record that bad faith occurred. But the only intent question is whether the failure to disclose Anderson's statement to the prosecution was mere negligence on behalf of every one of the detectives. *See Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (finding that a due process violation only requires more intention than mere negligence). And the question is whether they intended to do the act itself, not whether they intended to violate Epps's rights. *See Hudson v. New York City*, 271 F.3d 62, 69 (2d Cir. 2001) (reversing because the jury instructions implied that there must be proof the officers intended to violate the plaintiff's rights, rather than making it clear the only question is whether the officers intended to use force). Whether the

---

[5] That the first criminal court did not credit Anderson, is of no moment. After Epps's exoneration, her testimony is reopened for consideration by a factfinder in this action. *See Dukes v. City of Albany*, 289 F. Supp. 3d 387, 393 (N.D.N.Y. 2018) ("a vacated criminal conviction cannot have preclusive effect"). Nor was it proper here for the Magistrate Judge to parse Anderson's story and make credibility findings to diminish the import of her statement. *Tolan v. Cotton*, 572 U.S. 650, 656–58 (2014). Nevertheless, her deposition in this case makes clear that her account about the timing and substance of her disclosure to the police, which was unimpeached, was credible and compelling.

detectives can convince a jury that this was all an accident—even though, instead of claiming this was an inadvertent mistake, they lied and said Anderson was making up her statement—should be determined at trial.

In sum, the defense of qualified immunity is unavailing as is any contention that Anderson's statement was not disclosable *Brady* material.

## III.   THE MAGISTRATE JUDGE FAILED TO ADDRESS EPPS'S ACTUAL POST-TRIAL DUE PROCESS CLAIMS.

The Magistrate Judge recommended dismissing multiple hypothetical claims regarding Epps's post-trial due process, but never actually ruled on his actual claims. To be clear: Epps is not claiming that he has a post-trial *Brady* right. RR at 55. Epps is not claiming that detectives are liable for their testimony at the C.P.L. § 440 hearing or at trial—the key inquiry is whether they lied to the prosecution before their testimony. RR at 56-57. And Epps is not making any claims relating to Anderson's post-trial statements to detectives. RR at 57-59. Epps has two, separate, due process claims for fabricating evidence. First, Epps claims that detectives Bohen and Minor lied about how Epps was actually identified initially by Bradley, using a mugbook rather than a photo array, which falsely made it appear that Epps was discovered through police work, while hiding the fact they used a procedure that increased the likelihood that Epps would be wrongfully identified. Second, Epps claims that his right to a fair § 440 hearing, and fair post-trial proceedings, was undermined by detectives Stambach, Giardina, and Costantino[6] when they told the prosecution that Anderson was lying about telling them about Montgomery pre-trial

---

[6] Plaintiff has agreed not to proceed against Detectives Raniero Massechia and Charles Aronica, and Chief Joseph Riga. Plaintiff also agreed to dismiss Detective Robert Chella due to his lack of involvement. The Magistrate Judge appears to believe that Chella was personally involved. RR at 55-58. So Plaintiff did not feel as though he could stipulate to simply dismiss him. If the Court agrees he was personally involved in this violation, he should remain in the case. But Plaintiff also agreed that the Defendants could make any arguments they wanted as to why he should be dismissed, even if not included in the original moving papers.

(when Epps had *Brady* rights) which both prevented Epps from arguing he was entitled to a new trial based on this *Brady* violation, and undermined Anderson's credibility, leading to the judge at the § 440 hearing to discrediting her testimony entirely.

    **a.  The law regarding fabrication of evidence.**

        Police detectives are never allowed to lie under oath in affidavits, to lie to prosecutors, or to create false police paperwork that is used as part of a prosecution. A prosecution must be based on the truth. Following this obvious principle of constitutional law, the Second Circuit has condemned, in the strongest terms, police officers who forward fabricated testimony to prosecutors, leading to the deprivation of someone's liberty: "[A] police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process' … and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

        A due process claim, alleging an officer fabricated evidence, requires proof that: "[A]n (1) investigating official (2) fabricates evidence (3) that is likely to influence a [fact finder's] decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016). A due process claim based on fabricated evidence is not limited to trial, and extends to evidence that could have been used throughout the criminal process including in a hearing. *See Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021) (applying *Garnett* to a suppression hearing); *Frost v. New York City Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020) (noting that these have been "imprecisely named" fair trial claims, even though the evidence at issue need never be presented to a jury). Notably, probable cause is no defense to these claims. *Garnett*, 838 F.3d at 278. And

23

the question of whether the fabrication caused the alleged deprivation of liberty and resulting damages, is best left to a jury. *See Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) (finding that causation and foreseeability in civil rights cases are best left to the finder of fact).

