UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CORY EPPS,

Plaintiff,

v.                                                          Case No. 1:19-cv-00281

THE CITY OF BUFFALO,
DETECTIVE JOHN BOHEN,
DETECTIVE REGINALD MINOR,
DETECTIVE MARK STAMBACH,
DETECTIVE JAMES GIARDINA,
DETECTIVE ANTHONY COSTANTINO,
DETECTIVE ROBERT CHELLA,
RANIERO MASSECHIA, CHARLES ARONICA,
AND CHIEF JOSEPH RIGA,

Defendants.

---

# MEMORANDUM IN RESPONSE TO PLAINTIFF'S OBJECTIONS TO JUDGE FOSCHIO'S REPORT AND RECOMMENDATION

**HODGSON RUSS LLP**
*Attorneys for Defendants*
Hugh M. Russ, Esq.
Peter A. Sahasrabudhe, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ...................................................1

STATEMENT OF FACTS ...................................................3

A.        The Tomika Means Homicide ...................................................3

B.        The Investigative Activities of Detective Bohen ...................................................4

C.        The Investigative Activities of Detective Minor ...................................................5

D.        Bradley's Subsequent Identification of Epps Establishing Probable Cause Independent of the Investigative Activities Taken by Detectives Bohen and Minor ...................................................5

E.        Detective Stambach's Investigative Activities ...................................................7

F.        Detective James Giardina's Investigative Activities ...................................................9

G.        Detective Sergeant Costantino's Investigative Activities ...................................................9

POINT I.        EPPS HAS CONCEDED THAT DISMISSAL OF HIS MALICIOUS PROSECUTION CLAIMS WAS APPROPRIATE ...................................................10

POINT II.        EPPS CANNOT HOLD THE INDIVIDUAL DEFENDANTS LIABLE FOR ALLEGED *BRADY* VIOLATIONS ...................................................12

A.        The Alleged Brady Evidence Was Not Admissible Either as Direct Evidence or Impeachment Evidence ...................................................12

B.        Defendants are Entitled to Qualified Immunity on Epps's *Brady* Claim ...................................................13

C.        The Alleged Suppression of Anderson's Statement was not a *Brady* Violation ...................................................18

POINT III.        THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY ON EPPS'S POST-TRIAL DUE PROCESS CLAIM ...................................................20

A.        Epps Must Not Be Permitted to Constructively Amend the Complaint to Assert a Pre-Trial Fabrication of Evidence Claim ...................................................20

B.        There is no Evidence of Post-Trial Fabrication of Evidence or a Post-Trial Constitutional Violation Committed by Detectives Bohen and Minor ...................................................23

i

## TABLE OF CONTENTS - cont'd

PAGE

C.      Detectives Stambach, Giardina, and Costantino are Entitled to Absolute Immunity on Epps's Post-Trial Due Process Claim ...............................................24

POINT IV.    DISMISSAL IS WARRANTED AS TO EPPS'S REMAINING STATE-LAW CLAIM..........................................................................................................26

A.      Epps's Remaining State-Law Constitutional Claim Must be Dismissed With Prejudice Because there was no Underlying Constitutional Violation.........26

B.      At the Very Least, the Remaining State-Law Constitutional Claim Should be Dismissed Without Prejudice..........................................................................28

CONCLUSION...........................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Federal Cases**

*Beaman v. Freesmeyer*,
    776 F.3d 500 (7th Cir. 2015) ...............................................................................16

*Bermudez v. City of New York*,
    790 F.3d 368, 377 (2d Cir. 2015).................................................................11, 12

*Brady v. Maryland*,
    373 U.S. 83 (1963).............................1, 2, 12, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24

*Brandon v. City of New York*,
    705 F. Supp. 2d 261 (S.D.N.Y. 2010).................................................................21, 22

*Briscoe v. LaHue*,
    460 U.S. 325 (1983).................................................................................26

*Buari v. City of New York*,
    530 F. Supp. 3d 356 (S.D.N.Y. 2021)....................................................................21

*Coleman v. City of Rochester*,
    No. 16-CV-6179, 2018 WL 6727535 (W.D.N.Y. Dec. 2018)................................................26

*Collins v. City of New York*,
    923 F. Supp. 2d 462 (E.D.N.Y. 2013) ..................................................................26

*Dennis v. Sec'y, Pa. Dep't of Corr.*,
    834 F.3d 263 (3d Cir. 2016)...........................................................................15

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*,
    557 U.S. 52 (2009)...................................................................................23

*Downs v. Hoyt*,
    232 F.3d 1031 (9th Cir. 2000) .....................................................................19, 20

*Ellsworth v. Warden*,
    333 F.3d 1 (1st Cir. 2003) (*en banc*)................................................................15

*Ermichine v. United States*,
    No. 06 CIV. 10208, 2011 WL 1842951 (S.D.N.Y. May 12, 2011)........................................24

*Fappiano v. City of New York*,
    640 Fed. App'x 115 (2d Cir. 2016)....................................................................11

## TABLE OF AUTHORITIES - cont'd

PAGE

*Frost v. New York City Police Department*,
    980 F.3d 231 (2d Cir. 2020)........................................................................20, 21

*Garnett v. Undercover Officer*,
    C0039, 838 F.3d 265 (2d Cir. 2016)...................................................................20

*Hoke v. Netherland*,
    92 F.3d 1350 (4th Cir. 1996) .............................................................................15

*Howard v. City of Durham*,
    68 F.4th 934 (4th Cir. 2023) .............................................................................23

*Hoyos v. City of New York*,
    999 F. Supp. 2d 375 (E.D.N.Y. 2013) ...............................................................11

*Issac v. City of New York*,
    No. 16-CV-472, 2018 WL 5020173 (E.D.N.Y. Aug. 2018)..................................27

*Jardine v. Dittmann*,
    658 F.3d 772 (7th Cir. 2011) .............................................................................15

*Johnson v. Folino*,
    705 F.3d 117 (3d Cir. 2013)...............................................................................15

*Kolari v. New York–Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006)...............................................................................28

*Kyles v. Whitney*,
    514 U.S. 419 (1995).........................................................................................17

*Lowell v. Lyft, Inc.*,
    17-CV-06251, 2023 WL 2622925 (S.D.N.Y. Mar. 2023)....................................10

*Luna v. Pico*,
    356 F.3d 481 (2d Cir. 2004).................................................................14, 16, 17

*Malley v. Briggs*,
    475 U.S. 335 (1986).........................................................................................14

*Mario v. P & C Food Mkts., Inc.*,
    313 F.3d 758 (2d Cir. 2002)...............................................................................10

*Miller v. Angliker*,
    848 F.2d 1312 (2d Cir. 1988).............................................................................17

iv

## TABLE OF AUTHORITIES - cont'd

PAGE

*Mullenix v. Luna*,
    577 U.S. 7 (2015).......................................................................................14, 17, 18

*O'Brien v. Yugartis*,
    54 F. Supp. 3d 186 (N.D.N.Y. 2014)...............................................................28

*Ortiz v. Wagstaff*,
    523 F. Supp. 3d 347 (W.D.N.Y. 2021)........................................................23, 24

