UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORY EPPS,<br><br>          **Plaintiff,**<br><br>-against-<br><br>THE CITY OF BUFFALO, DETECTIVE JOHN BOHAN, DETECTIVE REGINALD MINOR, DETECTIVE MARK STAMBACH, DETECTIVE JAMES GIARDINA, DETECTIVE ANTHONY CONSTANTINO, DETECTIVE ROBERT CHELLA, AND RANIERO MASSECHIA,<br><br>          **Defendants.** | Dkt. No. 19-cv-00281 |

**PLAINTIFF'S FURTHER OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS REGARDING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ...................................................................................................i

**TABLE OF AUTHORITIES** ............................................................................................ii

I. NO REASONABLE POLICE OFFICER IN THE SECOND CIRCUIT IN 1998 WOULD CONCLUDE THAT INFORMATION THAT SOMEONE ELSE COMMITTED THE CRIME, WHETHER BASED ON HEARSAY OR NOT, COULD BE WITHHELD. ...............................1

    a. Obviousness. ...................................................................................................2

    b. Disclosure was clearly required under Giglio and Kyles in 1998, even if a strict admissibility rule could be found to have existed then in the Supreme Court or Second Circuit. ...................................................................................................................3

    c. The view in other Circuits about admissibility being needed for materiality did not apply in the Supreme Court or the Second Circuit in 1998 .......................................7

II. THE RULE THAT THE GOVERNMENT IS NOT REQUIRED TO TAKE NOTES DURING WITNESS INTERVIEWS DOES NOT MEAN THAT ANDERSON'S INFORMATION ABOUT MONTGOMERY BEING THE TRUE KILLER IS NOT BRADY. .........................................................................................................................12

III. DEFENDANTS CONTINUED ATTEMPTS TO DISTORT EPPS' DUE PROCESS CLAIMS SHOULD BE REJECTED. ................................................................................13

IV. THE STATE LAW CONSTITUTIONAL CLAIMS AGAINST THE CITY OF BUFFALO SHOULD BE ALLOWED TO GO FORWARD. .....................................................15

**CONCLUSION** ................................................................................................................16

## TABLE OF AUTHORITIES

**CASES**

*Beaman v. Freesmeyer,* 776 F.3d 500 (7th Cir. 2015) ................................................................. 9

*Brady v. Maryland,* 373 U.S. 83 (1963) ............................................................................... passim

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ................................................................................... 2

*Chambers v. Mississippi,* 410 U.S. 284 (1973) .......................................................................... 10

*Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) ..................................................................... 13

*Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) ......................... 7, 8, 11

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009) .................................. 15

*Ellsworth v. Warden,* 333 F.3d 1 (1st Cir. 2003) .................................................................... 9, 11

*Giglio v. United States,* 405 U.S. 150 (1972) ...................................................................... passim

*Hoke v. Netherland,* 92 F.3d 1350 (4th Cir.1996) .......................................................... 9, 10, 11, 12

*Hope v. Pelzer,* 536 U.S. 730 (2002) ............................................................................................ 2

*Howard v. City of Durham*, 68 F.4th 934 (4th Cir. 2023) ........................................................... 15

*Jardine v. Dittman,* 658 F.3d 772 (7th Cir. 2011) ........................................................................ 9

*Kyles v. Whitely*, 514 U.S. 419 (1995) ................................................................................. passim

*Luna v. Pico*, 356 F.3d 481 (2d Cir. 2004) ................................................................................... 7

*Martinez v. City of Schenectady*, 97 N.Y.2d 78 (N.Y. 2001) ..................................................... 15

*Miller v. Angliker,* 848 F.2d 1312 (2d Cir. 1988) ....................................................................... 10

*Newton v. City of New York*, 779 F.3d 140 (2d Cir. 2015) ......................................................... 14

*Pennsylvania v. Ritchie,* 480 U.S. 39 (1987) .............................................................................. 10

*People v. DePasquale,* 54 N.Y.2d 693 (1981) .............................................................................. 5

*People v. Esteves,* 152 A.D.2d 406 (2d Dept 1989) ..........................................................10

*People v. James,* 242 A.D.2d 389 (2d Dept. 1997) ..........................................................10

*People v. Robinson,* 89 N.Y.2d 648 (1997) ......................................................................10

*People v. Sorge*, 201 N.Y. 189 (1950) ................................................................................5

