UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

CORY EPPS,

              Plaintiff,

      v.                                19-CV-281-LJV-LGF
                                         DECISION & ORDER

CITY OF BUFFALO, et al.,

              Defendants.

———————————————————

On March 1, 2019, the plaintiff, Cory Epps, commenced this action under 42

U.S.C. § 1983 against the City of Buffalo; Buffalo Police Detectives John Bohen,

Reginald Minor, Mark Stambach, James Giardina, Anthony Costantino, Robert Chella,

Raniero Masecchia, and Charles Aronica; and Buffalo Police Chief Joseph Riga.[1]

Docket Item 1. Epps alleges that the defendants violated his federal and state

constitutional rights during his prosecution for the 1997 murder of Tomika Means. *See*

*id.*

On August 18, 2021, this Court referred the case to United States Magistrate

Judge Leslie G. Foschio for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).

Docket Item 41. On October 7, 2022, the defendants moved for summary judgment.

Docket Item 77. Epps then responded, Docket Item 89, and the defendants replied,

Docket Item 94.

---

[1] Bohen's, Costantino's, and Masecchia's names are incorrectly spelled in the
case caption and complaint as "Bohan," "Constantino," and "Massechia." *See* Docket
Item 1; Docket Item 99 at 2 n.2, 3 n.3; Docket Item 103-3 at 4.

On May 21, 2023, Judge Foschio issued a Report and Recommendation ("R&R") finding that the defendants' motion for summary judgment should be granted. Docket Item 97; *see* Docket Item 99 (amended R&R).[2]  More specifically, Judge Foschio determined that Bohen, Minor, Stambach, Giardina, and Costantino were entitled to summary judgment on Epps's malicious prosecution, pre-trial due process, and post-trial due process claims and that any remaining state law claims should be dismissed. Docket Item 99 at 32-61.[3]  Chella, Masecchia, Aronica, and Riga did not move for summary judgment, but Epps had agreed not to pursue any claims against those defendants.  *See id.* at 61.  Nevertheless, because the parties had not yet filed a stipulation of dismissal, Judge Foschio found that the action should continue against those defendants.  *See id.* at 61-62.

The defendants objected to the portion of the R&R recommending that summary judgment not be entered in favor of Chella, Masecchia, Aronica, and Riga.  Docket Item 103.  Epps objected to the portions of the R&R recommending that summary judgment be entered in favor Bohen, Minor, Stambach, Giardina, and Costantino on his due process claims and that his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution be dismissed.  Docket Item 109.  Both sides also filed responses.  Docket Items 116 and 124.  This Court heard oral argument and reserved decision.  *See* Docket Item 131.

---

[2] The amended R&R "replace[d] an incorrect date on page 16, and clarifie[d] the status of the non-moving Defendants and the conclusion, but [made] no substantive changes."  Docket Item 99.

[3] Page numbers in docket citations refer to ECF pagination.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The district court must review de novo those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R as well as the parties' objections and responses; it also has thoroughly reviewed the record in this case, including the materials submitted to Judge Foschio. Based on that de novo review, this Court adopts in part and modifies in part Judge Foschio's R&R. More specifically, the Court accepts and adopts Judge Foschio's recommendation to enter summary judgment in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and to dismiss Epps's state law claims against the individual defendants. The Court, however, respectfully disagrees with Judge Foschio regarding Epps's pre-trial due process claims and Epps's claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution. The Court therefore modifies the R&R to allow those claims to proceed to trial.

## **BACKGROUND**[4]

## I.    **INVESTIGATION OF TOMIKA MEANS'S MURDER**

In May 1997, an unidentified individual shot and killed Tomika Means while she was sitting in her car near the corner of Chelsea Place and East Delvan Avenue in

---

[4] On summary judgment, the facts are construed in the light most favorable to the non-moving party—in this case, Epps. *See Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024). The following background is drawn from the parties' statements of fact, *see* Docket Items 79 and 91, as well as the exhibits submitted in support of and opposition

Buffalo, New York.  Docket Item 79 at ¶¶ 1-2; Docket Item 91 at ¶¶ 1.D-2.D.  Means's friend, Jacqueline Bradley, witnessed the shooting from the passenger seat of Means's car.  Docket Item 79 at ¶ 2; Docket Item 91 at ¶ 2.D.  The next day, Bradley worked with law enforcement—specifically, the Buffalo Police—to create an "identikit" composite sketch of Means's killer.[5]  Docket Item 79 at ¶ 6; Docket Item 91 at ¶ 6.D; *see* Docket Item 89-8 (identikit composite sketch created on May 27, 1997).