These claims are also not barred by absolute immunity, even if the finder of fact ultimately learned about the alleged evidence through testimony at a hearing or at trial. The allegation is that the Defendants' forwarded fabricated evidence to the prosecutor, effectively hijacking their independent prosecutorial decision making. So an officer is liable when they create a false narrative that influences the course of the prosecution. *See Rucks v. City of New York*, 96 F. Supp. 3d 138, 151 (S.D.N.Y. 2015). "[W]here, as here, police officers allegedly deceive and mislead subsequent decision-makers with false information, the chain of causation remains intact because the officers are charged with reasonably foreseeing that their actions will influence the subsequent decisions resulting in a deprivation of the plaintiff's liberty." *Buari v. City of New York*, 530 F. Supp. 3d 356, 385 (S.D.N.Y. 2021) (quoting *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 397 (S.D.N.Y. 2016) (collecting cases)).

Thus, there is no immunity for false statements and fabricated evidence created before the activity that can be protected by absolute immunity. *See Victory v. Pataki*, 814 F.3d 47, 66 (2d Cir. 2016), as amended (Feb. 24, 2016). Finding otherwise—that an officer could immunize themselves by repeating the false statements on the stand that they had previously provided to prosecutors—"would set a dangerous precedent: Any police officer could immunize for § 1983 purposes any unlawful conduct," merely by testifying in court to the same facts later. *Coggins v. Buonora*, 776 F.3d 108, 112–13 (2d Cir. 2015) (allowing fabrication of evidence claims to go forward even though the officer ultimately testified to the same facts in the grand jury).

24

Further, a detective can be liable for supplying false information that influences the prosecutions decision to prosecute, or continue a prosecution. As the Second Circuit has recognized: "A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced that decision." *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988)); *see also Ashley v. City of N.Y.*, 992 F.3d 128, 132 n.1 (2d Cir. 2021) (explaining that a fabrication of evidence claim is available any time the fabrication deprives someone of their liberty); *Frost v. New York City Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020) (allowing a fabrication of evidence claim to go forward because false statements about the identification procedure influenced the prosecution's decision to charge the plaintiff); *Victory v. Pataki*, 814 F.3d 47, 64 (2d Cir. 2016), as amended (Feb. 24, 2016) (fabricated evidence at parole hearing deprived plaintiff of his liberty); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) (fabricated evidence provided to the grand jury deprived plaintiff of his liberty).

### b. The identification fabrication.

The fabricated identification procedure used here meets all five elements of the due process claim. (1) Bohen and Minor were investigating officials, acting under color of law as detectives. (2) Bohen and Minor fabricated evidence by using mugbooks to make the identification, and then lying and saying that they actually got a tip about Epps from a family member, put Epps into a photo array, and then showed the array to Bradley. (3) This lie was likely to influence the jury's decision at trial. The photo array lie made it appear as though Epps was identified through their investigation, rather than him being picked from a book despite having no link to their investigation whatsoever. This lie also concealed the fact that they had used a procedure that greatly increased the chance that Bradley would make a false

identification, as Dr. Kovera testified. (4) The reports and photo array that Bohen and Minor created were forwarded to the prosecution, who used them at trial. (5) The prosecution relied on these reports and the photo array in deciding whether to put Epps in the lineup, whether to prosecute him, and whether to call Bradley as a witness to make the identification at trial. A jury at the civil trial here could readily find, based on the evidence and Dr. Kovera's expert testimony, that Epps was wrongly identified, prosecuted, and imprisoned for a lengthy period of time, as a result of these fabrications.

**c. The false statements that undermined Epps's post-trial motions and hearings.**

The fabrications about when Anderson told Stambach, Giardina, and Costantino about Montgomery, and his connection to the Means murder, violated Epps's right to due process during his post-trial motions and hearings. This too fits all the elements of the claim. (1) Stambach, Giardina, and Costantino were investigating officials, acting under color of law as detectives. (2) They fabricated evidence by lying to the prosecution about when Anderson first made her statement. If Anderson had provided her exculpatory statement before trial, Epps had a right to it, but after trial he did not, so when Anderson first made this statement was of paramount importance. While it highly likely, and a jury could infer, that these detectives told the prosecution this lie long before the C.P.L. § 440 hearing, we know that these officers lied to the prosecution and the criminal court when they each signed an affidavit and gave it to the prosecution. Stambach swore under oath that: "During my conversation with Anderson she never mentioned that Paul Pope told her Russell Montgomery killed Tomika Means." Pl. Ex. Y. Giardina swore under oath that: "At no time during the course of this interview did Anderson make any reference to the Tamika Means murder or Cory Epps.." Pl. Ex. EE. And Constantino swore under oath that: "During my investigation of the Cory Epps case I never received any information naming Russell Montgomery as the shooter prior to the Epps trial." Pl. Ex. CC. (4)

These false statements, ultimately memorialized in sworn affidavits, were forwarded to the prosecution.