*Palmer v. Monroe County Sherriff*,
    378 F. Supp. 284, 290-291 (W.D.N.Y. 2005).................................................22

*Pierre v. City of Rochester*,
    16-CV-6428, 2018 WL 10072453 (W.D.N.Y. Sep. 2018)...............................23, 24

*Reid v. Simmons*,
    163 F. Supp. 2d 81 (D.N.H. 2001).................................................................19

*Ricciuti v. N.Y.C. Transit Auth.*,
    124 F.3d 123 (2d Cir. 1997)........................................................................20, 21

*Saucier v. Katz*,
    533 U.S. 194, 121 S.Ct. 2151 (2001)............................................................14

*Smalls v. Collins*,
    10 F.4th 117 (2d Cir. 2021) .........................................................................21

*Sykes v. James*,
    13 F.3d. 515 (2d Cir. 1993)........................................................................25, 26

*Torres v. City of New York*,
    16 Civ. 6719, 2017 WL 4325822 (E.D.N.Y. Sep. 2017).................................11

*United States v. Bagley*,
    473 U.S. 667 (1985)......................................................................................17

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002)...........................................................................15

*United States v. Gleason*,
    265 F. Supp. 880 (S.D.N.Y. 1967)...............................................................16

*United States v. Morales*,
    746 F.3d 310 (7th Cir. 2014) .......................................................................15

## TABLE OF AUTHORITIES - cont'd

PAGE

*United States v. Rodriguez,*
496 F.3d 221 (2d Cir. 2007).................................................................19

*Tirolo v. Nassau County,*
24 F.4th 98, 111-113 (2d Cir. 2022) ....................................................28

*Valentin v. City of Rochester,*
11-CV-6238, 2018 WL 5281799 (W.D.N.Y. Oct. 2018) .......................18

**State Cases**

*Brown v. State of New York,*
89 N.Y.2d 172 (1996) ..........................................................................27

*Martinez v. City of Schenectady,*
97 N.Y.2d 78 (2001) ..................................................................27, 28, 29

*People v. Lumpkins,*
141 Misc. 2d 581 (Sup. Ct. Kings Cnty. 1988).....................................16

*People v. Smith,*
127 A.D.2d 864 .....................................................................................16

*Wood v. Bartholomew,*
516 U.S. 1, 6 (1995)..............................................................................15

**Rules**

CPLR § 205(a) .............................................................................................29

## PRELIMINARY STATEMENT

The story told by Cory Epps in his compliant and in summary judgment briefing is no doubt compelling.  Epps's plight may reasonably draw sympathy from judges, attorneys, and lay-people alike.  But to hold the defendants in this case liable for heinous constitutional violations, the law requires more than a compelling and sympathetic story.  Epps has not adduced sufficient evidence as a matter of law to maintain any of the causes of action pled in his complaint.  Accordingly, the Court should adopt in full all portions of Magistrate Judge Foschio's Report and Recommendation ("R&R") which carefully justifies summary judgment in favor of the defendants.

Epps does not object to the portions of the R&R which recommend dismissal of his malicious prosecution claims.  He has thus conceded that summary judgment is warranted as to his two chief claims focusing on the **pre-trial** conduct of the individual defendants in this case.  Epps's only remaining claim which focuses on the **pre-trial** conduct of the individual defendants is his claim premised upon an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  But Magistrate Judge Foschio was correct to recommend summary judgment as to Epps's *Brady* claim –on multiple grounds.  Epps rests hus *Brady* claim on certain defendants failing to write down an alleged double hearsay statement. This statement was not directly related to the actual homicide which the defendants were investigating at the time.  For the reasons stated in the R&R, this failure does not amount to a *Brady* violation.  More to the point though, it certainly was not clearly established in 1998 that *Brady* required police officers to write the statement down or immediately notify prosecutors that the inadmissible statement had been made.  This state of the law entitles the individual defendants to dismissal of Epps's *Brady* claim based on qualified immunity.

After Epps's *Brady* claim, the only remaining claim against the individual defendants is his "post-trial" or "post-conviction" due process claim. As he did in briefing before Magistrate Judge Foschio, Epps attempts to reinvent this claim to resemble a due process claim premised upon fabrication of evidence. The fundamental flaw with Epps's approach, however, is that a due process fabrication of evidence claim involves an individual's right to a fair trial –and thus would implicate the individual defendants' investigative activities ***prior*** to Epps being tried and convicted for the murder of Tomika Means. Not only is the evidence insufficient for Epps to establish a traditional pre-trial fabrication of evidence claim, more importantly –***Epps did not plead such a claim in his complaint***. Rather, Epps's claim expressly focuses on the individual defendants' post-trial conduct. But the record clearly demonstrates that any post-trial steps taken by the individual defendants were performed in their capacities as witnesses in a judicial proceeding rather than law enforcement officers gathering or collecting evidence. The law could not be clearer on this point –because the individual defendants were acting as witnesses in a judicial proceeding, they are entitled to ***absolute immunity***.

The only remaining claim at issue after the *Brady* and post-trial due process claim is Epps's *respondeat superior* claim brought against the City of Buffalo. As Judge Foschio determined, that claim should also be dismissed on multiple grounds. The *respondeat superior* claim is brought pursuant to the New York State Constitution, and it invokes issues which Epps's own citations demonstrate ***have never been dealt with by New York courts***. Thus, principles of federalism and comity at the very least require dismissal of the state constitutional claim without prejudice once Epps's federal claims are dismissed.

**STATEMENT OF FACTS**

The parties agreed prior to summary judgment briefing that dismissal was appropriate on all of Epps's claims against the following four individual defendants: Chella, Aronica, Masecchia, and Riga.  Dkt. 103-1; 103-2.  Given this agreement, the following statement of facts focuses only on the five individual defendants against whom Epps is still pursuing liability: Bohen, Minor, Giardina, Stambach, and Costantino. A more complete statement of facts can be found in the previously filed Statement of Undisputed Facts (Dkt. No. 79) and Memorandum of Law (Dkt. No. 80), both of which were filed in support of defendants' motion for summary judgment.  The facts discussed here are particularly relevant to the specific points raised by Epps in his objections to the R&R.

**A.     The Tomika Means Homicide**

Epps alleges he was wrongfully convicted for the murder of Tomika Means, which occurred in May of 1997.  Early in the morning of May 27, 1997, Ms. Means was shot by a then unidentified perpetrator near the corner of Chelsea and East Delevan.  Dkt. 78 ("Sahsrabudhe Decl." or "Decl."), Ex. 11 at p. 127-138.  The parties do not dispute that the then unidentified perpetrator committed the murder in a road rage incident by shooting Means at near point blank range.  (*Id.*).  The only eye witness to the crime was Ms. Means's friend who was a passenger in Ms. Means's car at the time of the shooting.  (*Id.*).  The shooter reached over herto accomplish the murder.  This friend, a young woman by the name of Jacqueline Bradley, ultimately identified Epps as the perpetrator of the homicide, which subsequently led to Epps's arrest and conviction.