*Sinclair v. Goord*, No. 07-CV-1317 (LEK)(RFT),
     2009 WL 9056089 (N.D.N.Y. Mar. 10, 2009) .............................................................3

*Spence v. Johnson,* 80 F.3d 989 (5th Cir.1996) ................................................................10

*State v. Bryant,* 202 Conn. 676, 688 (1987)......................................................................10

*Taylor v. Illinois,* 484 U.S. 400 (1988) .............................................................................10

*Taylor v. Rojas,* __ U.S. __, 141 S.Ct. 52 (2020) ..............................................................2

*United States v. Bagley,* 473 U.S. 667 (1985) ...........................................................passim

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) .....................................................9, 10, 11

*United States v. Gleason,* 265 F.Supp. 880 (S.D.N.Y.1967) ...........................................10

*United States v. Katsourgrakis*, 715 F.2d 769 (2d Cir. 1983) ...........................................5

*United States v. Morales*, 746 F.3d 310 (7th Cir. 2014) ..................................................11

*United States v. Pflaumer*, 473 U.S. 922 (1985).................................................................8

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)................................................12

*Victory v. Pataki*, 814 F.3d 47 (2d Cir. 2016), as amended (Feb. 24, 2016) ..................14

*Wood v. Bartholomew,* 516 U.S.1 (1995) .................................................................passim

**STATUTES**

CPL § 440 ....................................................................................................................13, 14

Plaintiff Cory Epps ("Epps") hereby submits this Memorandum of Law in in Reply to Defendants' Response (Docket No. 116) and in Further Support of his Objections to the Report and Recommendations of Magistrate Judge Leslie G, Foschio regarding the Motion for Summary Judgment filed by the City of Buffalo ("City"), Detective John Bohen ("Bohen"), Detective Reginald Minor ("Minor), Detective Mark Stambach ("Stambach"), Detective James Giardina ("Giardina"), and Detective Anthony Constantino ("Constantino").

I.  **NO REASONABLE POLICE OFFICER IN THE SECOND CIRCUIT IN 1998 WOULD CONCLUDE THAT INFORMATION THAT SOMEONE ELSE COMMITTED THE CRIME, WHETHER BASED ON HEARSAY OR NOT, COULD BE WITHHELD.**

After *Brady v. Maryland,* 373 U.S. 83 (1963), no reasonable police officer, following a criminal defendant's constitutional rights, would suppress information that someone other than the accused committed the crime, whether it was initially provided in hearsay form or not. It's just obvious. But if a strict "admissibility" rule existed in the Supreme Court or Second Circuit in 1998, which was not the case, *Giglio v. United States,* 405 U.S. 150 (1972), and *Kyles v. Whitely*, 514 U.S. 419 (1995), which address use and not technical admissibility, required disclosure of the alternate perpetrator evidence.

Even going into the weeds under a narrow view of *Brady* alone, the R&R and the Defendants are wrong about *Brady's* scope in 1998. *Brady* never contained a condition that to be material, exculpatory evidence had to be technically admissible as direct evidence at a trial. Rather, the touchstone has always been whether the information can be *used* to affect, or undermine confidence in, the outcome. The fleeting out-of-circuit cases in the Fourth and Seventh Circuit about "admissibility" relied upon by Defendants did not change the prevailing view in the Supreme Court or the Second Circuit. Indeed, these outlier cases did not, even for a

1

short time, foreclose the use and thus the need to disclose the alternate perpetrator evidence at issue.

   a. **Obviousness.**

This case is simple at its core. A prior case need not be on point to place a police officer on notice that his/her conduct is unconstitutional. A circumstance may be so obvious that a reasonable officer would just know what to do. *Taylor v. Rojas,* __ U.S. __, 141 S.Ct. 52, 53-54 (2020); *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). "Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). This is a case where the obviousness doctrine clearly applies. Neither the R&R nor the Defendants address it.

Here, Anderson told the police that Russell Montgomery killed Tamika Means, that Epps, who was about to face trial, did not do it, and that both look alike. The case against Epps was also remarkably weak. There was only one eyewitness ("not the most satisfying of evidence" as noted by the trial judge who sentenced Epps in 1998); the identification was made after a fleeting, stressful gunpoint attack, along with other risk factors commonly understood at the time to be associated with misidentification; and there was a strong alibi. Montgomery and Epps also look alike as Anderson said ("eerily similar" to quote the District Attorney who conceded Epps's exoneration). *See United States v. Bagley,* 473 U.S. 667 (1985) (the weaker the case, the more material the withheld evidence). With these facts, it's unfathomable to think that a police officer in the small Buffalo homicide unit in 1998, working on both Montgomery and Epps's cases, with pictures of both at them at their fingertips, would think that Anderson's information could be brushed under the carpet.