Several weeks later, on June 26, Detective Bohen noted in a P-73 report that Linda Means—the victim's aunt—had called the station and said that the identikit composite of her niece's killer looked like Cory Epps.  Docket Item 79 at ¶¶ 6-7; Docket Item 91 at ¶¶ 6.D-7.D; *see also* Docket Item 89-7 at 2 (copy of P-73 report created by Bohen on June 26, 1997).  On July 6, Bohen, along with fellow Detective Minor, showed Bradley a photo array[6] that included Epps's picture.  *See* Docket Item 79 at ¶¶ 5-12; Docket Item 91 at ¶¶ 5.D-12.D; *see also* Docket Item 78-27 at 1-2 (copy of photo array shown to and signed by Bradley on July 6, 1997).  Bradley identified Epps as the person

---

to the defendants' motion for summary judgment and are undisputed unless otherwise noted.

[5] The "identikit" is a "commonly employed composite technique."  James Lang, Note, *Hearsay and Relevancy Obstacles to the Admission of Composite Sketches in Criminal Trials*, 64 B.U. L. REV. 1101, 1104 (1984).  "It consists of over 500 transparent plastic overlays each bearing an individual facial characteristic—eyes, noses, chins, hairlines, etc.," as well as "transparencies of other identifying characteristics, such as age lines and scars." *Id.*  "A trained . . . operator selects those overlays he deems most similar to the witness' description of the offender," and "[a]s each successive overlay is added a complete face begins to develop," allowing the "composite [to] be produced in just a few minutes." *Id.*

[6] Epps asserts that Bohen and Minor presented Bradley with a mug book containing his photograph, not a photo array.  *See* Docket Item 91 at ¶ 8.D; *see also* Docket Item 78-9 at 6-12 (excerpt from Bradley's deposition taken on October 29, 2021).

who had killed Means.  Docket Item 79 at ¶¶ 11-13; Docket Item 91 at ¶¶ 11.D-13.D; *see also* Docket Item 78-27 at 3 (copy of affidavit signed by Bradley on July 6, 1997, acknowledging her identification of Epps).

After Bradley identified Epps, Assistant Erie County District Attorney Patricia Carrington applied for an order requiring Epps to participate in an in-person lineup, and Erie County Court Judge Timothy Drury granted Carrington's application.  Docket Item 79 at ¶¶ 25-26; Docket Item 91 at ¶¶ 25.D-26.D; *see* Docket Item 78-22 (copy of Carrington's application); Docket Item 78-23 (copy of Judge Drury's order granting Carrington's application).  On July 30, Epps participated in two in-person lineups at which both ADA Carrington and Epps's counsel were present, and Bradley identified Epps in both lineups.  *See* Docket Item 79 at ¶¶ 27-35; Docket Item 91 at ¶¶ 27.D-35.D. And on August 7, a grand jury indicted Epps for Means's murder.  *See* Docket Item 79 at ¶¶ 36-39; Docket Item 91 at ¶¶ 36.D-39.D.

## II.    INVESTIGATION OF PAUL POPE'S MURDER

On April 17, 1998, while investigating the murder of Paul Pope, Buffalo Police Detectives Stambach and Giardina interviewed Pope's girlfriend, Wymiko ("Pumpkin") Anderson.  *See* Docket Item 79 at ¶¶ 41, 50; Docket Item 91 at ¶¶ 41.D, 50.D; *see also* Docket Item 78-31 (copy of Anderson's statement recorded April 17, 1998).  Detective Costantino also was present at some point during Anderson's interview.[7]  *See* Docket

---

[7] The defendants assert that Costantino "only spoke with Anderson after Epps had been convicted."  Docket Item 79 at ¶ 52; *see* Docket Item 78-15 at 2 (excerpt from hearing testimony given by Costantino in 2001).  But Costantino testified most recently that he remembered Anderson saying, on the day she was interviewed by Stambach and Giardina, that "she was the girlfriend of Montgomery at one time, Pope, or one of them, and that she was told by someone that Montgomery did the shooting of Tomika

Item 79 at ¶ 52; Docket Item 91 at ¶ 52.D; *see also* Docket Item 78-7 at 105 (excerpt from Costantino's deposition taken on February 12, 2021). Anderson told the detectives that she believed a man named Russell Montgomery had killed Pope. *See* Docket Item 79 at ¶ 43; Docket Item 91 at ¶ 43.D.