(3) This lie had an enormous impact on the finder of fact, the criminal court judge who presided over the § 440 hearing. His plain ruling was that Epps's was not entitled to a new trial because he believed the detectives and did not believe Anderson: "ln contrast to the testimony of Ms. Anderson, Buffalo Police Department Homicide Detectives … Based upon the proof received I find that Wymiko Anderson is not a credible witness … " Pl. Ex. GG.

(5) These fabrications deprived Epps of his liberty. Epps would likely have secured a new trial, had these detectives told the truth, which would have bolstered, rather than undermined, Anderson's statement, and it would have been clear that Epps was entitled to Anderson's statement before his trial, both under the United States and New York Constitutions. The sole reason the criminal court gave for denying the § 440 motion was that Anderson was not credible. Pl. Ex. GG. In fact, what ultimately secured Epps's release was Witness 1 coming forward with the same statement that Anderson made, which is further proof that, had these detectives told the truth, Epps would have been released far sooner.

In sum, had Stambach, Giardina, and Costantino not fabricated evidence, a jury here could find that Epps would have won a new trial, and then an acquittal at retrial. Certainly, this raises an issue of fact that cannot be extinguished on summary judgment.

## IV.   THE MAGISTRATE JUDGE ERRED IN FINDING THAT THE STATE LAW CONSTITUTIONAL CLAIMS AGAINST THE CITY OF BUFFALO MUST BE DISMISSED IF THE FEDERAL CLAIMS AGAINST THE OFFICERS ARE.

The Magistrate Judge ruled that the "dismissal of all claims against the individual Defendant Detectives would bar Plaintiff's claim against the City on a theory of *respondeat superior* liability." RR at 60. This is wrong because qualified immunity does not apply to

*respondeat superior* claims, and because the state law *Brady* standard is more favorable to Epps than the federal one.

A common law right of action for violations of the New York State Constitution arise when there are no other alternative remedies. *See Brown v. State*, 89 N.Y.2d 172, 192 (N.Y. 1996) (finding a common law cause of action for violations of the State Constitution when the alternative remedies, "all fall short"). There are no *respondeat superior* claims against a municipality under 42 U.S.C. § 1983, and no state law torts cover due process claims, so courts regularly allow claims against a municipality for violations of the New York State Constitution because there is no other equivalent remedy. *See Buari v. City of New York*, 530 F. Supp. 3d 356, 409 (S.D.N.Y. 2021) (collecting cases allowing due process claims under state law against the City of New York to go forward).

The Second Circuit recently ruled that qualified immunity does not apply to state law claims against a municipality under *respondeat superior*: "[E]ven though [the officer] is shielded from personally paying for the damages he caused by falsely arresting [the plaintiff], the County remains liable for those damages under New York state law." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 113 (2d Cir. 2022). So even if Stambach, Giardina, and Costantino are individually dismissed because the law was not clearly established, the claims against the City should go forward. Further, the New York State Constitution provides more protection for *Brady* violations than the federal constitution, further demonstrating why any other remedies are inadequate. *See People v. Vilardi*, 76 N.Y.2d 67, 77 (N.Y. 1990) (applying a lessor standard for materiality under the New York State Constitution for *Brady* violations). So a dismissal under the federal standard may not require a dismissal under the state standard.

**CONCLUSION**

For the reasons stated above, the Magistrate Judge's recommendations regarding the

claims raised herein should not be followed, and these claims should advance to trial.

Dated: New York, New York
June 22, 2023

                                    GLENN A. GARBER, P.C.

                                    By:          /s/

                                         Glenn A. Garber

                                    The Woolworth Building
                                    233 Broadway Suite 2370
                                    New York, New York 10279
                                    Phone: (212) 965-9370

                                    RICKNER PLLC

                                    By:          /s/

                                         Rob Rickner

                                    14 Wall Street, Suite 1603
                                    New York, New York 10005
                                    Phone: (212) 300-6506

                                    *Attorneys for Plaintiff Cory Epps*