**B.** **The Investigative Activities of Detective Bohen**

Detective John Bohen's relevant investigative activities consist largely of showing Bradley a photo array with Epps's photo present.  Decl., Ex. 3 at p. 83; (Decl., Ex. 35. Detective Bohen conducted this procedure in early July, approximately a month and a half after the Means murder.  (*Id.*).  Detective Bohen had been told by Linda Means, the homicide victim's aunt, that she had heard people claim that Epps may have been the perpetrator.  Decl. Ex. 35, Ex. 28, Ex. 16 at p. 6-7.  Bradley picked out Epps's photo from the photo array.  She did so confidently and without qualification.  Decl. Ex. 28; Ex. 35.

Bradley's deposition testimony led Epps's counsel to believe that, rather than show Bradley a photo array, Detective Bohen in fact showed Bradley a mug book.  Decl. Ex. 9 at p. 7-12.  According to Epps's argument, Bradley's testimony demonstrated that Epps was originally identified by Bradley though a mug book, because she explained that she looked through a large book with a collection of male mugshots.  The parties do not dispute, however, that at some point prior to Epps's trial, Bradley identified Epps through accepted photo identification procedures implemented by Detective Bohen.

Regardless of whether Bradley identified Epps in a photo array or mug book, the evidence unequivocally demonstrates that her initial identification of Epps's photo occurred prior to Epps's trial for the Means murder, which began on April 20, 1998. Dkt. 1 at ¶ 53.  Further, any report made by Detective Bohen regarding Bradley's photo identification occurred prior to Epps's trial, and any report made by Detective Boehn regarding his discussions with Bradley's aunt occurred prior to Epps's trial, as well.  Decl. Ex. 35, Ex. 28.

Detective Bohen did not participate in any of the post-trial proceedings held after Epps's conviction.  Nor is there any evidence that Detective Bohen gathered evidence, took statements, or generated reports relevant to the Means homicide after Epps's trial began.  In other words, Detective Bohen was not involved in any post-trial or post-conviction investigative activities.

### C.   The Investigative Activities of Detective Minor

The parties do not dispute that, regardless of whether Bradley viewed a mug book or a photo array, Detective Reginald Minor's only relevant involvement in this case stems from his presence with Detective Bohen when he showed Bradley photos.  Decl. Ex. 16 at p. 7. Detective Minor was not involved in any other relevant investigative activity that led to Epps's arrest and prosecution.  As with Detective Bohen, there is no evidence that Detective Minor gathered evidence, took statements, or generated reports relevant to the Means homicide after Epps's trial began.  In other words, like Detective Bohen, Detective Minor was not involved in any post-trial or post-conviction investigative activities.  Detective Minor also did not testify or act as a witness in any post-trial proceedings initiated by Epps after his conviction.

### D.   Bradley's Subsequent Identification of Epps Establishing Probable Cause Independent of the Investigative Activities Taken by Detectives Bohen and Minor

After Bradley had identified Epps's photograph, Assistant District Attorney Patricia Carrington made an application to Erie County Court for an order directing Epps to appear for an in person lineup.  Decl. Ex. 23.  New York County Court Judge Timothy Drury granted ADA Carrington's application and ordered Epps to appear for an in person lineup.  Decl. Ex. 24.  Prior to Judge Drury's order, Epps had indicated in a statement given to detectives that he would volunteer to appear for an in person lineup.  Decl. Ex. 34.

Pursuant to Judge Drury's order, on July 30, 1997, Detective Sergeant Henry Smardz of BPD's Evidence Collection Unit oversaw and conducted an in person lineup in which Bradley observed Epps standing next to five fillers.  Decl. Ex. 16 at p. 23-42.  Detective Sergeant Smardz is not a party to this action.   The fillers were the same ethnicity as Epps, were of the same relative age, and were of the same relative appearance.  Salvatore Abate, Esq., represented Epps and was present throughout the entire lineup.  (*Id.*). ADA Carrington was also present throughout the entire lineup.  (*Id.*).  Neither Mr. Abate nor ADA Carrington objected to any of the procedures implemented during the in person lineup.  In fact, ADA Carrington observed what she considered to be a good lineup with no improprieties.  Dkt. 94-2 at ¶ 4.

After viewing Epps standing next to the five fillers, Bradley picked out Epps. Decl. Ex. 16 at p. 23-42.  After viewing him among the fillers again but in a different position, Bradley identified Epps a second time.  (*Id.*).  Seeing Epps in person caused such an emotional response from Bradley that she began to shake and cry.  (*Id.* at p. 32.).  In later proceedings, ADA Carrington described Bradley's identification at the lineup as one of the most compelling and convincing identifications she had ever seen a witness make. Decl. Ex. 17.

Based on Bradley's identification at the lineup, Epps was arrested and arraigned one day later, on July 31, 1997.  A grand jury then indicted Epps on August 7, 1997.  Decl. Ex. 40.  The indictment was issued based on the testimony of Bradley, in questioning of ADA Carrington.  Decl. Ex. 10.  ADA Carrington's questions focused exclusively on Bradley's account of the murder and her identification of Epps at the lineup ordered by Judge Drury.  (*Id.*). There was no questioning regarding photo array procedures conducted by BPD homicide

detectives.  Based on this testimony, the grand jury decided there was probable cause to believe that Epps had committed the Means homicide.  Decl. Ex. 31.

Importantly, ADA Carrington independently spoke with Bradley in between her identification of Epps at the lineup and her grand jury testimony.  Dkt. 94-2 at ¶ 5.  During that conversation with Ms. Bradley, Ms. Bradley did not waiver from her identification of Epps as the perpetrator of the Means homicide.  (*Id.*).

Of equal importance, Detectives Bohen and Minor were not involved in the lineup or in any subsequent interview ADA Carrington had with Bradley.  Moreover, none of the five remaining individual defendants testified during grand jury proceedings or interviewed Bradley before her grand jury testimony.

**E.      Detective Stambach's Investigative Activities**

Detective Stambach did not investigate the Means homicide.  Decl. Ex. 5 at p. 25. He played no role in gathering any evidence which was the basis for Epps's arrest and prosecution.  The only involvement Detective Stambach has in this case stems from an interview he took of Wymiko Anderson on April 17, 1998.  The interview occurred almost a year after the Means homicide, many months after Epps was indicted, and only days before Epps's trial was set to begin.  Anderson was not being interviewed in connection with the Means murder. Detective Stambach was interviewing Anderson because she was an on and off romantic partner of a different and more recent murder victim, Paul Pope.  (*Id.* at p. 32.).  Anderson and Pope shared children together, and Anderson was a witness who may have had pertinent information to give in connection with Pope's murder.

During her April 17, 1998 interview, Anderson relayed to Detective Stambach that she suspected Russell Montgomery was responsible for murdering Pope.  Decl. Ex. 32.  This much is undisputed.  Anderson also claims that, after detectives asked what Montgomery looked like, she relayed to them that he looked like the composite sketch created in connection with the Means investigation, which had been broadcast on news telecasts and in local newspapers.  Decl. Ex. 8 at p. 24-25.   Anderson also claims that she relayed to Detective Stambach that the morning of the Means murder, Montgomery, who was an associate of Pope's, came to get Pope from the home where he was staying with Anderson.  (Id. at p. 25); Decl Ex. 12 at p. 47-50.   Anderson claims that when Pope returned, he told her that Montgomery had confessed to him that he had murdered Means.   Decl. Ex. 12 at p. 47-50.  Anderson alleges that Detective Stambach did not write down this part of her statement, and that this information was omitted from her sworn statement given in connection with the Pope homicide.  The parties dispute whether Anderson actually made this statement, but for purposes of this motion, Anderson's allegations are assumed to be true.