Qualified immunity depends on what a layperson, not a lawyer or a judge, would think the law was at the time. *See Sinclair v. Goord*, No. 07-CV-1317 (LEK)(RFT), 2009 WL

2

9056089, at *5 (N.D.N.Y. Mar. 10, 2009). While this can cut in favor of qualified immunity because non-lawyer state actors should not be required to navigate complex areas of the law to know how to act, the inverse is also true. In some cases, a reason to withhold information may be so hidden in the legal weeds that no reasonable officer would ever pick up on it. In this case the information was clearly exculpatory and clearly helpful to the defense. Only a legal scholar, and one misinterpreting *Brady* and its progeny through the prism of erroneous minority out-of-circuit law (arguably dicta), would be able to conceive an argument that the third-party culpability evidence may not need to be turned over.

Qualified immunity asks what a reasonable officer would think. The defense is not license for police officers to dive into deep legal rabbit holes, conjure flawed legal arguments, and then hide beyond them to violate someone's constitutional rights.

   b. **Disclosure was clearly required under *Giglio* and *Kyles* in 1998, even if a strict admissibility rule could be found to have existed then in the Supreme Court or Second Circuit.**

The admissibility focus by the Magistrate and Defendants is a red herring. Even if a strict admissibility rule was followed by the Supreme Court and Second Circuit for materiality under *Brady*, which was not the case, impeachment material under *Giglio*, and information that impugns the integrity of the police investigation under *Kyles*, needed to be disclosed before Epps's trial. Anderson's revelation about Montgomery being the true killer is of this ilk. Undoubtedly, information covered by *Giglio* and *Kyles* is not always formally admissible at a trial—*i.e.*, offered by the defense and accepted into evidence by the trial court in tangible form.

As raised in Plaintiff's opening papers, *Giglio v. United States* addresses impeachment material, not formally admissible evidence. 405 U.S. 150, 150 (1972). There, it was the fact of promises made to a witness that he would not be prosecuted if he cooperated. Thus, it was merely a line of questioning enabled by information that the

3

witness had an incentive to lie. *Giglio* came down over twenty-five years before Epps's trial. Similarly, in *United States v. Bagley,* decided over twelve years before Epps's trial, the impeachment material was the possibility of reward to a witness if he testified to the prosecutor's satisfaction; the form of the evidence was inquiry on cross-examination. 473 U.S. 667 (1985). Confronting Bradley with the fact that she may have mistaken Epps for someone else who looked like him would have been an important challenge to her credibility, and she was the only witness against him.

The R&R and Defendants do not even mention *Giglio,* the R&R failed to consider impeachment material in the analysis, and Defendants merely touch upon impeachment and give it short shrift. Defendants say: "Despite Epps's claims that this statement constituted 'scathing' impeachment evidence the reality is that this statement could never have been used by Epps's counsel at his trial – either as direct evidence of innocence ***or for impeachment.***" (Resp. at 13) (emphasis in original). The Defendants' papers go on to criticize Plaintiff for failing to explain "how Anderson's statement actually might have been used for impeachment," and argue that any effort to use it after calling Anderson as a trial witness or on cross-examination of Bradley would be shut down by sustained objections. (*Id.*).  But this is wrong.

In opposition to the summary judgment motion, Plaintiff provided an affidavit from David Cotter, one of his trial counsels, explaining the ways they would have *used* Anderson's information. In the affidavit, Cotter said that if the "information had been provided prior to trial, as it should have been, we would have done a number of things to utilize it as part of Mr. Epps' defense." He then provided a litany, including:

- Requesting a trial continuance to investigate Anderson's information.

4

- Investigating Montgomery, obtaining a picture of him, and comparing it to Epps.

- Urging the prosecution to investigate Montgomery and advocating for dismissal in light of Epps's alibi and the weakness of the case.

- Conducting a background search of Montgomery and speaking to other witnesses who he may have also confessed to.

- Showing the sole eyewitness, Jackie Bradley, Montgomery's photograph before she testified, and if she refused to cooperate showing his photo to her on cross-examination.