The parties disagree about the other details of the interview. According to Epps, Anderson also told the detectives that Montgomery looked like the individual depicted in the identikit composite of Means's killer and that Pope had told her that Montgomery admitted to killing Means. *See* Docket Item 79 at ¶¶ 44-46; Docket Item 91 at ¶¶ 44.D-46.D; *see also* Docket Item 78-8 at 24-27 (excerpt from Anderson's deposition taken on August 11, 2021). But according to the defendants, Anderson did not tell the detectives that Pope had told her that Montgomery had admitted to killing Means. *See* Docket Item 79 at ¶¶ 47, 51; *see also* Docket Items 78-19, 78-20 and 78-21 (copies of affidavits signed by Constantino, Stambach, and Giardina, respectively, on August 30, 2000).

## III.  EPPS'S CRIMINAL PROCEEDINGS

On April 24, 1998, a jury found Epps guilty of Means's murder. *See* Docket Item 79 at ¶¶ 54, 58; Docket Item 91 at ¶ 54.D, 58.D. The jury convicted Epps based solely on Bradley's identification of Epps as the killer. *See* Docket Item 79 at ¶¶ 55-57; Docket Item 91 at ¶¶ 55.D-57.D; *see also* Docket Item 78-11 (copy of Bradley's trial testimony).

A few days later, Epps's trial counsel received an anonymous letter stating that the wrong man had been convicted for Means's murder and that Montgomery was the real killer. *See* Docket Item 79 at ¶¶ 59-61; Docket Item 91 at ¶¶ 59.D-61.D; *see also*

[Means] and [Pope] knew about it, or [Montgomery] told [Pope]." *See* Docket Item 78-7 at 105.

Docket Item 78-32 (copy of Anderson's letter to Epps's trial counsel dated April 27, 1998).  After identifying Anderson as the author of the anonymous letter, Epps sought relief under section 440 of New York's Criminal Procedure Law.[8]  *See* Docket Item 79 at ¶¶ 62-63; Docket Item 91 at ¶¶ 62.D-63.D.  More specifically, Epps sought to vacate the judgment entered against him based on: (1) newly discovered, previously unavailable evidence demonstrating his innocence and (2) the prosecution's failure to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Docket Item 79 at ¶ 64; Docket Item 91 at ¶ 64.D.

Acting New York State Supreme Court Justice Joseph McCarthy denied Epps's motion to the extent it was based on newly available evidence but determined that an evidentiary hearing was necessary regarding the *Brady* issue.  *See* Docket Item 79 at ¶¶ 65, 69; Docket Item 91 at ¶¶ 65.D; 69.D; *see also* Docket Item 78-24 (copy of Justice McCarthy's order dated March 2, 2001).  Following the evidentiary hearing, Justice McCarthy denied the remainder of Epps's section 440 motion.  Docket Item 79 at ¶¶ 66-68; Docket Item 91 at ¶¶ 66.D-68.D; *see* Docket Items 78-12, 78-13, 78-14, and 78-15 (copies of witnesses' testimonies from section 440 evidentiary hearing); Docket Item 78-25 (copy of Justice McCarthy's order dated September 13, 2001).

---

[8] Section 440 allows a court, upon motion by a defendant, to vacate a judgment in several different instances, including where: (1) "improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom"; or (2) "new evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant."  N.Y. Crim. Proc. Law § 440.10(1)(f)-(g) (McKinney 1998) (citation modified).

## IV.    EPPS'S EXONERATION

In 2014, a new witness ("Witness 1") came forward with evidence that Montgomery had indeed killed Means.  Docket Item 79 at ¶¶ 70-71; Docket Item 91 at ¶¶ 70.D-71.D; *see* Docket Item 84 (copy of Witness 1's unredacted affidavit dated November 11, 2014).  Former Buffalo Police Department Homicide Chief Riga, acting in his capacity as an investigator for the Erie County District Attorney's Office, interviewed Witness 1 on approximately three occasions in either 2016 or 2017 and found Witness 1 credible.  *See* Docket Item 79 at ¶¶ 72-73; Docket Item 91 at ¶¶ 72.D-74.D; *see also* Docket Item 78-37 (copy of Riga's deposition taken on May 5, 2021).

Based on the statements made by Witness 1, Epps filed another section 440 motion in 2017.  *See* Docket Item 79 at ¶ 74; Docket Item 91 at ¶ 75.D.  The Erie County District Attorney's Office did not oppose that motion, and on December 1, 2017, Erie County Court Judge James F. Bargnesi granted the motion and vacated the judgment against Epps.  Docket Item 79 at ¶ 76; Docket Item 91 at ¶ 77.D; *see* Docket Item 78-38 (copy of Judge Bargnesi's order dated December 1, 2017).  Epps then filed the case at bar on March 1, 2019.  *See* Docket Item 1.

## LEGAL PRINCIPLES

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  Conversely, "summary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues

in favor of that party." *Id.* (citation modified). "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence." *Id.*

"If the evidence submitted in support of [a] summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation modified). "An unopposed summary judgment motion may also fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Id.* (citation modified).