Detective Stambach did not investigate the Means homicide after Epps's trial began.  He did not take any statements, he did not generate any reports, nor did he develop any evidence relevant to the Means homicide Epps for which was convicted.  Detective Stambach's only relevant post-trial involvement with the Means homicide was the fact that he acted as a witness in Epps's subsequent NYCPL 440 hearing and submitted an affidavit at the request of the Erie County District Attorneys' Office in connection with that same proceeding.  Decl. Ex. 13, 20.

**F.      Detective James Giardina's Investigative Activities**

Detective Giardina  did not play any meaningful role in the investigation of the Means homicide, either.  Decl. Ex. 6 at p. 22.  He played no role in gathering any evidence which was the basis for Epps's arrest and prosecution.  (*Id.*). The only involvement Detective Giardina had in this case is that he was present with Detective Stambach when Anderson was interviewed on April 17, 1998.  Decl. Ex. 21.   Thus, Detective Giardina's only involvement here is his failure to record Anderson's statement regarding what Paul Pope told her about what Russell Montgomery told him the morning of the Means murder.

Similar to Detective Stambach, Detective Giardina did not investigate the Means homicide after Epps's trial began.  He did not take any statements, he did not generate any reports, nor did he develop any evidence relevant to the Means homicide after Epps was convicted.  Detective Giardina's only relevant post-trial involvement with the Means homicide occurred when he testified in Epps' subsequent NYCPL 440 hearing, and submitted an affidavit at the request of the Erie County District Attorneys' Office in connection with the same proceeding.  Decl. Ex. 14, 21.

**G.      Detective Sergeant Anthony Costantino's Investigative Activities**

Although the fact is very much in dispute, Epps argues that Detective Sergeant Anthony Costantino was present when Anderson relayed her alleged double hearsay statement during her interview on April 17, 1998.  However, there is no evidence of Detective Sergeant Costantino taking relevant witness statements or developing evidence relevant to the Means homicide after Epps's trial began.  Detective Sergeant Costantino did not conduct any relevant post-conviction investigation related to the Means homicide which effected Epps's post-

conviction proceedings.  Detective Sergeant Costantino's only relevant post-conviction conduct stems from the fact that he testified at Epps's NYCPL 440 hearing and submitted an affidavit at the request of the District Attorneys' Office in connection with the same proceeding.  Decl. Ex. 15, 19.

## **ARGUMENT**

**POINT I.       EPPS HAS CONCEDED THAT DISMISSAL OF HIS MALICIOUS PROSECUTION CLAIMS WAS APPROPRIATE**

The Court should grant summary judgment on Epps's two claims for malicious prosecution –especially because Epps does not specifically object to the portions of R&R which recommend dismissal of those claims. Epps expressly abandoned his malicious prosecution claims as to Detectives Stambach, Giardina, and Costantino, leaving only his malicious prosecution claims against Detectives Bohen and Minor.

"If a party fails to object to a particular portion of a report and recommendation, further review thereof is generally precluded." *Lowell v. Lyft, Inc*., 17-CV-06251,  2023 WL 2622925 (S.D.N.Y. Mar. 2023) (citing *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)). A District Court "may adopt those portions of the report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Id.* (cleaned up).

Here, there were both a factual and legal basis for Magistrate Judge Foschio to recommend dismissal of the malicious prosecution claims. "It is well-settled that even where a plaintiff alleges that a malicious prosecution is based on fabricated evidence, the existence of

probable cause independent of the fabricated evidence is a defense to that claim."   *Torres v. City of New York*, 16 Civ. 6719,  2017 WL 4325822, *4 (E.D.N.Y. Sep. 2017); *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 290 (E.D.N.Y. 2013).   Even though Epps claims that Detective Bohen and Minor "fabricated evidence," which they did not, summary judgment was still warranted given the independent probable cause created by Bradley's identification of Epps at the lineup –which did not involve Bohen or Minor.   *Fappiano v. City of New York*, 640 Fed. App'x 115, 119 (2d Cir. 2016).   Probable cause was also emphasized by Bradley's subsequent identification of Epps in her interview with ADA Carrington and during her grand jury testimony.   *See id.*  Detectives Bohen and Minor were not involved in any of these events – all of which created probable cause for Epps's arrest and prosecution.

In *Bermudez* v. *City of New York*, an instructive case, the Second Circuit affirmed the trial court's grant of summary judgment dismissing the plaintiff's malicious prosecution claims. 790 F.3d 368, 377 (2d Cir. 2015).  There, the plaintiff demonstrated that police officers had coerced witnesses into identifying him as the perpetrator of a homicide: They then fabricated an account of the identification to the prosecutor handling the case.  *Id.* at 372-373. Notwithstanding this evidence, the Court held that the plaintiff could not maintain his malicious prosecution claim. After the police's alleged misconduct, the witnesses had independently identified the plaintiff as the perpetrator of the homicide to the assigned prosecutor, which created independent probable cause.  *Id.* at 377.

As in *Bermudez*, even if the Court were to adopt Epps's wild speculation of misconduct on the part of Detectives Minor and Bohen, there was ample probable cause for Epps's prosecution independent of any investigative activity taken by these two detectives.  790

F.3d at 377.   Thus, as the police in *Bermudez* were entitled, this independent probable cause

entitles Detectives Bohen and Minor to summary judgment on Epps's malicious prosecution

claims.   The portions of the R&R recommending complete dismissal of Epps's malicious

prosecution claims should thus be affirmed.

> **POINT II.    EPPS CANNOT HOLD THE INDIVIDUAL**
> **DEFENDANTS LIABLE FOR ALLEGED**
> ***BRADY* VIOLATIONS**

The R&R must also be affirmed to the extent that it recommended dismissal of

Epps's *Brady* based claim –which Epps pursues against Detectives Stambach, Giardina, and

Costantino only.  The R&R correctly finds that the defendants are entitled to qualified immunity

with respect to the *Brady* claim and that Wymiko Anderson's double hearsay statement is not

even *Brady* evidence.

**A.    The Alleged *Brady* Evidence Was Not Admissible Either as Direct Evidence or Impeachment Evidence**

The Court must recognize the nature and context of the statement that Anderson

allegedly made to the individual defendants –the sole statement upon which Epps builds his

*Brady* claim.  The defendants were not interviewing Anderson in connection with the Means

homicide –they were conducting an entirely separate investigation into the Pope murder, which

occurred at a different time and in a different place.  Anderson alleges that, at some point during

this interview, she told the detectives that almost a year prior, her (now dead) ex-boyfriend told

her, that Russell Montgomery confessed to him, that he (Montgomery) was the perpetrator of the

Means homicide.[1]  Despite Epps's claim that this statement constituted "scathing" impeachment

---

[1]      When compared to the strong, repeated, and unequivocal identifications of Epps by the one witness who
made first hand observations of the Means homicide, it can hardly be argued that Anderson's statement, if

evidence, the reality is that this statement could never have been used by Epps's counsel at his trial –either as direct evidence of innocence *or for impeachment*.