(Cotter Affidavit, Ex. V. at 2).

As to the last point, of course defense counsel would have had a good faith basis to show Montgomery's photo to Bradley based on Anderson's statement, and the inquiry should not have been precluded. *United States v. Katsourgrakis*, 715 F.2d 769 (2d Cir. 1983); *People v. Sorge*, 201 N.Y. 189 (1950); *People v. DePasquale,* 54 N.Y.2d 693 (1981). If counsel had the photo and confronted Bradley with it, there is every reason to believe that Bradley would have acknowledged that they looked alike. Montgomery and Epps's photographs were shown to Bradley in 2002, three years after Epps's trial and she said: "I see a definite similarity between Russell Montgomery and Cory Epps." (Bradley Affidavit, Ex. W.). Moreover, Epps's criminal attorney was allowed to cross-examine Bradley with photos of other suspects that had emerged. Thus, the argument that a court would not permit the photographic confrontation is incorrect; and it would have borne fruit.

Trial counsel for Epps, Andrew LoTempio (now Justice LoTempio), made a pretrial demand for *Brady* and *Giglio* material and asked for "material that provides the defense the opportunity to make informed decisions regarding the trial strategy," noting that a prosecutor is "require[d] to turn over materials specifically requested by the defendant which will help in cross-examination" and with trial and defense strategies. (Demand, Ex. F.) In addition, he specifically asked the prosecutor to "[s]tate whether anyone other than the defendant was…

5

[q]uestioned or considered a suspect; and [i]f so, state the name of, when, where and by whom questioned or considered and the crimes for which questioned or considered." (*Id.* at 10). Consequently, trial counsel was very interested in the type of information Anderson provided, and it is apparent that he would have utilized it effectively had it been turned over.

*Kyles v. Whitley,* decided three years before Epps's trial, not only reiterated the impeachment rule, but it also held that information that impugns the police investigation should be disclosed. 514 U.S. 419 (1995). There, withheld inconsistent statements by a witness could have made him a target for the crime the defendant was accused of. With them, the defense could have attacked the "thoroughness and even the good faith of the investigation," and raised "the remarkably uncritical attitude on the part of the police" toward the witness on which the case hinged. *Id.* at 445. The Court noted that even if the defense took "the more conservative course" and left the witness off the stand, "the defense could have examined the police to good effect on their knowledge of [the witness's] statements and so have attacked the reliability of the investigation in failing even to consider [his] possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted [by the witness]." *Id.* at 446 (parentheses, not brackets, in original). Certainly, had Epps's counsel known about Anderson's statement, the fact of it and the police failure to investigate Montgomery as the killer would have been an effective challenge to the quality of the police work.

Here, the police did absolutely nothing even though the mere comparison of Montgomery and Epps's photos would have broken open the case. Obviously, a challenge to the police's lack of work or concern about finding the truth could have been made with a cursory investigation

6

and with questions of police witnesses based on Anderson's "hearsay" account, and without admitting any formal evidence.

The R&R and Defendants' narrow focus on admissible evidence does not let the police off the hook, and qualified immunity can offer no defense in this case.

### c. The view in other Circuits about admissibility being needed for materiality did not apply in the Supreme Court or the Second Circuit in 1998

It is the law in the Supreme Court and the Circuit where the alleged constitutional violation occurred that controls. *See Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). Even if we ignore *Giglio* and *Kyles* and view the issue though the myopic lens used by the R&R and Defendants, the law in the Supreme Court and the Second Circuit still could not have caused a reasonable police officer in Buffalo in 1998 to believe that Anderson's statement could be withheld.

*Brady v. Maryland* does not require technical admissibility as a perquisite for materiality. *Bagley,* decided in 1985, speaks of *effective use* of the information and does not suggest a limit to admissible evidence. Likewise, *Kyles* considered how "competent counsel" would have used the information to make "a different result reasonably probable." Thus, it was always the impact of the information on the trial, not formal admissibility. Defendants home in on *Wood v. Bartholomew,* as the catalyst for the Circuit split. 516 U.S.1 (1995). They say it "left open the question of whether some inadmissible evidence might still be *Brady* material under certain circumstances, or whether inadmissible evidence is per say non-*Brady* material." (Resp. at 15). But this is misleading. In, *Dennis v. Sec'y, Pennsylvania Dep't of Corr*., a case cited by Defendants, puts it aptly. 834 F.3d 263 (3d Cir. 2016). There, applying AEDPA on habeas review the Third Circuit found that the "Pennsylvania Supreme Court's characterization of admissibility as dispositive under *Brady* was an unreasonable application of, and contrary to,