## DISCUSSION[9]

### I.    THE DEFENDANTS' OBJECTION

The defendants object to Judge Foschio's recommendation that Epps's claims against Chella, Masecchia, Aronica, and Riga proceed until the parties file a stipulation of dismissal. *See* Docket Item 103-3 at 4-7. They argue that Judge Foschio's recommendation is incorrect because Epps failed to "contest [their] assertion on summary judgment that he was no longer pursuing his claims against those individuals." *See id.* at 4.

In his own objections, Epps acknowledges that he agreed not to proceed against Masecchia, Aronica, and Riga. *See* Docket Item 109 at 27 n.6. He also acknowledges that he agreed to the dismissal of his claims against Chella for lack of personal involvement. *See id.* But according to Epps, Judge Foschio "appear[ed] to believe that

---

[9] The Court assumes familiarity with the analysis in Judge Foschio's R&R, Docket Item 99.

Chella was personally involved . . . so [he] did not feel as though he could stipulate to simply dismiss [Chella]." *Id.* (citation modified).

It is true that "when a counseled party moves for summary judgment, a partial response by the non-movant arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (citation modified); *see L.W. Matteson, Inc. v. Sevenson Env't Servs., Inc.*, 831 F. Supp. 2d 608, 618 (W.D.N.Y. 2011) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation modified)). As Judge Foschio observed, however, the defendants did not raise any arguments as to why they were entitled to summary judgment on Epps's claims against Chella, Masecchia, Aronica, and Riga; rather, they simply noted that Epps had agreed not to proceed against those defendants. *See* Docket Item 80 at 10 n.4.

Nevertheless, at oral argument on April 28, 2025, both sides agreed on the record to the dismissal of Epps's claims against Chella, Masecchia, Aronica, and Riga. *See* Docket Item 135 at 6-7. This Court is entitled to rely on that agreement. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 118 (S.D.N.Y. 2018) ("[F]or the Court to conduct proceedings properly, it must be able to rely upon representations made on the record by attorneys licensed to practice before it."). Epps's claims against Chella, Masecchia, Aronica, and Riga therefore are dismissed.

## II.    EPPS'S OBJECTIONS

### A.    Pre-Trial Due Process Claims

Epps first objects to Judge Foschio's recommendation that the defendants'

motion for summary judgment be granted on his pre-trial due process claims.  *See*

Docket Item 109 at 17-27.  Those claims are based on Stambach's, Giardina's, and

Costantino's alleged intentional failure to provide Epps with statements made by

Anderson during her police interview on April 17, 1998, which Epps says is a *Brady*

violation.  *See id.*  The three detectives argued to Judge Foschio that they are protected

by qualified immunity.  *See* Docket Item 80 at 33-36.

"Qualified immunity is an affirmative defense available to a person defending a

suit brought under [section] 1983, which shields public officials, including law

enforcement officers, 'from liability for civil damages [under that statute] insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025)

(second alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Because qualified immunity is an affirmative defense . . . , it is incumbent upon the

defendant to plead and adequately develop a qualified immunity defense."  *Id.* at 30-31

(citation modified).

"In deciding whether an official is entitled to qualified immunity, [courts] conduct[]

a two-pronged inquiry, asking whether the facts shown make out a violation of a

constitutional right, and whether the right at issue was clearly established at the time of

[the] defendant's alleged misconduct."  *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116

(2d Cir. 2024) (citation modified).  "The Supreme Court has left it up to courts to decide

the order in which to approach those questions."  *Id.* (citing *Pearson v. Callahan*, 555

11

U.S. 223, 236 (2009)).  But ultimately, "the party seeking summary judgment on the basis of qualified immunity bears the burden of proof for both queries."  *Id.* (citation modified).

For the reasons discussed below, Stambach, Giardina, and Costantino have not met their burden under either prong of the qualified immunity analysis.

### 1.    Violation of Constitutional Right

"Due process requires disclosure of evidence that is 'favorable to [the] accused' and 'material either to guilt or to punishment.'"  *McCray v. Capra*, 45 F.4th 634, 641 (2d Cir. 2022) (alteration in original) (quoting *Brady*, 373 U.S. at 87).  "So-called *Brady* material includes both evidence that is exculpatory and evidence that can be used to impeach a prosecution witness whose credibility may be 'determinative of guilt or innocence.'"  *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see United States v. Bagley*, 473 U.S. 667, 676 (1985) (indicating that there is no distinction between exculpatory and impeachment evidence under *Brady* because both are favorable to the accused).  But "[o]nly evidence that is *material* raises due process concerns."  *McCray*, 45 F.4th at 641.