Conspicuously absent from Epps's objections is any explanation as to how Anderson's statement actually might have been used for impeachment.  If Anderson were called to testify at trial, and she began to testify about what she heard from Pope about what Montgomery told him, any prosecutor worth their salt would have immediately objected, and the objection would have been quickly sustained.  A similar objection would have been drawn if, on cross-examination of Bradley, Epps's lawyer began to ask Bradley a question mentioning Anderson's double hearsay statement.  Again, the objection would have been summarily sustained.  There is simply no way in which Anderson's statement would have affected the scope of Bradley's cross-examination or could have been used to impeach her.

Thus, contrary to the suggestion made by Epps throughout his objections, Anderson's statement could not be used at trial for any purpose –including impeachment.  This fact is crucial in considering whether the defendants are entitled to qualified immunity on Epps's *Brady* claim –an issue discussed immediately below.

### B.   Defendants are Entitled to Qualified Immunity on Epps's *Brady* Claim

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  In keeping with this principle, federal courts hold that police officers are entitled to qualified immunity and are thus

---

it was made, would have alerted the defendants to the fact that Montgomery was the true killer.  Unlike Bradley, Anderson was not an actual witness to the Means homicide, and her statement was not even based on information relayed to her by a witness with firsthand knowledge of the crime–as it is undisputed that Paul Pope did not witness the Means murder.

shielded from individual liability unless they violate a plaintiff's clearly established constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001).  For qualified immunity purposes, courts look to whether the law was sufficiently clear at the time of the alleged violation such that "every reasonable [officer] would have understood that what he was doing violated [the right at issue]."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015).   That is the inquiry that the Court must undertake for purposes of the individual defendants qualified immunity defense: Would every reasonable police officer in 1998 have understood that *Brady* required disclosure of Anderson's double hearsay statement to prosecutors?  *Id.*  Given the state of the law in 1998, and even the state of the law today, the answer to that question is a resounding "no."

To determine whether a right is clearly established, the Court must look to whether, in 1998, there was sufficiently clear Supreme Court or Second Circuit authority setting forth that the defendants' conduct was unconstitutional.  *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004).  Multiple rounds of briefing before Magistrate Judge Foschio and before this Court have conclusively shown that no such authority existed in 1998.  Epps still fails to cite a single Second Circuit or Supreme Court case from prior to 1998 establishing that inadmissible, double hearsay evidence, or inadmissible evidence generally, was required to be turned over under *Brady*. Indeed, a review of the applicable authority on this precise issue demonstrates that the law in 1998 was not at all settled –and remains unsettled to this day in some jurisdictions.

In *Wood v. Bartholomew*, the Supreme Court held that an inadmissible polygraph test was not *Brady* material because the results were undoubtedly inadmissible and disclosure of the results could have had no direct effect on the outcome of the trial.  516 U.S. 1, 6 (1995).

*Wood*, however, left open the question of whether some inadmissible evidence might still be *Brady* material under certain circumstances, or whether inadmissible evidence is *per se* non-*Brady* evidence.

After *Wood* was published, a Circuit split developed on the issue.  *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 310 (3d Cir. 2016) (describing circuit split); *United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (same).    The Fourth and Seventh Circuits, for example, developed a *per se* rule establishing that all inadmissible evidence is by definition not *Brady* evidence.  *See, e.g., Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996); *Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011).  Other circuits, including the Second Circuit, eventually adopted a less restrictive rule that inadmissible evidence may nonetheless be *Brady* material if its disclosure could lead to the discovery of admissible evidence.  *See, e.g., Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013) ("[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence."); *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (*en banc*). The Second Circuit's position, however, had not been clearly pronounced until 2002, when it issued its decision in *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).   Indeed, the cases that discuss the Circuit split all cite to *Gil* as the instance where the Second Circuit first made its position known on this issue.  *See, e.g., Morales*, 746 F.3d at 314; *Ellsworth*, 333 F.3d at 5, n.4.

Accordingly, there can be no dispute that, in 1998, there was no clear Second Circuit or Supreme Court authority setting forth that the individual defendants were required under *Brady* to disclose Anderson's double hearsay statement to the prosecutors handling Epps's

case despite the statement's complete lack of admissibility.  This simple fact entitles the

defendants to qualified immunity.  *Luna*, 356 F.3d at 490.

Epps seeks to downplay that implications of the Circuit split by highlighting the

type of evidence that courts have subsequently held to be covered by *Brady*.  Dkt. No. 105 at p.

17.  In doing so, Epps misses the point.  Defendants point in highlighting the Circuit split is to

emphasize the fact that reasonable minds –including minds making up the federal judiciary—can

disagree on whether inadmissible evidence might nonetheless be considered *Brady* evidence.[2]  If

learned jurists throughout the country differ on whether Anderson's statement is *Brady* material

today, it certainly cannot be argued that every reasonable police officer in 1998 would have

recognized that Anderson's statement needed to be turned over under *Brady*.

Other attempts by Epps to argue that the defendants are not entitled to qualified

immunity similarly miss the mark.  That some state and District Court decisions may have

suggested that the defendants' conduct could have run afoul of *Brady* is of no moment.  *See, e.g.,*

*United States v. Gleason*, 265 F. Supp. 880, 886 (S.D.N.Y. 1967); *People v. Smith*, 127 A.D.2d

864; *People v. Lumpkins*, 141 Misc. 2d 581 (Sup. Ct. Kings Cnty. 1988). The inquiry is not

whether there was some authority suggesting that the defendants' conduct may have constituted

a *Brady* violation.  The inquiry is whether federal authority at the time was so clear that every

reasonable officer would have understood that the defendants' conduct constituted federal

constitutional violation.  *Mullenix* , 577 U.S. at 11.  To make that showing, Epps is required to

---

[2]      As one Circuit Court has explained: "the question of whether and when inadmissible evidence can be
Brady material remains an open question in many jurisdictions to this day."  *Beaman v. Freesmeyer*, 776
F.3d 500, 510 (7th Cir. 2015).

cite Second Circuit or Supreme Court authority. *Luna*, 356 F.3d at 490. His failure to do so demonstrates the defendants' entitlement to qualified immunity.

Epps's citation to cases like *United States v. Bagley*, 473 U.S. 667 (1985) and *Kyles v. Whitney*, 514 U.S. 419 (1995) are also unavailing. Dkt. No. 105 at p. 13-14. Those decisions say nothing regarding whether the ultimate admissibility of evidence effects a police officers' obligation to turn evidence over under *Brady*. Also readily distinguishable is *Miller v. Angliker*, 848 F.2d 1312 (2d Cir. 1988). Epps cites this case as an example of an instance where a court held that "alternate suspect" evidence needed to be disclosed under *Brady*. Dkt. 105 at p. 17. But Epps neglects to mention that, in that case, the Second Circuit expressly analyzed whether the "alternate suspect" evidence ***would have been admissible***. *Id.* at 1323-1324 (explaining that the Court had little doubt that the exculpatory evidence "would have been admissible) (emphasis added). Nothing about Miller, therefore, would have put the defendants on notice of the need to turn over potential alternative suspect evidence that was clearly inadmissible.