7

clearly established law as defined by the United States Supreme Court." *Id.* at 307. This was a reference to the state of Supreme Court law in 1991. *Dennis* emphasized that admissibility was never the law in the Supreme Court and stated that the "holding in *Wood* compels the opposite conclusion." It went on to note that:

> [T]he *Wood* Court analyzed the *effect* of suppressing the polygraph results, despite their uncontroverted inadmissibility. After acknowledging their inadmissibility, the *Wood* Court proceeded to examine whether, if disclosed, the results would have led to the discovery of evidence that would have influenced the course of trial, including pre-trial preparations. *See Wood*, 516 U.S. at 7, 116 S.Ct. 7 (considering whether trial counsel would have prepared differently given the results, though ultimately concluding that disclosure would not have resulted in a different outcome). The Supreme Court's decision to continue its inquiry in light of wholly inadmissible alleged *Brady* material is telling. As the District Court aptly observed, "[i]f inadmissible evidence could never form the basis of a *Brady* claim, the Court's examination of the issue would have ended when it noted that the test results were inadmissible." (cite omitted).

*Dennis*, at 308[1] (emphasis in original).

*United States v. Pflaumer* is also worth mentioning. 473 U.S. 922, 922 (1985). There, the Supreme Court remanded without opinion for further consideration in light of *Bagley* when a Seventh Circuit appeals court stated that "[i]n order to be material, evidence suppressed must

---

[1] There is a different context to the term "clearly established" law under AEDPA and for qualified immunity purposes because the latter deals with what a layperson would think, not necessarily what the law is at a given point in time. But it is certainly significant that the Third Circuit considered Supreme Court precedent to be "clearly established" for jurists in 1991, seven years before Epps's trial, and despite the minority view in the Fourth and Seventh Circuits. As *Dennis* explained:

> The United States Supreme Court has made no such express reservations when it comes to *Brady* materiality or an admissibility requirement. Consequently, to the extent that language from our sister circuits might be read to recognize a general admissibility requirement in *Brady*, we respectfully conclude that they have erred. Discrepancies as to the interpretation of *Wood* ought not to substantiate the Pennsylvania Supreme Court's erroneous application of the *Brady* materiality standard in this case.

*Dennis,* at 310, fn 27.

have been admissible at trial." Obviously, the Supreme Court would not have done this if the Seventh Circuit was right.

Of course, the Supreme Court has been consistent all along and *Wood* simply reinforces the notion that admissibility was not a critical component of *Brady*. But more to the point at hand, there is nothing to demonstrate that the erroneous view of *Brady* taken by the Fourth and Seventh Circuits contaminated the thinking in the Second Circuit such that a reasonable police officer would draw from these outsiders' wrong view.[2]

The fact that *Gil,* the pivotal Second Circuit case for the R&R, acknowledges noise in one circuit—it cites "*but see Hoke v. Netherland,* 92 F.3d 1350, 1356 n. 3 (4th Cir.1996) (ruling that inadmissible evidence, as a matter of law, is "immaterial" for *Brady* purposes)"—does not mean that before *Gil* the Second Circuit accepted a minority view that was based on a flawed and overly restrictive understanding of *Brady. United States v. Gil*, 297 F.3d 93 (2d Cir. 2002). Indeed, bringing the analysis to this place would cause the rule that qualified immunity is

---

[2] Although the Defendants talk about a "circuit split," it was only two Circuits, the Fourth and the Seventh, that had the mistaken view of *Brady.* And in 1998, before Epps's trial, it was primarily the Fourth Circuit's 1996 decision in *Hoke v. Netherland,* 92 F.3d 1350, 1356 n. 3 (4th Cir.1996). *Gil* only mentions *Hoke*. *Jardine v. Dittman,* 658 F.3d 772 (7th Cir. 2011), the Seventh Circuit case cited by Defendants (Resp. 15), was decided in 2011. References to a split did not emerge until *Ellsworth* in 2003, and that case merely cites *Hoke* for the so-called split. *Ellsworth v. Warden,* 333 F.3d 1 5, fn. 4 (1st Cir. 2003).