"The 'touchstone of materiality' is whether there is a 'reasonable probability' that the result of the trial would have been different had the relevant evidence been disclosed to the defendant."  *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  "A reasonable probability is 'the likelihood of a different result [that] is great enough to undermine confidence in the outcome of the trial.'"  *Id.* (alteration in original) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (explaining that "a [criminal] defendant's right to pre-trial

disclosure under *Brady* is not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed, much less that he is in fact innocent." (citation and internal quotation marks omitted)).  So "[t]he materiality of the undisclosed evidence [must be] evaluated 'in the context of the entire record.'" *McCray*, 45 F.4th at 641 (quoting *Turner v. United States*, 582 U.S. 313, 325 (2017)).

Here, viewing the facts in the light most favorable to Epps—as this Court must on the defendants' motion for summary judgment—there is evidence that on April 17, 1998, Anderson told Stambach, Giardina, and Costantino (1) that Montgomery looked like the identikit composite of Means's killer and (2) that Pope had told Anderson that Montgomery admitted to killing Means.[10]  *See* Docket Item 78-7 at 105; Docket Item 78-8 at 24-27.  Without question, those statements were favorable to Epps:  His trial counsel certainly could have used the information about Montgomery to develop an alternative-perpetrator defense, conduct further investigation, and challenge Bradley's identification of Epps on cross-examination.  *See, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (concluding that certain pieces of evidence were favorable "because they could have helped the defense suggest an alternative perpetrator or impeach [the prosecution's witnesses]").

In fact, after another witness later came forward with credible information that Montgomery had indeed killed Means, Epps was exonerated.  *See* Docket Item 79 at ¶¶ 70-76; Docket Item 91 at ¶¶ 70.D-77.D.  If Epps had Anderson's statements prior to

---

[10] As noted above, the defendants dispute that these statements were made to them.  But that is a question for trial:  The Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

trial, his counsel may well have been able to find that witness—or perhaps other witnesses—to support an alternative-perpetrator defense and undermine Bradley's testimony.  And especially because the only evidence at trial connecting Epps to Means's murder came from Bradley, that may well have resulted in a different outcome.  *See, e.g.*, *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) ("In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime." (citation and internal quotation marks omitted)).

For all those reasons, viewing the evidence and drawing all inferences in Epps's favor, the Court finds that there is a reasonable probability that the outcome would have been different had Epps been given Anderson's statements about Montgomery. Anderson's statements therefore were *Brady* material not disclosed to Epps before or during his criminal trial.  And for that reason, Stambach, Giardina, and Costantino are not entitled to summary judgment under the first prong of the qualified immunity analysis.  *See Soukaneh*, 112 F.4th at 116.

### 2.    Clearly Established Law

"To determine whether the relevant law [at issue] was clearly established, [courts] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law."  *Sabir v. Williams*, 52 F.4th 51, 63 (2d Cir. 2022) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)).  "Precedent directly on point is not required for law to be clearly established, and it is not necessary, of course, that the very action in question has previously been held unlawful."  *Id.*

14

(alteration, citations, and internal quotation marks omitted). "Thus, the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (citation and internal quotation marks omitted); *see Terebesi*, 764 F.3d at 230 ("[A] plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).

In their motion for summary judgment, Stambach, Giardina, and Costantino argued that "it was not clearly established in 1998, when Anderson's interview took place, that inadmissible double hearsay evidence constituted *Brady* material." Docket Item 80 at 8-9. Judge Foschio agreed, concluding that "the need to turn over [inadmissible] material . . . as evidence which could nevertheless lead to admissible evidence . . . [was] not established within the Second Circuit until [*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002)] was decided . . . well after the conclusion of [Epps's] criminal trial." Docket Item 99 at 42-43.

In *Gil*, the Second Circuit explained that to find *Brady* information to be material, a court "need only satisfy [itself] that: [1] either all or part of [evidence] is admissible; [2] the [evidence] could lead to admissible evidence; or [3] the [evidence] would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." 297 F.3d at 104. That observation, however, was nothing new: The Second Circuit held long before *Gil* that the relevant inquiry under *Brady* is not admissibility but rather the effect of the suppressed evidence "upon [the

defendant's] *preparation* for trial." *United States v. Polisi*, 416 F.2d 573, 578 (2d Cir. 1969) (emphasis added).