One aspect of Epps's argument as to why the defendants are not entitled to qualified immunity actually proves the defendants' point and nicely sums up this issue. Epps correctly points out that police officers do not have the same legal acumen as prosecutors to make complicated legal determinations on what constitutes *Brady* evidence. Dkt. 105 at p. 14-16. But that is exactly the point. Police officers cannot and should not be faced with the prospect of individual liability every time a difficult, complex, legally nuanced *Brady* issue arises. Under Epps's view, a police officer could be held individually liable in each instance that he or she fails to turn over to prosecutors evidence that may ***conceivably*** fall under the scope of

*Brady*.  But to impose such broad individual liability on police officers would invert the well-established qualified immunity standard –which exists for good reason.  The standard for individual liability is not whether an officer's conduct might arguably violate an individual's constitutional rights.  Rather, the standard is whether, given the state of the law, a police officer's conduct inarguably violated a constitutional right, and whether this would be understood by any reasonable officer at the time. *Mullenix*, 577 U.S. at 11.

Whether Detectives Stambach, Giardina, and Costantino were required to disclose to prosecutors a double hearsay statement made during their investigation of a separate crime committed many months after the Means homicide was a complicated and nuanced legal question in 1998.  It is a complicated and nuanced legal question today.   Certainly, reasonable officers in 1998 may have differed in their understanding of whether such a statement was required to be turned over under *Brady*.  This fact alone entitles the defendants to qualified immunity, and necessitates that the R&R should be adopted to the extent it recommends dismissal of Epps's *Brady* claim.

## C.    The Alleged Suppression of Anderson's Statement was not a *Brady* Violation

The R&R should also be adopted because the record does not show that the defendants actually committed a *Brady* violation.  Police officers may be held liable for *Brady* violations only when they intentionally suppress exculpatory evidence. *Valentin v. City of Rochester*, 11-CV-6238, 2018 WL 5281799, at \*12-\*13 (W.D.N.Y. Oct. 2018).  As Magistrate Judge Foschio correctly noted, a mere failure to write down or take notes during a statement made by a witness does not constitute a *Brady* violation. *United States v. Rodriguez*, 496 F.3d 221, 224-225 (2d Cir. 2007).

Here, Epps takes issue with the fact that the defendants did not write down Anderson's double hearsay statement tentatively implicating Russell Montgomery as the perpetrator of the Means homicide when they were investigating a separate crime. But *Rodriguez* teaches that this alone does not constitute a *Brady* violation. 496 F.3d at 224-225. Moreover, Epps cannot establish a *Brady* violation based on the detectives' failure to realize the relevance of Anderson's statement and then immediately notify the prosecutor in charge of handling the Means case. *Reid v. Simmons*, 163 F. Supp. 2d 81, 92-93 (D.N.H. 2001) (discussing *Brady* obligations of police officers during when they investigate separate, seemingly unrelated crimes). Police officers are not obligated under *Brady* to hastily notify prosecutors every time they come across evidence which may arguably be relevant to one of the prosecutor's ongoing matters. *See id.* For these reasons, Magistrate Judge Foschio was correct in holding that the detectives did not commit a *Brady* violation. This is further reason why the R&R should be adopted.

Also, a *Brady* violation cannot be shown where courts must resort to speculation to determine what admissible evidence may have been discovered through disclosure of materials which themselves are not admissible. *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (upholding denial of Brady claim where petitioner resorted to speculation regarding what admissible evidence might have been discovered) (emphasis added). Here, Epps has put forth many theories of how disclosure of Anderson's statement might have changed the outcome of his trial, but he has not concretely shown what admissible evidence would have been discovered by him or his counsel if Anderson's statement was disclosed. Because there is no way to determine how its disclosure could have led to admissible evidence without resorting to rampant

speculation, the defendants cannot be said to have violated *Brady*.  *Downs*, 232 F. 3d at 1037.

For this reason, too, the R&R correctly recommended dismissal of Epps's *Brady* claim.

**POINT III.   THE INDIVIDUAL DEFENDANTS ARE
ENTITLED TO ABSOLUTE IMMUNITY ON
EPPS'S POST-TRIAL DUE PROCESS CLAIM**

The R&R also correctly recommends dismissal of Epps's "post-trial due process"

claim.  Epps cannot be permitted at this late stage to constructively amend this claim to advance

a due process "fabrication of evidence" claim, which was not pled and invokes an entirely

different set of rights and considerations.  When the evidence is considered in the context of the

actual claim pled by Epps in his complaint, it is clear that the defendants are entitled to summary

judgment.

**A.     Epps Must Not Be Permitted to Constructively Amend the Complaint to Assert a
Pre-Trial Fabrication of Evidence Claim**

In arguing that his post-conviction due process claim should be allowed to

proceed to trial, Epps surveys case-law from within this Circuit explaining and describing  an

entirely different cause of action available to civil rights plaintiffs – a cause of action stemming

from a police officer's ***pre-trial*** fabrication of evidence.  Dkt. 104 at p. 23; *See, e.g., Ricciuti v.

N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Garnett v. Undercover Officer*, C0039,

838 F.3d 265, 277 (2d Cir. 2016) (emphasis added).  The very case law cited by Epps reveals

that the right implicated by such a cause of action is an individual's due process right to a fair

trial.  *Frost v. New York City Police Department*, 980 F.3d 231, 250 (2d Cir. 2020) (describing

cause of action as focused on "***fair trial*** right against deprivation of liberty that results when a

police officer fabricates and forwards evidence to prosecutor that would likely influence a jury's

decision")  *Ricciuti*, 123 F.3d at 130 ("when a police officer creates false information likely to

20

influence a jury's decision and forwards that information to prosecutors, he violates the accused's ***constitutional right to a fair trial***") (emphasis added); *see also Buari v. City of New York*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021)).   While Epps may technically be correct that "fabricated" evidence need not actually be used in a trial to pursue such a claim, the case law he cites reveals that the fabrication of evidence must have the potential to influence the outcome of a trial –thus establishing that the right at issue under such a claim is decidedly a ***pre-trial*** right. *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021) (allowing fabrication of evidence claim to proceed where fabricated evidence did influence a pre-trial suppression hearing and thus could have impacted a subsequent trial); *Frost*, 980 F.3d at 260 (emphasizing that cause of action can be maintained where the fabricated evidence could have had an influence of a jury's ultimate decision).

Thus confusing are Epps's attempts to save his ***post-trial*** due process claim by relying on this line of authority –which clearly focuses on an individual's ***pre-trial*** rights.  If Epps had wanted to bring a claim for pre-trial fabrication of evidence, nothing prevented him from doing so.  He was more than capable of pleading a fabrication of evidence claim along with his other pre-trial claims for malicious prosecution and for an alleged *Brady* violation.  *Brandon v. City of New York*, 705 F. Supp. 2d 261 (S.D.N.Y. 2010) (setting forth that civil rights plaintiffs may simultaneously bring malicious prosecution and fabrication of evidence claims in the same action).  He chose not to plead one.  And the defendants were entitled to conduct discovery, pursue defenses, and develop their litigation strategy accordingly.