Defendants also pull the following quote from *Beaman v. Freesmeyer,* 776 F.3d 500, 510 (7th Cir. 2015) (Resp. at 16, fn. 2): "The question of whether and when inadmissible evidence can be *Brady* material remains an open question in many jurisdictions today." But this statement was made in 2015 and does not address the state of the law in 1998.

governed by what the law is in the Supreme Court and the local Circuit at the time to have no practical effect.

Quite clearly, *Gil* does not suggest that it is laying down a rule in the Second Circuit that did not otherwise exist. (Resp. at 15). It cites to numerous cases for the proposition that information that "could lead to admissible evidence [or]… be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise" is *Brady* material, and draws from cases before 1998 and one as early as 1967, to make the point. *Gil* at 104 (citing *Spence v. Johnson,* 80 F.3d 989 (5th Cir.1996), and *United States v. Gleason,* 265 F.Supp. 880 (S.D.N.Y.1967)). It is quite a stretch indeed, to find that *Gil's* cite to *Hoke* as a "but see," means that a reasonable police officer in 1998 would think that the alternate perpetrator evidence could be withheld because it might have been inadmissible.[3]

---

[3] The comment in *Miller v. Angliker,* 848 F.2d 1312 (2d Cir. 1988), that the alternate perpetrator evidence "would have been admissible," noted by Defendants (Resp. at 17), does not necessarily mean that admissibility is a requirement. In any event there is context to this comment. After conviction, it surfaced that the police and the prosecutor had information that someone else may have committed some of the murders *Miller* pled guilty to. Declining to find a *Brady* violation, the trial court relied on the third-party culpability doctrine and the need for "evidence which directly connects that third party with the crime" *Miller*, at 1317. Reversing, the Second Circuit relied on the constitutional right to present a defense and to due process of law, citing federal law and Connecticut law – *Taylor v. Illinois,* 484 U.S. 400 (1988), *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987), and *State v. Bryant,* 202 Conn. 676, 688 (1987). *Bryant* points to *Chambers v. Mississippi,* 410 U.S. 284 (1973), where the Court reversed for the failure to admit a declaration against penal interest, despite a state law that precluded it. Thus, at bottom *Miller* underscores the "right to present a defense" and the need to admit reliable hearsay, despite overly restrictive, technical evidentiary rules that unfairly interfere with a viable defense. As argued in Plaintiff's opening brief, Anderson's statement would have passed a reliability test and could have been admitted under New York's constitutional exception to the hearsay rule. (Obj. at 15, fn. 3).

Prior to Epps's trial, the New York State Court of Appeal in *People v. Robinson,* 89 N.Y.2d 648, 654 (1997), rested on constitutional principles of due process to permit a criminal defendant to introduce grand jury testimony of an unavailable witness, even though it did not fall within a recognized hearsay exception. *People v. James,* 242 A.D.2d 389, 389 (2d Dept. 1997) (same); *see also People v. Esteves,* 152 A.D.2d 406, 413 (2d Dept 1989) (there is authority for finding that the exclusion of exculpatory hearsay statements may result in the denial of the defendant's right to a fair trial, in violation of due process, where the statement was critical to the defendant's

Contrary to Defendant's argument, none of the out-of-Circuit cases suggest that *Gil* was a turning point in the Second Circuit. *Dennis* does not even mention *Gil*. *United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014), another case relied upon by Defendants that could mark a turning point in the Seventh Circuit to the correct side, cites *Gil* but not as if it were a watershed moment in the Second Circuit. It merely says that "[t]he First, Second, Third, Sixth, and Eleventh Circuits have not read *Brady* so narrowly" before citing *Gil*. Nor does *Ellsworth,* a First Circuit case cited by Defendants, indicate that the Second Circuit was operating under a misunderstanding of *Brady* before *Gil.* (Resp. at 15). *Ellsworth* just states that "[m]ost circuits addressing the issue have said yes [it's *Brady*] if the withheld evidence would have led directly to material admissible evidence," and in a footnote cites to *Gil* as "See, e.g.," *Ellsworth,* at 5, fn. 4 (brackets added). Silence from the Second Circuit prior to *Gil* does equal law. And an argument based on law by omission should not carry the day in a qualified immunity analysis.[4]

Even if the faint cry of *Hoke* was the litmus test for the Second Circuit in 1998, *Hoke* did not go so far as to say that all inadmissible exculpatory evidence can be withheld. In *Hoke,* the

---

defense and bore substantial assurances of trustworthiness, albeit it was not admissible upon the basis of any exception recognized by the State's rules of evidence.").