In *Polisi*—decided nearly three decades before Epps's trial—the Second Circuit said that "[t]he importance of *Brady* . . . is its holding that the concept out of which the constitutional dimension arises in these cases[] is prejudice to the defendant measured by the effect of the suppression upon [the] defendant's preparation for trial, rather than its effect upon the jury's verdict." *Id.* at 577. "In order to violate the defendant's constitutional right to evidence necessary to the preparation of his defense," the Second Circuit continued, "'the evidence must also be shown to be material and of some substantial use to the defendant.'" *Id.* at 578 (quoting *United States v. Tomaiolo*, 378 F.2d 26, 28 (2d Cir. 1967)). In other words, if evidence would have substantially helped the defense prepare for trial—even if the jury ultimately would never have seen that evidence—it was potential *Brady* material.

Thus, in *Polisi*, the court found that the prosecution's failure to turn over inconsistent testimony given by coconspirators at a later trial while the defendant's conviction was still on appeal was a *Brady* violation. "At the [first] trial, Anthony Polisi was made to appear the mastermind of the series of robberies" by his accomplices, the court explained. *Id.* But at the later trial of John Franzese—who "was not mentioned by the accomplices" at Polisi's trial—"the same accomplices testified that Franzese was the mastermind of the bank-robbery operations." *Id.*; *see United States v. Franzese*, 392 F.2d 954 (2d Cir. 1968), *cert. granted in part, judgment vacated in part sub nom. Giordano v. United States*, 394 U.S. 310 (1969). Because the government failed to disclose that information—which it must have known before Polisi's trial—"Polisi never

had the opportunity to use the differing version . . . to raise the issue of the credibility of the accomplices, nor to question the whole fabric of the change of leadership story." *Polisi*, 416 F.2d at 578.  The court did not discuss the admissibility of this other testimony; rather, the inquiry was how it might have assisted the defense in preparing for trial.  *See id.* at 577-78.

A year later, in *United States v. Bonnano*, 430 F.2d 1060 (2d Cir. 1970), the Second Circuit found a *Brady* violation when the government failed to disclose evidence that "a major prosecution witness[] was awaiting trial on an indictment in the same district on a securities fraud charge."  *Id.* at 1061.  Although the prosecution ultimately conceded on appeal that the evidence would be admissible, the Second Circuit explained that "[e]ven if the indictment were inadmissible at trial, this would not diminish its obvious value to the defense in preparing for trial and in giving it a lead to investigate."  *Id.* at 1062.  "Moreover," the court explained, "failing to disclose evidence valuable to the defense, even on the good faith belief by the prosecutor that it would be inadmissible at trial, deprives the defense of the opportunity to argue its admissibility and the court of its function of deciding the question."  *Id.; see also United States v. Gleason*, 265 F. Supp. 880, 886 (S.D.N.Y. 1967) (acknowledging that "the prosecution's duty of disclosure as affirmed in *Brady*[] cannot be limited to materials or information demonstrated in advance to be competent evidence." (citation modified)).

So too here.  There is little question that the information about Montgomery would have been of "some substantial use to [Epps]" in preparing his defense, *see Polisi*, 416 F.2d at 578; among other things, it at least would have given Epps's counsel "a lead to investigate," *see Bonnano*, 430 F.2d at 1062.  As noted above, Epps

potentially could have called other witnesses and certainly could have developed an alternative-perpetrator theory that might have undermined Bradley's identification.  So clearly established law made that evidence material.

What is more, law enforcement officers have an obligation under *Brady* to turn over to the prosecution team *any* favorable evidence regardless of materiality.  *See Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (holding that "police satisfy their obligations under *Brady* when they turn exculpatory [or impeachment] evidence over to the prosecutors").  That rule was clearly established long before the start of Epps's criminal trial, *see id.*, and "makes good sense . . . because the police may lack 'the requisite legal acumen' to determine whether materials constitute *Brady* evidence . . . [and] should not be charged with 'mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions,'" *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021) (second alteration in original) (quoting *Walker*, 974 F.2d at 299).  So to the extent that the defendants suggest that reasonable law enforcement officers would not have understood the nuances of the materiality question, that argument lacks merit.

In sum, the Court finds that no reasonable law enforcement officer in 1998 would have concluded that he or she did not need to disclose Anderson's statements to the prosecution under *Brady* simply because those statements themselves might have been inadmissible.  *See Nat'l Rifle Assoc. of Am. v. Vullo*, 144 F.4th 376, 390 (2d Cir. 2025) (explaining that "an official is . . . qualifiedly immune from liability unless, under the particular circumstances the official faced, any reasonable official would have known for certain that the conduct was unlawful under then-existing precedent." (citation modified)).  And had the defendants disclosed the information to the prosecutors,  the

prosecution team should have determined under clearly established law that those statements were *Brady* material that could have assisted Epps in his trial preparation.

For all those reasons, Stambach, Giardina, and Costantino are not entitled to summary judgment on Epps's *Brady* claim.