Indeed, to allow Epps to constructively amend his complaint at this late stage to include a due process fabrication of evidence claim –when such a claim is decidedly absent from

any pleading- would be incredibly unfair and prejudicial to the defendants.  The reality that certain facts pled in the complaint may have been consistent with a due process fabrication of evidence claim does not excuse Epps from failing to assert such a claim in his complaint, and this failure prevents Epps from constructively amending his complaint after discovery has closed.  In this regard, *Palmer v. Monroe County Sherriff*, a decision from this District, is particularly instructive.  378 F. Supp. 284, 290-291 (W.D.N.Y. 2005) (Siragusa, J.).   There, two plaintiffs sought leave to amend their complaint after the close of discovery.  *Id.* at 286. The plaintiffs requested leave to assert a cause of action for fabrication of evidence when the operative pleading only stated a claim for malicious prosecution.  *Id.* at 287.  Magistrate Judge Feldman and subsequently District Judge Siragusa denied the plaintiffs' request.  Given that discovery had closed and there was "no evidence that the defendants ever understood that the plaintiffs were seeking to assert a [fabrication of evidence claim]" the plaintiffs were not entitled to amend their complaint at such a late stage of the litigation.  *Id.* at 291.

Epps's attempt to re-frame his post-trial cause of action to assert a due process fabrication of evidence claim mirrors the request by the plaintiffs in *Palmer* to amend their complaint.  As in *Palmer*, because no due process fabrication of evidence claim has ever been articulated by Epps until now when discovery has closed and defendants have moved for summary judgment, he must not be permitted to pursue such a claim.  Accordingly, Epps's belated invocation of the "fabrication of evidence" cause of action is not a ground  disturb Magistrate Judge Foscho's recommendation that the post-trial due process claim be dismissed.[3]

---

[3]     It also bears noting that Epps would not even be able to maintain a pre-trial fabrication of evidence claim against any of the five remaining individual defendants.  With respect to Detectives Stambach, Giardina, and Costantino, Epps exclusively complains of their alleged suppression of Anderson's alleged double

**B.**      **There is no Evidence of Post-Trial Fabrication of Evidence or a Post-Trial Constitutional Violation Committed by Detectives Bohen and Minor**

The rights of an individual who has gone through a trial and been convicted are far more limited than an individual who is being investigated for a crime or an individual charged with a crime who awaits trial.  *Pierre v. City of Rochester*, 16-CV-6428 , 2018 WL 10072453, at *17 (W.D.N.Y. Sep. 2018) (citing *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)).  Although the extent of post-conviction rights has not been robustly discussed in  case law, what is clear is that a police officer must actually have been involved in some form of post-conviction investigative activity to be held liable for a post-conviction deprivation of rights. *See Howard v. City of Durham*, 68 F.4th  934, 940, 944 (4th Cir. 2023) (holding that two officers could be held liable under similar claim based on their having conducted interviews and gathered evidence decades after the  plaintiff was convicted).

For this simple reason, Epps's post-trial due process claim against Detectives Bohen and Minor fails as a matter of law.  Bohen and Minor did not collect evidence, interview witnesses, or conduct any relevant investigative activity related to the Means homicide after Epps's criminal trial began in 1998.  They were not even witnesses in any post-conviction proceedings.  To remind the Court, the only relevant involvement Bohen and Minor have in this case is their implementation of photo identification procedures with Jaqueline Bradley –which

---

hearsay statement or, in other words, a *Brady* violation.  But a due process claim premised upon *Brady* is legally distinguishable from a claim premised upon fabrication of evidence.  *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 367 (W.D.N.Y. 2021) (fabrication of evidence is not redressable as a *Brady* violation).  Moreover, there is absolutely no evidence establishing that the photo array conducted by Detectives Bohen and Minor was fabricated or made up. So a pre-trial fabrication of evidence claim would not lie against those defendants, either.

indisputably happened *prior* to Epps's trial and conviction.[4]   In no way can Detectives Bohen and Minor be said to have committed a post-trial deprivation of Epps's constitutional rights.   The R&R should thus be adopted to the extent it recommends dismissal of the post-trial claim against these two defendants.

**C.     Detectives Stambach, Giardina, and Costantino are Entitled to Absolute Immunity on Epps's Post-Trial Due Process Claim**

With respect to Detectives Stambach, Giardina, and Costantino, the conduct that Epps takes issue with involves their alleged pre-trial suppression of Anderson's statement.   Epps could not even maintain a "fabrication of evidence" claim against these defendants for this conduct, as a *Brady*-based due process violation is conceptually distinct from a due process violation based upon the fabrication of evidence.  *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 367 (W.D.N.Y. 2021) (fabrication of evidence is not redressable as a Brady violation).   Epps also cannot maintain a post-trial due process claim for this alleged pre-trial suppression, as "there is no freestanding substantive due process right to *Brady*-like disclosure post-conviction."  *Pierre*, 2018 WL  10072453 at *17 (citing *Ermichine v. United States*, No. 06 CIV. 10208, 2011 WL 1842951, at *13 (S.D.N.Y. May 12, 2011)).   Under this law, the alleged pre-trial suppression of Anderson's statement is not a basis to hold Detectives Stambach, Giardina, and Costantino liable under Epps's post-trial claim.

---

[4]      For this reason, the clear implication of Epps's pleading is that the only claims applicable to Detectives Bohen and Minor were Epps's pre-trial malicious prosecution claims, as Bohen and Minor were not involved in the event giving rise to Epps's *Brady* claim.  Defendants proceeded with discovery, developed their litigation strategy, and moved for summary judgment based on this understanding –an understanding that was developed from a plain reading of the complaint.

Left for these three defendants when the alleged pre-trial suppression claim is removed is their participation in Epps's post-trial proceedings *as witnesses*. That is what Epps's post-trial due process claim targets. Dkt. No. 1 at ¶ 119 ("Plaintiff filed motions under CPL § 330 and § 440 and was granted a hearing pursuant to CPL § 440. Plaintiff has a right to a fair and honest consideration of his motions and to a fair hearing, ***based on full disclosure of the true facts by all relevant witnesses, including the Defendant Detectives***) (emphasis added). And that is what the parties understood Epps's post-trial due process claim to be about throughout this litigation –his claim that the defendants lied when they acted as witnesses during post-trial proceedings. The fundamental problem with Epps's approach is that witnesses, including police officers, are entitled to absolute immunity for acts done in their capacity as participants in a judicial proceeding. *Sykes v. James*, 13 F.3d. 515, 520 (2d Cir. 1993) ("Functional categories, rather than the status of the defendant, control immunity analysis, and functions most apt to be accorded absolute immunity are those integrally related to the judicial process").