Here, had trial counsel known about Montgomery's confession, he would have investigated it, made a compelling case of reliability, and he should have been permitted to offer it as a declaration against penal interest despite the extra layer of hearsay. Montgomery looks like Epps and meets the description better than Epps with pock marks on his face; both frequented the same bars; Montgomery lived in the area of the murder; and, he killed Pope to silence him about his admission to the Means's murder. And of course, Pope was dead and thus unavailable due to Montgomery's illegal conduct.

[4] In fact, *Ellsworth* says that "given the policy underlying *Brady,* we think it *plain* [emphasis added] that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6–8, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), implicitly assumes this is so." *Ellsworth,* at 5, fn. 4 (emphasis on "could" in original).

evidence at issue was prior instances of sex with rape victim. Not only were they barred under Virginia's rape shield law but were irrelevant to the defense. This is the holding: "That [the victim] previously had sexual intercourse with [other men] is arguably altogether irrelevant, but at the very least is not material, to whether she consented to have sex with Hoke on the night of the murder. There is, in our judgment, no chance at all that the outcome of Hoke's capital murder trial would have been different had the defense known of these prior incidents of sexual intimacy." *Hoke,* at 1357. This focuses on the impact of the evidence, which *Brady, Giglio, Bagley* and *Kyles* teach, not on formal admissibility. The passing statement in a footnote in *Hoke* that Defendant's position stems from is:

> As even Hoke's counsel acknowledged, J.A. at 1191, these statements may well have been inadmissible at trial under Virginia's Rape Shield Statute, and therefore, as a matter of law, "immaterial" for *Brady* purposes. *See Wood v. Bartholomew,* 516 U.S. 1, ——, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995).

*Hoke*, at 1356, fn. 3. This does not mean that all technically inadmissible evidence and that which can be used effectively by the defense is not *Brady,* and to the extent that it can say this it is dicta.

In sum, for a variety of reasons, the R&R and Defendants' hyper-focus on technical admissibility in the *Brady* materiality analysis does not raise a plausible qualified immunity defense. The question is whether a reasonable officer would have known to disclose it (they would), and whether Epps's criminal attorney could have made use of it at trial (he could have). Admissibility is, and was in 1998, not dispsotivet.

II. **THE RULE THAT THE GOVERNMENT IS NOT REQUIRED TO TAKE NOTES DURING WITNESS INTERVIEWS DOES NOT MEAN THAT ANDERSON'S INFORMATION ABOUT MONTGOMERY BEING THE TRUE KILLER IS NOT *BRADY*.**

The R&R and Defendants' reliance on *United States v. Rodriguez*, 496 F.3d 221, 224-225 (2d Cir. 2007), is unavailing. Although *Rodriguez* stands for the basic proposition that the

government is not required to take notes during witness interviews, it explicitly states that lies that can impugn a witness's credibility do have to be disclosed even if not memorialized in notes. *Id.* at 226 ("If the district court's reason for declining to compel the Government to make disclosure was that the lies were not set forth in any document or recording ('I have never seen anything that says the government has to turn over oral information.'), we disagree.").

Of course, Anderson's revelation that Montgomery admitted to killing Means had great exculpatory value, and it had to be provided under *Brady* whether recorded by the police or not. Nor was this a "mere failure to write down or take notes," a fleeting reference to an unrelated case, or a speculative piece of useless information, as Defendants innocently describe it. (Resp. 18-20). The narrative here is that the police hid the information because they knew it was important to Epps's defense, and that they did nothing to investigate it. There can be no doubt that had Epps's able trial counsel known about it, they would have investigated it and discovered how similar Epps and Montgomery looked, and that with Montgomery's pock marks he matched Bradley's description of the shooter more than Epps, and they would have used this information in a number of ways, including advocating for dismissal, and confronting Bradley with it.

### III. DEFENDANTS CONTINUED ATTEMPTS TO DISTORT EPPS' DUE PROCESS CLAIMS SHOULD BE REJECTED.

Epps is not claiming that the officers fabricated their affidavits, used in the CPL § 440 proceedings, before Epps's trial. This fabrication, clear from the record, came afterwards, and no motion to amend the pleadings to add such a claim is necessary. Similarly, Epps is not claiming that Defendants are liable for their post-trial hearing testimony. Rather, they are liable for what they told the prosecutors, memorialized in their affidavits, months before they ever testified. *See Coggins v. Buonora*, 776 F.3d 108, 112–13 (2d Cir. 2015) (explaining how dangerous it would

be to allow officers to immunize themselves from liability for making false statements simply by later repeating the same statements to a jury).