### B.    Post-Trial Due Process Claims

Epps also objects to Judge Foschio's recommendation that summary judgment be entered on his post-trial due process claims. *See* Docket Item 109 at 27-32. More specifically, he argues that Judge Foschio failed to address either of his two post-trial due process claims for fabrication of evidence. *See id.* As discussed further below, neither of those claims may proceed to trial.

"The Due Process Clause [of the Fourteenth Amendment] promises a right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Ortiz v. Stambach*, 137 F.4th 48, 66 (2d Cir. 2025) (citation modified). "More specifically, when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under [section] 1983." *Id.* at 66-67 (citation modified). "To prevail on a [s]ection 1983 fabrication of evidence claim, a plaintiff must demonstrate that (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Id.* at 67 (citation modified).

### 1.    Bohen and Minor

Epps says that his first post-trial claim for fabrication of evidence involves Bohen's and Minor's lying about how Bradley initially identified Epps as Means's killer. *See* Docket Item 109 at 27.  According to Epps, Bohen and Minor fabricated the tip from Means's aunt to cover up the fact that Bradley first identified him by looking at a mug book rather than a photo array.  *See id.* at 30-31.

As an initial matter, to the extent Epps asserts that Judge Foschio failed to address a *pre-trial* due process claim against Bohen and Minor for fabrication of evidence, that argument lacks merit because that claim was never raised in the complaint.  Epps's pre-trial due process claims are based solely on the purported *Brady* violation, *see* Docket Item 1 at ¶¶ 109-17, and *Brady* claims are distinct from claims based on fabrication of evidence, *see Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 367 (W.D.N.Y. 2021) (acknowledging that "fabrication of evidence is not redressable as a *Brady* violation"); *Li v. City of New York*, 246 F. Supp. 3d 578, 626 (E.D.N.Y. 2017) ("A defendant's right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs . . . , and also when an officer forwards fabricated evidence to prosecutors." (citation modified)).

In fact, Epps did not assert a pre-trial fabrication-of-evidence claim against Bohen and Minor until his response to the motion for summary judgment.  *See* Docket Item 90 at 24.  And it is well settled that "a party may not use his or her opposition to a dispositive motion as a means to amend the complaint."  *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 365 (2d Cir. 2007) (summary order) (citation modified); *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  So Epps cannot maintain a pre-trial fabrication of evidence claim now.

20

Nor can Epps defeat summary judgment on a post-trial fabrication claim.  Epps did not challenge the identification procedures employed by Bohen and Minor *post-trial* in his initial section 440 motion, and there is no evidence that the two detectives participated in the hearing in any way.  *See generally* Docket Items 78-24 and 78-25. So Epps cannot establish that Bohen and Minor caused him to suffer a post-trial deprivation of liberty.  *See Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2021) (explaining that, in the context of a fabrication of evidence claim, a plaintiff must "prove that she suffered a deprivation of liberty that is not too remote of a consequence of the act of creating the false information" (citation modified)).  Bohen and Minor therefore are entitled to summary judgment on Epps's post-trial due process claim against them.

### 2.    Stambach, Giardina, and Costantino

Epps says that his second post-trial claim for fabrication of evidence is against Stambach, Giardina, and Costantino for lying to the prosecutors who prepared the detectives' affidavits submitted in opposition to Epps's initial section 440 motion.  *See* Docket Item 109 at 27-28.  That claim fails because Stambach, Giardina, and Costantino are entitled to absolute immunity in connection with it.

Law enforcement officers are entitled to absolute immunity for their testimony in judicial proceedings.  *See Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983); *see also Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008) ("The Supreme Court has extended absolute immunity to police officers testifying at judicial proceedings on the ground that this type of immunity existed at common law for citizen-witnesses.").  But that immunity also extends to "preparatory activity, such as a preliminary discussion in

which the witness relates the substance of his intended testimony." *See Rehberg v. Paulk*, 566 U.S. 356, 370 (2012). "Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Id.* at 369 (citation modified).

Here, Epps attempts to do exactly that. He says that he "is not claiming that [the] [d]efendants are liable for their post-trial hearing testimony[;] [r]ather, they are liable for what they told the prosecutors, memorialized in their affidavits, months before they ever testified." Docket Item 124 at 17. The affidavits, he says, "were the reason that these same [d]efendants were called to the stand, by the prosecution, to testify to the same fabrications." *Id.* at 18. Had the defendants "told the truth [to the prosecutors]," Epps posits, "the [section] 440 hearing would have been entirely different, and a jury here could find that [he] would have been released years earlier." *Id.*

In other words, Epps says that had the defendants not lied to prosecutors when preparing for the hearing, the prosecutors never would have called them to testify. That may be true, but it does not change the fact that the real harm came from the false testimony. Put another way, absent the protected testimony, Epps cannot meet the elements of his post-trial due process claim. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) ("When a police officer claims absolute immunity for his . . . testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his [section] 1983 claim without resorting to the . . . testimony."). Accordingly, Epps's post-trial due process claim against Stambach, Giardina, and Costantino is dismissed.