The only post-conviction conduct by Stambach, Giardina, or Costantino which Epps can credibly claim "undermined" his post-trial proceedings was their testimony at his NYCPL 440 hearing, or the affidavits they submitted as fact witnesses for the exact same proceeding. When they testified and submitted affidavits they were acting as witnesses to an ongoing judicial proceeding as opposed to acting in their capacity as law enforcement officers collecting and gathering evidence. For this reason, Stambach, Giardina, and  Costantino are entitled to absolute immunity on Epps's post-trial due process claim. *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983); *Sykes*, 13 F.3d at 519-520. They are absolutely immune from liability,

even if their testimony and affidavits were, as Epps claims, perjurious.  *Collins v. City of New York*, 923 F. Supp. 2d 462, 473 (E.D.N.Y. 2013).

Accordingly, this Court should also adopt the portions of the R&R which recommend dismissal of Epps's post-trial due process claim against Detectives Stambach, Giardina, and Costantino.

### POINT IV.   DISMISSAL IS WARRANTED AS TO EPPS'S REMAINING STATE-LAW CLAIM

Epps pursues his fifth and final cause of action against the City of Buffalo only. That claim seeks to hold the City of Buffalo liable under a theory of *respondeat superior* and  is brought pursuant to the New York State Constitution.  The claim should be dismissed for multiple reasons.  The Court can certainly dismiss the claim with prejudice but, at the very least, the Court should decline to retain supplemental or pendent jurisdiction over this claim once all of the federal claims are dismissed.

### A.   Epps's Remaining State-Law Constitutional Claim Must be Dismissed With Prejudice Because there was no Underlying Constitutional Violation

Epps cannot recover against the City on his state-law due process claim if the Court finds that none of the individual defendants violated his constitutional rights or committed any state-law torts against him.  Because there is no individual liability on the part of any individual defendant or on the part of any unnamed individual acting as an employee or agent of the City, Epps cannot obtain liability against the City under a theory of *respondeat superior*.  The claim should therefore be dismissed with prejudice. *Coleman v. City of Rochester*, No. 16-CV-6179, 2018 WL 6727535 at *6 (W.D.N.Y. Dec. 2018) (dismissing plaintiff's state constitutional

claims where he had "not demonstrated any basis for liability on the part of any of the City's agents or employees").

Further, even if Epps were able to show that his constitutional rights were violated, he cannot maintain a state-law due process claim against the City.  Plaintiffs can assert *respondeat superior* claims under the New York State Constitution only when no other state laws provide an "adequate alternative remedy."  *Issac v. City of New York*, No. 16-CV-472, 2018 WL 5020173 at *19-20 (E.D.N.Y. Aug. 2018).

Here, New York law provides someone in Epps's position with an adequate alternative remedy to seek redress for the alleged constitutional violations at issue.  Epps was prosecuted and convicted.  As a result, New York's post-conviction remedies provided him with an adequate alternative way to address the alleged unconstitutional activities by the defendant detectives.  This is not a situation where Epps was never prosecuted and thus has no means of seeking redress other than through an action for damages. *Cf. Brown v. State of New York*, 89 N.Y.2d 172, 192, (1996).  Epps can and did incoke New York's post-conviction remedies in an effort to seek recompense for the individual defendants' alleged misconduct.  In one instance, he was unsuccessful.  Years later, he was able to obtain a reversal of his conviction.  Because Epps was not left in a "damages or nothing" situation, he cannot maintain his state-law due process claim. *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83-84 (2001) (dismissing identical claim where plaintiff had shown "no grounds that would entitle her to a damage remedy in addition to the substantial benefit she already had received from dismissal of the indictment and release from incarceration").  For this reason, too, Epps's final cause of action must be dismissed with prejudice.

**B.    At the Very Least, the Remaining State-Law Constitutional Claim Should be Dismissed Without Prejudice**

If the Court is not inclined to dismiss Epps's remaining state-law claim with prejudice, dismissal without prejudice is warranted under the circumstances presented here. For the reasons addressed in Points I-III *supra.*, all of Epps's federal claims must be dismissed. With each of Epps's federal claims dismissed, the Court has the authority and discretion to decline to retain pendent jurisdiction over the remaining state law claim. *O'Brien v. Yugartis*, 54 F. Supp. 3d 186, 193-194 (N.D.N.Y. 2014) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims") (citing *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)) (other citations omitted) (cleaned up).

Of particular concern here is what the correct approach would be if certain federal claims were dismissed on qualified immunity grounds. In this regard, Epps's citation to *Tirolo v. Nassau County* raises more questions than it answers. 24 F.4th 98, 111-113 (2d Cir. 2022). That case involved a very unique procedural posture. A federal claim was permitted to proceed to trial against an individual defendant while a state-law *respondeat superior* claim was simultaneously permitted to proceed against a County defendant. *Id.* at 104-105. Based on the trial evidence, the District Court correctly concluded that the individual defendant was entitled to qualified immunity on the federal claim, notwithstanding the fact that the jury had entered a verdict in the plaintiff's favor on that claim. *Id.* at 105, 108-109. But the jury also found in favor of the plaintiff against the County defendant on the state-law *respondeat superior* claim similar to the one Epps brings in this case. Id. at 105, 110-112. Given that the case had already gone to trial and a verdict had already been rendered in the plaintiff's favor, the Second Circuit

held that dismissal without prejudice was not the appropriate approach to take at that juncture. *Id.* at 113, n. 11.

Both the majority opinion and the concurring opinion in *Triolo*, however, expressly acknowledge that no New York court has ever addressed the precise issue presented here. *Id.* at 111 (majority opinion explaining that New York courts have only found vicarious liablity in other contexts; 114 (concurring opinion acknowledging that "not a single New York court has addressed the issue).   That is, no New York court has ever decided whether a state-law *respondeat superior* claim can be maintained against a municipality when the municipality's employee has been dismissed from the case on qualified immunity grounds.  Further, both the majority and comity opinions in *Triolo* acknowledge principles of federalism and comity dictate that it would be preferable for a New York court to weigh in on the issue in the first instance.  Id. at 113, n. 11; 114-115.

Because the unique procedural posture presented in *Triolo* is not before this Court, the Court should decline to retain jurisdiction over the remaining state-law claim.  The parties have not gone to trial, no verdict or judgment has been rendered, and Epps would have six months to re-file his state law claim in New York state court if the claim were dismissed without prejudice.  CPLR § 205(a).  This unique and complex state-law issue should be left to New York State courts.  In other words, if certain defendants are dismissed only on qualified immunity grounds, then it should be left to New York courts to determine whether Epps may nonetheless pursue the City of Buffalo on a *respondeat superior* theory of liability under New York law.

For these reasons, at a minimum, dismissal without prejudice is warranted as to Epps's state-law *respondeat superior* claim. The portions of the R&R recommending dismissal of that claim should be adopted in full.

### <u>CONCLUSION</u>

For the foregoing reasons, the defendants respectfully request that the Court adopt each portion of the R&R which recommends summary judgment in favor of defendants.

Dated:      Buffalo, New York
             July 26, 2023

                          **HODGSON RUSS LLP**
                          *Attorneys for Defendants*

                          By: <u>//s Peter A. Sahasrabudhe</u>
                               Hugh M. Russ, Esq.
                               Peter A. Sahasrabudhe, Esq.
                          The Guaranty Building
                          140 Pearl Street, Suite 100
                          Buffalo, NY  14202-4040
                          717.856.4000

017635.00059 Litigation 16580615v1