Epps's claim here is not complicated. He had a due process right to a fair § 440 proceeding. Defendants Stambach, Giardina, and Costantino violated that right when they falsely told the prosecutors that Anderson had not told them about Montgomery until after Epps was convicted. These statements were memorialized in affidavits, and they were the reason that these same Defendants were called to the stand, by the prosecution, to testify to the same fabrications. If Defendants had told the truth, the § 440 hearing would have been entirely different, and a jury here could find that Epps would have been released years earlier. That is the claim. Defendants are now asking this Court to find that lies like these do not violate Epps's right to due process, simply because they lied in post-trial proceedings, rather than after his conviction. This is not, and cannot be, the law. Epps had a right to a fair prosecution at every stage of the proceedings.

Criminal defendants have a liberty interest, and due process rights, in fair § 440 hearings. *See Newton v. City of New York*, 779 F.3d 140, 150 (2d Cir. 2015) (finding that § 440 creates a liberty interest); *see also Ramchair v. Conway*, 601 F.3d 66, 74 (2d Cir. 2010) (explaining that there is a due process right to adequate appellate counsel). Unsurprisingly, at every post-trial hearing where a criminal defendant has a liberty interest, they have a right to only face truthful evidence and testimony at that hearing. For example, in *Victory v. Pataki*, the Second Circuit found that there was a viable cause of action for fabrications in a parole hearing, even though the parole commissioner was entitled to absolute immunity for his later quasi-judicial conduct at that hearing. 814 F.3d 47, 66 (2d Cir. 2016), as amended (Feb. 24, 2016). If the claims in *Victory* can go forward, the claims here can go forward, and Defendants do not have a single case that

relieves them from their obligation to tell the truth to the prosecution, before or after a criminal trial.

Defendants' reliance on *Howard v. City of Durham* is misplaced because the case strongly supports Epps's position here, not theirs. 68 F.4th 934 (4th Cir. 2023). There, the Fourth Circuit recognized that state law created a post-trial liberty interest, and that this right may "beget yet other rights to procedures essential to the realization of the parent right." *Id*. at 947 (quoting *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68 (2009)). To protect North Carolina's right to post-conviction *Brady* material, the Fourth Circuit found an obligation to truthfully disclose such information to the prosecutor. *Id*. at 947-48. The right here is slightly different; Epps claims that detectives must tell the truth, while Howard only requires good faith disclosure. But in practice there is little difference. The right to a hearing "begets" a right to the truth.

## IV. THE STATE LAW CONSTITUTIONAL CLAIMS AGAINST THE CITY OF BUFFALO SHOULD BE ALLOWED TO GO FORWARD.

As stated in the initial Opposition to the R&R, the claims under the New York State Constitution should go forward to trial, particularly given that Epps's federal claims should also go forward to trial. And the one case Defendants cited that suggests theses state law claims should be dismissed is inapposite. The New York Court of Appeals did uphold dismissal of claims under the State Constitution in *Martinez v. City of Schenectady*, but there the plaintiff was caught with illegal drugs and the court rightfully found that excluding the evidence and dismissing the criminal prosecution was enough of a benefit—making a further award of monetary damages unnecessary. 97 N.Y.2d 78, 83 (N.Y. 2001). Epps is innocent, and a damages award will help make him whole; he was not, like the plaintiff in *Martinez*, actually guilty but

15

relieved of liability—an exceptional benefit—due to defects in a warrant. Here, there may be no remedy for the egregious harm, but for the State constitutional claims.

## CONCLUSION

For the further reasons stated above, the Magistrate Judge's recommendations regarding the claims raised herein should not be followed, and these claims should advance to trial.

Dated: New York, New York
      August 28, 2023

GLENN A. GARBER, P.C.

By:    /s/

    Glenn A. Garber

The Woolworth Building
233 Broadway Suite 2370
New York, New York 10279
Phone: (212) 965-9370

RICKNER PLLC

By:    /s/

    Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506

*Attorneys for Plaintiff Cory Epps*