C.    Article I, Section 6, Claim

Finally, Epps objects to Judge Foschio's recommendation that his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution[11] be dismissed. *See* Docket Item 109 at 32-33. In Epps's view, that claim should proceed to trial because respondeat superior liability is not cognizable under section 1983, and his only viable claim against the city therefore is under the state constitution. *See id.* This Court agrees with Epps.

"Courts in this Circuit have uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under [section] 1983 for violations of parallel provisions of the U.S. Constitution." *Buari v. City of New York*, 530 F. Supp. 3d 356, 408 (S.D.N.Y. 2021) (citation modified). "These courts rely on the premise that [section] 1983 provides an 'adequate' alternative remedy for violations of the New York State Constitution." *Id.* at 409 (citation modified). "Thus, where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Id.* (citation modified).

Respondeat superior liability is not cognizable under section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). But it is cognizable under the provisions of the New York State Constitution. *See Brown v. New York*, 674 N.E.2d 1129, 1142 (N.Y. 1996). So to the extent Epps seeks to hold the City of Buffalo vicariously liable for the failure of Stambach, Giardina, and Costantino to disclose

---

[11] Article I, Section 6 of the New York State Constitution states, in relevant part, that "no person shall be deprived of life, liberty[,] or property without due process of law." N.Y. Const. art. I, § 6 (citation modified).

23

Anderson's statements under *Brady*, that claim does not fall within the scope of section 1983. *See, e.g.*, *Buari*, 530 F. Supp. 3d at 409-10 (allowing state constitutional due process claim against municipality to proceed because section 1983 does not provide an adequate alternative remedy for respondeat superior claims); *see also Brown*, 89 N.Y.2d at 194 ("A plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of section 1983."). Epps's claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution therefore may proceed to trial.

## III.    REMAINING CLAIMS

Judge Foschio also recommended that summary judgment be entered in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and that Epps's remaining state law claims against the individual defendants be dismissed. *See* Docket Item 99 at 43-53, 59-61. Epps does not object to those recommendations, and neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendations of a magistrate judge to which no objections are raised. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).

Nevertheless, the Court has reviewed those portions of the R&R and agrees with Judge Foschio. More specifically, Epps's malicious prosecution claims fail because the detectives had probable cause to prosecute him for Means's murder based on Bradley's photographic and in-person identifications. *See, e.g.*, *Thompson v. City of New York*, 603 F. Supp. 2d 650, 657-58 (S.D.N.Y. 2009) (concluding that a witness's identification of the plaintiff in both a photo array and an in-person lineup established probable cause sufficient to defeat malicious prosecution claim); *see also Savino v. City of New York*,

331 F.3d 63, 72 (2d Cir. 2003) (acknowledging that "the existence of probable cause is a complete defense to a claim of malicious prosecution").

Further, without a viable malicious prosecution claim against any of the individual defendants, Epps cannot pursue a parallel claim against the City of Buffalo under Article I, Section 12, of the New York State Constitution.[12]  *See, e.g.*, *Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014) ("Because Plaintiff has not demonstrated any basis for liability on the part of any of the City's agents or employees, her respondeat superior claim also fails." (citation modified)).  And Epps cannot pursue any state law claims against the individual defendants because section 1983 provides an adequate alternative remedy for those claims.  *See Buari*, 530 F. Supp. 3d at 409-10.

The Court therefore accepts Judge Foschio's recommendation to enter summary judgment in favor of Bohen, Minor, Stambach, Giardina, and Costantino on Epps's malicious prosecution claims and to dismiss Epps's remaining state law claims against the individual defendants.

---

[12] Article I, Section 12 of the New York State Constitution provides that "the right of the people to be secure in their persons, houses, papers[,] and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  N.Y. Const. art. I, § 12 (citation modified).

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment, Docket Item 77, is GRANTED in part and DENIED in part.  Epps's pre-trial due process claims against Stambach, Giardina, and Costantino, as well as his claim against the City of Buffalo under Article I, Section 6, of the New York State Constitution, may proceed to trial.  But Epps's remaining claims are dismissed.  The Court will schedule a status conference to set a trial date.


SO ORDERED.

Dated:    January 16, 2026
          Buffalo, New York


                                            /s/ Lawrence J. Vilardo
                                          LAWRENCE J. VILARDO
                                          UNITED STATES DISTRICT JUDGE